14 CV 3945

JUDGE PAULEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEWLEAD HOLDINGS LTD.,

                              Petitioner,

        vs.

IRONRIDGE GLOBAL IV LIMITED,

                              Respondent,

        and

VSTOCK TRANSFER, LLC, as transfer agent,

                              Notice Party.

14 Civ. _____ (  )

RECEIVED
JUN 03 2014
U.S.D.C. S.D. N.Y.
CASHIERS

**MEMORANDUM OF LAW IN SUPPORT OF NEWLEAD HOLDINGS LTD.'S
PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID
OF INTERNATIONAL ARBITRATION PROCEEDING**

TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................... 1

FACTUAL BACKGROUND........................................................................................ 6

ARGUMENT ............................................................................................................. 16

    I.    THE COURT HAS SUBJECT MATTER JURISDICTION TO
        CONSIDER AN INJUNCTION SOUGHT IN AID OF
        INTERNATIONAL ARBITRATION .............................................................. 16

    II.    A TEMPORARY RESTRAINING ORDER AND PRELIMINARY
         INJUNCTION ARE REQUIRED TO PRESERVE THE STATUS QUO
         PENDING ARBITRATION.......................................................................... 18

         A.    Petitioner Will Suffer Irreparable Harm Absent a Preliminary
             Injunction ............................................................................................... 18

         B.    Petitioner Has Shown Sufficiently Serious Questions Going to the
             Merits of the Claim as to Make It Fair Ground for Litigation ................. 20

         C.    A Balance of Hardships Tips Decidedly In Favor of Petitioner .............. 23

CONCLUSION.,.......................................................................................................... 24

## TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Able v. United States,*
    44 F.3d 128 (2d Cir. 1995)...................................................................................................18

*Borden v. Meiji Milk Products Co., Ltd.,*
    919 F.2d 822 (2d Cir. 1990)................................................................................................17

*Doninger v. Niehoff,*
    527 F.3d 41 (2d Cir. 2008)..................................................................................................18

*Freedom Holdings, Inc. v. Spitzer,*
    408 F.3d 112 (2d Cir. 2005)................................................................................................18

*Gold Fields Ltd. v. Harmony Gold Mining Co.,*
    No. 04 Civ. 8767 (RMB), 2004 U.S. Dist. LEXIS 23874 (S.D.N.Y. Nov. 23, 2004)............23

*Janmort Leasing, Inc. v. Econo-Car International, Inc.,*
    475 F. Supp. 1282 (E.D.N.Y. 1979) ...................................................................................19

*Ranger Oil Ltd v. Petrobank Energy & Resources Ltd,*
    No. 00 Civ. 3139 (SHS), 2000 U.S. Dist. LEXIS 7571 (S.D.N.Y. May 23, 2000)................23

*Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.,*
    749 F.2d 124 (2d Cir. 1984)................................................................................................19

*ScripsAmerica, Inc. v. Ironridge Global LLC d/b/a Ironridge Global IV, Ltd.,*
    No. 2:14-cv-03962 (C.D. Cal. May 22, 2014) ....................................................................16

*SEC v. Masri,*
    523 F. Supp. 2d 361 (S.D.N.Y. 2007).................................................................................21

*Semmes Motors, Inc. v. Ford Motor Co.,*
    429 F.2d 1197 (2d Cir. N.Y. 1970)......................................................................................18

*Tradescape.com v. Shivaram,*
    77 F. Supp.2d 408 (S.D.N.Y. 1999).....................................................................................23

*Veleron Holding, B.V. v. Stanley,*
    No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 55246 (S.D.N.Y. Apr. 2, 2014) ................21

*Venconsul N.V. v. TIM Int'l N.V.,*
    No. 03 Civ. 5387 (LTS) (MHD), 2003 U.S. Dist. LEXIS 13594 (S.D.N.Y. Aug. 6, 2003)....17

**State Cases**

*Ironridge Global IV, Ltd v Green Automotive Company, Inc.*,
Case No. BC526570 (Sup. Ct. Calif., Los Angeles, May 14, 2014) ......................................15

**Federal Statutes**

9 U.S.C. § 201, *et seq.*............................................................................................................16, 17

15 U.S.C. § 77a, *et seq.*..................................................................................................................10

15 U.S.C. § 78u-4 ...........................................................................................................................14

**Other Authorities**

*Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd*,
(1962) 2 QB 26 (Bermuda) ..........................................................................................20

*Photo Production Ltd. v Securicor Transport Ltd.*,
(1980) AC 827 (Bermuda) ............................................................................................20

*Suisse Atlantique Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central*,
(1967) 1 AC 361 (Bermuda) .........................................................................................20

*White and Carter (Councils) Ltd. v McGregor*,
(1962) AC 413 (Bermuda) ............................................................................................20

Petitioner NewLead Holdings Ltd. ("NewLead" or "Petitioner"), through its attorneys, Thompson Hine LLP, respectfully submits this memorandum of law, together with the accompanying Declaration Of Antonis Bertsos In Support Of Petition Of Petitioner Newlead Holdings Ltd. For Temporary Restraining Order And Injunction In Aid Of International Arbitration Proceeding dated June 2, 2014 ("Bertsos Decl."), and the Declaration Of Richard De Palma In Support Of Petition Of Petitioner Newlead Holdings Ltd. For Temporary Restraining Order And Injunction In Aid Of International Arbitration Proceeding dated June 3, 2014 ("De Palma Decl."), all in support of its Petition seeking a temporary restraining order and an injunction in aid of a currently pending international arbitral proceeding (the "Arbitration") between NewLead and Respondent Ironridge Global IV Limited ("Respondent" or "Ironridge"). The Petition requests that the Court issue an order restraining and enjoining Respondent Ironridge Global IV Limited ("Respondent" or "Ironridge") and those acting in concert with it, as well VStock Transfer, LLC ("VStock"), the current registrar and transfer agent for the Common Shares of NewLead listed on NASDAQ Global Select Market ("NASDAQ"), and any successor transfer agent ("Transfer Agent"), pending the confirmation of an Award issued in the Arbitration, from taking any steps whatsoever:

(a)     to convert any of the Series A Preference Shares of NewLead registered in name of Ironridge ("Preference Shares") into Common Shares of NewLead ("Common Shares"); and/or

(b)     to issue any Common Shares to Ironridge, whether in connection with the conversion of the Preference Shares or otherwise.

### PRELIMINARY STATEMENT

On or about May 9, 2014, Ironridge commenced the Arbitration with JAMS International pursuant to a mandatory arbitration clause contained in the Share Subscription Agreement dated March 4, 2014 between NewLead and Ironridge (the "Subscription Agreement") seeking

"monetary damages in excess of US $2,000,000.00 to date." Bertsos Decl. at ¶ 5 & Exhibit A. Ironridge has demanded that the Arbitration be conducted and the hearings held in New York. See Bertsos Decl. ¶ 6. Newlead agrees on New York as the venue. Bertsos Decl. ¶ 7.

NewLead intends to interpose an answer and counterclaim in the Arbitration (which is not due until on or about June 20, 2014 by applicable rule) seeking (i) a declaration that (a) the Transaction Documents are terminated at NewLead's election due to Ironridge's substantial material breaches of those agreements as outlined below; and (b) even if the Transaction Documents are not terminated, Ironridge has no entitlement to additional Common Shares of NewLead; and (ii) seeking damages against Ironridge based upon its violations of the federal and state securities laws and for breach of contract and fraud.

### *Emergency Relief Is Required To Prevent Ironridge From Destroying NewLead*

This application is absolutely necessary because, due to Ironridge's material breaches of the contracts at issue, and its wrongful and fraudulent conduct as detailed below, NewLead is on the brink of destruction. Bertsos Decl. at ¶ 10. Emergency relief is required to prevent Common Shares from being issued and placed into the market during the pendency of the Arbitration when NewLead is actively litigating the propriety of any further issuances to Ironridge. The issuance and introduction of these additional Common Shares in and of itself constitutes irreparable injury. In addition, equitable relief is required to stop Ironridge from obtaining additional Common Shares of NewLead for use in an ongoing unlawful "death spiral" scheme that is a serious threat to the continued existence of NewLead. In order to obtain Common Shares for use in its scheme, Ironridge (among other wrongful conduct) has been abusing the terms and intent of a letter of instruction issued to the Transfer Agent in connection with the initial investment, and refusing to honor a Notice of Election by NewLead dated May 27, 2014 (the "Notice of Election") pursuant to the Subscription Agreement and ancillary

2

documents.  The Petition seeks immediate relief from the Court to stop this wrongful, illegal, and utterly destructive stock manipulation scheme by enjoining this conduct.

The matter before this Court, and which is being litigated in the Arbitration, involves a "death spiral" financing and stock manipulation scheme (described in greater detail below) by Ironridge that has <u>artificially driven down the price of NewLead's Common Shares from $146.50 per share (March 13, 2014) to $0.3899 per share (May 15, 2014) in only **two months**</u>.  Bertsos Decl. at ¶ 11.

As part of its scheme, Ironridge has obtained vast quantities of Common Shares and has dumped those Common Shares as part of its scheme to manipulate the share price of NewLead. NewLead has been and will continue to be irreparably harmed by Ironridge's conduct, as will its public shareholders and the public markets generally.  Bertsos Decl. at ¶ 12.

Ironridge has exceeded daily Common Share trading limitations and has been "short selling" NewLead's Common Shares -- both acts being material breaches of the agreements in place.  Bertsos Decl. at ¶ 13.  As a result, NewLead served upon Ironridge a Notice of Default dated May 12, 2014 ("Notice of Default and Termination") which, among other things, declared the Subscription Agreement, the Certificate of Designations of Preferences, Rights and Limitations of Series A Preference Shares (the "Certificate of Designations") and the other documents ancillary to the subscription transaction ("Transaction Documents") terminated. Bertsos Decl. at ¶ 14 & Exhibit B.

NewLead has advised Ironridge that it will not honor any Conversion Notices or requests to issue additional Common Shares to Ironridge.  Bertsos Decl. at ¶ 15.

When Ironridge first converted a portion of its Preference Shares (100 on April 10 and 100 on April 17, 2014), it received the appropriate amount of Common Shares (termed

"Conversion Shares" in the Certificate of Designations).  However, the Common Shares being

issued to Ironridge based upon its recent demands are in connection with its claimed entitlement

to "Dividends" and "Embedded Dividend Liability" under the Subscription Agreement.  Bertsos

Decl. at ¶ 19.

> Section I.C.2. of the Certificate of Designations specifically provides that:

> Dividends, as well as any applicable Embedded Dividend Liability payable hereunder,
> are payable **at the Corporation's election,** (a) **in cash,** or (b) in Common Shares valued
> at the volume weighted average price of the Common Shares for the applicable Equity
> Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the
> Trading Days during the Equity Conditions Measuring Period.

Bertsos Decl. at ¶ 20 & Exhibit D.

To protect itself from Ironridge's ongoing wrongful scheme, in accordance with the

Transaction Documents and without prejudice to NewLead's claims in the Arbitration and

applications before this Court, NewLead made the election under the Transaction Documents to

pay Dividends and any applicable Embedded Dividend Liability in cash, and not in Common

Shares of NewLead, as set forth in the Notice of Election:

> We are in receipt of your further issuance notice dated May 22, 2014 pursuant to your
> conversion notices dated April 10, 2014 and April 17, 2014. As we have previously
> advised you by Notice of Default dated May 12, 2014 (the ''Notice''), the Transaction
> Documents (as that term is defined therein) are no longer valid and in effect because,
> among other things, of your material breaches of the Transaction Documents as set forth
> in the Notice.

> Notwithstanding the foregoing, if and only to the extent that the Transaction Documents
> are deemed not to be terminated and/or are determined to be in full force and effect, and
> only if NewLead is ultimately found to be liable to pay such dividend and any applicable
> embedded dividend liability by a tribunal of competent jurisdiction,  please be advised
> that NewLead hereby elects to pay the dividend and any applicable embedded dividend
> liability in cash, and not in common shares of NewLead.

> In addition, for all the conversion notices previously delivered and all of the conversion
> notices requesting additional shares, NewLead never elected  to issue common shares to
> pay such dividends and embedded dividend liability and, therefore, any receipt of
> common shares in connection  with such dividends and embedded dividend liability was
> in error and NewLead immediately requests the return of such shares and all further

4

conversion notices requesting additional shares are not valid and are to be paid in cash. This election is made without prejudice to any claims or defenses which NewLead now has, or hereafter may have, as against Ironridge.

Bertsos Decl. at ¶ 21 & Exhibit E.

As a result, even in the unlikely event that Ironridge were to succeed on its contract claims in the Arbitration (which it will not), Ironridge will not be entitled to the issuance of additional Common Shares as demanded, but only to the payment of cash as provided by the provisions of the Subscription Agreement. Bertsos Decl. at ¶ 22.

Ironridge has continued to demand issuance of additional Common Shares from the Transfer Agent. Bertsos Decl. at ¶ 16. In doing so, Ironridge has relied upon the terms of an Irrevocable Letter of Instruction dated March 4, 2014 ("Irrevocable Letter Of Instruction") which was issued in connection with the initial investment. Bertsos Decl. at ¶ 17 & Exhibit C (without attachments). The Irrevocable Letter of Instruction provides irrevocable instruction to the Transfer Agent in the event that Ironridge was entitled to the issuance of Common Shares in connection with the Conversion of Preferred Shares. Bertsos Decl. at ¶ 18. However, due to the termination and the Notice of Election, Ironridge is not so entitled, but is simply abusing the situation through the Irrrevocable Letter of Instruction. The result is that Ironridge is obtaining vast quantities of shares despite the termination and Notice of Election -- to the extreme and wrongful detriment of NewLead.

Notwithstanding both the Notice of Default and Termination and the Letter of Election, on Friday, May 30, 2014, Ironridge sent directly to VStock a notice demanding an additional 3,820,000 Common Shares (the "May 30, 2014 Conversion Notice"). Bertsos Decl. at ¶ 25 & Exhibit G.

Although NewLead has advised VStock of the existence of both the Notice of Default and Termination and the Notice of Election, VStock has indicated that, absent an order from this

Court, it will, based upon the Irrevocable Letter of Instruction, issue the requested Common Shares to Ironridge in connection with the May 30 Conversion Notice and any future conversion notices from Ironridge. Bertsos Decl. at ¶ 27 .

By this application, NewLead respectfully asks this Court to enjoin the conversion of Preferred Shares by, and the issuance of any further Common Shares to, Ironridge, pending the outcome of the Arbitration. Bertsos Decl. at ¶ 28.

### FACTUAL BACKGROUND

NewLead is an international shipping company that owns a fleet of dry bulk carriers and mining assets whose Common Shares are admitted for listing and trade on NASDAQ under the symbol "NEWL". Bertsos Decl. at ¶ 44.

Ironridge is a British Virgin Islands' company that is part of Ironridge Global Partners, LLC, a rogue or "Bluebeard" investor that has had a history of investing in public companies purportedly to assist in financing their operations and expansion but, as NewLead has now discovered, has been preying upon public companies in need of financing through a device called "death spiral" financing. Bertsos Decl. at ¶ 45.

Upon information and belief, VStock is a California limited liability company with a principal place of business in Cedarhurst, New York. Bertsos Decl. at ¶ 46.

As NewLead has only recently discovered, and far too late, Ironridge has repeatedly used the same "death spiral" financing and stock manipulation scheme against numerous other U.S. public companies. Although the mechanism by which Ironridge initially receives the preferred stock can vary slightly depending on the victim, the scheme by which it destroys the target and obtains hugely disproportionate profits is largely the same in every case. Bertsos Decl. at ¶ 48.

Initially, Ironridge provides "financing" to the intended victim company, as it did here, by purchasing the target's convertible preferred stock. The terms of the arrangement -- known

6

colloquially as a "toxic convertible" -- allows the preferred stock to be converted into common stock at a value tied to (but significantly less than) the lowest market value of the common stock during a period of time surrounding the time of conversion; the lower the stock price, the greater the number of common shares received in the conversion.  Bertsos Decl. at ¶ 49.

Ironridge aggressively short-sells the target's common stock both before and after conversion to drive down the share price, or employs other techniques in order to manipulate the price downward.  Later, Ironridge exercises its toxic convertibles to obtain shares of the victim's common stock at artificially depressed (and contractually discounted) prices, profiting from the difference between the price at which the stock was sold short and the artificially depressed price at which it was obtained through conversion.  Ironridge then uses the shares obtained upon conversion to cover its short positions.  Bertsos Decl. at ¶ 50.

Ironridge makes a large profit, but the target company is devastated.  This has certainly been the case for NewLead (and for other victims).  Bertsos Decl. at ¶ 51.  For example, on its original investment of $2,500,022.50, in two short months, Ironridge has already seen a return of **nearly $13 million so far**.  It has only converted a small percentage of the total Preferred Shares in its name.  Unless stopped, Ironridge will continue to convert Preferred Shares, short sell NewLead's Common Shares, and cover with converted Common Shares, all the while making a huge profit until NewLead is driven out of existence.  Bertsos Decl. at ¶ 52.

During this time, NewLead has not only been forced to sell its own shares at an artificially low price in the conversion, but the issuance of the shares upon conversion has diluted the value of the outstanding Common Shares, which has caused the Common Shares price to fall further -- hence the characterization "death spiral."  As the Common Shares price has

7

plummeted, NewLead has found it impossible to raise the capital it needs to continue in business. Bertsos Decl. at ¶ 53.

Ironridge fraudulently induced NewLead to issue convertible Preference Shares based on assurances that it and its principals, including John Kirkland ("Kirkland"), Brendan O'Neill ("O'Neill") and Richard Kreger ("Kreger") were reputable, trustworthy, long-term investors who would not put pressure on NewLead's stock. Bertsos Decl. at ¶ 54.

Pursuant to the Subscription Agreement, Ironridge agreed to subscribe for 2,500 Preference Shares for an aggregate subscription amount of US$25,000,000. The terms of the subscription were as follows:

(i)     at closing, Ironridge paid to NewLead US$2,500,022.50 in cash, representing payment, in full, for 250 Preference Shares and payment of the nominal value of the remaining 2,250 Preference Shares (being US$0.01 per share) issued to it. Ironridge also received an additional 250 Preference Shares in consideration for a commitment fee payable to it in respect of the investment; or

(ii)    the balance of the subscription proceeds were secured by the issue by Ironridge of nine promissory notes (in the principal amount of U$2,499,997.50 each) (the "Notes"); or

(iii)   pursuant to the Transaction Documents, Ironridge is entitled to convert the 500

Bertsos Decl. at ¶ 62.

Clause IV.M (Share Conversions) of the Subscription Agreement limits the ability of Ironridge to sell Common Shares on any Trading Day (as defined therein). The aggregate trading limit is expressed to be the greater of three amounts, as follows:

20% of (a) the daily trading volume for that day or (b) the worldwide average daily trading volume in the Common Shares on all exchanges on which the Common Shares are listed (excluding the Defendant's sales) for the 10 Trading Days immediately preceding such Trading Day;

$295,000 worth of Common Shares; or

any greater amount that NewLead permits any other person to sell.

8

Bertsos Decl. at ¶ 64.

Further, clause IV.I (No Shorting) provides that Ironridge will not engage in or effect, directly or indirectly, any Short Sale (as defined therein) of NewLead's share capital. Bertsos Decl. at ¶ 65.

Certain rights and restrictions attaching to the Preference Shares are set out in the Certificate of Designations. Bertsos Decl. at ¶ 66. Specifically, Clause G of the Certificate of Designations sets out the mechanics for conversion and provides the mechanism whereby Ironridge may deliver a written notice to NewLead of its election to convert the Preference Shares. Bertsos Decl. at ¶ 67.

Upon conversion, Ironridge is entitled to a set number of Common Shares, and separately to the payment of "Dividends." Bertsos Decl. at ¶ 68. Section I.C.2. of the Certificate of Designations specifically provides that:

> Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable **at the Corporation's election,** (a) **in cash**, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

Bertsos Decl. at ¶ 69.

As part of the transaction, Ironridge induced NewLead to enter into the Irrevocable Letter of Instruction. However, the Irrevocable Letter of Instruction applies only to the extent Ironridge is entitled to the issuance of Common Shares (which it is currently not). Bertsos Decl. at ¶ 70. Based upon all of Ironridge's misrepresentations, NewLead was not concerned that Ironridge would short sell or manipulate the price of NewLead's Common Shares. There were prohibitions on short selling and daily trading limits in the Transaction Documents. Bertsos Decl. at ¶ 71. Thus, NewLead was completely unaware of the potential disastrous consequences of the conversion and pricing provisions that Ironridge had built into the Transaction Documents

without NewLead's knowledge.  Although NewLead does not agree that the contract provisions
operate as Ironridge has interpreted them, that is a dispute to be determined in the Arbitration.
Bertsos Decl. at ¶ 72.

 For example, Ironridge drafted the Certificate of Designation to include provisions that
essentially provided that upon conversion of Preferred Shares, Ironridge would be entitled to
Dividends at the time of Conversion, if paid in Common Shares, of almost an unlimited number
of Common Shares so long as the share price continued to go down.  The Dividends are
determined "in Common Shares valued at the volume weighted average price of the Common
Shares for the applicable Equity Conditions Measuring Period [a period starting thirty Trading
Days before and ending Thirty Trading Days after the relevant date], not to exceed 85.0% of the
Closing Price on any of the Trading Days during the Equity Conditions Measuring Period."  So
long as the share price continued to drop, Ironridge claims[1] that the Equity Conditions Measuring
Period continues to be open-ended, and additional Common Shares would keep being issued at
an amount not to exceed the 85% of the lowest closing price on any Trading Day.  Bertsos Decl.
at ¶ 73.

 Pursuant to the Irrevocable Instruction Letter, once Ironridge demands conversion of
Preference Shares or issuance of Common Shares, the Transfer Agent is (arguably) directed to
issue the relevant number of Common Shares to Ironridge.  Bertsos Decl. at ¶ 74.  Because
Ironridge is a "Non-U.S. Person" who purchased securities pursuant to Regulation S of the
Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "33 Act"), Ironridge's converted Common
Shares were not freely tradable until the end of the 40 day hold period after it obtains the
security.  Bertsos Decl. at ¶ 75.

---

[1] NewLead believes that the Equity Conditions Measuring Period is tied to the date upon which Ironridge receives the "Conversion Shares" not when it receives additional Common Shares in payment of any obligations for Dividends or Imbedded Dividend Liability.

Contrary to its commitment to act as a long-term investor in NewLead, on April 10, 2014 (the 36th day of the hold period), Ironridge began converting Preference Shares to Common Shares, and requesting that the Common Shares be issued beginning on April 14, 2014 – the 40th day of the old period. Bertsos Decl. at ¶ 76. In each of Ironridge's Conversion Notices, Ironridge asked for the maximum number of shares it could obtain without becoming a 10% (or greater) holder of NewLead's Common Shares ("9.99% blocker") and thereby avoiding Section 16 reporting obligations. Bertsos Decl. at ¶ 78. Ironridge then began dumping converted Common Shares into the market on April 14 – the first day it could do so -- and continued to sell large blocks of Common Shares daily as part of its scheme to put pressure on the NewLead stock price (although we believe that they began manipulating the Common Share Price as early as March 13 or 14 (see below). Bertsos Decl. at ¶ 79. Indeed, for 14 straight Trading Days beginning April 14, Ironridge converted and sold the maximum volume of total outstanding Common Share that it could without incurring Section 16 reporting obligations (and in at least one case exceeding that limit), establishing that its intent was specifically to manipulate the Common Share price and harm NewLead. Bertsos Decl. at ¶ 80. During this period, Ironridge exceeded the daily trading volume limits contained in clause IV.M of the Subscription Agreement constituting a material breach of the Subsciption Agreement. Bertsos Decl. at ¶ 81.

As part of its fraudulent scheme and in violation of the provisions of the Subscription Agreement, Ironridge has exceeded the daily trading limit on at least five separate days: April 14, 28, 30 and May 1 and 2, 2014. On each day, Ironridge has failed to meet each of the three tests contained in the Subscription Agreement. Bertsos Decl. at ¶ 82.

On March 14, 2014, the opening price of the Common Shares was $162.50. This is the close before the approximate first Trading Day that would form the beginning of the Equity

Conditions Measuring Period for Ironridge's April 14 Trading. Beginning on March 14, 2014, the Common Shares of NewLead began an historically unprecedented period of high trading volume, jumping from 9,717 shares on March 13 to 153,275 shares on March 14, 2014. Thereafter, the share trading volumes have remained historically high, and towards the end of March, rose exponentially – 10,464,710 on May 15; 11,317,580 on May 16; 32,352,490 on May 19 and a high of 54,245,800 on May 20, 2014. Bertsos Decl. at ¶ 84.

Upon information and belief, and consistent with the unusual, historically high trading volumes coinciding with the Ironridge transaction, NewLead believes that Ironridge began manipulating the trading volume and share price for the Common Shares starting on or about March 14 in order to achieve the maximum benefits when it converted its Preferred starting on April 10 and trading shares on April 14, 2014 (the Equity Conditions Measuring Period would reach back that far). NewLead believes that Ironridge has been causing shares to be sold or short selling to manipulate down the price to receive the maximum benefit at its later conversion. Bertsos Decl. at ¶ 85.

On April 14, the opening price of the Common Shares was $25.50. The closing price on May 15, 2014 was $0.3899. Bertsos Decl. at ¶ 86. To date, Ironridge has converted only a very small portion of the Preference Shares held by it and sold the Common Shares arising from such conversion. Bertsos Decl. at ¶ 87.

In order to effectuate the manipulation of NewLead's share price, Ironridge has been both exceeding the daily trading volumes limitations set forth in the Transaction Documents as well as short selling NewLead's Common Shares, in violation of its contractual commitments. Overall, this series of wrongful acts has artificially depressed the trading price of NewLead's Common Shares so that Ironridge can profit immensely from covering its short sales with below market

converted Common Shares. Bertsos Decl. at ¶ 88. Moreover, based on information provided to NewLead by Ironridge, Ironridge has sold more Common Shares than it has received, to date, pursuant to the terms of the Subscription Agreement. Bertsos Decl. at ¶ 89.

On April 16, 2014, after the market closing, Ironridge requested and received at the next trading day opening 2,550,000 Common Shares which would bring Ironridge to a total possession of 234,291 Common Shares in excess of its 9.99% blocker. NewLead believes that these 234,291 Common Shares were used to cover a short position that Ironridge had, establishing that, as part of its fraudulent scheme and in violation of the provisions of the Subscription Agreement, Ironridge has been short selling NewLead Common Stock. Bertsos Decl. at ¶ 90.

Although this is proof of just one instance of short selling, upon information and belief, Ironridge is vigorously short selling NewLead Common Stock to both artificially deflate the share price and make profits for itself through its market manipulation scheme. NewLead believes that Ironridge is also short selling without having cover from borrowed shares because it knows that it will get additional Common Shares under the Transaction Documents and further, by manipulating the share price down, it will continue to receive shares through its fraud and misuse of the Irrevocable Letter of Instruction on an exponential and never-ending basis (that is until the company is put into liquidation and winding up). Bertsos Decl. at ¶ 91.

As such, Ironridge has been selling borrowed Common Shares, or Common Shares that it did not yet possess (and which it would later acquire through the conversion of Preference Shares), i.e., short selling Common Shares, in breach of clause IV.I. Bertsos Decl. at ¶ 93.

The sale of Common Shares by Ironridge in breach of the terms of the Subscription Agreement has, to date, resulted in a return of over US$13,000,000 to date on an investment of US$2,500,022.50. Bertsos Decl. at ¶ 94.

The misuse of the Irrevocable Letter of Instruction to obtain shares (in the face of NewLead's election to pay Dividends and Embedded Dividend Liability in cash rather than Common Shares), and the breaches of the undertakings given by Ironridge in clauses IV.I and IV.M are such that they have adversely affected the market price of the Common Shares and the continued actions of Ironridge threaten the ability of NewLead to continue in business. Bertsos Decl. at ¶ 95.

### *Ironridge's Continuing Pattern Of Fraud And Market Manipulation*

NewLead was unaware of Ironridge's prior death spiral financing schemes at the time of doing the transaction with it. As it has now learned, the victims of these frauds are often ignorant of the details of how the scheme has been carried out because the wrongdoers typically carry out their schemes in secret, through offshore entities -- both to provide the initial funding and to engage in the manipulative trading. In addition, because of the automatic discovery stay provision of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3)(B) ("PSLRA"), victims of this type of fraud are unable to pursue discovery. As a result, in pleading their claims, the victims must rely heavily on inferences to be drawn from circumstantial evidence. Bertsos Decl. at ¶ 98.

The wrongdoers in these cases are usually "Bluebeard" investors; that is, the overwhelming majority of the companies in which they "invest" experience death spirals soon after the "investment." In addition, the wrongdoers like Ironridge typically assure the victim prior to purchasing the convertible securities that they are long-term investors, but, soon after

purchasing the convertible securities, they exercise their rights of conversion and sell the shares obtained upon conversion. <u>This is exactly what Ironridge did in its negotiations with NewLead.</u> Bertsos Decl. at ¶ 99.

NewLead has recently discovered that at least two other public companies are currently litigating this exact pattern of fraudulent conduct with Ironridge:  Green Automotive Company, Inc., and ScripsAmerica.  Bertsos Decl. at ¶ 100.

### *Green Automotive*

In *Ironridge Global IV, Ltd v Green Automotive Company, Inc.*, Ironridge sought an injunction requiring Green Automotive to issue additional shares of common stock to Ironridge pursuant to a similar toxic preferred death spiral financing scheme.  Case No. BC526570 (Sup. Ct. Calif., Los Angeles, May 14, 2014); Bertsos Decl. at ¶ 101.

In her decision denying Ironridge's motion, Judge Deirder Hill describes the dispute as follows:

> Plaintiff seeks an order enforcing the settlement agreement arguing that defendant is refusing to issue 55,000,000 additional shares of Defendants common stock as required by the settlement agreement.  Plaintiff seeks a court order (1) requiring Defendant and its officers and directors, including  CEO Ian Hobday and transfer agent Action Stock Transfer to immediately issue 55,000,000 shares of common stock to Plaintiff, (2) restraining and enjoining such persons from issuing or transferring any shares to any other person until transfer is made to Plaintiff, and (3) for payment of Plaintiff's legal fees and costs.

> Defendant argues that Plaintiff has received $2,000,000 in shares of Defendant for its $500,000 claim, which is a four-fold return. Defendant argues that when the parties submitted their application for an order approving the stipulated settlement to the court for a *fairness* hearing  on December 2, 2013, Plaintiff never disclosed  to the court or to Defendant that Plaintiff's interpretation of the Stipulation could lead to such a radically unfair result.  Defendant is suspicious that Plaintiff has engaged in a pattern of similar frauds on corporations and courts as a purported "toxic financier."  Defendant requests that this court find that the Stipulation as interpreted by Plaintiff is not fair, deny this motion, and establish a procedure  to determine the amount by which Plaintiff unfairly and fraudulently profited from its scheme so as to pay restitution   to Defendant. However, if this court determines that additional discovery is required to obtain evidence necessary to adjudicate the matter, the court should allow the parties to conduct  such

discovery.  In either event, the court should dissolve the TRO in view of Plaintiff's utter failure to resent admissible evidence that it is likely to prevail on the merits.

Bertsos Decl. at ¶ 102 & Exhibit M.

*ScripsAmerica*

On or about May 22, 2014, ScripsAmerica, Inc. filed a complaint in the United States District Court for the Central District of California alleging claims of securities fraud, market manipulation, common law fraud and breach of contract against Ironridge and its principal, Kirkland on alleged fact incredibly similar to those set out here.  In essence, ScripsAmerica alleges that Ironridge and Kirkland engaged in a toxic spiral financing scheme that mirrors in all respects the fraudulent scheme that Ironridge has perpetrated on NewLead.  *ScripsAmerica, Inc. v. Ironridge Global LLC d/b/a Ironridge Global IV, Ltd.*,  No. 2:14-cv-03962 (C.D. Cal. May 22, 2014); Bertsos Decl. at ¶ 104 & Exhibit N.

This recurring pattern of conduct by Ironridge is certainly sufficient evidence of scienter on the part of Ironridge.  Bertsos Decl. at ¶ 105.

Paragraph 30 of the ScripsAmerica complaint reads as follows:

30.   Plaintiff's conduct with respect to Defendant is part of a wider pattern illegal and deceptive activity.  Indeed, Plaintiff has engaged in essentially the same or similar wrongful conduct in connection with the stock of many other companies.  The watchdog website "Scam Informer" recently observed that "[t]he destruction in stocks [IRONRIDGE] has completed transactions with makes the devastation from Hurricane Irene seem tame by comparison."

Bertsos Decl. at ¶ 106 and Exhibit N at ¶ 30.

## ARGUMENT

### I.   THE COURT HAS SUBJECT MATTER JURISDICTION TO CONSIDER AN INJUNCTION SOUGHT IN AID OF INTERNATIONAL ARBITRATION

The Court has subject matter jurisdiction to consider an injunction sought in aid of international arbitral proceedings, pursuant to its powers under 9 U.S.C. § 201 *et seq.* (the New

16

York Convention on the Recognition and Enforcement of Foreign Arbitral Awards). In *Borden v. Meiji Milk Products Co., Ltd.*, 919 F.2d 822, 826 (2d Cir. 1990), the Second Circuit held that "entertaining an application for a preliminary injunction in aid of arbitration is consistent with the court's powers pursuant to [9 U.S.C.] § 206." In issuing its decision, the court explained that seeking equitable remedies is consistent with the "provisions and . . . spirit" of the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards because the "the desire for speedy decisions in arbitration is 'entirely consistent with a desire to make as effective as possible recovery upon awards, after they have been made, which is what provisional remedies do.'" *Id.* (internal citations omitted).

Further, *Borden* has been interpreted as "recognizing a court's power to entertain requests for provisional remedies in aid of arbitration even where the request for the remedies *does not* accompany a motion to compel arbitration." *Venconsul N.V. v. TIM Int'l N.V.*, No. 03 Civ. 5387 (LTS) (MHD), 2003 U.S. Dist. LEXIS 13594, at *7 (S.D.N.Y. Aug. 6, 2003) (emphasis added). In *Venconsul*, for example, the district court held that it had subject matter jurisdiction pursuant to the Convention over a motion for a preliminary injunction even where such motion was not accompanied by a motion to compel arbitration or confirm an arbitral award. In issuing its decision, the court observed that exercising such jurisdiction would help "preserve the possibility of recoveries upon [arbitral] awards." *Id.* at *8. There, like here, an arbitration proceeding was already pending when the motion for injunctive relief was brought. Moreover, in *Venconsul* the court issued its decision, in part, because the arbitration was taking place in New York City, which the Court observed "reduce[d] the risk of a decision on the merits here encouraging improper forum shopping." *Id.* So too here, the parties have agreed to arbitrate in New York.

II.     A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION
        ARE REQUIRED TO PRESERVE THE STATUS QUO PENDING
        ARBITRATION

A preliminary injunction should issue upon the Petitioner's showing of three essential

elements:  (1) that the injunction is necessary to prevent irreparable harm; (2) either (a) the

Petitioner is likely to prevail on the merits, *or* (b) the Petitioner has shown sufficiently serious

questions going to the merits of the claim as to make it fair ground for litigation; and (3) a

balance of the hardships tips decidedly in favor of the Petitioner.  *See Doninger v. Niehoff*, 527

F.3d 41, 47 (2d Cir. 2008); *Able v. United States*, 44 F.3d 128, 130 (2d Cir. 1995).  Each of these

elements is satisfied here.

   A.     **Petitioner Will Suffer Irreparable Harm Absent a Preliminary Injunction**

Absent injunctive relief, NewLead will suffer irreparable harm.

Emergency relief is required to prevent Common Shares from being issued and placed

into the market during the pendency of the Arbitration when NewLead is actively litigating the

propriety of any further issuances to Ironridge.  The issuance and introduction of these additional

Common Shares in and of itself constitutes irreparable injury.  In addition, equitable relief is

required to stop Ironridge from obtaining additional Common Shares of NewLead for use in an

ongoing unlawful "death spiral" scheme that is a serious threat to the continued existence of

NewLead.

"To satisfy the irreparable harm requirement, [petitioner] must demonstrate that absent a

preliminary injunction [it] will suffer 'an injury that is neither remote nor speculative, but actual

and imminent,' and one that cannot be remedied 'if a court waits until the end of trial to resolve

the harm.'"  *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005) (internal

citations omitted).  Moreover, the complete loss of a business constitutes irreparable harm.  *See,*

*e.g.*, *Semmes Motors, Inc. v. Ford Motor Co.*, 429 F.2d 1197, 1205 (2d Cir. N.Y. 1970)

(termination of auto dealership constitutes irreparable harm where right to continue a business in which plaintiff had engaged for twenty years and into which his son had recently entered is not measurable entirely in monetary terms); *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 749 F.2d 124, 125-26 (2d Cir. 1984) (holding that loss of plaintiff's distributorship, an ongoing business representing years of effort and livelihood of owners, constitutes irreparable harm and noting that what plaintiffs stand to lose cannot be fully compensated by monetary damages); *see generally Janmort Leasing, Inc. v. Econo-Car International, Inc.*, 475 F. Supp. 1282, 1294 (E.D.N.Y. 1979) ("[i]n this circuit it is firmly settled that the loss or destruction of a going business constitutes irreparable harm, whether viewed as an injury not compensable in monetary terms, or as one which cannot be reduced to monetary value with 'sufficient accuracy to make damages an adequate substitute' for injunctive relief") (internal citations omitted).

Here, there can be no doubt that Ironridge's conduct is destroying NewLead's access to the capital needed to pursue its business plans. Unless restrained by the Court, Ironridge intends to continue to convert the Preference Shares and sell the Common Shares arising thereunder (at a significant profit) with a view of driving down the market value of the Common Shares on NASDAQ. If Ironridge is not enjoined, NewLead will be put in a position where the market value of its Common Shares will become so low that its business and the interests of all its other public shareholders will be irreparably damaged. Moreover, if Ironridge's pattern of abuse is allowed to continue, there is a high likelihood that the Common Shares of NewLead will be de-listed for being unable to comply with the continued listing requirements of NASDAQ, particularly the $1 bid price and minimum market capital rules. And in the absence of an injunction, the Board of Directors of NewLead will have no choice but to commence winding-up proceedings. Put simply, absent an injunction, NewLead's business will be destroyed.

**B.     Petitioner Has Shown Sufficiently Serious Questions Going to the Merits of the Claim as to Make It Fair Ground for Litigation**

In the pending arbitration, NewLead will be asserting claims for breach of contract and market manipulation.  There are sufficiently serious questions going to the merits of each of these claims as to make them fair ground for litigation.

As described above, notwithstanding both the Notice of Default and Termination and the Letter of Election, Ironridge has continued to send directly to VStock additional notices demanding the issuance of Common Shares.  On Friday, May 30, 2014, Ironridge sent directly to VStock a notice demanding an additional 3,820,000 Common Shares (the "May 30, 2014 Conversion Notice").  Even though Ironridge is not entitled to additional Common Shares (the Company has elected to pay such Dividends and Embedded Dividend Liability in cash), it is abusing the terms and intent of the Irrevocable Letter of Instruction to obtain wrongfully additional Common Shares for use in its illegal and fraudulent "death spiral" financing and stock manipulation scheme.

Turning to NewLead's breach of contract claim, under Bermuda law, where a breach is "fundamental" (*e.g.,* where one party to a contract commits a breach which goes to the heart of the contract), the innocent party may elect: (a) to affirm the contract, insist on performance and sue for damages; or (b) treat the breach as a repudiation, accept that the contract is terminated with the result that both parties are relieved of further performance and sue for damages. *Suisse Atlantique Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central* (1967) 1 AC 361 (Bermuda); *Photo Production Ltd. v Securicor Transport Ltd.* (1980) AC 827 (Bermuda); *Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd* (1962) 2 QB 26 (Bermuda); *White and Carter (Councils) Ltd. v McGregor* (1962) AC 413 (Bermuda).  Here, Ironridge breached certain covenants of the Subscription Agreement that are aimed at restricting the sale of

20

the Common Shares and protecting the price of the Commons Shares.  One of those covenants establishes a daily trading limit (clause IV.M) while another provides that Ironridge will not engage or effect, directly, or indirectly, any Short Sale of NewLead's share capital (clause IV.I).

Ironridge has, on the basis of the number of Common Shares sold by it, exceeded the daily trading limit on at least five separate days:   April 14, 28, 30 and May 1 and 2, 2014. Moreover, based on information provided to NewLead by Ironridge, Ironridge has sold more Common Shares than it has received, to date, pursuant to the terms of the Subscription Agreement.   Accordingly, Ironridge has been selling borrowed Common Shares (*e.g.* short selling Common Shares) or has been short selling in anticipation of receiving further converted Common Shares, all in breach of clause IV.I.

Turning to NewLead's claim of market manipulation, such a claim requires a plaintiff to allege (1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange. *Veleron Holding, B.V. v. Stanley*, No. 12 Civ. 5966 (CM), 2014 U.S. Dist. LEXIS 55246, at *32 (S.D.N.Y. Apr. 2, 2014).  Where "an investor conducts an open-market transaction with the intent of artificially affecting the price of the security, and not for any legitimate economic reason, [such actions] can constitute market manipulation." *SEC v. Masri*, 523 F. Supp. 2d 361, 372 (S.D.N.Y. 2007).

Here, from the very beginning Ironridge has sought to manipulate the Common Share price and harm NewLead through its "death spiral" scheme by exceeding the daily trading volumes set forth in the Transaction Documents as well as short selling New Lead's Common Shares.  Upon information and belief, and consistent with the unusual, historically high trading

21

volumes coinciding with the Ironridge transaction, NewLead believes that Ironridge began manipulating the trading volume and share price for the Common Shares starting on or about March 14 in order to achieve maximum benefits when it converted its Preferred Shares starting on April 10, 2014 and trading shares on April 14, 2014.

On April 10, 2014 (the 36th day of the hold period), Ironridge began converting Preference Shares to Common Shares, and requesting that the Common Shares be issued beginning on April 14, 2014 – the 40th day of the hold period.  In each instance, Ironridge asked for the maximum number of shares it could obtain without becoming a 10% (or greater) holder of NewLead's Common Shares and thereby avoiding Section 16 reporting obligations.  Ironridge then began dumping Common Shares into the market on April 14 – the first day it could do so – and continued to sell large blocks of Commons Shares daily as part of its scheme to put pressure on the NewLead stock price.  For 14 straight trading days beginning April 14, 2014 Ironridge converted and sold the maximum volume of outstanding Common Shares that it could without incurring Section 16 reporting obligations, establishing that its intent was specifically to manipulate the Common Share price and harm NewLead.

Moreover, upon information and belief, Ironridge is short selling NewLead Common Shares to both artificially deflate the share price and make profits for itself through its market manipulation scheme.  Based on the information provided to NewLead by Ironridge, Ironridge has sold more Common Shares than it has received, to date, pursuant to the terms of the Subscription Agreement.  For example, On April 16, 2014, after the market closing, Ironridge requested and received at the next trading day opening 2,550,000 Common Shares which would bring Ironridge to a total possession of 234,291 Common Shares in excess of its 9.99% blocker. NewLead believes that these 234,291 Common Shares were used to cover a short position that

Ironridge had.  NewLead believes that Ironridge is also short selling without having cover from borrowed shares because it knows that it will get additional Common Shares under the Transaction Documents and further, by manipulating the share price down, it will continue to receive shares through its fraud and misuse of the Irrevocable Letter of Instruction on an exponential and never-ending basis (that is until the company is put into liquidation and winding up).[2]

**C.     A Balance of Hardships Tips Decidedly In Favor of Petitioner**

The nature of the injunctive relief Petitioner requests makes the final element of the preliminary injunction analysis – a balance of the relative hardships to the parties – resolve in favor of granting the relief.[3]  In contrast to NewLead, which as described above, will suffer irreparable harm if Ironridge's conduct is left unrestrained, Ironridge will suffer no prejudice if an injunction issues because it can be made whole by money damages if it succeeds in the Arbitration. *See, e.g., Ranger Oil Ltd v. Petrobank Energy & Resources Ltd*, No. 00 Civ. 3139 (SHS), 2000 U.S. Dist. LEXIS 7571, at *22 (S.D.N.Y. May 23, 2000) (to demonstrate irreparable harm, the 'moving party must show that the injury it will suffer . . . is not capable of being fully remedied by money damages.'") (internal citation omitted).  *Gold Fields Ltd. v. Harmony Gold Mining Co.*, No. 04 Civ. 8767 (RMB), 2004 U.S. Dist. LEXIS 23874, at *17-18 (S.D.N.Y. Nov. 23, 2004) (finding that plaintiff failed to establish irreparable harm, in part, because an adequate remedy existed by way of an action for damages).

Indeed, Ironridge has already commenced the Arbitration seeking <u>only</u> monetary damages for the alleged delay in converting Preferred Shares and issuing Common Shares.

---

[2] NewLead has recently discovered that at least two other public companies are currently litigating this exact pattern of fraudulent conduct with Ironridge:  Green Automotive and ScripsAmerica.

[3] The balance of the hardships inquiry "asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided." *Tradescape.com v. Shivaram*, 77 F. Supp.2d 408, 411 (S.D.N.Y. 1999).

Moreover, the Certificate of Designations provides a calculation mechanism for determining Ironridge's damages in the unlikely event it were to succeed in the Arbitration. Thus, while NewLead is faced with the destruction of its company and a fraud being perpetrated on it and its public shareholders, Ironridge seeks only money damages which, although unlikely to be awarded, is subject to a contractual calculation.

## CONCLUSION

For the foregoing reasons, Petitioner respectfully requests that its petition for a temporary restraining order and an injunction in aid of currently pending international arbitral proceedings be granted.

Dated: New York, New York
      June 3, 2014

                    **THOMPSON HINE LLP**

                    By:

                        Richard De Palma
                        335 Madison Ave.
                        12th Floor
                        New York, NY 10017
                        (212) 344-5680 *Telephone*
                        (212) 344-6101 *Facsimile*
                        *Richard.DePalma@ThompsonHine.com*

                        *Counsel for NewLead Holdings Ltd.*