UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEWLEAD HOLDINGS LTD.,

Petitioner,

vs.

IRONRIDGE GLOBAL IV LIMITED,

Respondent,

and

VSTOCK TRANSFER, LLC, as transfer agent,

Notice Party.

14 Civ. _____ ( )



RECEIVED
JUN 03 2014
U.S.D.C. S.D. N.Y.
CASHIERS

### DECLARATION OF RICHARD DE PALMA
### IN SUPPORT OF PETITION OF PETITIONER NEWLEAD HOLDINGS LTD. FOR
### TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF
### INTERNATIONAL ARBITRATION PROCEEDING

I, RICHARD DE PALMA, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am an attorney and a partner of Thompson Hine LLP, counsel for Petitioner

NewLead Holdings Ltd. ("Petitioner") in the above-captioned proceeding. I respectfully submit

this declaration in support of Petitioner's Petition for Temporary Restraining Order and

Injunction in Aid of International Arbitration Proceeding.

2.      Annexed hereto as Exhibit A is a true and correct copy of *Photo Production Ltd. v*

*Securicor Transport Ltd.* (1980) AC 827.

3.      Annexed hereto as Exhibit B is a true and correct copy of *Suisse Atlantique*

*Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central* (1967) 1 AC 361.

4.   Annexed hereto as Exhibit C is a true and correct copy of *Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd* (1962) 2 QB 26.

5.   Annexed hereto as Exhibit D is a true and correct copy of *White and Carter (Councils) Ltd. v McGregor* (1962) AC 413.

6.   Annexed hereto as Exhibit E is a true and correct copy of the Declaration Of Antonis Bertsos In Support Of Petition Of Petitioner NewLead Holdings Ltd. For Temporary Restraining Order And Injunction In Aid Of International Arbitration Proceeding dated June 2, 2014.  Due to the emergency circumstances of this matter and the location of Petitioner in Greece, it is necessary to file a copy rather than the original signed Declaration.  The original will be filed as soon as it arrives in New York.

7.   I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2014
       New York, New York

RICHARD DE PALMA

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEWLEAD HOLDINGS LTD., | 14 Civ. _____ ( ) |
| Petitioner, | |
| vs. | |
| IRONRIDGE GLOBAL IV LIMITED, | |
| Respondent, | |
| and | |
| VSTOCK TRANSFER, LLC, as transfer agent, | |
| Notice Party. | |

## DECLARATION OF RICHARD DE PALMA
## IN SUPPORT OF PETITION OF PETITIONER NEWLEAD HOLDINGS LTD. FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF INTERNATIONAL ARBITRATION PROCEEDING

I, RICHARD DE PALMA, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am an attorney and a partner of Thompson Hine LLP, counsel for Petitioner NewLead Holdings Ltd. ("Petitioner") in the above-captioned proceeding. I respectfully submit this declaration in support of Petitioner's Petition for Temporary Restraining Order and Injunction in Aid of International Arbitration Proceeding.

2.     Annexed hereto as Exhibit A is a true and correct copy of *Photo Production Ltd. v Securicor Transport Ltd.* (1980) AC 827.

3.     Annexed hereto as Exhibit B is a true and correct copy of *Suisse Atlantique Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central* (1967) 1 AC 361.

1

4. Annexed hereto as Exhibit C is a true and correct copy of *Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd* (1962) 2 QB 26.

5. Annexed hereto as Exhibit D is a true and correct copy of *White and Carter (Councils) Ltd. v McGregor* (1962) AC 413.

6. Annexed hereto as Exhibit E is a true and correct copy of the Declaration Of Antonis Bertsos In Support Of Petition Of Petitioner NewLead Holdings Ltd. For Temporary Restraining Order And Injunction In Aid Of International Arbitration Proceeding dated June 2, 2014. Due to the emergency circumstances of this matter and the location of Petitioner in Greece, it is necessary to file a copy rather than the original signed Declaration. The original will be filed as soon as it arrives in New York.

7. I declare under penalty of perjury that the foregoing is true and correct.

Dated: June 3, 2014
      New York, New York

RICHARD DE PALMA

Exhibit A



FOCUS - 3 of 3 DOCUMENTS

Photo Production Ltd v Securicor Transport Ltd

HOUSE OF LORDS

[1980] AC 827, [1980] 1 All ER 556, [1980] 2 WLR 283, (48 MLR 24)

**HEARING-DATES:** 12, 13, 14 NOVEMBER 1979, 14 FEBRUARY 1980

14 FEBRUARY 1980

**CATCHWORDS:**

Contract - Fundamental breach - Effect on exception clause - Exclusion of applicability of exception clause - Destruction of subject-matter of contract - Defendants contracting to guard factory against fire but instead causing fire which destroyed factory - Whether breach of contract eliminating exception clause - Whether defendants able to rely on exception clause to limit their liability.

**HEADNOTE:**

The plaintiffs, a company which owned a factory, entered into a contract with the defendants, a security company, by which the defendants were to provide security services at the factory, including night patrols. While carrying out a night patrol at the factory an employee of the defendants deliberately lit a small fire which got out of control. The factory and stock inside, together valued at £615,000, were completely destroyed. The plaintiffs sued the defendants for damages on the ground that they were liable for the act of their employee. The defendants pleaded, inter alia, an exception clause in the contract, to the effect that 'under no circumstances' were the defendants to be 'responsible for any injurious act or default by any employee... unless such act or default could have been foreseen and avoided by the exercise of due diligence on the part of the [defendants] as his employer; nor, in any event, [were the defendants to] be held responsible for... any loss suffered by the [plaintiffs] through... fire or any other cause, except in so far as such loss [was] solely attributable to the negligence of the [defendants'] employees acting within the course of their employment...' No negligence was alleged against the defendants for employing the employee. The trial judge held that the defendants were entitled to rely on the exception clause. The Court of Appeal a reversed his decision, holding that there had been a fundamental breach of the contract by the defendants which precluded them from relying on the exception clause. The defendants appealed to the House of Lords.

a [1978] 3 All ER 146

Held - The appeal would be allowed for the following reasons --

(i) There was no rule of law by which an exception clause in a contract could be eliminated from a consideration of

the parties' position when there was a breach of contract (whether fundamental or not) or by which an exception clause could be deprived of effect regardless of the terms of the contract, because the parties were free to agree to whatever exclusion or modification of their obligations they chose and therefore the question whether an exception clause applied when there was a fundamental breach, breach of a fundamental term or any other breach, turned on the construction of the whole of the contract, including any exception clauses and because (per Lord Diplock) the parties were free to reject or modify by express words both their primary obligations to do that which they had promised and also any secondary obligations to pay damages arising on breach of a primary obligation (see p 560 b to d, p 561 c to f, p 565 b, p 566 c to e, p 567 f g, p 568 a h and p 570 a to d, post); Suisse Atlantique Societe d'Armement Maritime SA v NV Rotterdamsche Kolen Centrale [1966] 2 All ER 61 explained and applied; Charterhouse Credit Co Ltd v Tolly [1963] 2 All ER 432, Harbutt's Plasticine Ltd v Wayne Tank and Pump Co Ltd [1970] 1 All ER 225 and Wathes (Western) Ltd v. Austins (Menswear) Ltd [1976] 1 Lloyd's Rep 14 overruled.

(ii) Although the defendants were in breach of their implied obligation to operate their service with due and proper regard to the safety and security of the plaintiffs' premises, the exception clause was clear and unambiguous and protected the defendants from liability (see p 564 c to f, p 568 d e, p 569 e f and p 570 b c, post).

Per Curiam. (i) In commercial matters generally, when the parties are not of unequal bargaining power and when the risks are normally borne by insurance, the parties should be left free to apportion the risks as they think fit, having regard to difficulties of deciding at what point the breach in fact becomes fundamental and the date at which the termination is to be fixed (see p 561 j to p 562 b, p 568 b c, p 569 f g and p 570 b c, post).

(ii) Much of the difficulty regarding the 'termination' of a contract and its effect on the plaintiff's claim for damages arise from uncertain or inconsistent terminology; in particular (per Lord Wilberforce) the use of rescission' as an equivalent for discharge, though justifiable in some contexts, may lead to confusion in others, and (per Lord Diplock) the expression 'fundamental breach' should be confined to an event resulting from the failure by one party to perform a primary obligation which has the effect of depriving the other party of substantially the whole benefit which it was the intention of the parties that he should obtain from the contract, so that the party not in default may elect to put an end to all primary obligations of both parties remaining unperformed, while 'breach of condition' should be confined to the situation where the contracting parties have agreed, whether by express words or by implication of law, that any failure by one party to perform a particular primary obligation irrespective of the gravity of the event that has in fact resulted from the breach shall entitle the other party to elect to put an end to all primary obligations of both parties remaining unperformed (see p 562 e to h, p 565 e f and p 566 h to p 567 a, post).

Observations on, and analysis of, the primary and secondary obligations arising under a contract (see p 565 g to 567 e, post).

Decision of the Court of Appeal [1978] 3 All ER 146 reversed.

**NOTES:**

For the doctrine of fundamental breach of contract, see 9 Halsbury's Laws (4th Edn) paras 372, 545.

For rules of construction in relation to exclusion clauses and the effect of breach of such clauses, see ibid paras 370-380.

**CASES-REF-TO:**

Alderslade v Hendon Laundry Ltd [1945] 1 All ER 244, [1945] KB 189, 114 LJKB 196, 172, LT 153, CA, 3 Digest (Reissue) 469, 3116.
Angelia, The, trade and Transport Inc v Iino Kaiun Kaisha Ltd [1973] 2 All ER 144, [1973] 1 WLR 210, [1972] 2 Lloyd's Rep 154, Digest (Cont Vol D) 823, 1355a.

Boston Deep Sea Fishing and Ice Co Ltd v Ansell (1888) 39 Ch D 339, [1886-90] All ER Rep 65, CA, 1(2) Digest (Reissue) 662, 4525.

Charterhouse Credit Co Ltd v Tolly [1963] 2 All ER 432, [1963] 2 QB 683, [1963] 2 WLR 1168, CA, Digest (Cont Vol A) 649, 43c.

Hain Steamship Co Ltd v Tate & Lyle Ltd [1936] 2 All ER 597, 155 LT 177, 19 Asp MLC 62, 41 Com Cas 350, 55 Ll L Rep 159, HL, 41 Digest (Repl) 385, 1737.

Harbutt's Plasticine Ltd v. Wayne Tank and Pump Co Ltd [1970] 1 All ER 225, [1970] 1 QB 447, [1970] 2 WLR 198, [1970] 1 Lloyd's Rep 15, CA, 12 Digest (Reissue) 475, 3407.

Hardwick Game Farm v Suffolk Agricultural and Poultry Producers Association Ltd [1966] 1 All ER 309, [1966] 1 WLR 287, [1966] 1 Lloyd's Rep 197, CA; on appeal sub nom Henry Kendall & Sons (a firm) v William Lillico & Sons Ltd [1968] 2 All ER 444, [1969] 2 AC 31, [1968] 3 WLR 110, [1968] 1 Lloyd's Rep 547, HL, Digest (Cont Vol C) 853, 781b.

Heyman v Darwins Ltd [1942] 1 All ER 337, [1942] AC 356, 111 LJKB 241, 166 LT 306, HL, 2 Digest (Repl) 492, 435.

Hong kong Fir Shipping Co Ltd v Kawasaki Kisen Kaisha Ltd [1962] 1 All ER 474, [1962] 2 QB 26, [1962] 2 WLR 474, [1961] 2 Lloyd's Rep 478, CA, 41 Digest (Repl) 363, 1553.

Johnson v Agnew [1979] 1 All ER 883, [1979] 2 WLR 487, HL.

Karsales (Harrow) Ltd v Wallis [1956] 2 All ER 866, [1956] 1 WLR 936, CA, 26 Digest (Repl) 666, 35.

Kenyon, Son & Craven Ltd v. Baxter Hoare & Co Ltd [1971] 2 All ER 708, [1971] WLR 519, [1971] 1 Lloyd's Rep 232, 3 Digest (Reissue) 451, 3019.

Levison v Patent Steam Carpet Cleaning Co Ltd [1977] 3 All ER 498, [1978] QB 69, [1977] 3 WLR 90, CA.

Morris v C W Martin & Sons Ltd [1965] 2 All ER 725, [1966] 1 QB 716, [1965] 3 WLR 276, [1965] 2 Lloyd's Rep 63, CA, 3 Digest (Reissue) 436, 2958.

Moschi v Lep Air Services Ltd [1972] 2 All ER 393, [1973] AC 331, [1972] 2 WLR 1175, HL, Digest (Cont Vol D) 368, 625a.

Suisse Atlantique Societe d' Armement Maritime SA v NV Rotterdamsche Kolen Centrale [1966] 2 All ER 61, [1967] 1 AC 361, [1966] 2 WLR 944, [1966] 1 Lloyd's Rep 529, HL, Digest (Cont Vol B) 652, 2413a.

UGS Finance Ltd v National Mortgage Bank of Greece [1964] 1 Lloyd's Rep 446, CA.

Ward (R V) Ltd v Bignall [1967] 2 All ER 449, [1967] 1 QB 534, [1967] 2 WLR 1050, CA, Digest (Cont Vol C) 858, 2522a.

Wathes (Western) Ltd v Austins (Menswear) Ltd [1976] 1 Lloyd's Rep 14, CA.

## INTRODUCTION:

Appeal. This was an appeal by the defendants, Securicor Transport Ltd ('Securicor'), against a decision of the Court of Appeal n1 (Lord Denning MR, Shaw and Waller LJJ) dated 15th March 1978 allowing an appeal by the plaintiffs, Photo Production Ltd, from a judgment of MacKenna J given on 7th April 1976 whereby he dismissed the plaintiffs' action against Securicor claiming damages for breach of contract between the parties dated 2nd January 1968 and/or the negligence of Securicor in the employment of or for the acts done by their servant, George Andrew Musgrove, or for the negligence of other servants or agents of Securicor which caused the destruction by fire of the plaintiffs' factory at Gillingham, Kent, on the night of 18th/19th October 1970. The quantum of damages was agreed at £615,000 but liability was disputed. The facts are set out in the opinion of Lord Wilberforce.

n1 [1978] 3 All ER 146, [1978] 1 WLR 856

## COUNSEL:

Richard Yorke QC, Anthony Machin QC and Roger Toulson for Securicor. Michael Wright QC and John Crowley for Photo Production Ltd.

**JUDGMENT-READ:**

Their Lordships took time for consideration. 14th February. The following opinions were delivered.

**PANEL:** LORD WILBERFORCE, LORD DIPLOCK, LORD SALMON, LORD KEITH OF KINKEL AND LORD SCARMAN

**JUDGMENTBY-1:** LORD WILBERFORCE.

**JUDGMENT-1:**

LORD WILBERFORCE. My Lords, this appeal arises from the destruction by fire of a factory owned by the respondents ('Photo Productions') involving loss and damage agreed to amount to £615,000. The question is whether the appellants ('Securicor') are liable to the respondents for this sum.

Securicor are a company which provides security services. In 1968 they entered into a contract with Photo Productions by which for a charge of £8 15s od (old currency) per week it agreed to 'provide their Night Patrol Service whereby four visits per night shall be made seven nights per week and two visits shall be made during the afternoon of Saturday and four visits shall be made during the day of Sunday'. The contract incorporated printed standard conditions which, in some circumstances, might exclude or limit Securicor's liability. The questions in this appeal are (i) whether these conditions can be invoked at all in the events which happened and (ii) if so, whether either the exclusion provision, or a provision limiting liability, can be applied on the facts. The trial judge (MacKenna J) decided these issues in favour of Securicor. The Court of Appeal n1 decided issue (i) in Photo Productions' favour invoking the doctrine of fundamental breach. Waller LJ in addition would have decided for Photo Productions on issue (ii).

n1 [1978] 3 All ER 146, [1978] 1 WLR 856

What happened was that on a Sunday night the duty employee of Securicor was one Musgrove. It was not suggested that he was unsuitable for the job or that Securicor were negligent in employing him. He visited the factory at the correct time, but when inside he deliberately started a fire by throwing a match onto some cartons. The fire got out of control and a large part of the premises was burnt down. Though what he did was deliberate, it was not established that he intended to destroy the factory. The judge's finding was in these words:

'Whether Musgrove intended to light only a small fire (which was the very least he meant to do) or whether he intended to cause much more serious damage, and, in either case, what was the reason for his act, are mysteries I am unable to solve.'

This, and it is important to bear it in mind when considering the judgments in the Court of Appeal, falls short of a finding that Musgrove deliberately burnt or intended to burn Photo Productions' factory.

The condition on which Securicor relies reads, relevantly, as follows:

'Under no circumstances shall the Company [securicor] be responsible for any injurious act or default by any employee of the Company unless such act or default could have been foreseen and avoided by the exercise of due diligence on the part of the Company as his employer; nor, in any event, shall the Company be held responsible for; (a) Any loss suffered by the customer through burglary, theft, fire or any other cause, except insofar as such loss is solely attributable to the negligence of the Company's employees acting within the course of their employment...'
There are further provisions limiting to stated amounts the liability of Securicor on which it relies in the alternative if held not to be totally exempt.

It is first necessary to decide on the correct approach to a case such as this where it is sought to invoke an exception

or limitation clause in the contract. The approach of Lord Denning MR in the Court of Appeal was to consider first whether the breach was 'fundamental'. If so, he said, the court itself deprives the party of the benefit of an exemption of limitation clause. Shaw and Waller LJJ substantially followed him in this argument.

Lord Denning MR in this was following the earlier decision of the Court of Appeal, and in particular his own judgment in Harbutt's Plasticine Ltd v Wayne Tank and Pump Co Ltd n2. In that case Lord Denning MR distinguished two cases: (a) the case where as the result of a breach of contract the innocent party has, and exercises, the right to bring the contract to an end; and (b) the case where the breach automatically brings the contract to an end, without the innocent party having to make an election whether to terminate the contract or to continue it. In the first case Lord Denning MR, purportedly applying this House's decision in Suisse Atlantique Societe d' Armement Maritime SA v NV Rotterdamsche Kolen Centrale n3, but in effect two citations from two of their Lordships' speeches, extracted a rule of law that the 'termination' of the contract brings it, and with it the exclusion clause, to an end. The Suisse Atlantique case n3 in his view --

n2 [1970] 1 All ER 225, [1970] 1 QB 447

n3 [1966] 2 All ER 61, [1967] 1 AC 361

'affirms the long line of cases in this court that when one party has been guilty of a fundamental breach of the contract... and the other side accepts it, so that the contract comes to an end... then the guilty party cannot rely on an exception or limitation clause to escape from his liability for the breach.'
See (Harbutt's case n1).He then applied the same principle to the second case.

n1 [1970] 1 All ER 225 at 235, [1970] 1 QB 447 at 467

My Lords, whatever the intrinsic merit of this doctrine, as to which I shall have something to say later, it is clear to me that so far from following this House's decision in the Suisse Atlantique case n2 it is directly opposed to it and that the whole purpose and tenor of the Suisse Atlantique case n2 was to repudiate it. The lengthy, and perhaps I may say sometimes indigestible speeches of their Lordships, are correctly summarised in the headnote n3 --

n2 [1966] 2 All ER 61, [1967] 1 AC 361

n3 [1967] 1 AC 361 at 362

'(3) That the question whether an exceptions clause was applicable where there was a fundamental breach of contract was one of the true construction of the contract.'
That there was any rule of law by which exception clauses are eliminated, or deprived of effect, regardless of their terms, was clearly not the view of Viscount Dilhorne, Lord Hodson or myself.The passages invoked for the contrary view of a rule of law consist only of short extracts from two of the speeches, on any view a minority. But the case for the doctrine does not even go so far as that. Lord Reid, in my respectful opinion, and I recognise that I may not be the best judge of this matter, in his speech read as a whole, cannot be claimed as a supporter of a rule of law. Indeed he expressly disagreed with Lord Denning MR's observations in two previous case (Karsales (Harrow) Ltd v Wallis n4 and UGS Finance Ltd v National Mortgage Bank of Greece) n5 in which he had put forward the 'rule of law' doctrine. In order to show how close the disapproved doctrine is to that sought to be revived in Harbutt's case n6 I shall quote one passage from the Karsales case n7:

n4 [1956] 2 All ER 866, [1956] 1 WLR 936

n5 [1964] 1 Lloyd's Rep 446

n6 [1970] 1 All ER 225, [1970] 1 QB 447

n7 [1956] 2 All ER 866 at 868-869, [1956] 1 WLR 936 at 940

'Notwithstanding earlier cases which might suggest the contrary, it is now settled that exempting clauses of this kind, no matter how widely they are expressed, only avail the party when he is carrying out his contract in its essential respects. He is not allowed to use them as a cover for misconduct or indifference or to enable him to turn a blind eye to his obligations. They do not avail him when he is guilty of a breach which goes to the root of the contract.'

Lord Reid n8 comments as to this that he could not deduce from the authorities cited in the Karsales case n4 that the proposition stated in the judgments could be regarded as in any way 'settled law'. His conclusion is stated thus n9: 'In my view no such rule of law ought to be adopted', adding that there is room for legislative reform.

n4 [1956] 2 All ER 866, [1956] 1 WLR 936

n8 [1966] 2 All ER 61 at 73, [1967] 1 AC 361 at 401

n9 [1966] 2 All ER 61 at 76, [1967] 1 AC 361 at 405

My Lords, in the light of this, the passage from the Suisse Atlantique case n10 cited by Lord Denning MR has to be considered. For convenience I restate it:

n10 [1966] 2 All ER 61 at 71, [1967] 1 AC 361 at 398

'If fundamental breach is established, the next question is what effect, if any, that has on the applicability of other terms of the contract. This question has often arisen with regard to clauses excluding liability, in whole or in part, of the party in breach. I do not think that there is generally much difficulty where the innocent party has elected to treat the breach as a repudiation, bring the contract to an end and sue for damages. Then the whole contract has ceased to exist including the exclusion clause, and I do not see how that clause can then be used to exclude an action for loss which will be suffered by the innocent party after it has ceased to exist, such as loss of the profit which would have accrued if the contract had run its full term.'

It is with the utmost reluctance that, not forgetting the 'beams' that may exist elsewhere, I have to detect here a mote of ambiguity or perhaps even or inconsistency. What is referred to is 'loss which will be suffered by the innocent party after [the contract] has ceased to exist' and I venture to think that all that is being said, rather elliptically, relates only to what is to happen in the future, and it not a proposition as to the immediate consequences caused by the breach; if it were, that would be inconsistent with the full and reasoned discussion which follows.

It is only because of Lord Reid's great authority in the law that I have found it necessary to embark on what in the end may be superfluous analysis. For I am convinced that, with the possible exception of Lord Upjohn whose critical passage, when read in full, is somewhat ambiguous, their Lordships, fairly read, can only be taken to have rejected those suggestions for a rule of law which had appeared in the Court of Appeal and to have firmly stated that the question is one of construction, not merely of course of the exclusion clause alone, but of the whole contract.

Much has been written about the Suisse Atlantique case n1. Each speech has been subjected to various degrees of analysis and criticism, much of it constructive. Speaking for myself I am conscious of imperfections of terminology, though sometimes in good company. But I do not think that I should be conducing to the clarity of the law by adding to what was already too ample a discussion a further analysis which in turn would have to be interpreted. I have no second thoughts as to the main proposition that the question whether, and to what extent, an exclusion clause is to be applied to a fundamental breach, or a breach of a fundamental term, or indeed to any breach of contract, is a matter of construction of the contract. Many difficult questions arise and will continue to arise in the infinitely varied situations in which

contracts come to be breached: by repudiatory breaches, accepted or not, anticipatory breaches, by breaches of conditions or of various terms and whether by negligent, or deliberate, action, or otherwise. But there are ample resources in the normal rules of contract law for dealing with these without the superimposition of a judicially invented rule of law. I am content to leave the matter there with some supplementary observations.

n1 [1966] 2 All ER 61, [1967] 1 AC 361

1. The doctrine of 'fundamental breach' in spite of its imperfections and doubtful parentage has served a useful purpose. There were a large number of problems, productive of injustice, in which it was worse than unsatisfactory to leave exception clauses to operate. Lord Reid referred to these in the Suisse Atlantique case n2, pointing out at the same time that the doctrine of fundamental breach was a dubious specific. But since then Parliament has taken a hand: it has passed the Unfair Contract Terms Act 1977. This Act applies to consumer contracts and those based on standard terms and enables exception clauses to be applied with regard to what is just and reasonable. It is significant that Parliament refrained from legislating over the whole field of contract. After this Act, in commercial matters generally, when the parties are not of unequal bargaining power, and when risks are normally borne by insurance, not only is the case for judicial intervention undemonstrated, but there is everything to be said, and this seems to have been Parliament's intention, for leaving the parties free to apportion the risks as they think fit and for respecting their decisions.

n2 [1966] 2 All ER 61 at 76, [1967] 1 AC 361 at 406

At the stage negotiation as to the consequences of a breach, there is everything to be said for allowing the parties to estimate their respective claims according to the contractual provisions they have themselves made, rather than for facing them with a legal complex so uncertain as the doctrine of fundamental breach must be. What, for example, would have been the position of Photo Productions' factory if instead of being destroyed it had been damaged, slightly or moderately or severely? At what point does the doctrine (with what logical justification I have not understood) decide, ex post facto, that the breach was (factually) fundamental before going on to ask whether legally it is to be regarded as fundamental? How is the date of 'termination' to be fixed? Is it the date of the incident causing the damage, or the date of the innocent party's election, or some other date? All these difficulties arise from the doctrine and are left unsolved by it.

At the judicial stage there is still more to be said for leaving cases to be decided straightforwardly on what the parties have bargained for rather than on analysis, which becomes progressively more refined, of decisions in other cases leading to inevitable appeals. The learned judge was able to decide this case on normal principles of contractual law with minimal citation of authority. I am sure that most commercial judges have wished to be able to do the same (cf The Angelia, Trade and Transport Inc v Iino Kaiun Kaisha Ltd n1, per Kerr J). In my opinion they can and should.

n1 [1973] 2 All ER 144 at 164, [1973] 1 WLR 210 at 232

2. Harbutt's Plasticine Ltd v Wayne Tank and Pump Co Ltd n2 must clearly be overruled. It would be enough to put that on its radical inconsistency with the Suisse Atlantique case n3. But even if the matter were res integra I would find the decision to be based on unsatisfactory reasoning as to the 'termination' of the contract and the effect of 'termination' on the plaintiffs' claim for damage. I have, indeed, been unable to understand how the doctrine can be reconciled with the well accepted principle of law, stated by the highest modern authority, that when in the context of a breach of contract one speaks of 'termination' what is meant is no more than that the innocent party or, in some cases, both parties are excused from further performance. Damages, in such cases, are then claimed under the contract, so what reason in principle can there be for disregarding what the contract itself says about damages, whether in 'liquidates' them, or limits them, or excludes them? These difficulties arise in part from uncertain or inconsistent terminology. A vast number of expressions are used to describe situations where a breach has been committed by one party of such

character as to entitle the other party to refuse further performance: discharge, rescission, termination, the contract is at an end, or dead, or displaced; clauses cannot survive, or simply go. I have come to think that some of these difficulties can be avoided; in particular the use of 'rescission', even if distinguished from rescission ab initio, as an equivalent for discharge, though justifiable in some contexts (see Johnson v Agnew n4) may lead to confusion in others. To plead for complete uniformity may be to cry for the moon. But what can and ought to be avoided is to make use of these confusions in order to produce a concealed and unreasoned legal innovation: to pass, for example, from saying that a party, victim of a breach of contract, is entitled to refuse further performance, to saying that he may treat the contract as at an end, or as rescinded, and to draw from this the proposition, which is not analytical but one of policy, that all or (arbitrarily) some of the clauses of the contract lose, automatically, their force, regardless of intention.

n2 [1970] 1 All ER 225, [1970] 1 QB 447

n3 [1966] 2 All ER 61, [1967] 1 AC 361

n4 [1979] 1 All ER 883, [1979] 2 WLR 487

If this process is discontinued the way is free to use such words as 'discharge' or 'termination' consistently with principles as stated by modern authority which Harbutt's case n2 disregards. I venture with apology to relate the classic passages. In Heyman v Darwins Ltd n5 Lord Porter said:

n2 [1970] 1 All ER 225, [1970] 1 QB 447

n5 [1942] 1 All ER 337 at 360-361, [1942] AC 356 at 399

'To say that the contract is rescinded or has come to an end or has ceased to exist may in individual cases convey the truth with sufficient accuracy, but the fuller expression that the injured party is thereby absolved from future performance of his obligations under the contract is a more exact description of the position. Strictly speaking, to say that, upon acceptance of the renunciation of a contract, the contract is rescinded is incorrect. In such a case the injured party may accept the renunciation as a breach going to the root of the whole of the consideration. By that acceptance he is discharged from further performance and may bring an action for damages, but the contract itself is not rescinded.' Similarly Lord Macmillan n1; see also Boston Deep Sea Fishing and Ice Co Ltd v Ansell n2 per Bowen LJ. In Moschi v Lep Air Services Ltd n3 my noble and learned friend Lord Diplock drew a distinction (relevant for that case) between primary obligations under a contract, which on 'rescission' generally come to an end, and secondary obligations which may then arise. Among the latter he included an obligation to pay compensation, ie damages. And he stated in terms that this latter obligation 'is just as much an obligation arising from the contract as are the primary obligations that it replaces'. My noble and learned friend has developed this line of thought in an enlightening manner in his opinion which I have now had the benefit of reading.

n1 [1942] 1 All ER 337 at 346-347, [1942] AC 356 at 373

n2 (1888) 39 Ch D 339 at 361

n3 [1972] 2 All ER 393 at 403, [1973] AC 331 at 350

These passages I believe to state correctly the modern law of contract in the relevant respects; they demonstrate that the whole foundation of Harbutt's case n4 is unsound. A fortiori, in addition to Harbutt's case n4 there must be overruled Wathes (Western) Ltd v Austine (Menswear) Ltd n5 which sought to apply the doctrine of fundamental breach to a case where, by election of the innocent party, the contract had not been terminated, an impossible acrobatic, yet necessarily engendered by the doctrine. Similarly, Charterhouse Credit Co Ltd v Tolly n6 must be overruled, though the result might have been reached on construction of the contract.

n4 [1970] 1 All ER 225, [1970] 1 QB 447

n5 [1976] 1 Lloyd's Rep 14

n6 [1963] 2 All ER 432, [1963] 2 QB 683

3. I must add to this, by way of exception to the decision not to 'gloss' the Suisse Atlantique n7, a brief observation on the deviation cases, since some reliance has been placed on them, particularly on the decision of this House in Hain Steamship Co Ltd v Tate & Lyle Ltd n8 (so earlier than the Suisse Atlantique n7) in the support of the Harbutt n4 doctrine. I suggested in the Suisse Atlantique n7 that these cases can be regarded as proceeding on normal principles applicable to the law of contract generally, viz that it is a matter of the parties' intentions whether and to what extent clauses in shipping contracts can be applied after a deviation, ie a departure from the contractually agreed voyage or adventure. It may be preferable that they should be considered as a body of authority sui generis with special rules derived from historical and commercial reasons. What on either view they cannot do is to lay down different rules as to contracts generally from those later stated by this House in Heyman v Darwins Ltd. n9 The ingenious use by Donaldson J in Kenyon, Son & Craven Ltd v Baxter Hoare & Co Ltd n10 of the doctrine of deviation in order to reconcile the Suisse Atlantique Case n7 with Harbutt's case n4, itself based in part on the use of the doctrine of deviation, illustrates the contortions which that case has made necessary and would be unnecessary if it vanished as an authority.

n4 [1970] 1 All ER 225, [1970] 1 QB 447

n7 [1966] 2 All ER 61, [1967] 1 AC 361

n8 [1936] 2 All ER 597

n9 [1942] 1 All ER 337, [1942] AC 356

n10 [1971] 2 All ER 708, [1971] 1 WLR 519

4. It is not necessary to review fully the numerous cases in which the doctrine of fundamental breach has been applied or discussed. Many of these have now been superseded by the Unfair Contract Terms Act 1977. Others, as decisions, may be justified as depending on the construction of the contract (cf Levison v Patent Steam Carpet Cleaning Co Ltd n1 in the light of well-known principles such as that stated in Alderslade v Hendon Laundry Ltd n2.

n1 [1977] 3 All ER 498, [1978] QB 69

n2 [1945] 1 All ER 244, [1945] KB 189

In this situation the present case has to be decided. As a preliminary, the nature of the contract has to be understood. Securicor undertook to provide a service of periodical visits for a very modest charge which works out at 26p per visit. It did not agree to provide equipment. It would have no knowledge of the value of Photo Productions' factory; that, and the efficacy of their fire precautions, would be known to Photo Productions. In these circumstances nobody could consider it unreasonable that as between these two equal parties the risk assumed by Securicor should be a modest one, and that Photo Productions should carry the substantial risk of damage or destruction.

The duty of Securicor was, as stated, to provide a service. There must be implied an obligation to use care in selecting their patrolmen, to take care of the keys and, I would think, to operate the service with due and proper regard to the safety and security of the premises. The breach of duty committed by Securicor lay in a failure to discharge this latter obligation. Alternatively it could be put on a vicarious responsibility for the wrongful act of Musgrove, viz, starting a fire on the premises; Securicor would be responsible for this on the principle stated in Morris v C W Martin &

Sons Ltd. n3 This being the breach, does condition 1 apply? It is drafted in strong terms, 'Under no circumstances, any injurious act or default by any employee'. These words have to be approached with the aid of the cardinal rules of construction that they must be read contra proferentem and that in order to escape from the consequences of one's own wrongdoing, or that of one's servant, clear words are necessary. I think that these words are clear. Photo Productions in fact relied on them for an argument that since they exempted from negligence they must be taken as not exempting from the consequence of deliberate acts. But this is a perversion of the rule that if a clause can cover something other than negligence it will not be applied to negligence. Whether, in addition to negligence, it covers other, eg deliberate, acts, remains a matter of construction requiring, of course, clear words. I am of opinion that it does and, being free to construe and apply the clause, I must hold that liability is excluded. On this part of the case I agree with the judge and adopt his reasons for judgment. I would allow the appeal.

n3 [1965] 2 All ER 725 at 739, [1966] 1 QB 716 at 739

**JUDGMENTBY-2:** LORD DIPLOCK.

**JUDGMENT-2:**

LORD DIPLOCK. My Lords, my noble and learned friend Lord Wilberforce has summarised the facts which have given rise to this appeal. The contract which falls to be considered was a contract for the rendering of services by the defendants ('Securicor') to the plaintiffs ('Photo Productions'). It was a contract of indefinite duration terminable by one month's notice on either side. It had been in existence for some 2 1/2 years when the breach that is the subject-matter of these proceedings occurred. It is not disputed that the act of Securicor's servant, Musgrove, in starting a fire in the factory which they had undertaken to protect was a breach of contract by Securicor; and, since it was the cause of an event, the destruction of the factory, that rendered further performance of the contract impossible, it is not an unnatural use of ordinary language to describe it as a 'fundamental breach'.

It was by attaching that label to it that all three members of the Court of Appeal found themselves able to dispose of Securicor's defence based on the exclusion clause restricting its liability for its servants' torts in terms which Lord Wilberforce has already set out, by holding that where there had been a fundamental breach by a party to a contract there was a rule of law which prevented him from relying on any exclusion clause appearing in the contract, whatever its wording might be.

The Court of Appeal was, I think, bound so to hold by previous decisions of its own, of which the first was Harbutt's Plasticine Ltd v Wayne Tank and Pump Co. n1 It purported in that case to find support for the rule of law it there laid down in the reasoning of this House in Suisse Atlantique Societe d'Armement Maritime SA v Rotter damsche Kolen Centrale. n2 I agree with Lord Wilberforce's analysis of the speeches in the Suisse Atlantique case, n2 and with his conclusion that this House rejected the argument that there was any such rule of law. I also agree that the Harbutt's Plasticine case n1 and the subsequent cases in which the so-called 'rule of law' was applied to defeat exclusion clauses should be overruled, though the actual decisions in some of the later cases might have been justified on the proper construction of the particular exclusion clause on which the defendant relied.

n1 [1970] 1 All ER 225, [1970] 1 QB 447

n2 [1966] 2 All ER 61, [1967] 1 AC 361

My Lords, the contract in the instant case was entered into before the passing of the Unfair Contract Terms Act 1977. So what we are concerned with is the common law of contract, of which the subject-matter is the legally enforceable obligations as between the parties to it of which the contract is the source. The 'rule of law' theory which the Court of Appeal has adopted in the last decade to defeat exclusion clauses is at first sight attractive in the simplicity of its logic. A fundamental breach is one which entitles the party not in default to elect to terminate the contract. On

his doing so the contract comes to an end. The exclusion clause is part of the contract, so it comes to an end too; the party in default can no longer rely on it. This reasoning can be extended without undue strain to cases where the party entitled to elect to terminate the contract does not become aware of the breach until some time after it occurred; his election to terminate the contract could not implausibly be treated as exercisable nunc pro tunc. But even the superficial logic of the reasoning is shattered when it is applied, as it was in Wathes (Western) Ltd v Austins (Menswear) Ltd n3, to cases where, despite the 'fundamental breach', the party not in default elects to maintain the contract in being.

n3 [1976] 1 Lloyd's Rep 14

The fallacy in the reasoning, and what I venture to think is the disarray into which the common law about breaches of contract has fallen, is due to the use in many of the leading judgments on this subject of ambiguous or imprecise expressions without defining the sense in which they are used. I am conscious that I have myself sometimes been guilty of this when I look back on judgments I have given in such cases as Hong Kong Fir Shipping Co Ltd v Kawakasi Kisen Kaisha Ltd, n4 R V Ward Ltd v Bignall, n5 Moschi v Lep Air Services Ltd, n6 and in particular Hardwick Game Farm v Suffolk Agricultural and Poultry Producers Association Ltd, n7 when commenting unfavourably on the then budding doctrine of fundamental breach in a portion of my judgment in the Court of Appeal that did not subsequently incur the disapproval of this House. n8

n4 [1962] 1 All ER 474, [1962] 2 QB 26

n5 [1967] 2 All ER 449, [1967] 1 QB 534

n6 [1972] 2 All ER 393, [1973] AC 331

n7 [1966] 1 All ER 309, [1966] 1 WLR 287

n8 Sub nom Henry Kendall & Sons (a firm) v William Lillico & Sons Ltd [1968] 2 All ER 444, [1969] 2 AC 31

My Lords, it is characteristic of commercial contracts, nearly all of which today are entered into not by natural legal persons, but by fictitious ones, ie companies, that the parties promise to one another that something will be done, for instance, that property and possession of goods will be transferred, that goods will be carried by ship from one port to another, that a building will be constructed in accordance with agreed plans, that services of a particular kind will be provided. Such a contract is the source of primary legal obligations on each party to it to procure that whatever he has promised will be done is done. (I leave aside arbitration clauses which do not come into operation until a party to the contract claims that a primary obligation has not been performed.)

Where what is promised will be done involves the doing to a physical act, performance of the promise necessitates procuring a natural person to do it; but the legal relationship between the promisor and the natural person by whom the act is done, whether it is that of master and servant, or principal and agent, or of parties to an independent subcontract, is generally irrelevant. If that person fails to do it in the manner in which the promisor has promised to procure it to be done, as, for instance, with reasonable skill and care, the promisor has failed to fulfil his own primary obligation. This is to be distinguished from 'vicarious liability', a legal concept which does depend on the existence of a particular legal relationship between the natural person by whom a tortious act was done and the person sought to be made vicariously liable for it. In the interests of clarity the expression should, in my view, be confined to liability for tort.

A basic principle of the common law of contract, to which there are no exceptions that are relevant in the instant case, is that parties to a contract are free to determine for themselves what primary obligations they will accept. They may state these in express words in the contract itself and, where they do, the statement is determinative; but in practice a commercial contract never states all the primary obligations of the parties in full; many are left to be incorporated by

implication of law from the legal nature of the contract into which the parties are entering. But if the parties wish to reject or modify primary obligations which would otherwise be so incorporated, they are fully at liberty to do so by express words.

Leaving aside those comparatively rare cases in which the court is able to enforce a primary obligation by decreeing specific performance of it, breaches of primary obligations give rise to substituted secondary obligations on the part of the party in default, and, in some cases, may entitle the other party to be relieved from further performance of his own primary obligations. These secondary obligations of the contract breaker and any concomitant relief of the other party from his own primary obligations also arise by implication of law, generally common law, but sometimes statute, as in the case of codifying statutes passed at the turn of the century, notably the Sale of Goods Act 1893. The contract, however, is just as much the source of secondary obligations as it is of primary obligations; and like primary obligations that are implied by law secondary obligations too can be modified by agreement between the parties, although, for reasons to be mentioned later, they cannot, in my view, be totally excluded. In the instant case, the only secondary obligations and concomitant reliefs that are applicable arise by implication of the common law as modified by the express words of the contract.

Every failure to perform a primary obligation is a breach of contract. The secondary obligation on the part of the contract breaker to which it gives rise by implication of the common law is to pay monetary compensation to the other party for the loss sustained by him in consequence of the breach; but, with two exceptions, the primary obligations of both parties so far as they have not yet been fully performed remain unchanged. This secondary obligation to pay compensation (damages) for non-performance of primary obligations I will call the 'general secondary obligation'. It applies in the cases of the two exceptions as well.

The exceptions are: (1) where the event resulting from the failure by one party to perform a primary obligation has the effect of depriving the other party of substantially the whole benefit which it was the intention of the parties that he should obtain from the contract, the party not in default may elect to put an end to all primary obligations of both parties remaining unperformed (if the expression 'fundamental breach' is to be retained, it should, in the interests of clarity, be confined to this exception); (2) where the contracting parties have agreed, whether by express words or by implication of law, that any failure by one party to perform a particular primary obligation ('condition' in the nomenclature of the Sale of Goods Act 1893), irrespective of the gravity of the event that has in fact resulted from the breach, shall entitle the other party to elect to put an end to all primary obligation of both parties remaining unperformed (in the interests of clarity, the nomenclature of the sale of Goods Act 1893, 'breach of condition', should be reserved for this exception).

Where such an election is made (a) there is substituted by implication of law for the primary obligations of the party in default which remain unperformed a secondary obligation to pay monetary compensation to the other party for the loss sustained by him in consequence of their non-performance in the future and (b) the unperformed primary obligations of that other party are discharged. This secondary obligation is additional to the general secondary obligation; I will call it 'the anticipatory secondary obligation'.

In cases falling within the first exception, fundamental breach, the anticipatory secondary obligation arises under contracts of all kinds by implication of the common law, except to the extent that it is excluded or modified by the express words of the contract. In cases falling within the second exception, breach of condition, the anticipatory secondary obligation generally arises under particular kinds of contracts by implication of statute law; though in the case of 'deviation' from the contract voyage under a contract of carriage of goods by sea it arises by implication of the common law. The anticipatory secondary obligation in these cases too can be excluded or modified by express words.

When there has been a fundamental breach or breach of condition, the coming to an end of the primary obligations of both parties to the contract at the election of the party not in default is often referred to as the 'determination' or 'rescission' of the contract or, as in the Sale of Goods Act 1893, 'treating the contract as repudiated'. The first two of these expressions, however, are misleading unless it is borne in mind that for the unperformed primary obligations of the party in default there are substituted by operation of law what I have called the secondary obligations.

The bringing to an end of all primary obligations under the contract may also leave the parties in a relationship, typically that of bailor and bailee, in which they owe to one another by operation of law fresh primary obligations of which the contract is not the source; but no such relationship is involved in the instant case.

I have left out of account in this analysis as irrelevant to the instant case an arbitration or choice of forum clause. This does not come into operation until a party to the contract claims that a primary obligation of the other party has not been performed; and its relationship to other obligations of which the contract is the source was dealt with by this House in Heyman v Darwins Ltd n1.

n1 [1942] 1 All ER 337, [1942] AC 356

Mr Lords, an exclusion clause is one which excludes or modifies an obligation, whether primary, general secondary or anticipatory secondary, that would otherwise arise under the contract by implication of law. Parties are free to agree to whatever exclusion or modification of all three types of obligations they please within the limits that the agreement must retain the legal characteristics of a contract and must not offend against the equitable rule against penalties, that is to say, it must not impose on the breaker of a primary obligation a general secondary obligation to pay to the other party a sum of money that is manifestly intended to be in excess of the amount which would fully compensate the other party for the loss sustained by him in consequence of the breach of the primary obligation. Since the presumption is that the parties by entering into the contract intended to accept the implied obligations, exclusion clauses are to be construed strictly and the degree of strictness appropriate to be applied to their construction may properly depend on the extent to which they involve departure from the implied obligations. Since the obligations implied by law in a commercial contract are those which, by judicial consensus over the years or by Parliament in passing a statute, have been regarded as obligations which a reasonable businessman would realise that he was accepting when he entered into a contract of a particular kind, the court's view of the reasonableness of any departure from the implied obligations which would be involved in construing the express words of an exclusion clause in one sense that they are capable of bearing rather than another is a relevant consideration in deciding what meaning the words were intended by the parties to bear. But this does not entitle the court to reject the exclusion clause, however unreasonable the court itself may think it is, if the words are clear and fairly susceptible of one meaning only.

My Lords, the reports are full of cases in which what would appear to be very strained constructions have been placed on exclusion clauses, mainly in what today would be called consumer contracts and contracts of adhesion. As Lord Wilberforce has pointed out, any need for this kind of judicial distortion of the English language has been banished by Parliament's having made these kinds of contracts subject to the Unfair Contract Terms Act 1977. In commercial contracts negotiated between businessmen capable of looking after their own interests and of deciding how risks inherent in the performance of various kinds of contract can be most economically borne (generally by insurance), it is, in my view, wrong to place a strained construction on words in an exclusion clause which are clear and fairly susceptible of one meaning only even after due allowance has been made for the presumption in favour of the implied primary and secondary obligations.

Applying these principles to the instant case, in the absence of the exclusion clause which Lord Wilberforce has cited, a primary obligation of Securicor under the contract, which would be implied by law, would be an absolute obligation to procure that the visits by the night patrol to the factory were conducted by natural persons who would exercise reasonable skill and care for the safety of the factory. That primary obligation is modified by the exclusion clause. Securicor's obligation to do this is not absolute, but is limited to exercising due diligence in their capacity as employers of the natural persons by whom the visits are conducted, to procure that those persons shall exercise reasonable skill and care for the safety of the factory.

For the reasons given by Lord Wilberforce it seems to me that this apportionment of the risk of the factory being damaged or destroyed by the injurious act of an employee of Securicor while carrying out a visit to the factory is one which reasonable businessmen in the position of Securicor and Photo Productions might well think was the most

economical. An analogous apportionment of risk is provided for by the Hague Rules n1 in the case of goods carried by sea under bills of lading. The risk that a servant of Securicor would damage or destroy the factory or steal goods from it, despite the exercise of all reasonable diligence by Securicor to prevent it, is what in the context of maritime law would be called a 'misfortune risk', something which reasonable diligence of neither party to the contract can prevent. Either party can insure against it. It is generally more economical for the person by whom the loss will be directly sustained to do so rather than that it should be covered by the other party by liability insurance. This makes it unnecessary to consider whether a later exclusion clause in the contract which modifies the general secondary obligation implied by law by placing limits on the amount of damages recoverable for breaches of primary obligations would have applied in the instant case.

n1 See the Carriage of Goods by Sea Act 1971, Sch

For the reasons given by Lord Wilberforce and in application of the principles that I have here stated, I would allow this appeal.

**JUDGMENTBY-3:** LORD SALMON.

**JUDGMENT-3:**

LORD SALMON. My Lords, the contract with which this appeal is concerned is a very simple commercial contract entered into by two highly experienced business enterprises, the appellants, whom I shall call 'Securicor' and the respondents, whom I shall call 'Photo Productions'.

This appeal turns in my view entirely on certain words in the contract which read as follows:

'Under no circumstances shall [Securicor] be responsible for any injurious act or default by any employee of [Securicor] unless such act or default could have been foreseen and avoided by the exercise of due diligence on the part of [Securicor] as his employer.'

We are not concerned with the Unfair Contract Terms Act 1977 since the present contract was entered into before that Act was passed. Accordingly, I prefer to express no view about the effect of that Act as the result of this appeal depends solely on the common law.

The facts relevant to this case are very short. Indubitably, one of Securicor's servants called Musgrove committed an injurious act or default which caused Photo Productions' factory to be burned down, and as a result, Photo Productions suffered a loss of £615,000. This disaster occurred when Musgrove was visiting the factory on patrol one Sunday night and deliberately threw a lighted match on some cartons lying on the floor of one of the rooms he was inspecting. Whether Musgrove intended to light only a small fire or to burn down the factory and what his motives were for what he did were found by the learned trial judge to be mysteries which it was impossible to solve.

No one has suggested that Securicor could have foreseen or avoided by due diligence the act or default which caused the damage or that Securicor had been negligent in employing or supervising Musgrove.

The contract between the two parties provided that Securicor should supply a patrol service at Photo Productions' factory by four visits a night for seven nights a week and two visits every Saturday afternoon and four day visits every Sunday. The contract provided that for this service Securicor should be paid £8 15s 0d a week. There can be no doubt that, but for the clause in the contract which I have recited, Securicor would have been liable for the damage which was caused by their servant Musgrove whilst indubitably acting in the course of his employment: see Morris v C W Martin & Sons Ltd n1. To my mind, however, the words of the clause are so crystal clear that they obviously relieve Securicor from what would otherwise have been their liability for the damage caused by Musgrove. Indeed the words of the clause are incapable of any other meaning. I think that any businessman entering into this contract could have had no

doubt as to the real meaning of this clause and would have made his insurance arrangements accordingly. The cost to Photo Productions for the benefit of the patrol service provided by Securicor was very modest and probably substantially less than the reduction of the insurance premiums which Photo Productions may have enjoyed as a result of obtaining that service.

n1 [1965] 2 All ER 725, [1966] 1 QB 716

Clauses which absolve a party to a contract from liability for breaking it are no doubt unpopular, particularly when they are unfair, which incidentally, in my view, this clause is not. It is, I think, because of the unpopularity of such clauses that a so called 'rule of law' has been developed in the Court of Appeal to the effect that what was characterised as 'a fundamental breach of contract', automatically or with the consent of the innocent party, brings the contract to an end; and that therefore the contract breaker will then immediately be barred from relying on any clause in the contract, however clearly worded, which would otherwise have safeguarded him against being liable, inter alia, in respect of the damages caused by the default: see for example Karsales (Harrow) Ltd v Wallis n2, per Denning LJ and Harbutt's Plasticine Ltd v Wayne Tank and Pump Co Ltd n3.

n2 [1956] 2 All ER 866 at 868-869, [1956] 1 WLR 936 at 940

n3 [1970] 1 All ER 225, [1970] 1 QB 447

I entirely agree with my noble and learned friend Lord Wilberforce's analysis of the Suisse Atlantique case n4 which explains why the breach does not bring the contract to an end and why the so-called 'rule of law' on which Photo Productions rely is therefore non-existent. This proposition is strongly supported by the passage recited by Lord Wilberforce in Lord Porter's speech in Heyman v Darwins Ltd n1.

n4 [1966] 2 All ER 61, [1967] 1 AC 361

n1 [1942] 1 All ER 337 at 360-361, [1942] AC 356 at 399

Any persons capable of making a contract are free to enter into any contract they may choose; and providing the contract is not illegal or voidable, it is binding on them. It is not denied that the present contract was binding on each of the parties to it. In the end, everything depends on the true construction of the clause in dispute about which I have already expressed my opinion.

My Lords, I would accordingly allow the appeal.

**JUDGMENTBY-4:** LORD KEITH OF KINKEL.

**JUDGMENT-4:**

LORD KEITH OF KINKEL. My Lords, I agree with the speech of my noble and learned friend Lord Wilberforce, which I have had the advantage of reading in draft and to which I cannot usefully add anything.

Accordingly I too would allow the appeal.

**JUDGMENTBY-5:** LORD SCARMAN.

**JUDGMENT-5:**

LORD SCARMAN. My Lords, I have had the advantage of reading in draft the speech delivered by my noble and

learned friend Lord Wilberforce. I agree with it. I would, therefore, allow the appeal.

I applaud the refusal of the trial judge, MacKenna J, to allow the sophisticated refinements into which, before the enactment of the Unfair Contract Terms Act 1977, the courts were driven in order to do justice to the consumer to govern his judgment in a commercial dispute between parties well able to look after themselves. In such a situation what the parties agreed (expressly or impliedly) is what matters; and the duty of the courts is to construe their contract according to its tenor.

**DISPOSITION:**

Appeal allowed.

**SOLICITORS:**

Berrymans (for Securicor); Stanleys & Simpson, North (for Photo Productions Ltd).

Exhibit B

A

SUISSE ATLANTIQUE SOCIÉTÉ D'ARME-
    MENT MARITIME S.A. .    .    .    .    APPELLANTS

H. L. (E.) \*

1965
*Nov.* 2, 3
1966
*Jan.* 11, 12,
13, 17, 18, 19;
*Mar.* 31

AND

B

N.V. ROTTERDAMSCHE KOLEN CEN-
    TRALE    .    .    .    .    .    .    RESPONDENTS

*Shipping—Charterparty—Demurrage—Damages, Limit of?—American-
    ised Welsh coal charter — Consecutive voyages — Delays by
    charterers in loading and discharging cargoes preventing vessel
    performing more voyages in charter time—Whether shipowners
    entitled to damages (less demurrage payments) for loss of further
    freights—Whether shipowners precluded from recovering further
    damages by reason of payments of demurrage.*

C

*Contract—Exceptions clause—Fundamental breach of contract—
    Breach of fundamental term—Difference between.*

*Ships' Names—General Guisan.*

D

    On December 31, 1956, the respondents agreed to charter a
vessel from the appellants for the carriage of coal from the
United States (East Coast) to Europe, the vessel returning in
ballast between each voyage. The charter was to remain in force
" for a total of two years consecutive voyages." Fixed periods of
laytime were provided within which the respondents were obliged
respectively to load and discharge the vessel on each voyage and
demurrage was payable, subject to certain exceptions, at the rate
of 1,000 dollars a day. Between October 16, 1957, and the end of
the charter the vessel made eight round voyages whereas the
appellants alleged that a further six voyages could have been
performed if the loading and discharging had been completed
within the laytime or a further nine voyages if the respondents
had loaded and discharged the vessel with reasonable despatch.

E

F

    This claim went to arbitration and, at the request of the
appellants, the arbitrators stated, inter alia, the following ques-
tions in the form of a consultative case: " whether . . . (A) (i)
the " appellants " are entitled to recover (subject to giving credit
for the demurrage payments received by them) any damages
suffered by them by reason of the respondents having failed to load
and discharge the vessel within the laydays whereby the charter-
party was (if so proved) rendered less profitable to the " appellants
" by consequent loss of voyages or voyage time. (ii) Upon the
assumption that such loss of profitability resulted from the
respondents having deliberately (i.e., with the wilful intention of

G

    \* *Present*: VISCOUNT DILHORNE, LORD REID, LORD HODSON, LORD
UPJOHN and LORD WILBERFORCE.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

A

limiting the number of contractual voyages) failed to load and/
or discharge the vessel (*a*) with such ordinary despatch as the
circumstances permitted or (*b*) within the laydays the " appellants
" are entitled to recover any damages suffered by the " appellants
" through the charterparty having been rendered less profitable
as aforesaid subject to giving credit for the demurrage payments
received by them and for any such despatch money as would have
been earned by the respondents."

B

Mocatta J. answered both (A) (i) and (ii) in the negative. The
Court of Appeal affirmed that decision.

On appeal to the House of Lords, the appellants contended:
(i) that the appellants had under the charterparty a contractual
right to the number of voyages which would be performed if
both parties complied with their obligations; (ii) that the appel-
lants' claim for the loss of freight on the voyages which should
have been performed was not limited to the demurrage payments;
and (iii), that the breaches of contract which caused the delays
complained of amounted to a fundamental breach or a breach
going to the root of the contract thus entitling the appellants to
repudiate the contract and that, accordingly, such breach prevented
the respondents from relying on the demurrage clause as limiting
their liability: —

C

D

*Held*, dismissing the appeal, (1) that no contractual right that
not less than a certain number of voyages should be accomplished
was to be implied either on the construction of the contract or
by operation of law (post, pp. 389E, 396B, 407F, 417A–G, 429E).

(2) That where delay was due to detention of the vessel and
the demurrage provisions applied thereto the damages obtainable
were limited to the demurrage payments (post, pp. 389G, 396B,
407F, 417G–418A, 429E).

E

*Aktieselskabet Reidar* v. *Arcos Ltd.* [1927] 1 K.B. 352; 42
T.L.R. 737, C.A. considered.

(3) That the question whether an exceptions clause was applic-
able where there was a fundamental breach of contract was one
of the true construction of the contract (post, pp. 392E, 399C–D,
405F–G, 410A–F, 425E—426B, 431G—432E).

F

Observations of Denning and Parker L.JJ. in *Karsales
(Harrow) Ltd.* v. *Wallis* [1956] 1 W.L.R. 936, 940, 943; [1956] 2
All E.R. 866, C.A., disapproved.

Observations of Pearson L.J. in *U. G. S. Finance Ltd.* v.
*National Mortgage Bank of Greece and National Bank of Greece,
S.A.* [1964] 1 Lloyd's Rep. 446, 453, C.A., approved.

G

(4) That in the circumstances the appellants had not repudiated
the contract; that in any event the demurrage clause was an
agreed damages clause and not an exceptions clause and that,
accordingly, on the true construction of the charterparty, the
appellants were not entitled to claim that damages were at large
(post, pp. 394G—396A, 406G—407D, 411D, 413B–C, 414A–D, 419C–D,
421B–D, 435F—436E, 437D—438A).

*Per* Lord Upjohn. The phrases " fundamental breach " and

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

"breach of a fundamental term" have been used interchangeably in some of the cases; but in fact they are quite different. There is no magic in the words "fundamental breach"; this expression is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as to go to the root of the contract which entitles the other party to treat such breach or breaches as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudiation and treat the whole contract at an end and sue for damages generally or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can only sue for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken. But the expression "fundamental term" has a different meaning. A fundamental term of a contract is a stipulation which the parties have agreed either expressly or by necessary implication, or which the general law regards as a condition which goes to the root of the contract so that *any* breach of that term may at once and without further reference to the facts and circumstances be regarded by the innocent party as a fundamental breach and thus is conferred on him the alternative remedies at his option that I have just mentioned (post, pp. 421F—422D).

Decision of the Court of Appeal [1965] 1 Lloyd's Rep. 533, C.A., affirmed.

APPEAL from the Court of Appeal.

This was an appeal from an order of the Court of Appeal (Sellers, Harman and Diplock L.JJ.) dated March 11, 1965, dismissing an appeal by the appellants, Suisse Atlantique Société d'Armement Maritime S.A., from an order of Mocatta J. dated January 11, 1965, made on the hearing of a consultative case stated under section 21 (1) (a) of the Arbitration Act, 1950, for the decision of the High Court by two arbitrators appointed pursuant to the terms of a charterparty.

On December 21, 1956, a charterparty was ostensibly concluded between the appellants as disponent owners and the respondents, N.V. Rotterdamsche Kolen Centrale, as charterers of m.v. *Silvretta*. The charterparty was in the Americanised Welsh Coal Charter form, with certain adaptations, and provided for the carriage of a cargo of coal from Hampton Roads, Baltimore or Philadelphia to a port in Belgium or Holland or to a German North Sea port. The following provisions of the charterparty were particularly relevant:

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A

" 3.  The cargo to be loaded into vessel at the average rate of 1,500 tons per running day . . . if longer detained charterer to pay $1,000 U.S. currency per running day (or pro rata for part thereof) demurrage.

" 8.  The cargo to be taken from alongside by consignee at port of discharge, free of expense and risk to the vessel, at the average rate of (clause No. 22) tons per day . . . if longer detained, consignee to pay vessel demurrage at the rate of $1,000 U.S. currency per running day (or pro rata for part thereof).

B

" 23.  It is agreed that the m.v. *Silvretta* will perform under this charter until replaced, in June/July 1957 by owners new building No. 445, of 12,000 tons ten per cent. more or less, now under construction at Rijeka. . . . This charter is to remain in force for a total of two years consecutive voyages, with final cancelling date on last voyage March 10, 1959, vessel always returning in ballast between trips."

C

Clause 22 set out different discharging rates for Holland and Belgium and German North Sea.

Before the events with which this appeal was concerned, a dispute arose between the appellants and the respondents, as the respondents contended that the charterparty was concluded without their authority and was not binding upon them.  The details of that dispute were not material to the present appeal, for by an agreement dated October 8, 1957, between the appellants and the respondents it was agreed as follows:

D

" (1) Without prejudice to the dispute referred to in clause (3) hereof the parties hereto shall henceforward perform the charterparty of December 21, 1956, upon return of the m.v. *General Guisan* to Hampton Roads, notice of readiness being expected to be tendered by Suisse Atlantique on or about October 16, 1957."

E

It was pursuant to this agreement that the present dispute was referred to arbitration under the provisions in clause 3 of the charterparty.

F

By their points of claim in the arbitration the appellants alleged that it was an implied term of the charterparty, (1) that the respondents would co-operate and/or concur with the appellants and/or would do all things necessary to enable the appellants to perform the maximum possible number of voyages and to earn the maximum possible amount of freight under the charterparty; (2) that the respondents would do nothing to prevent the appellants from performing such voyages and earning such freight.  Alternatively the appellants alleged that it was the duty of the respondents not wilfully to delay the loading or discharging of the vessel, but

G

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

A    to load and discharge her with all reasonable speed so as to enable the maximum possible number of voyages to be performed and the maximum possible amount of freight to be earned. Alternatively, they alleged that the respondents were in breach of contract in respect of those occasions when the laytime had been exceeded, and that they were entitled to damages for the consequent diminu-

B    tion in the number of freight-earning voyages performed.

The appellants further alleged that the implied terms and the duty of the respondents as set out above had not been performed from about October 17, 1957, until March 7, 1959, as a result of which only eight voyages had been performed in that period, instead of 17 or alternatively 14 voyages. The appellants offered

C    to give credit for $149,993.08 paid by the respondents as demurrage during this period, and claimed that their net loss thereafter was $772,866.92 or alternatively $476,490.92.

By their points of defence the respondents admitted the charterparty and the agreement dated October 8, 1957, but denied that any such terms were to be implied therein as the appellants alleged, or

D    that they were under any duty not wilfully to delay the loading or discharging of the vessel. They admitted that the laydays had been exceeded, except on one occasion, on each of the eight voyages that the vessel performed. The respondents denied that they had thereby committed any breach of contract or duty. Alternatively they maintained that payment of demurrage totalling $154,554.15

E    and its receipt by the appellants constituted an accord and satisfaction of the appellants' claims.

The arbitrators on the appellants' application stated a consultative case for the opinion of the court on August 19, 1964, pursuant to section 21 (1) (a) of the Arbitration Act, 1950. The only fact found by the arbitrators in addition to the facts admitted by the

F    respondents in their points of defence was that, by reason of the periods spent by the vessel at the loading and discharging ports during her eight voyages, she was able to perform fewer voyages during the period of the charterparty than would have been possible if loading and discharging had been completed within the laytime.

G    This fact was admitted by the respondents before the arbitrators. No finding was made as to the alleged failure by the respondents to co-operate and concur in the performance of the maximum possible number of voyages, or as to the allegation that they wilfully delayed the vessel, or as to the loss and damages alleged by the appellants. All these allegations were denied by the respondents.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Questions of law were stated by the arbitrators for the opinion
of the court as follows:

" Whether upon the facts found and upon the true construc-
tion of the charterparty dated December 21, 1956, and the
agreement dated October 8, 1957:

(A) (i) The claimants [the appellants] are entitled to
recover (subject to giving credit for the demurrage payments
received by them) any damages suffered by them by reason
of the respondents' having failed to load and discharge the
vessel within the laydays whereby the charterparty was (if so
proved) rendered less profitable to the claimants by consequent
loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability
resulted from the respondents having deliberately (i.e., with
the wilful intention of limiting the number of contractual
voyages) failed to load and/or discharge the vessel: (a) with
such ordinary dispatch as the circumstances permitted, or
(b) within the laydays, the claimants are entitled to recover
any damages suffered by the claimants through the charter-
party having been rendered less profitable as aforesaid subject
to giving credit for the demurrage payments received by them
and for any such despatch money as would have been earned
by the respondents.

(B) If the answer to any of the questions under (' A ') be
' Yes,' the payment by the respondents and acceptance by the
claimants of demurrage in respect of those periods when the
laydays were exceeded preclude the claimants from recovering
any damages otherwise recoverable by them in accordance
with such answer or answers."

Before Mocatta J. it was agreed that the court should confine
its decision to answering questions A (i) and (ii) and that the words
" or voyage time " at the end of A (i) added nothing. The judge
answered both these questions in the negative. On appeal, the
Court of Appeal dismissed the appeal.

*R. A. MacCrindle, Q.C.* and *A. Evans* for the appellants.
The questions are: (1) Under this class of contract, do the owners
have a contractual right to the number of voyages which should
be performed if both sides comply with their obligations? (2)
Whether or not they have such a right, are they limited to demur-
rage for loss of freights on the voyages which should have been
performed had the charterers complied with their obligations?
Is demurrage meant to cover all delay?

When a businessman is operating as carrier a profit-earning
charter, the longer the earning takes, the larger are his overheads
and the smaller is his profit; so if the delay is long enough, the

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale
———

A  owners of the ship will not only suffer loss from the overheads running, but will also suffer because their gross earnings will be diminished. Thus suppose that loading, the sea passage, discharging and returning in ballast take 48 days if the laytime is not exceeded; and that if the laytime is not exceeded the vessel would reach the loading port in due course in time to tender for loading

B  47 days before the cancelling date fixed for the last voyage she can perform only one more voyage. If by reason of the laytime being exceeded she is able to tender for loading only one day before the cancelling date she can still perform one more voyage. Hence for the delay the shipowner could only recover demurrage. But suppose the delay is so great that instead of 20 voyages the ship

C  can only do eight, demurrage is not, and is not intended to be, compensation to the owners for the loss of the cargoes and freights.

Demurrage is not compensation for deficiency in the quantity of the cargo loaded by the charterers: *Aktieselskabet Reidar* v. *Arcos Ltd.*[1] Nor is it compensation for deficiency in the number of cargoes loaded by the charterers. Demurrage is concerned

D  only with delay in loading and discharging that which is loaded. It is not concerned with a by-product of the delay, which renders it impossible to load what should have been loaded. The obligations are (1) to load within the laytimes and (2) to load on each voyage with that despatch which enables the owners to perform the contractual number of voyages. One cannot say at the outset

E  of the charterparty how many voyages will be performed under it, because performance is subject to maritime perils. But the charterers at the outset could estimate what would be the minimum number possible provided the two parties performed their obligations with the speed which the contract requires.

One must distinguish between the case where freights are

F  lost on a single voyage contract and on a consecutive voyage contract by a breach of the type of obligation here in question. As to the undertaking of reasonable dispatch, see *Anglo-Saxon Petroleum Co. Ltd.* v. *Admastos Shipping Co. Ltd.*[2] and Scrutton on Charterparties, 17th ed. (1964), p. 93, n. (f).

Clause 23 of the present charterparty provides for consecu-

G  tive voyages. There is, at the least, an express obligation on the charterers to allow a plurality of voyages. Hence if the charterers by delaying the ship at the first port prevent it from performing

---

[1] [1927] 1 K.B. 352; 42 T.L.R. 737, C.A.
[2] [1957] 2 Q.B. 233, 275; [1957] 2 W.L.R. 968; [1957] 2 All E.R. 311, C.A. (reversed on other grounds sub.

nom. *Admastos Shipping Co. Ltd.* v. *Anglo Saxon Petroleum Co. Ltd.* [1959] A.C. 133); [1958] 2 W.L.R. 688; [1958] 1 All E.R. 725, H.L.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

more than one, there is a breach and the owners are entitled to sue
for breach of an *express* term other than the laytime provisions.
This demonstrates that in the present case the owners are not
claiming for a breach of the laytime provisions simpliciter, but for
breach of a separate obligation derived from the charterparty as a
whole to permit the owners to load on the number of voyages per-
formable given compliance with the laytime clauses. Since it is
a breach of a separate obligation the demurrage clause is inapplic-
able so as to limit damages.

The substantial result of the decision in the court below is
the same as if there had been, not a consecutive voyage charter,
but a series of single voyage charters. But a consecutive voyage
charter must be construed as a whole.

In the case of a single voyage charter the charterers promise
a gross rate of remuneration to be earned over a period not
exceeding the sea passage and the laytime. In the present case
they promise a gross rate to be earned over as many consecutive
voyages, each not exceeding the sea passage and the laytime, as
prove to be performable in the period named. Of course, the sea
passage and the laytime cannot be foreseen by the calendar; they
may be affected by weather, strikes, riots and the like. In the
case of both a single voyage charter and a consecutive voyage
charter demurrage represents damages for delay in the earning
of the gross income but not for deprivation of part of that gross
income. In the case of a single voyage charter the charterers
promise not to detain the ship beyond the laytime, so that the
owners may be free to seek the speculative benefit of such employ-
ment as they may be able to obtain when the performance without
exceeding the laytime is over. In the case of a consecutive voyage
charter the promise again is not to delay the ship beyond the lay-
time, but there the charterers have *contractual rights* (when perfor-
mance of a voyage without exceeding the laytime is over) to compel
the owners to carry further cargoes under the charterparty at the
charterparty rates, and the owners have corresponding rights.
The present claim is in respect of a breach of the obligation of the
charterers to load those cargoes which should have been loaded, a
failure to load the right amount of freight-earning cargo at all.
The claim is consistent with what was said by Greer J. in the *Reidar*
case.[3] This claim is not in respect of mere detention but in respect
of the diminution of contractual freights which, but for the
detention, would have been earned.

---

[3] [1926] 2 K.B. 83; 42 T.L.R. 520; [1927] 1 K.B. 352.

H. L. (E.)

1966
———
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
———

A      Here the owners are complaining that they are entitled to damages because they have been deprived of their right to earn freights. The charterers delayed so long that the owners were unable to tender to earn the permissive freights. The fact that the inability to tender was brought about by the charterers' own fault debars the charterers from complaining of the failure to

B      tender.

Demurrage is not a remedy for delays which go to the whole basis of the contract and frustrate it: see *Connolly Shaw Ltd.* v. *A/S Nordenfjeldske D/S*[4] and Scrutton on Charterparties, 17th ed., p. 306, n. (f). If the breach is of a different calibre, the demurrage clause is irrelevant to damage flowing from "frustrating"

C      delays.

As to the effect of a fundamental breach, see *Charterhouse Credit Co. Ltd.* v. *Tolley.*[5] As to the effect of deviation, see *Hain Steamship Co. Ltd.* v. *Tate & Lyle Ltd.*[6] In the House of Lords it was said that the deviation was similar to a repudiation of the contract and that, accordingly, the shipowners were not

D      entitled to rely on the exceptions clause. If the party affected by the breach chooses to affirm the contract, his rights depend on the contractual terms. That case is consistent with the *Charterhouse* case[7] because in neither of them was an innocent party held to be debarred from obtaining damages if the fundamental breach had caused the damage. In the present case the breach

E      which went to the root of the contract did cause the damage. If the delays for which the respondents are responsible are such as to entitle the appellants to treat the charterparty as repudiated, the demurrage provisions do not apply and the appellants are entitled to recover the full loss they have suffered.

F      [Viscount Dilhorne stated that their Lordships wished to hear the respondents on the question whether the appellants should be allowed to raise the question of fundamental breach.]

*J. F. Donaldson Q.C.* for the respondents. The appellants should not be allowed to take this point, which was not taken in the Court of Appeal and which raises a question far wider than any taken so far. The point of the consultative case was to have

G      certain questions answered on the basis of certain facts found. Here the facts are not those which the appellants want and now

---

[4] (1934) 49 Ll.L.R. 183, 190; 50 T.L.R. 418.
[5] [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.
[6] (1936) 155 L.T. 177, 179–180; 52 T.L.R. 617; [1936] 2 All E.R. 597, H.L.(E.).
[7] [1963] 2 Q.B. 683.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

what they really want is to have the case sent back to the     A
arbitrators. This was a matter for the judge of first instance and
should not be brought in by a side-wind now.

*R. A. MacCrindle Q.C.* This point is in the appellants' printed
case in paragraph 27. The case was consultative only. The point
is open to the appellants on the claim or, if they go back to
arbitration, they can ask for a special case upon it. The question     B
whether a breach goes to the root of the contract is a matter of
mixed fact and law. The only reasonable way of dealing with the
question of substance is to allow argument on this question.

[VISCOUNT DILHORNE. The appellants will only be allowed to
argue this point on condition that supplemental cases are filed.
The hearing will be adjourned on their undertaking to pay all     C
the costs involved.]

F. C.

*H. V. Brandon Q.C., R. A. MacCrindle Q.C.* and *A. Evans*
for the appellants. The appellants now wish to develop their con-
tention that, if the appeal is not allowed for the reasons submitted     D
at the earlier hearing of the appeal, nevertheless it should be allowed
for the following reasons: (1) because, whether the clauses of the
charterparty providing for the payments of demurrage by the res-
pondents are exceptions clauses or clauses providing for the pay-
ment of liquidated damages, they do not govern the measure of
damages recoverable by the appellants for detention of the vessel     E
where the detention is such as to be a deviation from, or a repudia-
tion or fundamental breach of, the charterparty. (2) Because the
detention would be such as to be a deviation from, or a repudiation
or fundamental breach of, the charterparty, if (as the appellants
contend) it was in the aggregate so long as to frustrate the com-
mercial purpose of the charterparty. (3) Because the detention     F
would be such as to be a deviation from, or a repudiation or
fundamental breach of, the charterparty, if (as the appellants
further contend) it resulted from breaches which, in addition to
causing serious delay, were deliberate or wilful.

As to (2), it is necessary to assume a finding that the delay
was so long as to frustrate the commercial purpose of the charter-     G
party.

For the purposes of (3), it is necessary to assume that the delay
was serious and incurred deliberately or wilfully. On either of
these assumptions the damage clause does not apply to the damage
suffered because on the true construction of the contract it was
only intended to apply to non-fundamental breaches.

H. L. (E.)

1966
———
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
———

Reliance is placed on the following propositions: (1) A breach of contract which goes to the root of the contract, or which conflicts with its main purpose, is a deviation from, or a repudiation or fundamental breach of, such contract. (2) Exceptions clauses, including clauses limiting the amount of a party's liability for breaches, do not normally apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract. (3) Provisions in a contract making liquidated damages payable for breaches similarly do not normally apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract. (4) Propositions (2) and (3) above are not affected by the question whether the party suffering the breach which is a deviation from, or a repudiation or fundamental breach of, the contract elects, with knowledge of the breach, to rescind or affirm the contract. (5) Where a breach of contract takes the form of delay, and time is not of the essence of the contract, the breach will be a deviation from, or a repudiation or fundamental breach of, the contract, if the delay is, or will be, so long as to frustrate the commercial purpose of the contract. (6) A breach causing delay will also be a deviation from, or a repudiation or fundamental breach of, the contract if such breach, in addition to causing serious delay, is deliberate or wilful. (7) Propositions (5) and (6) above apply to the particular case of detention of a vessel by a charterer under a charterparty by exceeding the lay days. They also apply to a number of breaches collectively as well as to a single breach. (8) The appellants contend on the facts, and it will be open to the arbitrators hereafter to determine, that the detention of the vessel caused by the respondents' breaches of charterparty was in the aggregate so long as to frustrate the commercial purpose of the charterparty. (9) The appellants further contend on the facts, and it will be open to the arbitrators hereafter to determine, that the respondents' breaches of charterparty, whereby the vessel was detained, in addition to causing serious delay, were deliberate or wilful. (10) The demurrage provisions of the charterparty are provisions which either limit or liquidate the damages payable by the respondents for detaining the vessel beyond her lay days. (11) In the event of its being hereafter determined either: (a) that the detention of the vessel caused by the respondents' breaches of charterparty was in the aggregate so long as to frustrate the commercial purpose of the charterparty; or (b) that the respondents' breaches of charterparty, whereby the vessel was detained, in addition to causing serious delay, were

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A    deliberate or wilful, then, whether the demurrage provisions are provisions limiting or liquidating the damages payable by the respondents for detaining the vessel beyond her lay days, such provisions will not apply to such breaches.

Fundamental breach is exactly equivalent to repudiation by breach. It is submitted that there is only one " animal," namely, a breach that goes to the root of the contract, whatever it may be
B    termed. Thus, in commercial cases it is usually called " deviation," whilst in the more recent cases in the law of contract it is called " fundamental breach."

As to the authorities, the early cases were decided on a principle which may be termed that of constructive causation. Thus, in *Davis* v. *Garrett* [8] there was an exceptions clause relating
C    to usual perils of the sea. The case proceeded on the basis that there was a separate cause of action for deviation and that it was unnecessary for the plaintiff to show affirmatively that the loss there was occasioned by the tempest which arose on the deviated route but rather that it was for the defendant to show that the loss would still have occurred if the vessel had kept to the route con-
D    templated by the charterparty: see also *Scaramanga* v. *Stamp* [9]; *Lilley* v. *Doubleday* [10]; *Leduc & Co.* v. *Ward*. [11]  By the time of the decision in *Balian & Sons* v. *Joly, Victoria & Co. Ltd*. [12] however, there has been a shift in emphasis. The doctrine of constructive causation has gone and now it is stated that exceptions clauses do not apply to the different voyage; that is, once there has been a
E    fundamental departure from the terms of the original contract, a different contract arises: *Mallett* v. *Great Eastern Railway Co*. [13]; *Joseph Thorley Ltd.* v. *Orchis Steamship Co. Ltd*., [14] deviation " goes to the root of the contract," *per* Collins, M.R. [14]; *International Guano en Superphosphaatwerken* v. *MacAndrew (Robert) & Co*. [15]; *Gunyon* v. *South Eastern and Chatham Railway Com-*
F    *panies' Managing Committee*. [16]

*Morrison (James) & Co.* v. *Shaw, Savill and Albion Co. Ltd*. [17] is the highwater mark of the view that a shipowner whose vessel has deviated has no protection at all. It is doubtful whether all the reasoning in that case [17] is consistent with subsequent decisions

G

8 (1830) 6 Bing. 716.
9 (1880) 5 C.P.D. 295, C.A.
10 (1881) 7 Q.B.D. 510.
11 (1888) 20 Q.B.D. 475; 4 T.L.R. 313, C.A.
12 (1890) 6 T.L.R. 345, C.A.
13 [1899] 1 Q.B. 309; 15 T.L.R. 137, D.C.

14 [1907] 1 K.B. 660, 667; 23 T.L.R. 338, C.A.
15 [1909] 2 K.B. 360; 25 T.L.R. 529.
16 [1915] 2 K.B. 370; 31 T.L.R. 344, D.C.
17 [1916] 2 K.B. 783; 32 T.L.R. 712, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale
———

A  of this House. *The Cap Palos* [18] is a very important decision in the development of the doctrine of fundamental breach. Particular attention is drawn to the judgment of Atkin L.J. in his observations on repudiation. In *London & North Western Railway Co.* v. *Neilson* [19] this House considered the principle of fundamental breach to be one of construction and the observations of Scrutton

B  L.J. in *Gibaud* v. *Great Eastern Railway Co.* [20] on the way the principle proceeded originally were approved. The principle of fundamental breach was applied to a contract for the sale of goods in *Pollock & Co.* v. *Macrae* [21] which shows that a whole series of defects may add up to something which amounts to the goods delivered being quite different from what was contracted for.

C  Similarly a whole series of delays, as here, might lead to a situation where what is performed over two years is not what was contracted for and, therefore, the demurrage clause does not apply at all to any of the delay.

*Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.* [22] is a landmark in the development of this branch of the law. In both the

D  speeches of Lord Atkin and Lord Wright deviation is equated with fundamental breach. Further, Lord Wright equates both deviation and fundamental breach with repudiation. This brings the doctrine of deviation as previously established into line with the general law of contract and equates deviation with fundamental breach in any contract and with repudiation in any contract. The

E  effect of the decision was thus stated by Devlin J. in *Alexander* v. *Railway Executive* [23]:

" Where there has been a breach of a fundamental term of a contract giving the other party the right to rescind it, then, unless and until, with full knowledge of all the facts, he elects to affirm the contract and not to rescind it, the special

F  terms of the contract go and cannot be relied upon by the contracting party."

As to the question of affirmation, this was not a live issue until the *Hain* case, [24] where, on the peculiar facts of that case, there was a deviation at an early stage, for most of the earlier cases involved loss of the goods and therefore the substratum of

G  the contract had gone and there was no contract to affirm. In any

[18] [1921] P. 458; 37 T.L.R. 921, C.A.
[19] [1922] 2 A.C. 263; 38 T.L.R. 653, H.L.
[20] [1921] 2 K.B. 426, 435; 37 T.L.R. 422, C.A.
[21] 1922 S.C. (H.L.) 192, H.L.

[22] (1936) 41 Com.Cas. 350; 52 T.L.R. 617; [1936] 2 All E.R. 597, H.L.
[23] [1951] 2 K.B. 882, 889, 890; [1951] 2 T.L.R. 69; [1951] 2 All E.R. 442.
[24] 41 Com.Cas. 350.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

event, on the appellants' argument here affirmation as such is irrelevant.

    *Karsales (Harrow) Ltd.* v. *Wallis* [25] is the first of a series of cases where the doctrine of fundamental breach was applied to a hire-purchase agreement. If in that case [25] Denning and Parker L.JJ. are stating that as a matter of law it is impossible to contract out of a fundamental breach, then the appellants cannot support it, but it is submitted that it is exceedingly difficult to contract out of a liability which amounts to a fundamental breach. *Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.*[26] shows that a deliberate breach may well be a fundamental breach where if the same breach were not deliberate it would not. Deliberateness is material in determining the scope of an exceptions clause. *Hong-kong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.*[27] is a most informative decision on the categorisation of different terms of a contract and different types of breach. The old distinction between conditions and warranties is no longer tenable. It is authority for the proposition that frustrating delay is repudiatory delay—unreasonable delay is not sufficient. The question there [27] was whether accumulated breaches entitled a charterer to treat the contract as at an end. Here, it is submitted, there was a repudiation when the accumulated delay deprived the appellants of one complete voyage or, alternatively, when the accumulated delay deprived the appellants of a substantial number of contractual voyages.

    In *Yeoman Credit Ltd.* v. *Apps* [28] it was held that because there was a fundamental breach an exceptions clause did not apply and that the defendant was entitled to repudiate. It shows that although the approbation of the contract may prevent a plea that there was a total failure of consideration; it does not prevent a party from contending successfully that the loss in question was not covered by the exceptions clause. *Charterhouse Credit Co. Ltd.* v. *Tolly* [29] expressly decided that affirmation did not affect the right of the injured party to sue for fundamental breach and that a general exemption clause did not prevent a claim for damages. Upjohn L.J. in *Astley Industrial Trust Ltd.* v. *Grimley* [30] correctly

[25] [1956] 1 W.L.R. 936; [1956] 2 All E.R. 866, C.A.
[26] [1959] A.C. 576; [1959] 3 W.L.R. 214; [1959] 3 All E.R. 182, P.C.
[27] [1962] 2 Q.B. 26; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 474, C.A.

[28] [1962] 2 Q.B. 508; [1961] 3 W.L.R. 94; [1961] 2 All E.R. 281, C.A.
[29] [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.
[30] [1963] 1 W.L.R. 584, 597, 598; [1963] 2 All E.R. 33, C.A.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A   states the effects of fundamental breach and reliance is placed on the second effect there stated. Reliance is also placed on the observations of Pearson L.J. in *U. G. S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.*[31] that whether an exceptions clause applies to a fundamental breach is a question of the true construction of the contract.

B   As to proposition (1), the main authority relied upon is the *Hain Steamship* case.[32] As regards proposition (4), reliance is placed on the *Charterhouse Credit* case[33]; *Pollock & Co.* v. *Macrae*[34]; the *U. G. S.* case[35]; and *Wallis, Son & Wells* v. *Pratt & Haynes*.[36]

C   Breaches of contract fall into two categories: those that go to the root of the contract and those that do not. As to the latter, the only remedy is damages and general exceptions clauses will readily apply to them if the words in their ordinary meaning are wide enough to do so. As to the former class, two remedies are available: either to treat the contract as at an end or to treat it as remaining and to sue for damages, and as regards exceptions

D   clauses, they will not apply as a normal rule to breaches of this character. Thus each class has to be looked at from two standpoints: (1) the remedies available; (2) the applicability to them of exceptions clauses in general terms. As to breaches going to the root of the contract, the following statement from Cheshire and Fifoot on Contract, 6th ed. (1964), p. 502, is adopted:

E       " Breach, no matter what form it may take, always entitles the innocent party to maintain an action for damages, but it does not always discharge the contract. The distinction is important, for two results follow from a breach which is sufficiently serious to amount to a discharge: First, the party not in default, in addition to suing for damages, may refuse to perform the obligations that he has undertaken. Secondly,

F       the party at fault cannot rely on any term which has been inserted in the contract for the purpose of protecting him against liability."

        As to proposition (3), the demurrage clause allowing 1,000 dollars a day for delay is on its true construction a clause limiting the liability of the charterers and is not a clause liquidating

G   damages: see *Cellulose Acetate Silk Co.* v. *Widnes Foundry (1925) Ltd.*[37] All the circumstances have to be looked at, including that

---

[31] [1964] 1 Lloyd's Rep. 446, 453, C.A.
[32] 41 Com.Cas. 350.
[33] [1963] 2 Q.B. 683.
[34] 1922 S.C. (H.L.) 192.
[35] [1964] 1 Lloyd's Rep. 446.
[36] [1911] A.C. 394; 27 T.L.R. 431, H.L.
[37] [1933] A.C. 20; 48 T.L.R. 595, H.L.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

of the intention of the parties, before calling a clause a liquidated damages clause. Thus, where in a charterparty there is a clause which puts damages much lower than the parties must know the actual damage would be, then it is a limitation of liability clause and not a liquidated damages clause. In any event, insofar as *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*[38] and *Chandris* v. *Isbrandtsen-Moller Co. Inc.*[39] suggest that liquidated damages clauses, and in particular demurrage clauses, do not apply to breaches which are deviations from, or repudiations or fundamental breaches of, the contract, they were wrongly decided. Further, *Ethel Radcliffe Steamship Co. Ltd.* v. *W. & R. Barnett Ltd.*[40] should be overruled on the questions of repudiatory delay and deliberateness.

To the question whether there is any limit to the delay for which charterers can excuse themselves at the cost of paying demurrage only, the answer is that there are two limits: (1) frustrating delay whether deliberate or not; (2) deliberate delay whether frustrating or not. Both limits are questions of construction.

As to (1), frustrating delay, it is necessary to construe the expressions "if longer detained" in clauses 3 and 8 of the charter to ascertain whether it includes detention of the vessel for so long as to frustrate the charterparty. This has to be considered on two hypotheses: (a) that the demurrage provisions are limitations of liability provisions; (b) that they are liquidated damages provisions. So far as ending the contract is concerned, the effect of frustrating delay is well established. If neither party is at fault it determines the contract automatically. Neither has an option. If one party is at fault, the other has an option to treat the contract as at an end or as still subsisting and to sue for damages. The reason is because such delay makes the contract into something different from what was originally contemplated. If frustrating delay occurs ex hypothesi a demurrage clause cannot apply to it, for this is a clause dealing with damages for delay as contemplated by the parties.

There is in principle no valid ground for differentiating between exceptions clauses, including clauses limiting liability, on the one hand, and clauses providing for payment of liquidated damages on the other. As to limiting liability clauses, all the authorities support the appellants' argument: see especially *Brandt* v. *Liverpool,*

[38] [1917] 2 K.B. 193, C.A.
[39] [1951] 1 K.B. 240; 66 T.L.R. (Pt. 1) 971; [1950] 1 All E.R. 768.
[40] (1926) 31 Com.Cas. 222; 42 T.L.R. 385; 24 Ll.L.R. 277, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A *Brazil and River Plate Steam Navigation Co.*[41] on fundamental breach by delay.

As to the expression " if longer detained," if the respondents are relying on this phrase in clauses 3 and 8 in respect of both repudiatory and non-repudiatory delay, then it is for them to show that it applies on the contra preferentem doctrine.

B (2) As regards deliberate delay and the question whether on the true construction of the charterparty the expression " if longer detained " in clauses 3 and 8 includes detention resulting from a deliberate breach by the charterers themselves of the demurrage provisions, on the footing that they are provisions limiting liability there is weighty authority that they would not apply to a deliberate

C breach: see *Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.*[42] Where general words are used an exception will not be construed as covering deliberate acts. The reason for that is based on the presumed intention of the parties.

If the demurrage clause is to be considered a liquidated damages provision the position is more difficult, mainly because of the

D dearth of authority on the question. On principle it is difficult to see any distinction between liquidated damages clauses and exceptions clauses. The only authority is the *Ethel Radcliffe Steamship* case.[43] The point is clearly raised in the argument of Mr. Dunlop but it is submitted that it was dealt with in a wholly unsatisfactory way by the Court of Appeal. If it be held that

E that decision[43] runs contrary to the appellants' argument, the House is invited to hold that it was wrongly decided. It is a salutary principle that parties are not to be deemed to be excluding their liability for deliberate breaches of contract without stating so in the clearest possible terms. Where general words have to be construed they should be construed in a manner consonant with

F the true nature and purpose of the contract.

Effect can be given to the appellants' contention by the House giving a qualified answer to questions (A) (i) and (ii) of the consultative case, such as " yes, if the detention of the vessel was a deviation from, or a repudiation or fundamental breach of, the charterparty. Otherwise, no." It will then be for the arbitrators

G to find the facts material to the question whether the detention was of such a character or not, and to determine such question.

[Reference was also made to *United States Shipping Board and Bunge y Born*[44]; *United States Shipping Board* v. *Bunge y*

[41] [1924] 1 K.B. 575, C.A.                    [43] 31 Com.Cas. 222.
[42] [1959] A.C. 576.                    [44] (1924) 18 Ll.L.R. 422.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

*Born* [45]; *Cunard Steamship Co.* v. *Buerger* [46]; *Stag Line Ltd.* v. *Foscolo, Mango & Co.* [47]; *Bontex Knitting Works Ltd.* v. *St. John's Garage* [48]; *Swan Hunter and Wigham Richardson Ltd.* v. *France Fenwick Tyne & Wear Co. Ltd., The Albion* [49]; *Smeaton Hanscomb & Co.* v. *Sassoon I. Setty, Son & Co. (No.* 1) [50]; *Glynn* v. *Margetson & Co.* [51]; *Hollins* v. *J. Davy Ltd.* [52]; *John Carter (Fine Worsteds) Ltd.* v. *Hanson Haulage (Leeds) Ltd.* [53]; *Jackson* v. *Union Marine Insurance Co.* [54]; *Taubman* v. *Pacific Steam Navigation Co.* [55]]

*J. F. Donaldson Q.C.* and *C. S. Staughton* for the respondents. The law of England permits parties to a contract to provide what the measure of damages shall be in the event of breach of contract: *Dunlop Pneumatic Tyre Co. Ltd.* v. *New Garage Co.*, [56] *per* Lord Parker of Waddington and Lord Parmoor. The law of England also permits parties to limit their liability for breach of contract with certain statutory exceptions, for example, the Carriage of Goods by Sea Act, 1924. These two types of agreement are essentially different. Under an agreed measure of damages provision all that the plaintiff need prove is a breach, but in the case of a limited measure of damage provision the plaintiff must prove every penny of his damage to the limit. If the parties agree damages which in the circumstances turn out to be too low, that does not make the clause a limitation of damage provision, for that would be to change the nature of the clause retrospectively. The clause must be construed as at the date of the contract.

It may be asked: (a) what is covered by the term " remuneration " which a shipowner receives under a single or consecutive voyages charterparty? (b) what loss is suffered by a shipowner if his ship is detained during loading or discharging?

As to (a), it covers four matters: (i) The ballast voyage to the loading port. (ii) The permitted period in port for loading—the loading lay time. (iii) The laden voyage. (iv) The allowed period in port for discharging—the discharging lay time.

[45] (1924) 20 Ll.L.R. 73, C.A.; (1925) 31 Com.Cas. 118; 42 T.L.R. 174; 23 Ll.L.R. 257, H.L.
[46] [1927] A.C. 1; 42 T.L.R. 653, H.L.
[47] [1932] A.C. 328; 48 T.L.R. 127, H.L.
[48] (1943) 60 T.L.R. 44, 253, C.A.
[49] [1953] 1 W.L.R. 1026; [1953] 2 All E.R. 679, C.A.
[50] [1953] 1 W.L.R. 1468; [1953] 2 All E.R. 1471.
[51] [1893] A.C. 351; 9 T.L.R. 437, H.L.
[52] [1963] 1 Q.B. 844; [1963] 2 W.L.R. 201; [1963] 1 All E.R. 570.
[53] [1965] 2 Q.B. 495; [1965] 2 W.L.R. 553; [1965] 1 All E.R. 113, C.A.
[54] (1874) L.R. 10 C.P. 125.
[55] (1872) 26 L.T. 704.
[56] [1915] A.C. 79, 97, 100; 30 T.L.R. 625, H.L.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
___

A     As regards (b), the shipowner (i) is deprived of the opportunity of using the ship to earn a profit under the next engagement, which may be another charterparty or another voyage under the same charterparty, and (ii) he incurs expenditure on port dues, the crew's wages and on fuel bills during the period of detention. It is difficult for either party to estimate such loss, although it is easier to do so on a consecutive voyages charterparty.

B     On looking at the matter as a whole in the light of the above, what the parties have done here is a classic example of the adoption of a liquidated damages clause. That is what a demurrage clause is considered in law to be; it is not a limiting of liability clause: see Scrutton on Charterparties, 17th ed., p. 305. This was the view not only of Scrutton L.J. himself but also of subsequent editors, Lord Porter, McKinnon L.J., McNair J. and Mocatta J. It is thus very late in the day to challenge the nature of a demurrage clause. The above view also has the authority of Devlin J. in *Chandris* v. *Isbrandtsen-Moller Co. Inc.*[57]

D     The appellants' argument can be summarised as follows: (1) there were here two contractual obligations, only one of which was covered by the demurrage provisions. (2) There was only one obligation but two types of damage, only one of which was covered. (3) The demurrage provisions of the charterparty have no application to delay which is serious and deliberate or to delay which constitutes a fundamental breach.

E     (1) Were the charterers in breach of two obligations? It is common ground that the cargo was to be loaded and discharged at agreed rates. But was there a further independent obligation on the charterers so to act as to enable the owners to perform X voyages within a period of two years? X is the number of voyages which the owners could perform if the charterers complied with clauses 3, 8 and 22. The incalculability of X becomes apparent when it is realised that if on the first voyage, after delay, there is a fast passage the vessel might well arrive at the other side of the Atlantic at the same time as if there had been no delay in port but the vessel had been slowed down by storms.

G     By the express terms of this charterparty there is a clear obligation on the charterers to load and discharge at a particular rate and there is also a clear obligation on the owners to perform their part of the contract. Even if the charterparty is construed so as to give rise to the above additional obligation, the appellants

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

are still only entitled to the demurrage rate: see *Inverkip Steam-ship Co. Ltd.* v. *Bunge & Co.,*[58] *per* Scrutton L.J.; Scrutton on Charterparties, 17th ed., p. 306.

As regards an implied obligation, this will only be presumed when it is necessary in order to give business efficacy to the contract: see *The Moorcock,*[59] *per* Bowen L.J. In the present case there are four reasons for rejecting an implied term to give effect to the appellants' contention: (a) There is no business necessity for implying such a term. If the demurrage rate is correctly calculated it will cover the situation. (b) The parties could have provided that the number of days on demurrage should be limited but they did not choose so to do. (c) Alternatively, the parties could have made the charterers' obligation to be to employ the vessel for two years for X consecutive voyages but they did not do so. (d) The odd consequences which result from the implied term. Mocatta J. listed two of them: in the first place, it would be extremely difficult for charterers to know when they were in breach of it. Secondly, the provisions as to demurrage in clauses 3 and 8, which by reason of clause 23 must be read as applying to any exceeding of the fixed times for loading and discharging on each voyage during the charter period, would have an unusually restricted and almost capricious application. A third consequence might well be that if the delay exceeded one voyage and the demurrage rate was high, the charterers would be endeavouring to get back the demurrage and claiming damages for detention. It is impossible to formulate the term with accuracy and simplicity.

(2) It is said that there were here two types of damage. This contention is based on *Aktieselskabet Reidar* v. *Arcos Ltd.*[60] The vessel failed to load within the lay days. She could not earn freight whilst detained and she incurred expenses whilst she was lying in port. When the detention ended, the vessel was damaged in her freight carrying capacity, for when she sailed she could only load in order to comply with the law down to her winter marks. It was as though she was notionally deprived of one of her holds. In the present case, however, the damage is entirely different. If it be right that Bankes L.J. in *Reidar* v. *Arcos*[61] thought that there was only one obligation giving rise to two heads of damage, it was not a point apparently taken by counsel.[61] It is submitted that

[58] [1917] 2 K.B. 193, 203.
[59] (1889) 14 P.D. 64, 68, C.A.
[60] [1927] 1 K.B. 352; 42 T.L.R. 737, C.A.
[61] (1926) 25 Ll.L.R. 30, 31, 513, 514.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

**A** Bankes L.J. was wrong. The true view is that there these were two independent obligations.

(3) *The appellants' additional submission.* The steps in this argument are: (i) exceptions clauses do not apply to fundamental breach—proposition (2). (ii) Clauses agreeing damages are exceptions clauses or akin thereto—proposition (3). (iii) Delay will **B** constitute a fundamental breach of contract, if (a) it frustrates the commercial purpose of the contract, or (b) it is serious but not frustrating and is deliberate or wilful and in such event the demurrage clause will not apply—propositions (5) and (6). (iv) In ascertaining whether there has been a fundamental or serious breach of contract by reason of delay it is permissible to add together **C** separate periods of delay—proposition (8). (v) Whether or not the contract has been affirmed is irrelevant—proposition (4). (vi) It will be open to the arbitrators to find that the delays were serious or frustrating—proposition (8). (vii) It is open to the House to answer questions of law which are not stated by the arbitrators in the case, namely, whether on facts not found or pleaded the **D** respondents are liable in damages to the appellants.

As regards (1), the "new equity," the appellants have resiled from the position that there is a rule of law to this effect: but see *Bontex Knitting Works Ltd.* v. *St. John's Garage,*[62] *per* Lewis J.; *Smeaton Hanscomb & Co.* v. *Sassoon I. Setty, Son & Co. (No. 1),*[63] *per* Devlin J.; *Karsales (Harrow) Ltd.* v. *Wallis,*[64] **E** *per* Denning and Parker L.JJ.; *Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.,*[65] where the same idea was expressed, although there it was tied up with deliberateness; *Yeoman Credit Ltd.* v. *Apps,*[66] *per* Harman L.J.; *Charterhouse Credit Ltd.* v. *Tolly,*[67] *per* Donovan, Upjohn and Ormerod L.JJ.; *Astley Industrial Trust Ltd.* **F** v. *Grimley*[68]; *U. G. S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.,*[69] *per* Lord Denning M.R. and Harman L.J., contrast the observations of Pearson L.J.[70]; *Philip Boshali* v. *Allied Commercial Exporters Ltd.*[71]

The concession made by the appellants was rightly made in view of *Cunard Steamship Co. Ltd.* v. *Buerger,*[72] where Lord **G** Parmoor clearly contemplated that there could be a properly

---

[62] [1943] 2 All E.R. 690, 695.
[63] [1953] 1 W.L.R. 1468, 1470.
[64] [1956] 1 W.L.R. 936, 940, 943.
[65] [1959] A.C. 576, 588.
[66] [1962] 2 Q.B. 508, 523.
[67] [1963] 2 Q.B. 683, 703, 709, 715.

[68] [1963] 1 W.L.R. 584, 598.
[69] [1964] 1 Lloyd's Rep. 446, 450, 457.
[70] Ibid. 453.
[71] Unreported, 1961, November 14, P.C.
[72] [1927] A.C. 1, 13.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

drafted clause which covered what the appellants term "funda-      A
mental breach": see also *per* Atkin L.J. in *The Cap Palos.*[73]
Accordingly, it is now said that there is a rule of construction that
normally an exceptions clause should be construed as not applying
to a fundamental breach.

There is no category of breach of contract known as "funda-
mental breach" in English law. In determining the rights of      B
parties the courts must apply certain rules of construction and
certain rules of law and all the cases are merely applications of
these rules.

The primary rule of construction is that words are to be given
their normal and natural meaning. In case of doubt, conflict or
ambiguity the following sub-rules are invoked: (i) The main      C
purpose rule. This derives its name from the speech of Lord
Halsbury in *Glynn* v. *Margetson & Co.*[74]

> " looking at the whole of the instrument, and seeing what one
> must regard . . . as its main purpose, one must reject words,
> indeed whole provisions, if they are inconsistent with what
> one assumes to be the main purpose of the contract."      D

It is to be observed: (a) it is a rule of construction; (b) it is to be
applied principally (if not invariably) when there is a conflict
between the printed provisions of a standard form of contract and
the written or typed words inserted therein; (c) it is a rule which
must operate, if at all, when the contract is made. At that moment
the conflict must be apparent, and it must be determined which      E
words or whole provisions are to be struck out and which are
to remain. (ii) The four corners rule. If under a contract of
carriage or bailment the carrier or bailee departs from the agreed
route or uses a place other than that agreed on for storing the
goods, or otherwise exposes the goods to risks quite different from
those contemplated by the contract, he cannot rely on clauses in      F
the contract designed to protect him against liability arising within
the four corners of the contract. This rule has never been applied
to a bailor. (iii) The exceptions clauses rule. Exceptions to liabi-
lity under a contract are construed strictly and therefore if a word
is capable of two meanings the narrow meaning is preferred: see
*per* Devlin J. in *Alexander* v. *Railway Executive.*[75]  (iv) The      G
contra preferentem rule. An instrument is construed more forcibly
against the party putting forward the document. This has no
application here.

Two other relevant rules of law are the repudiation rule and

73 [1921] P. 458, 471, 472.          75 [1951] 2 K.B. 882, 893.
74 [1893] A.C. 351, 357.

H. L. (E.)
1966
—
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
——

the renunciation rule. These are quite different and must be kept distinct. The repudiation rule: (i) If one party to a contract commits an actual as opposed to an anticipatory breach of contract of a sufficiently serious character, the other party acquires a right either to disaffirm the contract or to affirm it. If the alleged contract breaker is protected by an exceptions clause, there is no breach. (ii) This right arises irrespective of whether the innocent party suffers damage. (iii) If the innocent party suffers damage he can recover damages however he elects. (iv) If he disaffirms the contract the contract is at an end and any further contractual relations with the other party depend on another contract express or implied. (v) If he affirms the contract he is bound by all its terms. (vi) Affirmation may be express or implied and the sole peculiarity of the marine deviation cases is that lapse of time does not usually give rise to an inference of affirmation because of the lack of knowledge. (vii) Affirmation may be accompanied by implied variation.

A classic example of the repudiation rule is *Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.*[76] It is true that Lord Atkin, Lord Wright and Lord Maughan, who delivered the opinions in that case, all refer to " fundamental breach " but if the case is read as a whole it is plain that the purport of the decision was that the breaches complained of were sufficiently serious to give rise to a right to repudiate and not that the circumstances gave rise to some special category of breach which had its own rules.

The renunciation rule. If one party to a contract so conducts himself as to evince an intention not to be bound by, or, the inability to perform the contract thereafter, the other party then acquires an option either to ignore this conduct or to treat it as a repudiatory breach. If he ignores it, he is entitled to continue to insist on performance, for " an unaccepted repudiation is a thing writ in water ": *Howard* v. *Pickford Tool Co. Ltd.*,[77] *per* Asquith L.J., and see also *Heyman* v. *Darwins Ltd.*,[78] *per* Viscount Simon. If he treats it as a repudiatory breach, the contract is at an end and he can sue for its breach. Devlin J. in *Universal Cargo Carriers Corporation* v. *Citati*[79] added the rider that the forecast breach must be of such a character that if it occurred it *would be* a repudiatory breach.

It has been said that deliberateness is a relevant factor. It

76 41 Com.Cas. 350, 357, 362, 371.
77 [1951] 1 K.B. 417, 421, C.A.
78 [1942] A.C. 356, 361; 58 T.L.R.
169; [1942] 1 All E.R. 337, H.L.

79 [1957] 2 Q.B. 401; [1957] 2
W.L.R. 713; [1957] 2 All E.R. 70.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A

is submitted that it may give to a minor actual breach the charac-
ter of a renunciation. If that happens the innocent party may
treat the contract as at an end, but if he does not the minor
actual breach remains and no amount of deliberateness will change
its character. But in the construction of an exceptions clause one
can have words which except an accidental but not a deliberate
breach: see *Alexander* v. *Railway Executive* [80] and *Hollins* v.
*J. Davy Ltd.* [81]

B

All the cases which have been cited, apart from the " new
equity " cases, are applications of the above two rules of law,
and the " new equity " cases can also be justified on the basis
that they are of a repudiatory nature.

As to the rule of construction, none of the sub-rules are
applicable here.

C

There is nothing in the decision in *Cellulose Acetate Silk Co.*
v. *Widnes Foundry (1925) Ltd.* [82] that in any way establishes that
an agreed measure of damages provision is at all akin to an excep-
tions clause or a clause limiting liability.

Applying the above rules to the present charterparty, if what
occurred here was a repudiatory breach, then the respondents
concede that the appellants had the option of sailing away and
if they had done so of suing for damages at common law. If,
however, the breach was not accepted as putting an end to the
charterparty, then the demurrage clause applies: *Ethel Radcliffe
Steamship Co. Ltd.* v. *W. & R. Barnett Ltd.,* [83] *per* Bankes and
Warrington L.JJ. *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.* [84]
is authority for the proposition that a demurrage clause applies to
repudiatory delay and in *Chandris* v. *Isbrandtsen-Moller Co. Inc.* [85]
Devlin J. found on the facts there that there was a repudiatory
breach and held expressly that the demurrage clause applied. The
principle laid down in the *Inverkip Steamship* case [86] and the
*Ethel Radcliffe Steamship* case [87] must have been applied to
thousands of charterparties. The principles laid down in com-
mercial cases should not be disturbed unless it is shown that they
are plainly wrong: *Atlantic Shipping and Trading Co.* v. *Dreyfus
(L.) & Co.,* [88] *per* Lord Dunedin.

D

E

F

As to delay which is serious and deliberately caused, the
respondents have conceded that deliberateness is relevant in rela-
tion to renunciation, but a renunciatory breach is nothing unless

G

80 [1951] 2 K.B. 882, 893.
81 [1963] 1 Q.B. 844, 854.
82 [1933] A.C. 20.
83 31 Com.Cas. 222, 230, 233.
84 [1917] 2 K.B. 193.
85 [1951] 1 K.B. 240.
86 [1917] 2 K.B. 193.
87 31 Com.Cas. 222.
88 [1922] 2 A.C. 250, 257.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

it is accepted, and here there was no acceptance and, therefore, even if the delay was deliberate, it is irrelevant to the issues to be determined.

As to the aggregation of separate periods of delay, this cannot be done here, for each period of loading and discharging is special to each particular voyage. *Pollock & Co.* v. *MacCrae* [89] was relied on but that case is plainly distinguishable, for there there were *concurrent* breaches all operating contemporaneously.

As to whether it is open to the arbitrators to find that the delays were serious or frustrating, it is possible for the arbitrators to find that the delays were serious but not to find that they were frustrating, bearing in mind that the total demurrage days were 154 out of a total of 511. This is, in effect, a time charter for present purposes and a two-year time charter has never hitherto been held to have been frustrated by a one-third delay of the total time of the charter.

Finally, it is submitted that it is not open to this House to answer the arbitrators' question (A) (i) as the appellants now contend, for so to do would necessitate the redrafting of the question. Similarly, question (A) (ii) cannot be answered on the ground that the delay was serious, for that matter is not raised by the question.

[Reference was also made to *Davis Contractors Ltd.* v. *Fareham Urban District Council.*[90]]

*C. S. Staughton* following. In *Western Steamship Co.* v. *Amaral Sutherland & Co.*[91] counsel for the plaintiffs in reply to a question by Bray J. contended, as do the appellants here, that a demurrage clause does not apply to a repudiatory breach and this argument was rejected by Bray J. in his judgment. It is plain authority for the contentions of the respondents here. Further, that decision[91] was approved by all three members of the Court of Appeal in *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*[92]

*H. V. Brandon* Q.C. in reply. It is implicit in the case for the respondents that they were entitled to detain the ship for an unlimited period under this charterparty upon payment of demurrage and that if they had done so that the appellants would not have been entitled either to bring the contract to an end or to claim damages apart from demurrage. If that view be rejected, as the

[89] 1922 S.C. (H.L.) 192.
[90] [1956] A.C. 696; [1956] 3 W.L.R. 37; [1956] 2 All E.R. 145, H.L.
[91] [1913] 3 K.B. 366, 368; 29 T.L.R. 660.
[92] [1917] 2 K.B. 193.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale
—

appellants submit it should be, then it is necessary to determine    A
the limit and the juridical basis of it.

To prevent an absurd situation developing in a business trans-
action it is necessary to imply a term that there will not be deliber-
ate delay. It is said that such a term could have been expressed
but that argument could be used against every clause that the
courts have ever implied.                                             B

As to the concept of two types of damage, *Aktieselskabet
Reidar* v. *Arcos Ltd.*[93] is a clear example of a case where two
types of damage flowed from the same act, one of which was
covered by the demurrage clause and the other was not, although
both were the result of the detention of the vessel. In the present
case it was as if the ship had been deprived of the use of two     C
of her holds.

As to fundamental breach, the following questions arise: (i)
could any breach of the lay day provisions be repudiatory? (ii) If
so, what breaches? (iii) Assuming that there could be repudiatory
breaches, would the demurrage provisions apply to them? (iv) On
the same assumption, is it open to the arbitrators to find that the   D
alleged breaches were repudiatory?

As to (i), it is impossible to contend that the ship could have
been detained in port for the whole two years on mere payment
of $1,000 a day, because, for example, the charterers had obtained
another vessel at a lower rate of freight. The answer is therefore
in the affirmative. As to (ii), the answer is, those that go to the   E
root of the contract. That includes (a) breaches of the lay day pro-
visions such as delay of so prolonged a character as to alter the
nature of the contract, which would as a matter of law be held to
go to the root of the contract. In this connection it is permissible
to aggregate successive separate periods of delay: see *Hongkong
Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.*,[94] per Upjohn   F
L.J. It also includes (b) deliberate breaches which produce serious
delay. Motivation is one element, together with the length of the
delay and the effect thereof on the other party in determining
whether the breach is repudiatory. If there is no deliberateness,
then the delay has to be frustrating to be repudiatory. The answer
to (iii) is in the negative. As to (iv), there is nothing to prevent the   G
arbitrators from finding that the alleged breaches were repudiatory.

As to the contention that as *a matter of law* a demurrage clause
is a liquidated damages clause, that does not follow; it is always
a question of construction. In a charterparty a demurrage clause

[93] [1927] 1 K.B. 352.                    [94] [1962] 2 Q.B. 26, 64, 65.

H. L. (E.)

1966

───

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

───

A　is prima facie a liquidated damages clause, but a particular demurrage clause has to be construed in relation to the particular circumstances of the particular case.

The *Western Steamship Co.* case [95] is of little assistance, for it was decided when the criterion was reasonable delay, but that yardstick has now gone.

B　It is to be observed that no case has been cited where a court (i) has found as a fact that there has been frustrating delay and therefore a repudiatory breach and then (ii) has found as a matter of law that a demurrage clause applies after that frustrating delay has occurred.

As to *Chandris* v. *Isbrandtsen-Moller Co. Inc.*,[96] which was C　much relied on, it is submitted that it was wrongly decided, alternatively that it is distinguishable on the grounds that it was not a case of repudiatory delay; the period of delay was not abnormal, although large. It was in fact a case of a non-repudiatory delay caused by a repudiatory delay at an earlier stage. If it be held that the decision is not so distinguishable, then it is submitted that D　the reasoning of Devlin J. can only be affirmed by holding that *Charterhouse Credit Co. Ltd.* v. *Tolly* [97] was wrongly decided.

As to the reliance on the doctrine of stare decisis, this is not applicable, for the principle advocated by the respondents has not found favour over the years. This is exemplified by the fact that, if it had, note (f) on p. 306 of Scrutton on Charterparties, 17th ed., E　would be unnecessary. [Reference was also made to *Davis Contractors Ltd.* v. *Fareham Urban District Council* [98]; *Hardwick Game Farm* v. *Suffolk Agricultural Poultry Producers Association* [99]; *Empresa Maritime de Transportes S.A. Plaintiff* v. *A. T. Massey Coal Company et al. Defendants*.[100]]

F　Their Lordships took time for consideration.

March 31, 1966. VISCOUNT DILHORNE. My Lords, this appeal is from a decision of the Court of Appeal (Sellers, Harman and Diplock L.JJ.) dismissing an appeal by the appellants from a decision by Mocatta J. on a consultative case in relation to a G　dispute between the parties which has arisen in connection with the charter of a vessel from the appellants.

On December 21, 1956, the respondents agreed to charter a

---

[95] [1913] 3 K.B. 366.
[96] [1951] 1 K.B. 240.
[97] [1963] 2 Q.B. 683.
[98] [1956] A.C. 696.

[99] [1966] 1 W.L.R. 287; [1966] 1 All E.R. 309, C.A.
[100] 1965 A.M.C. 517 (U.S.A.).

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Viscount
Dilhorne

vessel from the appellants for the carriage of coal from the United States to Europe. That charter was to remain in force " for a total of two years consecutive voyages " (clause 23 of the charterparty). The vessel had " with all possible dispatch " to " sail and proceed " to a port in the United States and there load on each voyage a cargo of coal " and being so loaded, shall therewith proceed with all possible dispatch " to a port in Europe (clause 1). She had to be loaded at a specified rate per running day and, if she was detained beyond the loading time, the charterers were to pay $1,000 a day demurrage. In computing the loading time, detention of the vessel in consequence of the happening of certain events was to be disregarded (clause 3). Similarly if she was detained longer than was required to unload her at the stipulated rate per day and that was not due to strikes, etc., or other causes beyond the control of the charterers, the charterers who were to discharge the cargo were to pay demurrage at the rate of $1,000 a day.

On September 16, 1957, the appellants regarded themselves as entitled to treat the charterparty as repudiated by reason of the respondents' delays in loading and discharging the vessel. This was not accepted by the respondents and on October 8, 1957, it was agreed, without prejudice to this dispute, that from thenceforward the charterparty would be carried out.

Between October 16, 1957, and the end of the charter the vessel made eight round voyages. The appellants contended that she ought reasonably to have completed each round voyage in 30 or 37 days including loading and unloading. On this basis eight voyages would have taken 240 or 296 days. In fact they took 511 and the difference, the appellants alleged, was due to delays in loading and unloading for which the respondents were responsible. The result was, so the appellants alleged, that the vessel did not make as many voyages as she should have done with the result that they were deprived of the freights they would have earned on 9 or alternatively 6 voyages. On this basis, after giving credit for the demurrage payments received by them, they claimed $772,866·92 and alternatively $476,490·92 from the respondents.

This claim went to arbitration and, at the request of the appellants, the arbitrators stated the following questions in the form of a consultative case :

"(A) (i) The claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents having failed to load and discharge the vessel within the

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

Viscount
Dilhorne

laydays whereby the charterparty was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

"(ii) Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel: (a) With such ordinary dispatch as the circumstances permitted, or (b) within the laydays, the claimants are entitled to recover any damages suffered by the claimants through the charterparty having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents.

" (B) If the answer to any of the questions under (' A ') be ' Yes,' the payment by the respondents and acceptance by the claimants of demurrage in respect of those periods when the laydays were exceeded preclude the claimants from recovering any damages otherwise recoverable by them in accordance with such answer or answers."

Before Mocatta J. it was agreed that he should confine his decision to answering questions A (i) and (ii) and that the words " or voyage time " at the end of A (i) added nothing.

Mr. MacCrindle for the appellants submitted to your Lordships, as he had in the courts below, that the appellants had under the charterparty a contractual right to the number of voyages which would be performed if both parties complied with their obligations; and, secondly, that the appellants' claim for the loss of freight on the voyages which should have been performed was not limited to the demurrage payments.

In my opinion, no such contractual right is to be implied either on the construction of the charterparty or by operation of law. The charterparty might have provided that not less than a certain number of voyages should be accomplished. It did not do so.

In support of their second contention the appellants relied on *Aktieselskabet Reidar* v. *Arcos Ltd.*[1] and, in particular, on the judgment of Bankes L.J. Although he came to the same conclusion as Atkin L.J. and Sargant L.J. he did so on somewhat different grounds. I do not consider that this decision affords any basis for the contention that, where demurrage provisions apply, it is possible to obtain more than the demurrage payments for the detention of a vessel.

On these issues I agree with, and do not think that it is necessary to add to, the judgments of the Court of Appeal and Mocatta J.

If in this case the appellants had been able to establish a breach

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

Viscount
Dilhorne

A

of the charterparty other than by the detention of the vessel, then *Aktieselskabet Reidar* v. *Arcos Ltd.*[1] is authority for saying that the damages obtainable would not be limited to the demurrage payments. In my opinion, they have not done so.

Towards the conclusion of his argument, Mr. MacCrindle sought to put forward a new argument, not advanced in the courts below nor in the appellants' case, to the effect that if the delays for which the respondents were responsible were such as to entitle the appellants to treat the charterparty as repudiated, the demurrage provisions did not apply and they were entitled to recover the full loss they had suffered.

B

While ordinarily this would not be permitted, as the result of refusing to allow it in the present case might be that the question would come before the courts on another consultative case, involving delay and expense, their Lordships decided to allow the argument to be advanced on condition that supplemental cases should be filed, the hearing adjourned and on the appellants undertaking to pay the costs involved.

C

At the resumed hearing Mr. Brandon sought to sustain this contention. He cited a large number of cases in which it had been held that where there had been deviation of a vessel, the owners of the ship were not entitled to rely on provisions in a charterparty or bill of lading protecting them from liability or limiting their liability for the loss of the kind that had occurred. It is not, I think, necessary to refer to all the cases cited. The principle is well established.

D

E

In *Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.*[2] Lord Atkin, with whose opinions Lord Thankerton and Lord Macmillan agree, said[3]:

"the effect of a deviation upon a contract of carriage by sea has been stated in a variety of cases but not in uniform language . . . Occasionally language has been used which suggests that the occurrence of a deviation automatically displaces the contract, as by the now accepted doctrine does an event which 'frustrates' a contract. In other cases where the effect of deviation upon the exceptions in the contract had to be considered language is used which . . . shows that the sole effect is, as it were, to expunge the exceptions clause, as no longer applying to a voyage which from the beginning of the deviation has ceased to be the contract voyage. I venture to think that the true view is that departure from the voyage

F

G

[1] [1927] 1 K.B. 352; 42 T.L.R.
737, C.A.

[2] (1936) 41 Com.Cas. 350; 52
T.L.R. 617; [1936] 2 All E.R. 597,
H.L.

[3] 41 Com.Cas. 350, 354.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

VISCOUNT
DILHORNE

contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by the contract terms."

He also said [4]:

"If this view be correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract. Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, 'I am not now bound by the contract whether it is expressed in charterparty, bill of lading, or otherwise.' . . . I am satisfied that once he elects to treat the contract as at an end he is not bound by the promise to pay the agreed freight any more than by his other promises. But, on the other hand, as he can elect to treat the contract as ended, so he can elect to treat the contract as subsisting; and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound."

Lord Wright M.R. in the same case said [5]:

"An unjustified deviation is a fundamental breach of a contract of affreightment."

and later [6]:

"But, however fundamental is the condition, it may still be waived by the goods owner. For this purpose the case is like any other breach of a fundamental condition, which constitutes the repudiation of a contract by one party; the other party may elect not to treat the repudiation as being final, but to treat the contract as subsisting, and to that extent may waive the breach, any right to damages being reserved."

See also *Chandris* v. *Isbrandtsen-Moller Co. Inc.,*[7] *per* Devlin J. This House thus treated the deviation cases as coming within the ordinary law of contract.

Mr. Brandon also cited *Mallett* v. *Great Eastern Railway Co.*[8] where goods were sent by a different route from that contracted for and a clause relieving the company of liability was consequently

4 41 Com.Cas. 350, 355.
5 Ibid. 362.
6 Ibid. 363.

7 [1951] 1 K.B. 240, 248, 249; 66 T.L.R. (Pt. I) 971; [1950] 1 All E.R. 768.
8 [1899] 1 Q.B. 309; 15 T.L.R. 137, D.C.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

VISCOUNT
DILHORNE

held not to apply; *Gunyon* v. *South Eastern and Chatham Railway Companies' Managing Committee* [9] where fruit was carried by goods train when the contract was for it to go by passenger train and so an exemption clause was held not to apply; and *Lilley* v. *Doubleday* [10] where goods were destroyed by fire in a warehouse other than that contracted for and an exemption clause was held not to apply.

These are all cases which illustrate the principle that where there has been a fundamental breach—and deviation is a fundamental breach—or a breach of a fundamental term, the party guilty of the breach cannot successfully rely on provisions in the contract designed for his protection in the performance of the contract.

In a number of cases (e.g., *Smeaton Hanscomb & Co.* v. *Sassoon I. Setty, Son & Co.,* (*No. I*) [11]; *Karsales (Harrow) Ltd.* v. *Wallis* [12]; *Yeoman Credit Ltd.* v. *Apps* [13]; *Astley Industrial Trust Ltd.* v. *Grimley* [14]; *Charterhouse Credit Co. Ltd.* v. *Tolly* [15]; and *U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.* [16]) there are judicial observations to the effect that exempting clauses, no matter how widely they are drawn, only avail a party when he is carrying out the contract in its essential respects. In my view, it is not right to say that the law prohibits and nullifies a clause exempting or limiting liability for a fundamental breach or breach of a fundamental term. Such a rule of law would involve a restriction on freedom of contract and in the older cases I can find no trace of it.

In each case not only have the terms and scope of the exempting clause to be considered but also the contract as a whole. In the cases I have cited above, I think that, on construction of the contract as a whole, it is apparent that the exempting clauses were not intended to give exemption from the consequences of the fundamental breach. Any provision that does so must be expressed in clear and unambiguous terms (see *Cunard Steamship Co.* v. *Buerger*, [17] *per* Lord Parmoor and *London & North Western Railway Co.* v. *Neilson*, [18] *per* Lord Dunedin). It must be apparent

[9] [1915] 2 K.B. 370; 31 T.L.R. 344, D.C.
[10] (1881) 7 Q.B.D. 510.
[11] [1953] 1 W.L.R. 1468; [1953] 2 All E.R. 1471.
[12] [1956] 1 W.L.R. 936; [1956] 2 All E.R. 866, C.A.
[13] [1962] 2 Q.B. 508; [1961] 3 W.L.R. 94; [1961] 2 All E.R. 281, C.A.
[14] [1963] 1 W.L.R. 584; [1963] 2 All E.R. 33, C.A.
[15] [1963] 2 Q.B. 683; [1963] 2 W.L.R. 1168; [1963] 2 All E.R. 432, C.A.
[16] [1964] 1 Lloyd's Rep. 446, C.A.
[17] [1927] A.C. 1, 13; 42 T.L.R. 653, H.L.
[18] [1922] 2 A.C. 263, 272; 38 T.L.R. 653, H.L.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

Viscount
Dilhorne

that such is its purpose and intention. In *Glynn* v. *Margetson &
Co.*[19] the contract was for the carriage of oranges from Malaga
to Liverpool and the charterparty contained a provision giving
the vessel liberty to go to any port not on the route from Malaga
to Liverpool. As a result of the vessel going to a port not on the
route from Malaga to Liverpool the oranges were damaged. In
that case[19] Lord Herschell L.C. said[20] that the main object and
intent of the charterparty was the voyage so agreed on and " it
would be to defeat what is the manifest object and intention of
such a contract to hold that it was entered into with a power to
the shipowner to proceed anywhere."

I think that the legal position was most clearly and accurately
stated by Pearson L.J. in *U.G.S. Finance Ltd.*[21] He said:

> " As to the question of ' fundamental breach,' I think there
> is a rule of construction that normally an exception or
> exclusion clause or similar provision in a contract should be
> construed as not applying to a situation created by a funda-
> mental breach of contract. This is not an independent rule of
> law imposed by the court on the parties willy-nilly in disregard
> of their contractual intention. On the contrary it is a rule of
> construction based on the presumed intention of the contract-
> ing parties. It involves the implication of a term to give to the
> contract that business efficacy which the parties as reasonable
> men must have intended it to have. This rule of construction
> is not new in principle but it has become prominent in recent
> years in consequence of the tendency to have standard forms
> of contract containing exceptions clauses drawn in extrava-
> gantly wide terms, which would produce absurd results if
> applied literally."

Although the terms are sometimes used as if their meaning was
the same, a fundamental breach differs from a breach of a funda-
mental term. In *Smeaton Hanscomb* v. *Sassoon I. Setty, Son &
Co. (No. 1)*,[22] Devlin J. said that he thought a fundamental term
was " something which underlies the whole contract so that, if it is
not complied with, the performance becomes something totally
different from that which the contract contemplates."

In relation to a fundamental breach, one has to have regard
to the character of the breach and determine whether in conse-
quence of it the performance of the contract becomes something
totally different from that which the contract contemplates.

The provisions as to demurrage in the charterparty indicate that

---

[19] [1893] A.C. 351; 9 T.L.R.
437, H.L.
[20] [1893] A.C. 351, 355.
[21] [1964] 1 Lloyd's Rep. 446, 453.
[22] [1953] 1 W.L.R. 1468, 1470.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

VISCOUNT
DILHORNE

it was appreciated that the respondents might be in breach of the charterparty by detaining the vessel beyond the laydays and yet carry out the charterparty. I do not think that breach of the charterparty by detention beyond the laydays can be regarded as a breach of a fundamental term.

Delay in the performance of a charterparty may amount to deviation and so to a fundamental breach. In *The Cap Palos* [23] where the contract was for the towage of a vessel, Atkin L.J. said:

"The " (towage) " figures appear to me to indicate such delay as to make the purported performance something quite different from that contracted for, a form of deviation quite familiar in marine adventures."

In *Brandt* v. *Liverpool, Brazil and River Plate Steam Navigation Co.* [24] delay by the owners of a vessel in dealing with bags of zinc was held by Scrutton L.J. [25] and Atkin L.J. [26] to amount to a deviation.

Breach of a charterparty by the detention of the vessel beyond the laydays by the charterers may, in my view, take on the character of a fundamental breach. If, for instance, there was a delay of many weeks in the loading of the vessel the consequence would be that the voyages, though in fact consecutive, would be totally different from those contemplated by the contract. Further, if it was established that a breach, though of itself not of sufficient duration as to lead to the conclusion that the performance of the contract became totally different from that contemplated, was committed deliberately and wilfully with the object of reducing the number of voyages accomplished, the breach might, in my opinion, take on the character of a fundamental breach. It is only in this connection, in determining whether there has been repudiatory conduct, that, in my opinion, the wilfulness of the breach has any relevance.

In this case the appellants contend that the totality of the delays in loading and unloading constituted a fundamental breach entitling them to treat the contract as repudiated and the demurrage provisions as not applying. They do not suggest that at any particular time between October 16, 1957, and the end of the charter the delays were such as to constitute a fundamental breach.

If there was a time after October 16, 1957, and before the end of the charterparty when they could have said that it had been

[23] [1921] P. 458, 470; 37 T.L.R. 921, C.A.
[24] [1924] 1 K.B. 575, C.A.
[25] Ibid. 597.
[26] Ibid. 601.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

Viscount
Dilhorne

repudiated by the respondents, they did not do so. They had full knowledge of the delays as they occurred, and if there was a time when they could have elected to treat the charterparty as at an end they must, in my view, be taken to have elected to waive the repudiation and to have affirmed the charterparty. If they affirmed the charterparty, then they were bound by its provisions in respect of events occurring after the affirmation, but waiver of the breach does not mean waiver of the right to damages for that breach (*Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.*[27]; *Chandris* v. *Isbrandt-sen-Moller Co. Inc.*,[28] *per* Devlin J.). In this connection there are, I think, certain passages in *Charterhouse Credit Co. Ltd.* v. *Tolly*[29] which require reconsideration.

If the appellants were entitled to treat the charterparty as repudiated, the demurrage provisions could only be held not to apply if they were provisions limiting the respondents' liability and, on construction of the contract as a whole, they were held not to apply in relation to the fundamental breach.

In my view, the demurrage provisions are not to be regarded as limiting the respondents' liability. In the circumstances of this case it may be that the amount of the demurrage payments bears little relation to the loss the appellants claim to have suffered. In *Chandris* v. *Isbrandtsen-Moller Co. Inc.*[30] Devlin J. said that the sum produced by demurrage " is generally less than damages for detention " and that a demurrage clause is merely a clause providing for liquidated damages for a certain type of breach. While it may be that a demurrage clause in a particular case is so drawn that on its proper construction it is to be treated as imposing a limitation on liability, in this case the demurrage provisions are, in my opinion, clearly provisions for the payment of agreed damages. If the clauses imposed a limit on liability, then the appellants would have to prove the actual loss they sustained and if it was less than the amount stated they would only recover the loss they proved. Here the parties agreed that demurrage at a daily rate should be paid in respect of the detention of the vessel and, on proof of breach of the charterparty by detention, the appellants are entitled to the demurrage payments without having to prove the loss they suffered in consequence.

In my view, the appellants cannot avoid the operation of these provisions and cannot recover more than the agreed damages for

[27] 41 Com.Cas. 350.
[28] [1951] 1 K.B. 240, 248.
[29] [1963] 2 Q.B. 683.
[30] [1951] 1 K.B. 240, 249.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

the detention of their vessel. (See *Cellulose Acetate Silk Co.* v. *Widnes Foundry (1925) Ltd.*[31])

For these reasons the further contention advanced by the appellants in my view fails and, in my opinion, this appeal should be dismissed.

LORD REID. My Lords, I am satisfied that for the reasons given by your Lordships this appeal could not succeed on any of the grounds submitted to the Court of Appeal and to your Lordships at the first hearing of this appeal. But at the end of his opening address counsel for the appellant put forward a new contention based on there having been a fundamental breach of contract by the respondents. Normally this House would not permit a new question of that character to be argued. But this is a consultative case stated by arbitrators and the appellants could still raise such a new question before the arbitrators. So in order to avoid delay and expense your Lordships adjourned the hearing on terms as to costs and ordered the parties to lodge supplementary cases dealing with this new contention. I only intend to deal with the new question argued at the second hearing.

The case arises out of a charterparty for two years' consecutive voyages made on December 21, 1956, between the appellants, the owners, and the respondents, the charterers. After a dispute the parties made a further agreement on October 8, 1957, to perform the charterparty for the remainder of the two-year period. The purpose of the charterparty was that on each voyage the vessel should proceed in ballast to an Atlantic port in the United States and there load coal to be carried to a port in the Netherlands. During this remaining part of the two years the vessel only made eight voyages and she spent some 380 days in ports of loading or discharge. There was provision for payment of demurrage with wide exceptions of causes of delay beyond the control of the charterer. But the respondents have admitted liability to pay demurrage for some 150 days. The complaint of the appellants is that by reason of the failure of the respondents to perform their contractual obligations to load and discharge within the laydays the appellants have been deprived of the freight which would have been earned on the additional voyages which would have been performed had there not been this delay for which the respondents are responsible. They claim that six or nine more voyages would

31 [1933] A.C. 20; 48 T.L.R. 595, H.L.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

have been performed within the period if the respondents had fulfilled their obligations and they estimate their loss from that cause at $875,000 or alternatively $580,000. The respondents' answer is that the appellants are only entitled to demurrage at the agreed rate of $1,000 per day and they have paid some $150,000 as demurrage.

The new contention submitted by the appellants is that the breaches of contract which caused these delays amounted to fundamental breach or breach going to the root of the contract so that at some time during the currency of the agreement the appellants would have been entitled to treat the breaches as a repudiation, to terminate or rescind the contract and to claim damages at common law. It is, I think, clear that if they did have that right they must be held to have elected not to treat the breaches as repudiatory. But they argue that nevertheless the fact that there was a fundamental breach prevents the respondents from relying on the demurrage clause as limiting their responsibility.

So the first question must be whether these delays can be regarded as involving fundamental breach. If so, it is for the arbitrators, at least in the first instance, to decide whether there was fundamental breach. The respondents deny that these breaches are capable of being regarded as amounting to fundamental breach. General use of the term " fundamental breach " is of recent origin and I can find nothing to indicate that it means either more or less than the well known type of breach which entitles the innocent party to treat it as repudiatory and to rescind the contract. The appellants allege that the respondents caused these delays deliberately (i.e., with the wilful intention of limiting the number of contractual voyages). They do not allege fraud or bad faith. This allegation would appear to cover a case where the charterers decided that it would pay them better to delay loading and discharge and pay the resulting demurrage at the relatively low agreed rate, rather than load and discharge more speedily and then have to buy more coal and pay the relatively high agreed freight on the additional voyages which would then be possible. If facts of that kind could be proved I think that it would be open to the arbitrators to find that the respondents had committed a fundamental or repudiatory breach. One way of looking at the matter would be to ask whether the party in breach has by his breach produced a situation fundamentally different from anything which the parties could as reasonable men have contemplated when the

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Reid

contract was made. Then one would have to ask not only what had already happened but also what was likely to happen in future. And there the fact that the breach was deliberate might be of great importance.

If fundamental breach is established the next question is what effect, if any, that has on the applicability of other terms of the contract. This question has often arisen with regard to clauses excluding liability, in whole or in part, of the party in breach. I do not think that there is generally much difficulty where the innocent party has elected to treat the breach as a repudiation, bring the contract to an end and sue for damages. Then the whole contract has ceased to exist including the exclusion clause, and I do not see how that clause can then be used to exclude an action for loss which will be suffered by the innocent party after it has ceased to exist, such as loss of the profit which would have accrued if the contract had run its full term. But that is not the situation in the present case, where in my view the appellants elected that the contract should continue in force.

Where the contract has been affirmed by the innocent party, at first sight the position is simple. You must either affirm the whole contract or rescind the whole contract: you cannot approbate and reprobate by affirming part of it and disaffirming the rest—that would be making a new contract. So the clause excluding liability must continue to apply. But that is too simple and there is authority for two quite different ways of holding that, in spite of affirmation of the contract as a whole by the innocent party, the guilty party may not be entitled to rely on a clause in it. One way depends on construction of the clause. The other way depends on the existence of a rule of substantive law.

As a matter of construction it may appear that the terms of the exclusion clause are not wide enough to cover the kind of breach which has been committed. Such clauses must be construed strictly and if ambiguous the narrower meaning will be taken. Or it may appear that the terms of the clause are so wide that they cannot be applied literally: that may be because this would lead to an absurdity or because it would defeat the main object of the contract or perhaps for other reasons. And where some limit must be read into the clause it is generally reasonable to draw the line at fundamental breaches. There is no reason why a contract should not make a provision for events which the parties do not have in contemplation or even which are unforeseeable, if sufficiently

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

clear words are used. But if some limitation has to be read in it seems reasonable to suppose that neither party had in contemplation a breach which goes to the root of the contract. Then the true analysis seems to me to be that the whole contract, including the clause excluding liability, does survive after election to affirm it, but that that does not avail the party in breach. The exclusion clause does not change its meaning: as a matter of construction it never did apply and does not after election apply to this type of breach, and therefore is no answer to an action brought in respect of this type of breach.

But applying a strict construction to these clauses is not sufficient to exclude them in all cases of fundamental breach. It cannot be said as a matter of law that the resources of the English language are so limited that it is impossible to devise an exclusion clause which will apply to at least some cases of fundamental breach without being so widely drawn that it can be cut down on any ground by applying ordinary principles of construction. So, if there is to be a universal rule that, no matter how the exclusion clause is expressed, it will not apply to protect a party in fundamental breach, any such rule must be a substantive rule of law nullifying any agreement to the contrary and to that extent restricting the general principle of English law that parties are free to contract as they may see fit.

There is recent authority for the existence of such a rule of law but I cannot find support for it in the older authorities. Most of them arose out of deviation from the contractual voyage or similar breaches of contracts of carriage by land. Any deviation has always been regarded as a breach going to the root of the contract, and it was held in these earlier cases that, if the consignor's goods were lost after there had been a deviation, the shipowner could not rely on clauses excluding or limiting his liability. The reasons given for this varied but I do not think that it is useful now to examine them in detail because it was made clear in the speeches in this House in *Hain Steamship Co. Ltd.* v. *Tate & Lyle Ltd.*[32] that there is no special rule applicable to deviation cases: the ordinary principles of the law of contract must be applied. The special feature of these cases is that the consignor's goods were lost before he knew of the deviation and therefore before he had any opportunity to elect whether or not to treat it as bringing the contract to an end. When he learns of the deviation and of the

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

subsequent loss of his goods there is hardly room for any election, but the fact that he sues for their value could be treated as an election to terminate the contract by reason of and immediately after the deviation.

Among the reasons given in the earlier cases I do not find any reliance on any rule of law that a party guilty of a breach going to the root of the contract can never rely on clauses excluding his liability. And I do not think that the decision in *Tate & Lyle's* case [32] assists us. There the owners of the goods had known of the deviation and had elected to waive it before the goods were lost. The breach was not a continuing breach and it did not cause the loss of the goods. In this case the breach, if it was a fundamental breach, was a continuing breach and it did cause the loss of which the appellants complain.

I think that *Smeaton Hanscomb* v. *Sassoon I. Setty, Son & Co. (No. 1)* [33] can be regarded as the first of the series of recent cases dealing with fundamental breach. There the question was whether a claim by the buyer was barred by a clause in the contract " any claim must be made within 14 days from the final discharge of the goods." Devlin J. said [34]:

> " It is no doubt a principle of construction that exceptions are to be construed as not being applicable for the protection of those for whose benefit they are inserted if the beneficiary has committed a breach of a fundamental term of the contract; and that a clause requiring the claim to be brought within a specified period is to be regarded as an exception for this purpose . . . I do not think that what is a fundamental term has ever been closely defined. It must be something, I think, narrower than a condition of the contract, for it would be limiting the exceptions too much to say that they applied only to breaches of warranty. It is, I think, something which underlies the whole contract so that, if it is not complied with, the performance becomes something totally different from that which the contract contemplates."

It is true that Lord Devlin says that he is applying a principle of construction but I think that he is really applying a substantive rule of law. He does not reach his conclusion by construing the clause in its context: there is no statement of any reason why the apparently general terms of this particular clause must be cut down or limited so as to make it only applicable to claims in respect of breaches which do not go to the root of the contract or which are not breaches of fundamental terms. And it does not appear to me

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

to be obvious that some canon of construction would require a limitation of the apparently general terms of this clause.

The next case is *Karsales (Harrow) Ltd.* v. *Wallis.*[35] There the contract provided that—" No condition or warranty that the vehicle is roadworthy," or " as to its age, condition or fitness for any purpose is given by the owner or implied herein." Lord Denning said [36]:

> " Notwithstanding earlier cases which might suggest the contrary, it is now settled that exempting clauses of this kind, no matter how widely they are expressed, only avail the party when he is carrying out his contract in its essential respects. He is not allowed to use them as a cover for misconduct or indifference or to enable him to turn a blind eye to his obligations. They do not avail him when he is guilty of a breach which goes to the root of the contract."

And Parker L.J. said [37]:

> " But, in my judgment, however extensive the exception clause may be, it has no application if there has been a breach of a fundamental term."

This is a clear statement of a rule of law. If it is right, it would be irrelevant that on its true construction an exempting clause must be held to be intended to apply to the breach in question, and that it is not so wide in its terms that as a matter of construction in its context its applicability must be limited. It must mean that the law does not permit contracting out of common law liability for a fundamental breach. I think that I should go on to examine the rest of the series of recent cases, but, under the present practice of the Court of Appeal with regard to the binding character of any of its own decisions, it was hardly to be expected that this statement of the law would not be followed. I should add that I cannot deduce from the authorities cited in *Karsales* [38] that the proposition stated in the judgments could be regarded as in any way settled law.

In *Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.*[39] I think that the ground of decision was that " The clause must therefore be limited and modified to the extent necessary to enable effect to be given to the main object and intent of the contract," [40]

---

[35] [1956] 1 W.L.R. 936.
[36] Ibid. 940.
[37] Ibid. 943.
[38] [1956] 1 W.L.R. 936.

[39] [1959] A.C. 576; [1959] 3 W.L.R. 214; [1959] 3 All E.R. 182, P.C.
[40] [1959] A.C. 576, 587.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

applying *Glynn* v. *Margetson & Co.*[41]  But in delivering the judg-ment of the Board Lord Denning made some observations about deliberate breach. He said [42]:

" And they deliberately disregarded one of the prime obliga-tions of the contract.  No court can allow so fundamental a breach to pass unnoticed under the cloak of a general exemp-tion clause "

and later [43]:

" The self-same distinction runs through all the cases where a fundamental breach has disentitled a party from relying on an exemption clause.  In each of them there will be found a breach which evinces a deliberate disregard of his bounden obligations."

Then he cited *Bontex Knitting Works Ltd.* v. *St. John's Garage*[44]; *Alexander* v. *Railway Executive*[45] and *Karsales (Harrow) Ltd.* v. *Wallis*[46] and added [47]:

" In each of those cases it could reasonably be inferred that the servant or agent deliberately disregarded one of the prime obligations of the contract.  He was entrusted by the principal with the performance of the contract on his behalf : and his action could properly be treated as the action of his principal.  In each case it was held that the principal could not take advantage of the exemption clause.  It might have been different if the servant or agent had been merely negli-gent or inadvertent."

In this connection I may refer to *The Cap Palos*[48] where Atkin L.J. referred to the importance of a breach being deliberate.

*Yeoman Credit Ltd.* v. *Apps*[49] was another case of hire-pur-chase of a car with an exemption clause similar to that in *Kar-sales.*[50]  Holroyd Pearce L.J.[51] quoted the passages from the judgments in *Karsales*[52] to which I have referred, and later on in his judgment [53] he referred to :

" such a non-performance or repudiation or breach going to the root of the contract as disentitles the owners to take refuge behind an exception clause intended only to give protection to those breaches which are not inconsistent with and not destructive of the whole essence of the contract."

*Charterhouse Credit Ltd.* v. *Tolly*[54] was a similar case but with

41 [1893] A.C. 351; 9 T.L.R. 437, H.L.
42 [1959] A.C. 576, 587, 588.
43 [1959] A.C. 576, 588.
44 (1943) 60 T.L.R. 44, 253, C.A.
45 [1951] 2 K.B. 882; [1951] 2 T.L.R. 69; [1951] 2 All E.R. 442.
46 [1956] 1 W.L.R. 936.
47 [1959] A.C. 576, 588, 589.
48 [1921] P. 458.
49 [1962] 2 Q.B. 508.
50 [1956] 1 W.L.R. 936.
51 [1962] 2 Q.B. 508, 517.
52 [1956] 1 W.L.R. 936.
53 [1962] 2 Q.B. 508, 520.
54 [1963] 2 Q.B. 683.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

A     more complicated facts.  It had been argued that the exemption
clause was not sufficiently clear to be given effect.  Donovan L.J.
said [55]:

> " I do not find it necessary to determine the true construc-
> tion of this clause, for even if it bears the construction con-
> tended for by the finance company, I am of the opinion that
B    it is of no avail to it in this case.  As has been often said in
> recent years, a fundamental breach of contract, that is, one
> which goes to its very root, disentitles the party in breach
> from relying on the provisions of an exempting clause."

and he gives *Karsales* [56] as his authority.

There was a finding that the hirer had elected to treat the con-
C     tract as still on foot and it was argued that therefore he must be
as much bound by the exemption clause as by any other clause.
On this matter Donovan L.J. said [57]:

> " The point is, apparently, free from direct authority, but,
> on principle, the election by the hirer of one remedy for the
> fundamental breach, instead of another remedy, ought, as I
D    see it, to make no difference to the ineffectiveness of an
> exempting clause in face of such a breach.  However this
> may be, two decisions of the House of Lords exist where one
> party to a contract elected to treat it as still subsisting despite
> a fundamental breach by the other, and succeeded in obtaining
> damages for such breach despite the existence in the contract
> of an exempting clause similar to clause 5 here.  One is
E    *Pollock & Co.* v. *Macrae* [58] and the other *Wallis, Son & Wells*
> v. *Pratt & Haynes.* [59]  The contention I am now considering
> was not specifically raised in either case, but it is impossible
> to think that, if valid, it would have been overlooked not only
> by the parties sued, but by all the courts before which the two
> cases came."

Upjohn L.J. said [60]:
F
> " The authorities establish that where there is a breach of
> a fundamental term the person in breach cannot rely on
> clauses of exclusion to protect him as against the other party.
> But the company said with some force that that is so, no
> doubt, when the innocent party treats the contract as repu-
> diated, but that if he elects to affirm the contract, then he
> must take the benefit of the contract subject to all its provi-
G    sions, including a clause of exclusion, and he can no longer
> plead that the finance company, though in breach of a funda-
> mental term, cannot rely on a clause of exclusion.  That is
> not, I think, an easy question, and there appears to be no

[55] [1963] 2 Q.B. 683, 703, 704.
[56] [1956] 1 W.L.R. 936.
[57] [1963] 2 Q.B. 683, 704.
[58] 1922 S.C.(H.L.) 192, H.L.

[59] [1911] A.C. 394; 27 T.L.R. 431,
H.L.
[60] [1963] 2 Q.B. 683, 709, 710.

H. L. (E.)

1966

———

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

———

LORD
REID
———

A

authority where the matter has been expressly decided. If I am right in the analysis of this fundamental term, that it really stems from the fact that the finance company must lend that which it contracts to lend and not something which is essentially different, it seems to me that the principle must apply whether it is a case of repudiation accepted by the hirer or whether he affirms the contract and sues for damages."

B

This was substantially repeated by him in *Astley Industrial Trust Ltd.* v. *Grimley*.[61] My noble and learned friend gave the example of a contract for delivery of a tractor and delivery instead of Suffolk Punch horses. I would be inclined to think that that was not delivery under the contract at all, but that it was an offer of a new contract on terms to be implied.

C

I do not think that either of the two cases to which Lord Donovan referred is of assistance in this connection. In each it was held that on a true construction the exempting clause was not wide enough to apply to the breach. In *Pollock & Co.* v. *Macrae*[62] Lord Dunedin said:

D

"Such conditions to be effectual must be most clearly and unambiguously expressed, as is always necessary in cases where a well-known common law liability is sought to be avoided."

Then he referred to *London & North Western Railway Co.* v. *Neilson*[63] and continued[64]:

E

"Reading the clauses in this light, I am of opinion that, although they excuse from damage flowing from the insufficiency of a part or parts of the machinery, they have no application to damage arising when there has been total breach of contract by failing to supply the article truly contracted for."

F

In *Wallis, Son & Wells* v. *Pratt & Haynes*[65] an inferior variety of seed was delivered but the buyer did not discover this until it was too late to reject the goods: so he sued for damages. The contract included the clause " sellers give no warranty express or implied " but it was held that this was not wide enough in its terms to apply to breach of a condition. In neither case was there any question of cutting down or limiting the application of a clause apparently wide enough to apply to the breach. Both really turned on pure construction.

G

[61] [1963] 1 W.L.R. 584, 598; [1963] 2 All E.R. 33, C.A.
[62] 1922 S.C.(H.L.) 192, 199.
[63] [1922] 2 A.C. 263.
[64] 1922 S.C.(H.L.) 192, 199.
[65] [1911] A.C. 394.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

In *U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.*[66] the question related to a condition to the effect that interest coupons were forfeited if not presented within six years. Lord Denning[67] repeated in substance what he had said in *Karsales*[68] and added[69]:

> " The doctrine does not depend on the customer electing to disaffirm the contract. Usually he has no option open to him. The contract has been broken irretrievably before he gets to know of it, and the only course for him is to sue for the breach. So the point does not very often arise. But even if he does get to know of it, in time to affirm or disaffirm, he can still treat the contract as in being, and sue for the breach (without being defeated by the exemption clause) provided always that the breach itself is continuing to operate and cause damage to him."

A different view was expressed by Pearson L.J.[70]:

> " As to the question of ' fundamental breach ', I think there is a rule of construction that normally an exception or exclusion clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of the contract. This is not an independent rule of law imposed by the court on the parties willy-nilly in disregard of their contractual intention. On the contrary it is a rule of construction based on the presumed intention of the contracting parties. It involves the implication of a term to give to the contract that business efficacy which the parties as reasonable men must have intended it to have. This rule of construction is not new in principle but it has become prominent in recent years in consequence of the tendency to have standard forms of contract containing exceptions clauses drawn in extravagantly wide terms, which would produce absurd results if applied literally."

If this new rule of law is to be adopted, how far does it go? In its simplest form it would be that a party is not permitted to contract out of common law liability for a fundamental breach. If that were right then a demurrage clause could not stand as limiting liability for loss resulting from a fundamental breach: and the same would apply to any clause providing for liquidated damages. I do not suppose that anyone has intended that this rule should go quite so far as that. But I would find it difficult to say just where the line would have to be drawn.

In my view no such rule of law ought to be adopted. I do not

[66] [1964] 1 Lloyd's Rep. 446.
[67] Ibid. 450.
[68] [1956] 1 W.L.R. 936.

[69] [1964] 1 Lloyd's Rep. 446, 450.
[70] Ibid. 453.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.

N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

take that view merely because any such rule is new or because it    A
goes beyond what can be done by developing or adapting existing
principles. Courts have often introduced new rules when, in their
view, they were required by public policy. In former times when
Parliament seldom amended the common law, that could hardly
have been avoided. And there are recent examples although, for
reasons which I gave in *Shaw* v. *Director of Public Prosecutions*,[71]    B
I think that this power ought now to be used sparingly. But my
main reason is that this rule would not be a satisfactory solution
of the problem which undoubtedly exists.

Exemption clauses differ greatly in many respects. Probably
the most objectionable are found in the complex standard
conditions which are now so common. In the ordinary way the    C
customer has no time to read them, and if he did read them he
would probably not understand them. And if he did understand
and object to any of them, he would generally be told he could take
it or leave it. And if he then went to another supplier the result
would be the same. Freedom to contract must surely imply some
choice or room for bargaining.    D

At the other extreme is the case where parties are bargaining on
terms of equality and a stringent exemption clause is accepted for
a quid pro quo or other good reason. But this rule appears to
treat all cases alike. There is no indication in the recent cases that
the courts are to consider whether the exemption is fair in all the    E
circumstances or is harsh and unconscionable or whether it was
freely agreed by the customer. And it does not seem to me to be
satisfactory that the decision must always go one way if, e.g., defects
in a car or other goods are just sufficient to make the breach of
contract a fundamental breach, but must always go the other way if
the defects fall just short of that. This is a complex problem which    F
intimately affects millions of people and it appears to me that its
solution should be left to Parliament. If your Lordships reject
this new rule there will certainly be a need for urgent legislative
action but that is not beyond reasonable expectation.

I have no doubt that exemption clauses should be construed    G
strictly and I think that this case must be decided by considering
whether there is any ground for adopting any but the natural
meaning of the demurrage clause. Having provided for the calcula-
tion of the laydays and for extension of the laydays when delays

[71] [1962] A.C. 220; [1961] 2 W.L.R. 897; [1961] 2 All E.R. 446, H.L.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
REID

A are caused by various events for which the charterer is not responsible, clause 3 of the charterparty continues:

> "If longer delayed charterer to pay $1,000 U.S. currency payable in the same manner as the freight per running day (or pro rata for part thereof) demurrage, if sooner dispatched vessel to pay charterer or his agents $500 U.S. currency per day (or pro rata for part thereof) dispatch money for lay time saved."

It is impossible to hold that these words are not wide enough to apply to the circumstances of the present case, whether or not there was fundamental breach. So the only question is whether there is any reason for limiting their scope. The authorities are against the appellants, but, even putting them aside, I can find no such reason. The appellants chose to agree to what they now say was an inadequate sum for demurrage, but that does not appear to me to affect the construction of this clause. Even if one assumes that the $1,000 per day was inadequate and was known to both parties to be inadequate when the contract was made, I do not think that it can be said that giving to the clause its natural meaning could lead to an absurdity or could defeat the main object of the contract or could for any other reason justify cutting down its scope. If there was a fundamental breach the appellants elected that the contract should continue and they did so in the knowledge that this clause would continue. On the whole matter I am of opinion that this appeal fails and that the questions should be answered as my noble and learned friend proposes.

LORD HODSON. My Lords, I agree with the judgments given already in the Court of Appeal and at first instance that this contract cannot be held to contain an implied obligation involving payment for the greatest number of voyages which could have been made if no delays had been experienced. Further, I do not find that the appellants can find support from the decision of the Court of Appeal in the case of *Aktieselskabet Reidar* v. *Arcos Ltd.*[72] The trial judge, Greer J., and two of the Lords Justices, Atkin L.J. and Warrington, were agreed that damages were payable as for dead freight beyond the sum due for demurrage. There a chartered vessel had been sent to Archangel, a White Sea port, to load a cargo of timber. She went there in plenty of time within the laydays to load a full and complete cargo according to the summer marks and summer carrying capacity of the vessel. Delay took place in

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
HODSON

loading and the number of laydays was exceeded in order to load the quantity which was loaded. She sailed with 306 standards short of the 850 standards of timber which she could have loaded because by the time the vessel sailed she could only load in order to comply with the law down to her winter marks. There was a breach separate from although arising from the same circumstances as the delay, and it was in these circumstances that damages were awarded.

The charterparty now under consideration provided for the carriage of coal from the United States (East Coast) to Europe and to return in ballast between each trip and remained in force " for a total of 2 years' consecutive voyages " (clause 23). Fixed periods of laytime were provided within which the respondents were obliged respectively to load and discharge the vessel on each voyage. During the relevant part of the two-year period the vessel performed eight voyages whereas the appellants contend that a further six voyages could have been performed if the loading and discharging had been completed within the laytime or a further nine voyages if the respondents had loaded and discharged the vessel with reasonable dispatch.

The detention beyond the agreed laytime is admittedly a breach of the charterparty, and the only question is whether in circumstances such as those which have arisen here the appellants are entitled to any further sum from the respondents over and above their demurrage for which the appellants give credit in their claim.

The matter for your Lordships to decide arises on a consultative case stated by arbitrators. The only relevant question is

"(A) Whether upon the facts found and upon the true construction of the charterparty dated December 21, 1956, and the agreement dated October 8, 1957:

(i) The claimants are entitled to recover (subject to giving credit for the demurrage payments received by them) any damages suffered by them by reason of the respondents having failed to load and discharge the vessel within the laydays whereby the charterparty was (if so proved) rendered less profitable to the claimants by consequent loss of voyages or voyage time.

(ii) Upon the assumption that such loss of profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel: (a) with such ordinary dispatch as the circumstances permitted, or, (b) within the laydays, the claimants are entitled to recover any damages suffered by the claimants through the charterparty

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
HODSON

A   having been rendered less profitable as aforesaid subject to giving credit for the demurrage payments received by them and for any such despatch money as would have been earned by the respondents."

It is emphasised on behalf of the appellants that since their obligation throughout was to perform all parts of the agreed voyages " with all possible dispatch " subject only to the operation

B   of expected perils, the respondents as charterers should likewise as a matter of construction of the clauses of the charterparty be held to be bound to load and discharge the vessel on a specific number of voyages only ascertainable and then with some difficulty at the end of the two-year period.

C   This argument was I think rightly rejected, but before your Lordships the argument was carried further in that it was said that although the demurrage rate here would be the measure of compensation in the ordinary case for delay of the vessel yet where the detention is so long as to frustrate the contract the words of the charterparty " if longer detained," whether or not the detention is

D   deliberate, i.e., with the wilful intention of limiting the number of contractual voyages, no longer govern the measure of compensation payable to the owners. Detention cannot, it is said, cover delay by the charterers of such a kind as to amount to repudiatory breach of the contract. Often expressions have been used in various cases such as fundamental breach or breach going to the root of a

E   contract to describe those situations which may be brought about through the fault of one party which have a frustrating effect and make the contract in its original form at any rate impossible of performance. Sometimes it is said that to hold the parties to the original contract after the breach would be to make a new contract

F   for them not to insist on performance of the old. The argument is quite general in its scope and not confined to cases involving the carriage of goods by sea or by land. Before considering the argument further it is pertinent to remember that your Lordships are not concerned with a case where the appellants have accepted a repudiation of the contract or purported to do so and sailed away.

G   The appellants continued to perform the contract and seek damages for delay over and above the demurrage rate. Thus, if they were to succeed in this appeal they would be faced with the difficulty of establishing when if at all the accumulated delay was such as would entitle them to sue for damages at large for the loss they have suffered.

As has been recognised at the Bar on both sides, the expression

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Hodson

"fundamental breach" is of comparatively recent origin and has seemed to have attained some mystical meaning in the law of contract. For my part, I doubt whether anything is to be gained by analysing the various expressions which have been used to describe breaches of contract so serious as to justify the injured party in throwing up the contract if he so chooses. Sometimes it has been declared that where a fundamental breach of contract had occurred an exceptions clause could not as a matter of law be relied upon, but the better view on the authorities, and that accepted by both sides before your Lordships, is that as a matter of construction normally an exception or exclusive clause or similar provision in a contract should be construed as not applying to a situation created by a fundamental breach of contract.

I have here quoted the language used by Pearson L.J. in *U.G.S. Finance* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.*[73] which is contained in the passage cited by my noble and learned friend, Lord Reid—see also the judgment of Diplock L.J. in *Hardwick Game Farm* v. *Suffolk Agricultural Poultry Producers Association*[74] in which judgment was delivered on December 20, 1965—a recent example of the acceptance of the opinion of Pearson L.J.

So long as one remembers that one is construing a document and not applying some rule of law superimposed upon the law of contract so as to limit the freedom of the parties to enter into any agreement they like within the limits which the law prescribes one can apply one's mind to each contract as it comes up for consideration. I would adopt the language of Atkin L.J. in *The Cap Palos*,[75]

> "I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including even wilful default; but he must use very clear words to express that purpose . . ."

This passage has the support of Lord Parmoor in *Cunard Steamship Co. Ltd.* v. *Buerger*.[76] I think it is unnecessary to refer in detail to those cases where the doctrine of fundamental breach has been stated as if it went further than a matter to be dealt with on construction. By way of example, in an unreported case, *Philip Boshali* v. *Allied Commercial Exporters Ltd.*,[77] Privy Council Appeal, No. 51 of 1959, the Board stated unequivocally that a

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
HODSON

A breach which goes to the root of a contract disentitles a party from relying on an exemption clause (*Karsales (Harrow) Ltd.* v. *Wallis*,[78] *per* Denning L.J.). It is to be noticed, however, that Lord Denning himself delivering a judgment of the Board in the year 1959 in *Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.*[79] treated the same matter as one of construction. As in this case counsel there conceded that finally the question was one of construction, and in the judgment of the Board this phrase appears[80]: ". . . as a matter of construction, their Lordships decline to attribute to it [viz., the clause] the unreasonable effect contended for."

Thus, even if the accumulated delays of the chartered ship were such as to justify the finding that the respondents are guilty of a fundamental breach of contract, nevertheless it would not follow as a matter of law that the demurrage clause entitling the amount of compensation for detention would not apply.

Even if one were to describe the demurrage clause as an exemption or exclusive clause, which I do not think it is, this result would not follow, for the contract must still be construed. Moreover, if one drives the argument that "fundamental breach" of contract introduces a rule of law that exemption clauses cannot be relied on far enough it would no doubt be sufficient to destroy the effect of a clause by which "demurrage" (that is agreed damages for detention) should be calculated. No case has ever gone so far.

It is convenient to remember that a great number of marine cases have been heard over the years in which "deviation" has been in question, and deviation has always been regarded as a serious matter. As Lord Atkin said in *Hain Steamship Co. Ltd.* v. *Tate & Lyle Ltd.*[81]:

" I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by any of the contract terms."

Later he said[81]:

"No doubt the extreme gravity attached to a deviation in contracts of carriage is justified by the fact that the insured cargo owner when the ship has deviated has become uninsured."

[78] [1956] 1 W.L.R. 936, 940.  [80] Ibid. 587.
[79] [1959] A.C. 576.  [81] 41 Com.Cas. 350, 354.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale
————
Lord
Hodson

Deviation cases are convenient examples for consideration A because they involve breaches of a fundamental term of the contract and there is usually no difficulty in ascertaining whether that term has been breached. If it has been the breach will be fundamental. The case is more difficult as a rule where, as here, the term involved can hardly be described as fundamental yet breaches of it may be said in the aggregate to be fundamental. I B doubt whether it is helpful to analyse or to sub-divide the cases which are concerned with these serious breaches or to try to give special names to individual clauses of such cases. The leading case of *Glynn* v. *Margetson & Co.*[82] is a striking example of a breach of a deviation clause in a contract which has been described as an application of the " main purpose " rule. This was a case of C deviation where the main purpose of the contract was the delivery of oranges from Malaga to Liverpool. The ship made in the opposite direction videlicet to Burriana, going further away from Liverpool than she was at Malaga and the oranges were damaged owing to the delay on the voyage. The shipowner relied on a clause which gave him liberty to proceed to and stay at any port D or ports within wide limits staying there as long as he liked for any purpose. Both Lord Herschell L.C. and Lord Halsbury, with whom the other members of the House agreed, treated the matter as one of construction of the contract and on that basis limited the liberty to ports in the course of the voyage.

Other expressions have been used, e.g., " the four corners rule." E Thus, under a contract of carriage or bailment if the carrier or bailee uses a place other than that agreed on for storing the goods, or otherwise exposes the goods to risks quite different from those contemplated by the contract, he cannot rely on clauses in the contract designed to protect him against liability within the four corners of the contract, and has only such protection as is afforded F by the common law. *Lilley* v. *Doubleday*[83] and *Gibaud* v. *Great Eastern Railway Co.*[84] are examples of such cases all of which depend on the construction of the contract.

Sometimes a position of absurdity is reached by the tacking on to formal words in a printed contract designed for a variety of purposes a specific bargain which cannot be performed if the G printed words are to apply. Such a case was *Glynn* v. *Margetson & Co.*[85] Lord Herschell L.C. said[86]:

---

[82] [1893] A.C. 351.
[83] 7 Q.B.D. 510.
[84] [1921] 2 K.B. 426; 37 T.L.R. 422, C.A.
[85] [1893] A.C. 351.
[86] Ibid. 355.

H. L. (E.)
1966
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
HODSON

"Where general words are used in a printed form which are obviously intended to apply, so far as they are applicable, to the circumstances of a particular contract, which particular contract is to be embodied in or introduced into that printed form, I think you are justified in looking at the main object and intent of the contract and in limiting the general words used, having in view that object and intent."

Treating the matter as one of construction the case is not affected by the affirmation of the contract. In this case the appellants, the owners of the ship, did not sail away; they continued to perform the contract to the bitter end and accordingly are bound by such of the terms of the contract as are applicable notwithstanding the breach of contract by the respondents, the charterers. I see no reason why the agreement as to the demurrage rate should not apply so long as the contract is being performed, whether the breach is treated as fundamental or not.

I think the decision of this House in *Pollock & Co.* v. *Macrae* [87] is of some assistance. There a contract for the building and installation of a set of motor marine engines which bound the builders to replace any parts faulty through bad material or workmanship contained a clause providing that all goods were supplied on the condition that the builders should not be liable for direct or consequential damages arising from the defective material or workmanship. It was held that this clause, while it protects the builders where a part or parts of the engines were defective, was of no avail where there had been a complete breach of contract owing to a series of defects in the engines which rendered them practically unserviceable. The buyer then had ineffectively elected to reject the goods and treat the contract as repudiated but was allowed to fall back on his alternative remedy for damages. Lord Dunedin said [88]:

"Now, when there is such a congeries of defects as to destroy the workable character of the machine, I think this amounts to a total breach of contract, and that each defect cannot be taken by itself separately so as to apply the provisions of the conditions of guarantee and make it impossible to claim damages."

The case turned on pure construction but it was decided on the basis that the whole of the contract had to be construed. I think the same applies to the case of *Wallis, Son & Wells* v. *Pratt &*

[87] 1922 S.C. (H.L.) 192.     [88] Ibid. 200.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
HODSON

A

*Haynes*,[89] another case of breach of contract of a repudiatory quality followed by affirmation.

On the construction of this contract I am of opinion that the parties have agreed to limit the damages payable for detention at the agreed demurrage rate and that there is no reason for not so limiting them whether or not there was an intention on the part of the respondents wilfully to limit the number of voyages. As has been stated in Scrutton on Charterparties and as Mocatta J. pointed out: demurrage in its strict meaning is a sum agreed by the charterer to be paid as liquidated damages for delay beyond a stipulated or reasonable time for loading or unloading. As a rule some deliberate or negligent conduct on the part of the charterer is involved for he is protected by a number of exceptions against any risks outside his control. No English authority was cited which assists the appellants. The researches of counsel only discovered one case which raises the point of deliberate delay consisting of detention so long as it suits the charterers' convenience. This was *Ethel Radcliffe Steamship Co. Ltd.* v. *W. & R. Barnett Ltd.*[90] Damages at large at common law were awarded by an arbitrator but the award was varied by Rowlatt J., and the Court of Appeal rejected the submission which had at first succeeded.

There the clause to be construed was as follows " orders as to port of discharge are to be given to the master within 24 hours after receipt by consignees of master's telegraphic report to consignees . . . of his arrival at the port of call; and for any detention waiting for orders, after the aforesaid 24 hours, the charterers or their agents shall pay to the steamer 30s. sterling per hour. . . ."

The court treated the 24 hours as equivalent to laydays and the 30s. per hour as demurrage and applied to the situation the passage at p. 348 of the 12th edition of Scrutton on Charterparties, article 128:

" Stipulations for demurrage may be
(1) *Exhaustive*: as ' 10 days for loading and demurrage at £20 per diem afterwards,' which covers all delay. On such a provision the shipowner cannot say that the provision for £20 a day demurrage only applies to a reasonable time, after the lapse of which he can claim damages for detention. After the lapse of a reasonable time he may take his ship away, but if he allows her to stay on he can only claim the agreed rate of demurrage."

---

[89] [1911] A.C. 394.        [90] (1926) 31 Com.Cas. 222; 42 T.L.R. 385; 24 Ll.L.Rep. 277, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
———
LORD
HODSON
———

In the current (17th) edition of this work, p. 306, the last sentence has been rewritten so as to read: "If the contract be not repudiated or frustrated, he can only claim the agreed rate of demurrage." Thus, the question of a frustrating delay is left open but the general proposition stated in the paragraph is supported by *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*,[91] as Atkin L.J. pointed out.[92]

An American case which was relied upon by the appellants should be noticed as the language of the judgment lends some support to their submission. This was *Empresa Maritime de Transportes S.A. Plaintiff* v. *A. T. Massey Coal Company et al. Defendants*[93] tried in the United States District Court, Eastern District of Virginia, Norfolk Division, in 1963. In that case damages were claimed for wrongful detention of the m.v. *Blue Star* within the laydays, the allegation being that the defendant coal supplier conspired with the charterer of the vessel intentionally to delay the *Blue Star* at loading by arranging that the coal would not be loaded on the vessel until laytime was about to expire so as to diminish the number of consecutive voyages the vessel could perform under a two-year consecutive voyage time charter agreement. The charter was also written on an Americanised Welsh Coal Charter form.

The claim succeeded on the construction of the charterparty but the facts were special and in any case, as the editors of the report point out in a note, there is authority in the courts of this country for the proposition that when a charterparty prescribes a fixed time to load there is no basis for implying an obligation on the part of the voyage charterer to load within a lesser time. See *Margaronis Navigation Agency Ltd.* v. *Henry W. Peabody & Co. of London Ltd.*[94]

For myself, I see no reason to hold that attributing to the respondents a wilful intention of limiting the number of contractual voyages affects the sums otherwise payable by way of demurrage so as to open the way to a claim for damages at large. I would accordingly agree with the learned judge that the question A in the consultative case be answered in the negative and dismiss the appeal.

[91] [1917] 2 K.B. 193, C.A.
[92] 31 Com.Cas. 222, 236, 237.
[93] 1965 A.M.C. 517 (U.S.A.).
[94] [1965] 1 Q.B. 300; [1964] 3 W.L.R. 111; [1964] 2 All E.R. 296; [1964] 1 Lloyd's Rep. 173; [1965] 2 Q.B. 430; [1964] 3 W.L.R. 873; [1964] 3 All E.R. 333; [1964] 2 Lloyd's Rep. 153, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

A

LORD UPJOHN. My Lords, in this appeal your Lordships are concerned with the rights and obligations of the contracting parties to a consecutive voyage charterparty dated December 21, 1956, made between the appellants, owners of the ship, and the respondents, the charterers. It provided for the carriage of coal for two years' consecutive voyages terminating in March, 1959, between Hampton Roads, Baltimore or Philadelphia on one side of the Atlantic and one safe port, Belgium, Holland or Germany on the other side, returning in ballast to the U.S.A. for a further cargo. Clause 3 of the charterparty provided for loading at an agreed rate with a widely drawn provision excluding from loading time (or laydays as they are usually called) time lost from a variety of events and causes immaterial to the matters in issue before your Lordships. The clause provided " If longer detained charterer to pay $1,000 U.S. currency per running day (or pro rata for part thereof) demurrage." There was a similar provision for demurrage if the time for the agreed rate of discharge was exceeded.

B

C

Whether because of the fall in freight rates after the re-opening of the Suez Canal in April of 1957 or for some other reason the ship greatly exceeded the permitted lay time in port and your Lordships were told that at one time the owners sailed the ship away treating the contract as repudiated by the charterers and accepting that repudiation. This led to an arbitration between the parties, not yet determined, and without prejudice to that arbitration the parties on October 8, 1957, agreed to perform the charterparty for the remainder of the stipulated term. Thereafter, save for the first voyage, the ship always greatly exceeded the laydays in port, both loading and unloading, and in fact during the term of the charterparty the ship performed only eight voyages. The charterers do not dispute their liability to pay demurrage for these lost days which amounts to the substantial sum of approximately $150,000. The owners, however, allege that but for the days lost in port the ship could have performed some six to nine additional profitable voyages during that time and upon that footing they claim large additional damages for loss of profit which the ship could have earned by reason of these additional voyages.

D

E

F

This dispute was referred to arbitration and has reached this House upon a consultative case by the arbitrators.

When the matter first came before your Lordships it was opened, as in the courts below, upon the footing that though the delays (beyond the laydays) in port were considerable, such delays

G

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

did not amount to repudiatory conduct on the part of the charterers.

It is not in doubt that every time the charterers exceeded the laydays in port they committed a breach of contract; a breach, however, for which the parties have agreed damages at the rate of $1,000 a day. But the owners argue that as this is not a single voyage charter but one contract for the performance of a number of consecutive voyages, damages are not to be determined solely by the length of detention of the ship in excess of the laydays in port as it was admitted they would have been in a single voyage charter, but that there was a further obligation upon the charterers to load and discharge within the lay time provided by the charter-party so that the ship might perform such a number of consecutive voyages each of a duration not exceeding the sea passage plus the permitted lay times in port, as proved to be capable of performance within the term of the charter. In other words, in a consecutive voyage charter there is a larger obligation upon the charterers to load and discharge the cargo within the laydays so that the owners may benefit from the profitable employment of their ship contemplated by the charterparty for the period of the charter. This obligation was said to arise either as a matter of construction of the charterparty regarded as a whole or from an implied term that the charterers would co-operate or concur in doing all things necessary to enable the owners to perform the maximum possible number of voyages and to earn the maximum possible amount of freight, which could in the ordinary course of events be performed or earned during the term of the charter.

My Lords, the charterparty in my opinion does not bear this construction. It is clear that the charterers have broken no express clause of the charterparty except the provision for detention in the ports of loading or discharge in excess of the laydays. The voyages have been in fact consecutive and I, for my part, can find nothing in the contract which imposes upon the charterers as a matter of construction or as a matter of necessary implication an obligation to undertake any additional requirement of loading within the laydays for breach of which they will be liable in damages beyond the rate of demurrage specified in the contract for exceeding those days. As both Mocatta J. and the Court of Appeal held, there was only one breach by the charterers, namely, a breach of the obligation to load and discharge at an agreed rate and the detention of the ship in a port beyond that date was a breach of contract for

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

which the parties had agreed damages. The owners, however, placed much reliance upon the case of *Aktieselskabet Reidar* v. *Arcos Ltd.*[95] but with all respect to the argument that was a very different case. In the view of Greer J. at first instance and the majority of the Court of Appeal there were in that case breaches of two quite independent obligations; one was demurrage for detention (as here) the other was a failure to load a full and complete cargo, which had become impossible owing to the onset of winter conditions and, therefore, entirely different considerations applied to that case. It is true that Bankes L.J. reached the same result by a different route on the particular facts of that case, but as Mocatta J. and the Court of Appeal, with whose judgments I am in full agreement, pointed out his ratio decidendi does not assist the owners in this quite different case. Accordingly, in my opinion, that case does not help your Lordships.

My Lords, I have dwelt upon this case at a little length because in the end I believe that the considerations which I have already mentioned are very material in deciding this appeal.

At the conclusion of his main argument counsel for the owners endeavoured to take a new point not raised in the courts below, namely, that the charterers had committed a fundamental breach of the contract which amounted to a repudiation and upon that footing it was urged that the owners were entitled to general damages for lack of profitability and were not confined to demurrage.

Your Lordships, in the special circumstances of this case, permitted the appeal to be re-argued de novo after supplemental cases had been lodged by each side. The owners' basic argument on this new case is that after the first voyage there were such delays beyond the laydays each time that the ship entered port for loading or discharge that the delays, each admittedly a breach of the charterparty, amounted cumulatively to a repudiation of the contract which entitled the respondents at their option to accept and to treat the contract as at an end and sail away. This appeal comes before your Lordships on a consultative case by the arbitrators and the relevant facts have not yet been found on this point so for the purposes of this point it is necessary to make the double assumption in favour of the owners, first, that it is open to the arbitrators on the facts to find that there has been a breach of contract by the charterers which goes to its root and entitled the owners to treat the contract as at an end and, secondly, that in fact

[95] [1927] 1 K.B. 352.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Upjohn

they will so find.  It was submitted by the charterers that upon the facts of this case, as a matter of law it was not open to the arbitrators to find in favour of the owners for it was said that out of 511 days which was the term of the charter after the agreement of October, 1957, only 154 days were demurrage days.  I cannot agree with this submission.  It is a proper matter of fact for the arbitrators to consider.  Accordingly, for the purpose solely of dealing with the argument I am prepared to make the assumptions desired by the owners.

But what seems to me quite clear, making these assumptions, is that there has been no acceptance by the owners of the repudiation which brought the contract to an end.  On the contrary, it seems to me clear that by their conduct the owners expressly affirmed the contract.  The relevant facts were known at all material times to them for they must have been made currently aware of the excessive delays in port; they had already sailed away once—I say nothing about that for it is still sub judice—but it was for the owners, knowing of the delays, to make up their minds whether to sail away again.  They did not do so and with full knowledge of all the facts elected to treat the contract as on foot until the expiry of the charterparty by effluxion of time.  It is this feature which gives rise to the whole difficulty in this interesting case.  For it is common ground that had the owners accepted the assumed repudiation and sailed away, thereby terminating the contract, none of its terms survived, and damages for breach of contract would have been at large including damages for loss of profitable employment of the ship for the term of the charterparty.

In general it cannot be disputed that where a party having an option to treat a contract at an end nevertheless affirms it, that contract and all its terms must remain in full force and effect for the benefit of both parties during the remainder of the period of performance, for it is not possible even for the innocent party to make a new contract between the parties without the concurrence of the other.  As Lord Atkin in *Hain Steamship Co. Ltd.* v. *Tate and Lyle Ltd.*[96] said:

" he can elect to treat the contract as subsisting; and if he does this with knowledge of his rights he must in accordance with the general law of contract be held bound."

and as Lord Wright said even more clearly [97]:

" In the present case the charterers elected to waive the breach,

[96] 41 Com.Cas. 350, 355.   [97] Ibid. 363.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Upjohn

with the result that the charterparty was not abrogated, but remained in force. The appellants were thus entitled to the benefit of the contract conditions, and in particular to rely on the exception of perils of the sea . . ."

and see *Chandris* v. *Isbrandtsen-Moller Co. Inc.*,[98] per Devlin J. That is this case. Now it is, in my opinion, quite clear that as a matter of construction of the charterparty the demurrage clause both as to loading and discharging is expressed without limitation of time and therefore applies throughout the term of the contract. If authority be wanted for this self-evident proposition it is to be found in *Western Steamship Co.* v. *Amaral Sutherland & Co.*,[99] *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*,[100] *Ethel Radcliffe Steamship Co. Ltd.* v. *W. & R. Barnett Ltd.*[101] Therefore, to succeed in this appeal the owner must displace the demurrage clause. He seeks to do so in reliance on the well-known doctrine that in certain circumstances a party to a contract cannot rely on an exception or limitation clause inserted solely for his benefit. But before examining this doctrine the first question which logically must be asked is, surely, whether this demurrage clause is a clause of exception or limitation. Whatever the ultimate ambit of the doctrine may be found to be it is, in my opinion, confined to clauses which are truly clauses of exception or limitation, that is to say clauses essentially inserted for the purpose only of protecting one contracting party from the legal consequences of other express terms of the contract or from terms which would otherwise be implied by law or from the terms of the contract regarded as a whole; just as a party may waive a clause which is inserted for solely his own benefit (see *Hawksley* v. *Outram*[102]) so per contra there are occasions when a party cannot be permitted to rely on such a clause. But if the clause is inserted for the benefit of both I know of no authority—and none has been cited—which entitles one party unilaterally to disregard its provisions. In my opinion, the demurrage clause with which we are concerned is a clause providing for agreed damages and is different from a clause excluding or limiting liability for damage by breach of contract by one party. An agreed damage clause is for the benefit of both; the party establishing breach by the other need prove no damage in fact; the other must pay that, no less but no more. But where liability for damage is limited by a clause then the person seeking

98 [1951] 1 K.B. 240, 248.
99 [1913] 3 K.B. 366; 29 T.L.R.
660.
100 [1917] 2 K.B. 193.
101 31 Com.Cas. 222
102 [1892] 3 Ch. 359, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Upjohn

to claim damages must prove them at least up to the limit laid down by the clause; the other party, whatever may be the damage in fact, can refuse to pay more if he can rely on the clause. As Greer J. said in relation to a demurrage clause in *Aktieselskabet Reidar* v. *Arcos Ltd.*[103]: " this clause was put in for my benefit as well as yours; it measures the damages I have to pay. . . ." Counsel for the owners sought to say that the agreed damages of $1,000 a day were much too low to be an estimate of damage and that it might be open to the arbitrators to hold that in truth this was in the nature of a penalty clause or a limitation clause limiting liability. I do not think it is open now to the owners to make this submission. It is quite clear on the authorities that the parties need not agree on a true estimate of damage. They are perfectly entitled to agree on a low rate. See *Cellulose Acetate Silk Co. Ltd.* v. *Widnes Foundry (1925) Ltd.*[104] and the *Chandris* case.[105]

Accordingly, in my opinion the demurrage clause is a clause which, the contract being affirmed, remains an agreed damages clause for the benefit of both parties and it is not a clause of exception or limitation inserted for the benefit of one party only to which the doctrine under consideration can properly be applied. That is sufficient to dispose of this appeal.

But in view of the arguments that have been addressed to your Lordships I think it is right that I should express my views thereon upon the footing that the demurrage clause in this case is indeed a clause of exception or limitation of liability inserted solely for the benefit of the charterer, and that it is therefore a clause to which in certain circumstances the doctrine relied upon by the appellants applies. That the doctrine exists is not in doubt, but it is necessary to examine the authorities to understand the principle upon which it is based.

There was much discussion during the argument upon the phrases " fundamental breach " and " breach of a fundamental term " and I think it is true that in some of the cases these terms have been used interchangeably; but in fact they are quite different. I believe that all of your Lordships are agreed and, indeed, it has not seriously been disputed before us that there is no magic in the words " fundamental breach "; this expression is no more than a convenient shorthand expression for saying that a particular breach or breaches of contract by one party is or are such as

---

[103] [1926] 2 K.B. 83, 86.
[104] [1933] A.C. 20.
[105] [1951] 1 K.B. 240, 249.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

to go to the root of the contract which entitles the other party to treat such breach or breaches as a repudiation of the whole contract. Whether such breach or breaches do constitute a fundamental breach depends on the construction of the contract and on all the facts and circumstances of the case. The innocent party may accept that breach or those breaches as a repudiation and treat the whole contract at an end and sue for damages generally or he may at his option prefer to affirm the contract and treat it as continuing on foot in which case he can sue only for damages for breach or breaches of the particular stipulation or stipulations in the contract which has or have been broken.

But the expression "fundamental term" has a different meaning. A fundamental term of a contract is a stipulation which the parties have agreed either expressly or by necessary implication or which the general law regards as a condition which goes to the root of the contract so that *any* breach of that term may at once and without further reference to the facts and circumstances be regarded by the innocent party as a fundamental breach and thus is conferred on him the alternative remedies at his option that I have just mentioned. I discussed this matter in the Court of Appeal in *Hongkong Fir Shipping Co. Ltd.* v. *Kawasaki Kisen Kaisha Ltd.*[106]

With these preliminary observations I must now examine some of the cases that were cited to your Lordships as examples of the principle that in some circumstances a party to the contract cannot rely on clauses inserted for his benefit. The earlier cases were nearly all cases of carriage of goods by sea or by land or concerned with the warehousing of goods. The principles on which these cases, mainly in the last century, were decided were not expressed by the judges to be related to repudiatory conduct on the part of one party thereto nor to any principle of frustration, for these conceptions were not so fully developed as they are now. Thus, in cases of carriage of goods by sea, an unreasonable deviation from the usual and customary course is and has always been considered as precluding the shipowner from relying on any clauses inserted for his protection—see for example *Davis* v. *Garrett*[107] and *Scaramanga* v. *Stamp.*[108] So strict is this rule that although the deviation has not been the cause of any loss to the plaintiff's

[106] [1962] 2 Q.B. 26, 63; [1962] 2 W.L.R. 474; [1962] 1 All E.R. 478, C.A.

[107] (1830) 6 Bing. 716.
[108] (1880) 5 C.P.D. 295, C.A.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
———
LORD
UPJOHN
———

goods and was, so to speak, a mere incident in the voyage, nevertheless having taken place the owner is no longer entitled to rely on clauses of exception contained in the relevant contract, unless it can be shown that the loss would have happened in any event (see *United States Shipping Board* v. *Bunge y Born*[109]; *Morrison (James) & Co.* v. *Shaw, Savill, and Albion Co. Ltd.*[110]). It was not, however, until this century that deviation was finally established as a fundamental breach. This was first suggested, rather tentatively, by Lord Esher M.R. in *Balian & Sons* v. *Joly, Victoria & Co. Ltd.*[111] but was accepted as the basis of his decision by the Court of Appeal in *Joseph Thorley Ltd.* v. *Orchis Steamship Co. Ltd.*[112] Collins M.R. pointed out that the deviation goes to the root of the contract and its performance is a condition precedent to the right of a shipowner to put the bill of lading in suit.

Finally, this House in *Hain Steamship Co. Ltd.* v. *Tate & Lyle Ltd.*[113] established the proposition in relation to carriage of goods by sea in the words of Lord Atkin[114] (with which the other Lords agreed):

> " I venture to think that the true view is that the departure from the voyage contracted to be made is a breach by the shipowner of his contract, a breach of such a serious character that, however slight the deviation, the other party to the contract is entitled to treat it as going to the root of the contract, and to declare himself as no longer bound by any of the contract terms."

So the law is now quite clearly established that unless the parties otherwise agree the usual and customary course on any voyage described in a charterparty is a fundamental term and therefore *any* breach of it (however for practical purposes irrelevant) is a fundamental breach. See this stated explicitly by Lord Wright in the *Tate & Lyle* case.[115] Moreover, Lord Atkin made it clear that the rule that the owner cannot rely on an exception clause in such a case is not because of anything special about such a clause but it is the result of the application of the ordinary law of contract. He said[116]:

> " If this view be correct, then the breach by deviation does not automatically cancel the express contract, otherwise the shipowner by his own wrong can get rid of his own contract.

[109] (1925) 31 Com.Cas. 118; 42 T.L.R. 174; 23 Ll.L.Rep. 257, H.L.
[110] [1916] 2 K.B. 783; 32 T.L.R. 712, C.A.
[111] (1890) 6 T.L.R. 345, C.A.
[112] [1907] 1 K.B. 660; 23 T.L.R. 338, C.A.
[113] 41 Com..Cas. 350.
[114] Ibid. 354.
[115] Ibid. 362, 363.
[116] Ibid. 355.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Upjohn

A

Nor does it affect merely the exceptions clauses. This would make those clauses alone subject to a condition of no deviation, a construction for which I can find no justification. It is quite inconsistent with the cases which have treated deviation as precluding enforcement of demurrage provisions. The event falls within the ordinary law of contract. The party who is affected by the breach has the right to say, 'I am not now bound by the contract whether it is expressed in charterparty, bill of lading, or otherwise.' "

B

Lord Atkin then went on to point out that equally the innocent party electing to treat the contract as at an end is not bound by his promise to pay the agreed freight any more than by his other promises.

C

The warehouse cases and cases of carriage by land have developed on parallel lines. The principle on which these cases proceeded originally is well stated by Scrutton L.J. in *Gibaud* v. *Great Eastern Railway Co.*[117] where he said:

D

"The principle is well known, and perhaps *Lilley* v. *Doubleday*[118] is the best illustration, that if you undertake to do a thing in a certain way, or to keep a thing in a certain place, with certain conditions protecting it, and have broken the contract by not doing the thing contracted for in the way contracted for, or not keeping the article in the place in which you have contracted to keep it, you cannot rely on the conditions which were only intended to protect you if you carried out the contract in the way in which you had contracted to do it."

E

These observations have subsequently been approved in your Lordships' House in *London & North Western Railway Co.* v. *Neilson.*[119] Thus, to give one or two examples from the cases to illustrate the general proposition, in *Lilley* v. *Doubleday*[120] itself the warehouseman contracted to store his goods at A but in fact he stored them at B. It was held that he could not rely on a clause of exception excusing him from loss without negligence though he could have relied on the clause if they had been warehoused at A. Again, in *Mallett* v. *Great Eastern Railway Co.*,[121] a consignment of fish contracted to be sent to Jersey by the Weymouth route was sent by the consignor by mistake via the Southampton route and although the steamers were due to arrive at Jersey at about the same time the Southampton steamer, being on a longer sea route, was delayed by bad weather and it was held that the consignor

F

G

117 [1921] 2 K.B. 426, 435.
118 7 Q.B.D. 510.
119 [1922] 2 A.C. 263.
120 7 Q.B.D. 510.
121 [1899] 1 Q.B. 309.

H. L. (E.)

1966

———

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale
———
LORD
UPJOHN
———

could not rely on a clause of exception for he had done something wholly at variance with the contract. So, too, in *Gunyon* v. *South Eastern and Chatham Railway Companies' Managing Committee*,[122] the goods were by mistake transferred from a passenger train by which means the consignor had contracted to send them on to a goods train, and it was held that the consignor could not rely on a clause of exception against liability for loss.

Just as in the case of deviation in sea voyages, it is a fundamental term of the relevant contract that ships shall proceed by the ordinary and customary route and that any deviation changes the adventure and is at once a fundamental breach, regardless of the consequences so in the other cases to which Scrutton L.J. referred in *Gibaud's* case[123] the true ratio decidendi in my view is that the law treats the stipulation that the goods shall be housed in a particular place or that they shall be consigned by a particular route or on a particular type of train as a fundamental term, breach of which at once entitles the other side to accept, if he so desires, as a fundamental breach. In forming this view I am fortified by the observations of Lord Dunedin in *London & North Western Railway Co.* v. *Neilson*[124] where he treats these observations of Scrutton L.J. as being illustrative of or comparable to a deviation in a shipping contract. I can see no justification for applying some special rule to those classes of case any more than in the deviation cases. Both are governed by and *only* by the general law relating to contracts.

If I am right in drawing this conclusion then the necessary result, in my opinion, is that the principle upon which one party to a contract cannot rely on the clauses of exception or limitation of liability inserted for his sole protection, is not because they are regarded as subject to any special rule of law applicable to such clauses as being in general opposed to the policy of the law or for some other reason but, just as in the deviation cases, it is the consequence of the application of the ordinary rules applicable to all contracts, that if there is a fundamental breach accepted by the innocent party the contract is at an end; the guilty party cannot rely on any special terms in the contract. If not so accepted the clauses of exception or limitation remain in force like all the other clauses of the contract.

Thus, for my part if in *Karsales (Harrow) Ltd.* v. *Wallis*[125]

---

[122] [1915] 2 K.B. 370.
[123] [1921] 2 K.B. 426, 435.
[124] [1922] 2 A.C. 263, 272.
[125] [1956] 1 W.L.R. 936.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

Denning L.J.[126] or Parker L.J.,[127] in passages which have
already been quoted in the speech of Lord Reid[128] and which,
therefore, I shall not repeat, were intending to lay down some
special rule of law applicable to exclusion or limitation clauses, I
find myself unable to agree. I prefer the view of Pearson L.J. in
*U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and
National Bank of Greece, S.A.*[129] that the matter is one of the true
construction of the contract. But before considering this question
of construction one matter remains to be stated. In very many
of the cases which were cited to your Lordships there was no
question of any election by the innocent party either to affirm or
disaffirm the contract when the other party had committed a funda-
mental breach. This is because in so many cases, as Lord Denning
pointed out in the *U.G.S.* case,[130] the voyage or journey or ware-
housing contract has been completed before the innocent party
gets to know of any breaches of it, and the only course open to
him is to sue for breach, and he does so upon the footing that he
is entitled to treat the whole contract as at an end, for the law is
clear that where there has been a fundamental breach he can only
be taken to affirm the contract if he knows his full rights. Thus, in
the *Bunge y Born* case[131] the whole argument in your Lordships'
House turned upon the question whether there had been a deviation
or not, and it was assumed that if deviation was proved the char-
terer could thereupon at the conclusion of the voyage sue as for a
fundamental breach.

Therefore, my Lords, as in my opinion the owners have
expressly affirmed the contract they cannot escape from the con-
sequences of the demurrage clause, unless as a matter of con-
struction of that clause they can show that it has no application to
the events of this case; this they cannot do for the reasons I have
already given. Accordingly, upon the footing that the demurrage
clause is a clause of exclusion or limitation, this does not avail the
owners in this case.

But, my Lords, again having regard to the arguments addressed
to your Lordships, I think I ought to make one or two observations
upon the question of construction of exclusion or limitation clauses.

It cannot be doubted that even while the contract continues in
force (that is there has been no fundamental breach but only some
lesser breach) exclusion clauses are strictly construed. Why this

126 [1956] 1 W.L.R. 936, 940.          129 [1964] 1 Lloyd's Rep. 446, 453.
127 Ibid. 943.                         130 Ibid. 450.
128 Ante, p. 401B–C.                    131 31 Com.Cas. 118.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

should be so is largely a matter of history and I think probably stems from the fact that in so many cases exceptions clauses are to be found in rather small print sometimes on the back of the main terms of the contract and that the doctrine of " contra proferentes " has been applied. But whatever the reason, that they are strictly construed against the contracting party seeking protection even during the currency of the contract cannot be doubted.

I refer only to two examples: the first is to be found in the judgment of Lord Sterndale M.R. in *The Cap Palos*,[132] where he expressly put his decision upon a strict construction of the exclusion clause relied on, and treated the contract as continuing. With all respect to the judgment of Atkin L.J. in that case,[133] I think the reasoning of Lord Sterndale is to be preferred. A second example is to be found in the observations of Lord Sumner in *London & North Western Railway Co.* v. *Neilson* [134] where he (in contrast to the other Lords) expressly put his decision upon the footing that the contract remained on foot, but he gave a very strict construction to the words " in transit " and held that it did not apply to goods not actually in transit which had wrongly been delivered to a railway cloakroom.

But where there is a breach of a fundamental term the law has taken an even firmer line for there is a strong, though rebuttable, presumption that in inserting a clause of exclusion or limitation in their contract the parties are not contemplating breaches of fundamental terms and such clauses do not apply to relieve a party from the consequences of such a breach even where the contract continues in force. This result has been achieved by a robust use of a well-known canon of construction, that wide words which taken in isolation would bear one meaning must be so construed as to give business efficacy to the contract and the presumed intention of the parties, upon the footing that both parties are intending to carry out the contract fundamentally. Thus, in *Leduc & Co.* v. *Ward* [135] where the charterparty was for a voyage from Fiume to Dunkirk " with liberty to call at any ports in any order," it was construed by Lord Esher M.R.[136] to mean any ports which would be substantially ports which in the course of the voyage would be passed on the named voyage, so that a call at Glasgow was held to be a deviation and, therefore, a breach of the fundamental term, notwithstanding the wide words of the exception. Again, in your

[132] [1921] P. 458, 465.
[133] Ibid. 468.
[134] [1922] 2 A.C. 263, 278.
[135] (1888) 20 Q.B.D. 475; 4 T.L.R. 313, C.A.
[136] 20 Q.B.D. 475, 482.

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
UPJOHN

Lordships' House in *Glynn* v. *Margetson & Co.*[137]: under a bill of lading the ship was to carry oranges from Malaga to Liverpool, but the words of exclusion permitted the ship to visit almost any ports in Europe or Africa. The voyage from Malaga to Liverpool was treated by Lord Herschell L.C.[138] as the main object and intent of the contract (that is, parenthetically, a fundamental term) and the wide words permitting calls at almost any port must be cut down so as not to defeat that object and intent. Lord Halsbury said [139]:

> " Looking at the whole of the instrument, and seeing what one must regard, for the reason which I will give in a moment, as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract."

The cases of *Cunard Steamship Co. Ltd.* v. *Buerger* [140] and the *Neilson* case [141] support the same view. In the former case [142] Lord Parmoor said of an exception clause:

> " [They] do not apply when . . . loss or damage has occurred outside the route or voyage contemplated by the parties when they entered into the contract of carriage, unless the intention that such limitations should apply is expressed in clear and unambiguous language."

In the latter case [143] Lord Dunedin said:

> " It is a broad principle of great importance in all contracts of carriage that when a carrier protects himself by exceptions, *unless they are very clearly worded*, they only apply to his carrying out of the contract and do not apply if he is doing something which he has not contracted to do." [The italics are mine.]

Both noble Lords were dealing with what we now call fundamental terms and illustrate both the presumption and its rebuttable character.

The appellants relied strongly on the case of *Charterhouse Credit Co. Ltd.* v. *Tolly.*[144] That case affords no help to them for it was dealing with breach of a fundamental term and there is no suggestion of such a breach in this case. That case is open to review by your Lordships and having had the advantage of much fuller argument than was afforded to us in the Court of Appeal in that case it is possible that the true justification of that decision

137 [1893] A.C. 351.
138 Ibid. 355.
139 Ibid. 357.
140 [1927] A.C. 1.
141 [1922] 2 A.C. 263.
142 [1927] A.C. 1, 13.
143 [1922] 2 A.C. 263, 272.
144 [1963] 2 Q.B. 683.

H. L. (E.)
1966
___
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale
___
LORD
UPJOHN
___

lies in the application of the presumption I have mentioned to the relevant clause of exclusion in that case.

My Lords, in view of the introduction in the questions posed by the arbitrator of the impact of a presumed wilful default, for my part I think it is only necessary to say that it seems to me as a matter of general principle that wilful default in connection with the matters we are now considering is relevant and relevant only to one matter, that is to say, whether in fact the owners can establish a fundamental breach. In cases such as this, where there has been no breach of any fundamental term, the question as to whether there has been a fundamental breach must be a question of fact and degree in all the circumstances of the case, but one of the elements in reaching a conclusion upon that matter is necessarily the question as to whether there has been a wilful breach, for as a practical matter it cannot be doubted that it is easier to find as a fact, for such it primarily is, that the charterers are evincing an intention no longer to be bound by the terms of the contract and are therefore guilty of repudiatory conduct if it can be established that the breaches have been wilful and not innocent. I say no more upon that.

My Lords, I would dismiss this appeal.

LORD WILBERFORCE. My Lords, I agree that the present appeal, in so far as it is based upon the reasons advanced in the original case lodged by the appellants, must fail and I do not find it necessary to add to the reasons for so finding given by Mocatta J. and the Court of Appeal. It is only upon the submissions contained in the appellants' supplementary case that I desire to add some observations, since these involve some issues of general importance in the law of contract.

The nature of the appellants' contentions can most conveniently be seen from the answer which they suggest should be given to the questions stated in the consultative case. To the first question (which is whether the owners can recover damages suffered by reason of the respondents having failed to load and discharge the vessels within laydays, whereby the charterparty was rendered less profitable to the owners by consequent loss of voyages or voyage time) the appellants suggest the qualified answer "Yes, if the detention of the vessel was a deviation from, or a repudiation or fundamental breach of, the charterparty. Otherwise, no." And they suggest that the same answer should be given to the second question which is based upon the assumption that such loss of

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

A

profitability resulted from the respondents having deliberately (i.e., with the wilful intention of limiting the number of contractual voyages) failed to load and/or discharge the vessel within the laydays.

In amplification of this, the appellants submit that the qualification appearing in the suggested answer would apply, first, if the detention of the vessel caused by the respondents' breaches of contract was in the aggregate so long as to frustrate the commercial purpose of the charterparty, or, secondly, if that detention was deliberate, in the special sense used in the consultative case. Whether either of these situations existed would be for the arbitrators to find. I am prepared to deal with the submissions of law so made upon the assumption that it is open to the arbitrators so to find that they might do so.

The appellants' main argument in law is formulated as follows: First, they say that a breach of contract which goes to the root of the contract or which conflicts with its main purpose is a deviation from or a repudiation or fundamental breach of such contract. Secondly, they contend that exceptions clauses do not apply to breaches which are deviations from or repudiations or fundamental breaches of the contract. These propositions contain in themselves implicitly or explicitly several distinct lines of argument. It is necessary to separate the strands before attempting to examine them.

It is convenient first to segregate the reference to what is sometimes (and conveniently) described as the main purpose rule. This is a rule of construction, a classic statement of which is found in Lord Halsbury's speech in *Glynn* v. *Margetson & Co.*[145]: it can be summed up in his words [146]:

" Looking at the whole of the instrument, and seeing what one must regard, as its main purpose, one must reject words, indeed whole provisions, if they are inconsistent with what one assumes to be the main purpose of the contract."

The decision in that case was that printed words in a document intended to be used in a variety of contracts of affreightment between a variety of ports ought to be restricted so as to be consistent with the purpose of the particular charterparty which was for a voyage from Malaga to Liverpool. There is no difficulty as to this, and I shall consider in due course whether it has any application to the relevant clause (i.e., the demurrage clause) in the contract.

[145] [1893] A.C. 351.     [146] Ibid. 357.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

Next for consideration is the argument based on "fundamental breach" or, which is presumably the same thing, a breach going "to the root of the contract." These expressions are used in the cases to denote two quite different things, namely, (i) a performance totally different from that which the contract contemplates, (ii) a breach of contract more serious than one which would entitle the other party merely to damages and which (at least) would entitle him to refuse performance or further performance under the contract.

Both of these situations have long been familiar in the English law of contract; and it will have to be considered whether the conception of "fundamental breach" extends beyond them. What is certain is that to use the expression without distinguishing to which of these, or to what other, situations it refers is to invite confusion.

The importance of the difference between these meanings lies in this, that they relate to two separate questions which may arise in relation to any contract. These are (as to (i)) whether an "exceptions" clause contained in the contract applies as regards a particular breach and (as to (ii)) whether one party is entitled to elect to refuse further performance.

The appellants, in their submission that exceptions clauses do not apply to "fundamental breaches" or "repudiations" confuse these two questions. There is in fact no necessary coincidence between the two kinds of (so-called fundamental) breach. For, though it may be true generally, if the contract contains a wide exceptions clause, that a breach sufficiently serious to take the case outside that clause, will also give the other party the right to refuse further performance, it is not the case, necessarily, that a breach of the latter character has the former consequence. An act which, apart from the exceptions clause, might be a breach sufficiently serious to justify refusal of further performance, may be reduced in effect, or made not a breach at all, by the terms of the clause.

The present case is concerned with the application of what may be said (with what justice will be later considered) to be an exceptions clause to a possible type of "fundamental breach." I treat the words "exceptions clause" as covering broadly such clauses in a contract as profess to exclude or limit, either quantitatively or as to the time within which action must be taken, the right of the injured party to bring an action for damages. Such a clause must, ex hypothesi, reflect the contemplation of the parties that a

H. L. (E.)
1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
**Kolen**
Centrale

LORD
WILBERFORCE

breach of contract, or what apart from the clause would be a breach of contract, may be committed, otherwise the clause would not be there; but the question remains open in any case whether there is a limit to the type of breach which they have in mind. One may safely say that the parties cannot, in a contract, have contemplated that the clause should have so wide an ambit as in effect to deprive one party's stipulations of all contractual force: to do so would be to reduce the contract to a mere declaration of intent. To this extent it may be correct to say that there is a rule of law against the application of an exceptions clause to a particular type of breach. But short of this it must be a question of contractual intention whether a particular breach is covered or not and the courts are entitled to insist, as they do, that the more radical the breach the clearer must the language be if it is to be covered. As Lord Parmoor said in *Cunard Steamship Co. Ltd.* v. *Buerger* [147] in relation to exception clauses:

> " [they] do not apply when . . . loss or damage has occurred outside the route or voyage contemplated by the parties when they entered the contract of carriage, unless the intention that such limitations should apply is expressed in clear and unambiguous language."

And in *The Cap Palos* [148] Atkin L.J. similarly said:

> " I am far from saying that a contractor may not make a valid contract that he is not to be liable for any failure to perform his contract, including even wilful default; but he must use very clear words to express that purpose . . ."

In application to more radical breaches of contract, the courts have sometimes stated the principle as being that a " total breach of the contract " disentitles a party to rely on exceptions clauses. This formulation has its use so long as one understands it to mean that the clause cannot be taken to refer to such a breach but it is not a universal solvent: for it leaves to be decided what is meant by a " total " breach for this purpose—a departure from the contract? but how great a departure?; a delivery of something or a performance different from that promised? but how different? No formula will solve this type of question and one must look individually at the nature of the contract, the character of the breach and its effect upon future performance and expectation and make a judicial estimation of the final result.

A few illustrations from three groups of decided cases may explain how the courts have dealt with this problem.

[147] [1927] A.C. 1, 13.                    [148] [1921] P. 458, 471, 472.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

(i) Supply of a different article: As long ago as 1838, where the contract provided for the supply of peas, but beans were delivered, Lord Abinger C.B. explained the difference between this case and a breach of "condition": "The contract is to sell peas, and if he sends him anything else in their stead, it is a non-performance of it." (*Chanter* v. *Hopkins* [149]). This was followed (after the Sale of Goods Act, 1893), in *Pinnock Brothers* v. *Lewis & Peat Ltd.*[150] (copra cake) and Pearson L.J. accepted the principle, while modernising the illustration (chalk for cheese) in *U.G.S. Finance Ltd.* v. *National Mortgage Bank of Greece and National Bank of Greece, S.A.*[151] Since the contracting parties could hardly have been supposed to contemplate such a mis-performance, or to have provided against it without destroying the whole contractual substratum, there is no difficulty here in holding exception clauses to be inapplicable.

(ii) Hire purchase cases: In several recent decisions, the courts have been able to hold wide exception clauses inapplicable by finding that what was delivered was totally different from that promised. Such are *Karsales (Harrow) Ltd.* v. *Wallis* [152] and *Charterhouse Credit Co. Ltd.* v. *Tolly*.[153] These cases, and others, follow the judgment of Devlin J. in *Smeaton Hanscomb & Co.* v. *Sassoon I. Setty & Co. (No. 1)* [154] where he expressed the test as being whether there was a performance totally different from that contemplated by the contract. In some of these cases difficult questions of fact have arisen in deciding whether there is the total difference, or merely a serious breach of contract, as can be seen by comparing the *Karsales* case [155] with *Astley Industrial Trust Ltd.* v. *Grimley* [156] and some doubt may be felt whether the right result on the facts was reached in *Charterhouse Credit Co. Ltd.* v. *Tolly* [157]: but the principle is well in line with that of the cases mentioned under (i).

(iii) Marine cases relating to deviation: There is a long line of authority the commencement of which is usually taken from the judgment of Tindal C.J. in *Davis* v. *Garrett*,[158] which shows that a shipowner who deviates from an agreed voyage, steps out of the contract, so that clauses in the contract (such as exceptions or limitation clauses) which are designed to apply to the contracted

[149] (1838) 4 M. & W. 399, 404.
[150] [1923] 1 K.B. 690; 39 T.L.R. 212.
[151] [1964] 1 Lloyd's Rep. 446, 453.
[152] [1956] 1 W.L.R. 936.
[153] [1963] 2 Q.B. 683.
[154] [1953] 1 W.L.R. 1468.
[155] [1956] 1 W.L.R. 936.
[156] [1963] 1 W.L.R. 584.
[157] [1963] 2 Q.B. 683.
[158] 6 Bing. 716.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

voyage are held to have no application to the deviating voyage.  **A**
The basis for the rule was explained in *Stag Line Ltd.* v. *Foscolo,
Mango & Co.*[159] by Lord Russell of Killowen in these terms:

> " it was well settled before the Act [of 1924] that an unjusti-
> fiable deviation deprived a ship of the protection of excep-
> tions.  They only applied to the contract voyage."

In *The Cap Palos*[160] Atkin L.J. had applied this principle to  **B**
contracts generally, adopting for this purpose the formulation of
Scrutton L.J. in *Gibaud* v. *Great Eastern Railway Company*[161]:

> " The principle is well-known, and perhaps *Lilley* v.
> *Doubleday*,[162] is the best illustration, that if you undertake to
> do a thing in a certain way, or to keep a thing in a certain
> place, with certain conditions protecting it, and have broken  **C**
> the contract by not doing the thing contracted for in the way
> contracted for, or not keeping the article in the place in which
> you have contracted to keep it, you cannot rely on the con-
> ditions which were only intended to protect you if you carried
> out the contract in the way which you had contracted to do it."

The words " intended to protect you " show quite clearly that the  **D**
rule is based on contractual intention.

The conception, therefore, of " fundamental breach " as one
which, through ascertainment of the parties' contractual intention,
falls outside an exceptions clause is well recognised and comprehen-
sible.  Is there any need, or authority, in relation to exceptions
clauses, for extension of it beyond this?  In my opinion there  **E**
is not.  The principle that the contractual intention is to be
ascertained—not just grammatically from words used, but by
consideration of those words in relation to commercial purpose (or
other purpose according to the type of contract)—is surely flexible
enough, and though it may be the case that adhesion contracts give
rise to particular difficulties in ascertaining or attributing a contrac-  **F**
tual intent, which may require a special solution, those difficulties
need not be imported into the general law of contract nor be
permitted to deform it.

The only new category of " fundamental breach " which in this
context I understand to have been suggested is one of " deliberate "
breaches.  This most clearly appears in the Privy Council case of
*Sze Hai Tong Bank Ltd.* v. *Rambler Cycle Co. Ltd.*[163]  The decision  **G**
itself presents no difficulty and seems to have been based on
construction:  it was that an exceptions clause referring to

[159] [1932] A.C. 328, 347; 48 T.L.R.       [161] [1921] 2 K.B. 426, 435.
127, H.L.                                   [162] 7 Q.B.D. 510.
[160] [1921] P. 458, 471.                   [163] [1959] A.C. 576.

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

" discharge " of the goods did not apply to a discharge wholly outside the contract, a case I would have thought well within the principle of the " deviation " cases. But the appellants rely on one passage in the judgment of the Board which seems to suggest that " deliberate " breaches may, of themselves, form a separate category, citing three previous English decisions. Two of them *Alexander* v. *Railway Executive*[164] and *Karsales (Harrow) Ltd.* v. *Wallis*[165] (on which I have already commented) are straightforward cases of " total departure " from what is contractually contemplated and present no difficulty. The third *Bontex Knitting Works Ltd.* v. *St. John's Garage*[166] does not appear to be based on the deliberate character of the breach. The decision may be justified on the basis that there was a breach of contract equivalent to a deviation, but if it goes beyond this I would regard it as of doubtful validity. The " deliberate " character of a breach cannot, in my opinion, of itself give to a breach of contract a " fundamental " character, in either sense of that word. Some deliberate breaches there may be of a minor character which can appropriately be sanctioned by damages: some may be, on construction, within an exceptions clause (for example, a deliberate delay for one day in loading). This is not to say that " deliberateness " may not be a relevant factor: depending on what the party in breach " deliberately " intended to do, it may be possible to say that the parties never contemplated that such a breach would be excused or limited: and a deliberate breach may give rise to a right for the innocent party to refuse further performance because it indicates the other party's attitude towards future performance. All these arguments fit without difficulty into the general principle: to create a special rule for deliberate acts is unnecessary and may lead astray.

I now come to the facts of the present case. First, it is necessary to decide what is the legal nature of the demurrage clause: is it a clause by which damages for breach of the contract are agreed in advance, a liquidated damages clause as such provisions are commonly called, or is it, as the appellants submit, a clause limiting damages? If it is the latter, the appellants are evidently a step nearer the point when they can invoke cases in which clauses of exception, or exemption, do not apply to particular breaches of contract. The appellants' strongest argument here rests upon the discrepancy which they assert to exist between the demurrage rate of $1,000 per diem and the freight rate for which the

H. L. (E.)
1966
Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

Lord
Wilberforce

charterparty provides. The extent of the discrepancy is said to be   A
shown by the difference between the appellants' claim for lost
freight (which is of the order of $900,000 on one calculation and
$600,000 on another) and the amount which they would receive
under the demurrage provision, which is approximately $150,000.
So, the argument runs, the $1,000 per diem cannot be a pre-estimate
of damage: it must be a limit in the charterer's favour.   B

I am unable to accept this. Leaving aside that the figures quoted
for lost freight represent merely the owners' claim, it must be borne
in mind that the $1,000-a-day figure has to cover a number of
possible events. There might have been delay for one day or a
few days beyond the laytime, in which case the owners might, and
probably would, lose nothing in the way of freight and only suffer   C
through increased overheads in port. Even if a case were to
arise where freight was lost, over a period of two years circum-
stances might well change which would affect adversely the owners'
anticipated rate of profit. So I am far from satisfied that any such
discrepancy has been shown between the agreed figure and reality
as requires the conclusion that the clause is not what on its face   D
it purports to be—particularly when one bears in mind that each
side derives an advantage from having the figure fixed and so being
assured of payment without the expense and difficulty of proof.

The form of the clause is, of course, not decisive, nor is there
any rule of law which requires that demurrage clauses should be
construed as clauses of liquidated damages; but it is the fact that   E
the clause is expressed as one agreeing a figure, and not as imposing
a limit: and as a matter of commercial opinion and practice
demurrage clauses are normally regarded as liquidated damage
clauses. (This has the authority of Scrutton on Charterparties,
10th and following editions, and see *Chandris* v. *Isbrandtsen-Moller
Co. Inc.*[167] per Devlin J.)   F

The clause being, then, one which fixes, by mutual agreement,
the amount of damages to be paid to the owners of the vessel if
" longer detained " than is permitted by the contract, is there any
reason why it should not apply in the present case in either of the
assumed alternatives, i.e., either that the aggregated delays add   G
up to a " frustrating " breach of contract, or that the delays were
" deliberate " in the special sense? In answering these questions
it is necessary to have in mind what happened. It appears that
there was an initial dispute between the owners and the charterers

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
*v.*
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

in which the owners claimed that they were entitled to treat the charterers as having repudiated the charterparty. This dispute was resolved by an agreement on October 8, 1957, under which the charterers agreed to pay an agreed sum as demurrage, leaving it to arbitration to decide whether the owners' claim was correct and, if so, what damages they should recover. It was further agreed that the charterparty should be performed for the remainder of the agreed two-year period. The manner in which it was performed is set out in a schedule to the consultative case. There were eight voyages in all, the last terminating on March 7, 1959, three days before the termination date. It is as regards these eight voyages that it is claimed that the delays in question occurred. During the whole of the period, although the periods spent in port on either side of the Atlantic (in fact at Rotterdam and, in every case but the first, Newport News) must have been known to the owners, who must also have been in a position to ascertain the availability of cargo and of loading and discharging facilities, the owners took no steps which would indicate that they regarded the charterparty as repudiated: they did not sail their vessel away but allowed it to continue with further voyages and took demurrage at the agreed rate for the delays. So there is no question here of any termination of the contract having taken place. Is there, then, any basis upon which the owners can escape from their bargain as regards detention of the vessel? In my opinion there is not. The arbitrators can (on the assumptions required) only find that the breach of contract falls within one, or other, or both of the two stated categories, namely, that they " frustrate the commercial purpose of the charterparty," or that the delays were " deliberate " (in the special sense). In either case, why should not the agreed clause operate? Or what reason is there for limiting its application to such delays as fall short of such as " frustrate the commercial purpose " or such as are not " deliberate "? I can see no such reason for limiting a plain contractual provision, nor is there here any such conflict between the demurrage clause and the main purpose of the contract as to bring into play the doctrine of *Glynn* v. *Margetson & Co.*[168] On a consideration of the nature of this clause, together with the events which took place, and in particular the fact that the owners did not during its currency put an end to the contract, I reach the conclusion that the owners are clearly

H. L. (E.)

1966

Suisse
Atlantique
Société
d'Armement
Maritime S.A.
v.
N.V. Rotter-
damsche
Kolen
Centrale

LORD
WILBERFORCE

bound by it and can recover no more than the appropriate amount of demurrage.

I find support for this conclusion in two decisions of the Court of Appeal. In *Inverkip Steamship Co. Ltd.* v. *Bunge & Co.*[169] there was a detention of the ship beyond (as was held) a reasonable time for keeping it on demurrage. The demurrage clause was in a similar form to that in the present case: "If detained longer than five days," and was held to be applicable to the whole period of delay. The Court of Appeal did not decide the question whether the delay was such as to amount to a " repudiatory breach," so that the master could have sailed away, but the implication at least of the judgment of Warrington L.J. is that the same result would have followed if this had been so. Then in *Ethel Radcliffe Steamship Co. Ltd.* v. *W. & R. Barnett Ltd.*,[170] there was a deliberate detention. The arbitrators' actual finding (which it is relevant to compare with the possible finding here) was that " the respondents neglected and refused to give such order under August 29, 1924, and did so deliberately as it suited their business arrangements to keep the steamer at St. Vincent." It was argued that the charterer had repudiated the contract and that the demurrage clause did not cover wilful detention, but the Court of Appeal held to the contrary. Counsel for the appellants submitted that these cases were wrongly decided but they seem to me to be entirely in accordance with principle, and I respectfully agree with them.

On the whole case, I would dismiss the appeal.

*Appeal dismissed.*

Solicitors: *Richards, Butler & Co.; William A. Crump & Son.*

J. A. G.

[169] [1917] 2 K.B. 193.          [170] 31 Com.Cas. 222.

Exhibit C

Royal Courts of Justice
20th December 1961

B e f o r e :

**LORD JUSTICE SELLERS**
**LORD JUSTICE UPJOHN**
and
**LORD JUSTICE DIPLOCK**

Between:

# HONG KONG FIR SHIPPING COMPANY

## v

# KAWASAKI KISEN KAISHA LIMITED

**(Transcript of the Shorthand Notes of The Association of Official Shorthandwriters, Ltd.,**
**Room 392, Royal Courts of Justice, and 2 New Square, Lincoln's Inn, London, W.C.2).**

**Mr. ASHTON ROSKILL, Q.C., Mr. BASIL ECKERSLEY and Mr. B. DAVENPORT (instructed by**
**Messrs. Constant & Constant)**
**appeared on behalf of the Appellants (Defendants).**
**Mr. STEPHEN CHAPMAN, Q.C., Mr. MICHAEL KERR, Q.C. and**
**Mr. C.S.STAUGHTON instructed by Messrs. William & Crump & Son)**
**appeared on behalf of the Respondents (Plaintiffs).**

**HTML VERSION OF JUDGMENT**

Crown Copyright ©

**LORD JUSTICE SELLERS**: Both parties to this action are resident abroad, the plaintiffs in Hong Kong and the defendants in Japan, and, in substitution for the arbitration provisions, they agreed to have the dispute tried in our Commercial Court and it came before Mr. Justice Salmon in the early part of this year.

The litigation arises out of a time charter-party dated Tokyo 26th December, 1956, on the printed form "Uniform Time Charter of the Baltic and International Maritime Conference", the relevant terms of which are set out in the judgment and need not be repeated here.

The plaintiffs had purchased a 25-year-old vessel called the "Antrim", which they renamed the "Hong Kong Fir", of some 5395 tons gross and 3145 tons net register, and this was its first charter under the new owners. The vessel was delivered on the 13th February, 1957, at Liverpool and duly set out in ballast on her intended voyage to Newport Mews, Virginia, and then via the Panama Canal, calling at Cristobal, to Osaka in Japan, which she was expected to reach in about two months. On account of various delays which the learned judge has found were due to the

shipowners' breaches of contract, Osaka was not reached until the 25th May, 1957, and because of very extensive repairs to her main engines and auxiliaries which had to be carried out there she was not ready to put to sea again and continue her service until 15th September.

In the meantime the charterers had on the 6th June, 1957, written to the shipowners cancelling the charter-party because of the delay, due, it was said, to the unseaworthiness of the vessel. On the 8th August, 1957, the shipowners intimated that the cancellation was unjustifiable and said that they would treat it as a wrongful repudiation by the charterers of the charter-party and hold them liable for damages. The vessel was offered to the charterers as available to come on hire after the repairs in early September but the charterers maintained their refusal to go *on* with the charter and by the 13th September, 1957, if not before, the charter-party was at an end. The refusal by the charterers has been held to have been wrongful and judgment has been entered for the plaintiffs. During the currency of the charter-party the freight market had fallen steeply with the result that the judgment awarded them £184,743 damages. There is no doubt that there were prolonged and aggravating delays due to breaches of contract by the shipowners, and at the outset of his argument learned Counsel for the appellants relied strongly on the judge's findings of fact, which he submitted clearly showed the extent and the nature of the shipowners' breaches of contract and justified the charterers in terminating the charter-party.

The learned judge did not accept the charterers' allegations that the vessel's machinery was inefficient and defective and that the vessel was in that respect unseaworthy on delivery at Liverpool. From that finding there is no appeal, but it has been emphasised that although Mr. Justice Salmon held that the diesel engines and other machinery were in reasonably good condition on the 13th February, 1957, he found that by reason of their age the engines needed to be maintained by an experienced, competent, careful and adequate engine-room staff. It was held, however, and this has been unchallenged by the shipowners in this appeal, that the engine-room staff was incompetent and insufficient and in this respect the vessel was unseaworthy when handed over and on leaving Liverpool and throughout the voyage to Osaka where she was re-staffed so as to fulfil completely her requirements. She had on delivery five engineers, three fitters and seven greasers. The previous owners had employed seven engineers and eight ratings, and the judgment finds the complement of the engine-room staff insufficient. If they had all been competent and efficient all might have been well notwithstanding the numerical deficiency of officers, but the Chief Engineer was addicted to drink and repeatedly neglected his duties. Incompetence stands out conspicuously in the events in the engine-room which led to delays, and it is not surprising that the judgment finds that the owners were in breach of the obligations under clause 1 of the charter. The same facts and findings, he held, established a breach of the obligation under clause 3 of the charter to maintain the vessel in a thoroughly efficient state in hull and machinery. Although the learned judge recognised the difficulty of obtaining skilled officers and men for the engine-room he found that the shipowners had not exercised due diligence and that they could not escape liability under clause 13 of the charter-party.

The charterers' position was alleviated somewhat by the vessel becoming off hire under clause 11A from time to time and the duration of the charter-party could have been extended by the charterers under clause 32 by adding the off-hire time to the period of the charter.

The judgment found against the charterers' contention that the delays frustrated the commercial purpose of the contract and this contention was not pressed before us. This is not a case of frustration of contract but it was submitted that the delay due to breach of contract by the shipowners was sufficient to entitle the charterers as innocent parties, that is in no way to blame for what had happened, to have regard to their interests under the contract and that it was just in all the circumstances that they should be held free to terminate as they did.

The two main issues of law arising on the findings, formulated by Mr. Ashton Roskill for the appellants, were;

(1) Is the seaworthiness obligation a condition the breach of which entitles the charterers to treat the contract as repudiated?

(2) Where in breach of contract a party fails to perform it, by what standard does the ensuing delay

fall to be measured for the purpose of deciding whether the innocent party is entitled to treat the contract as repudiated? Is that standard (as the judgment holds) such delay as is necessary to frustrate the contract or is it, as the appellants contend, unreasonable delay, that is longer time than it would be reasonable in all the circumstances for a charterer to wait?

By clause 1 of the charter-party the shipowners contracted to deliver the vessel at Liverpool "she being in every way fitted for ordinary cargo service". She was not fit for ordinary cargo service when delivered because the engine-room staff was incompetent and inadequate and this became apparent as the voyage proceeded. It is commonplace language to say that the vessel was unseaworthy by reason of "this inefficiency in the engine-room".

Ships have been held to be unseaworthy in a variety of ways and those who have been put to loss by reason thereof (in the absence of any protecting clause in favour of a shipowner) have been able to recover damages as for a breach of warranty. It would be unthinkable that all the relatively trivial matters which have been held to be unseaworthiness could be regarded as conditions of the contract or conditions precedent to a charterer's liability and justify in themselves a cancellation or refusal to perform on the part of the charterer. If, in the present case, the inadequacy and incompetence of the engine-room staff had been known to them, the charterers could have complained of the failure by the shipowners to deliver the vessel at Liverpool in accordance with clause 1 of the charter-party and could have refused to take her in that condition. The vessel was to be delivered not earlier than 1st February, 1957, and not later than 31st March, 1957, apparently. No evidence was directed to the provision "to be narrowed for twenty days within the month of January 1957", but even that clause, if invoked, would have given the shipowners a week in which to bring the engine-room staff into suitable strength and competency for the vessel's "ordinary cargo service". If the shipowners had refused or failed so to do, their conduct and not the unseaworthiness would have amounted to a repudiation of the charter-party and entitled the charterers to accept it and treat the contract as at an end. Ike time of delivery is clearly a condition of the contract and has often been held to be so. Unless a shipowner could in those circumstances have relied on clause 13, a charterer in addition to cancellation would be entitled to damages, if any were suffered, which would not have been so apparently in this case as the freight market had fallen about that time.

If what is done or not done in breach of the contractual obligation does not make the performance a totally different performance of the contract from that intended by the parties, it is not so fundamental as to undermine the whole contract. Many existing conditions of unseaworthiness can be remedied by attention or repairs, many are intended to be rectified as the voyage proceeds, so that the vessel becomes seaworthy; and, as the judgment points out, the breach of a shipowner's obligation to deliver a seaworthy vessel has not been held by itself to entitle a charterer to escape from the charter-party. The charterer may rightly terminate the engagement if the delay in remedying any breach is so long in fact, or likely to be so long in reasonable-anticipation that the commercial purpose of the contract would be frustrated.

Mr. Roskill recognised the weight of authority against him in seeking to make seaworthiness a condition of the contract the breach of which, in itself, was to be regarded as fundamental so as to entitle a charterer to accept it as a repudiation of the charter-party and to regard the charter-party as terminated, and he relied more strongly on his second argument.

We were referred to the whole range of authorities from the early 19th century to the present day in support of both contentions, and the judgment in my opinion very clearly and fairly deals with many of them, applying some and distinguishing others. In Bradford v. Williams (1872) 7 Exchequer, page 259, a case in which a ship's captain refused to load at the place stipulated for the month of September, 1871, but was willing to load at a port he was permitted to select prior to that month and it was held that the breach of the charter-party by the shipowner went to the root of the contract and the charterer was right in his refusal to load, Baron Martin said with much point

> "Contracts are so various in their terms that it is really impossible to argue from the letter of one to the letter of another. All we can do is to apply the spirit of the law to the facts of each particular case. Now I think the words 'conditions precedent' unfortunate. The real question,

apart from all technical expressions, is what in each instance is the substance of the contract".

Some ninety years later those words seem as apt as they then were when the authorities relied on were hut a fraction of those which have accumulated in the ensuing years.

This case calls for consideration of the charter-party obligations and the respective rights of the parties only where the vessel has been accepted and used. Here the charterers had in fact, though with much delay, taken the vessel in ballast across the Atlantic, collected the contemplated cargo and carried it to the intended destination, Osaka, where it was discharged commencing on the 29th May, 1957. In these circumstances it is not open to the charterers to rely on the obligation of seaworthiness as a condition precedent to an obligation on the charterers to pay freight or hire.

In the early part of last century, before a counterclaim could be raised against a plaintiff's claim, sustained efforts were made, in the problems which arose in the increasing overseas trade, to resist a shipowner's claim by alleging a condition precedent unfulfilled. In Ritchie v. Atkinson (1808) 10 East, page 295, it failed. Lord Ellenborough held that the delivery of a complete cargo was not a condition precedent to the recovery of freight and relied on the reasoning of Lord Mansfield in the well known decision in Boone v. Eyre. Just as the shortage of one nigger could not defeat the whole contract which stipulated for a fixed number of niggers to be transferred, no more would the shortage of some cargo defeat a claim for freight.

The same principle was applied in respect of seaworthiness in Havelock v. Geddes (1809) 10 East, page 555, where Lord Ellenborough pointed out that if the obligation of seaworthiness were a condition precedent the neglect of putting in a single nail after the ship ought to have been made tight, staunch, etc., would be a breach of the condition and a defence to the whole of the plaintiff's demand.

By 1810, in Davidson v. Gwynne (12 East, page 381), Lord Ellenborough was saying that it was useless to go over the same subject again "which has so often been discussed of late" and held the sailing with the first convoy was not a condition precedent, the object of the contract was the performance of the voyage and that had been performed.

Tarrabochia v. Hickie (1856) 1 Hurlstone & Norman, page 183, emphasises the same principle and I think is of no less effect because it relates to a voyage charter. Chief Baron Pollock, whose succinct judgment provides a complete answer to the appellants' case, cites Lord Ellenborough in Davidson v. Gwynne –

> "that unless the non-performance alleged in the breach of contract goes to the whole root and consideration of it the covenant broken is not to be considered as a condition precedent but as a distinct covenant for breach of which the party may be compensated in damages unless by the breach of the stipulation of the fitness of the vessel the object of the voyage is wholly frustrated".

This decision was approved in Stanton v. Richardson (9 Common Pleas, page 390), where the shipowner had undertaken to carry a cargo of wet sugar and the ship was not fit to carry it and, as the jury had found, could not be made fit in such time as not to frustrate the object of the voyage. The molasses had drained from the wet sugar into the hold in large quantities and the ship's pumps were unable to deal with it. The cargo was unloaded and the charterers were held entitled to refuse to reload it or to provide any other cargo. If the defect had been or could have been remedied within a reasonable time so as not to frustrate the adventure it would seem that the charterer's right would not have been to terminate the charter-party but to have claimed damages for any loss occasioned by the delay. Kish v. Taylor (1912 Appeal Oases, page 604) affirms that a contract of affreightment, in that case a voyage charter, is not put an end to by a breach of the stipulation of seaworthiness. The passage in Lord Atkinson's speech at page 617 on which the appellants relied –

> "The fact that a ship is not in a fit condition to receive her cargo or is from any cause unseaworthy when about to start on her voyage will justify the charterer or holder of the bill in repudiating his contract and refusing to he bound by it"

- does not undermine the principle applied in the case. It applies in terms to the commencement of the voyage and it was not relevant to the case to consider the extent and nature of the unfitness or the time and circumstances in which it could be rectified.

Tully v. Howling (1877 2 Queen's Bench, page 182), although in favour of the charterer, gives no support to the appellants here whether it was decided on the ground of the majority that time was the essence of the contract and that the charterer who had a contract for twelve months' service was not bound to ten months' service, or, as Mr. Justice Brett held on appeal, that the ship was not fit for the purpose for which she was chartered and could not be made fit within any time which would not have frustrated the object of the adventure.

The argument for the appellants contrasted the decisions on deviation with those on unseaworthiness and submitted that the latter was at least as grave as the former. But deviation amounts to a stepping out of the contract, or may do, and as such it is a repudiation of it and a substitution of a different voyage or engagement.

The formula for deciding whether a stipulation is a condition or a warranty is well recognised; the difficulty is in its application. It is put in a practical way by Lord Justice Bowen in Bentsen v. Taylor Sons & Co. (1893 2 Queen's Bench page 274-, at page 281);

> "There is no way of deciding that question except by looking at the contract in the light of the surrounding circumstances and then making up one's mind whether the intention of the parties, as gathered from the instrument itself, will best be carried out by treating the promise as a warranty sounding only in damages or as a condition precedent by the failure to perform which the other party is relieved of his liability".

In my judgment authority over many decades and reason support the conclusion in this case that there was no breach of a condition which entitled the charterers to accept it as repudiation and to withdraw from the charter.

It was not contended that the maintenance clause is so fundamental a matter as to amount to a condition of the contract. It is a warranty which sounds in damages.

The appellants' argument on the second submission in my judgment equally fails and is to be rejected on many of the authorities already cited.

It was submitted that the doctrine of frustration is quite independent of rights arising out of a breach of contract. If a party by his breach induces delay he cannot claim frustration which would have been self-induced. It was said that a delay which would frustrate a contract was not in the minds of the 19th century judges and that their language permits of a lesser period of delay being sufficient to justify an innocent party from continuing with his bargain after a reasonable delay due to the breach of contract. Reliance was placed on the judgment of Chief Justice Tindal in Freeman v. Taylor (8 Bingham, page 124), which upheld the verdict of a jury in a deviation case where the jury had answered in the affirmative the question whether the deviation was of such a nature and description as to deprive the freighter of the benefit of the contract into which he had entered. It was submitted that that should be the question here and that it should be answered in favour of the charterers.

In Universal Cargo Carriers Corporation v. Citati (1957 2 Queen's Bench, page 401) a similar argument was advanced by Mr. Ashton Roskill (then appearing for shipowners who had cancelled a voyage charter-party because no cargo had been provided) and he relied on passages in the line of cases which he cited to us here and the statement in Scrutton on Charterparties in the earlier

editions. After reviewing the authorities, including <u>Clipsham v. Vertue</u>, to which I have not previously referred, Mr. Justice Devlin (as he then was) said that those authorities were conclusive and with that I respectfully agree and with the opinion which they support stated by the learned judge on page 430: "But a party to a contract may not purchase indefinite delay by paying damages....When the delay becomes so prolonged that the breach assumes a character so grave as to go to the root of the contract, the aggrieved party is entitled to rescind. What is the yardstick by which this length of delay is to be measured? Those considered in the arbitration can now be reduced to two" (as in the present appeal) "first, the conception of a reasonable time, and secondly, such delay as would frustrate the charter-party....In my opinion the second has been settled as the correct one by a long line of authorities".

In my judgment Mr. Justice Salmon was clearly right in the answers he gave to both of the contentions of the charterers relied on in this court, supported as the answers were by established authority and good commercial reason.

I would dismiss the appeal.

**LORD JUSTICE UPJOHN**: I agree entirely with the judgment which has just been delivered. I shall not recite any of the facts, and propose only to add a few words upon the two main submissions so meticulously argued before us by Mr. Ashton Roskill for the appellants.

Logically his first submission, as he recognised, was that the obligation to provide a seaworthy vessel was a condition for breach of which the charterer was at once entitled to treat the contract as repudiated.

The charter-party (which, incidentally, was dated the 26th December, 1956, though it is common ground that it must in fact have been executed some weeks later for the respondent company was not incorporated at that date) contained the seaworthiness clause in these terms: "She being in every way fitted for ordinary cargo service". At first sight that would seem to be a basic term underlying the whole of the charter-party, for how could the vessel perform the tasks which the owners warranted that she was fit to perform unless she is in fact fit to meet the perils of the sea? So basic is this obligation in a charter-party that unless there is an express clause of exclusion, it will he implied where not expressed.

Yet with all respect to Mr. Roskill's argument, it seems to me quite clear that the seaworthiness clause is not in general treated as a condition for breach of which the charterer is at once entitled to repudiate. This is established by a number of authorities over a long period of years and I mention them without quoting from them. <u>Havelock v. Geddes</u> (10 East, page 555); <u>Tarrabochia v. Hickie</u> (1 Hurlstone & Norman, page 183; <u>Kish v. Taylor</u> (1912 Appeal Gases, page 604).

With regard to the last-mentioned case, Lord Justice Sellers has referred to certain observations of Lord Atkinson in his speech at the foot of page 617. These words were, of course, strongly relied upon by Mr. Roskill to support his argument. In my judgment, either they must be regarded as made *per incuriam*, for they are quite inconsistent with the plain decision of the House in that case and with the speech of the same noble Lord on the previous page; or it is possible that his speech may have been misreported and that the phrase "will justify" should have read "<u>may</u> justify", a suggestion made by Lord Justice Diplock during the course of the argument.

Why is this apparently basic and underlying condition of seaworthiness not, in fact, treated as a condition? It is for the simple reason that the seaworthiness clause is breached by the slightest failure to be fitted "in every way" for service. Thus, to take examples from the judgments in some of the cases I have mentioned above, if a nail is missing from one of the timbers of a wooden vessel or if proper medical supplies or two anchors are not on board at the time of sailing, the owners are in breach of the seaworthiness stipulation. It is contrary to common sense to suppose that in such circumstances the parties contemplated that the charterer should at once be entitled to treat the contract as at an end for such trifling breaches.

The classification of stipulations in a contract into conditions and warranties is familiar, and in

connection with the sale of goods these phrases have statutory definition. These phrases, however, came into being in connection with the ancient system of pleadings "before the Common Law Procedure Act, 1852, and when considering the remedies to which one party may be entitled for breach of a stipulation by the other the decision whether the stipulation is a condition or warranty may not provide a complete answer.

A condition, or a condition precedent to give it its proper title under the old system of pleading, was a condition performance of which had to be averred by the plaintiff in the declaration in order to establish his claim against the defendant. It was decided in the great plantation case of <u>Boone v. Eyre</u> (Henry Blackstone, page 273), however, that it was only necessary to aver as a condition precedent a condition which went to the whole consideration of both sides. The rule is, I think, best stated by Lord Ellenborough in <u>Davidson v. Gwynne</u> (12 East page 380, at page 388):

> "The principle laid down in <u>Boone v. Eyre</u> has been recognised in all the subsequent cases that unless the non-performance alleged in breach of the contract goes to the whole root and consideration of it the covenant broken is not to be considered as a condition precedent but as a distinct covenant for breach of which the party injured may be compensated in damages".

It is open to the parties to a contract to make it clear either expressly or by necessary implication that a particular stipulation is to be regarded as a condition which goes to the root of the contract, so that it is clear that the parties contemplate that any breach of it entitles the other party at once to treat the contract as at an end. That matter is to be determined as a question of the proper interpretation of the contract. Baron Bramwell in <u>Tarrabochia v. Hickie</u> has warned against the dangers of too ready an implication of such a condition. He said at page 188:

> "No doubt it is competent for the parties, if they think fit, to declare in express terms that any matter shall be a condition precedent, but when they have not so expressed themselves, it is necessary for those who construe the instrument to see whether they intended to do it. Since, however, they could have done it, those who construe the instrument should be chary in doing for them that which they might, but have not done for themselves".

Where, however, upon the true construction of the contract, the parties have not made a particular stipulation a condition, it would be unsound and misleading to conclude that, being a warranty, damages is a sufficient remedy.

In my judgment the remedies open to the innocent party for breach of a stipulation which is not a condition strictly so called, depend entirely upon the nature of the breach and its foreseeable consequences. Breaches of stipulation fall, naturally, into two classes. First there is the case where the owner by his conduct indicates that he considers himself no longer bound to perform his part of the contract; in that case, of course, the charterer may accept the repudiation and treat the contract as at an end. The second class of case is, of course, the more usual one and that is where due to misfortune such as the perils of the sea, engine failures, incompetence of the crew and so on, the owner is unable to perform a particular stipulation precisely in accordance with the terms of the contract try he never so hard to remedy it. In that case the question to be answered is, does the breach of the stipulation go so much to the root of the contract that it makes further commercial performance of the contract impossible, or in other words is the whole contract frustrated? If yea, the innocent party may treat the contract as at an end. If nay, his claim sounds in damages only. This is a question of fact fit for the determination of a jury.

If I have correctly stated the principles, then as the stipulation as to seaworthiness is not a condition in the strict sense the question to be answered is, did the initial unseaworthiness as found by the learned judge and from which there has been no appeal, go so much to the root of the contract that the charterers were then and there entitled to treat the charter-party as at an end? The only unseaworthiness alleged, serious though it was, was the insufficiency and incompetence of the crew, but that surely cannot be treated as going to the root of the contract for the parties

must have contemplated that in such an event the crew could be changed and augmented. In my judgment, on this part of his case Mr. Roskill necessarily fails.

I turn therefore to his second point: Where there have been serious and repeated delays due to the inability of the owner to perform his part of the contract, is the charterer entitled to treat the contract as repudiated after a reasonable time or can he do so only if delays are such as to amount to a frustration of the contract? Some of my earlier observations on the remedy available for breach of contract are relevant here but I do not repeat them.

I agree with the conclusions reached by the learned judge and by my Lord. I think that Mr. Justice Devlin (as he then was) came to clearly the right conclusion after an exhaustive review of the authorities in Universal Cargo Carriers Corporation v. Citati (1957 2 Queen's Bench, page 401). See also for a much earlier and very clear case Clipsham v. Vertue (5 Queen's Bench, page 265). I only desire to add this. Apart altogether from authority, it would seem to be wrong to introduce the idea that the innocent party can treat the contract as at an end for delays which, however, fall short of a frustration of the contract. Subject to the terms of the contract, of course, neither contracting party can unilaterally withdraw from the contract. If, however, one party by his conduct frustrates the contract, the law says that the other party may treat the contract as at an end. For breaches of the stipulation which fall short of that, the innocent party can only sue for damages. I do not see on principle how he can have some unilateral right to withdraw from the contract when the conduct of the other falls short of frustrating the contract. References in some of the earlier cases to reasonable time and so forth are readily explained by the fact that those words were used as synonymous with a frustrating time, that is to say a time "by which the further commercial performance of the contract became impossible.

Mr. Roskill has not seriously urged that in the circumstances of this case the delays, serious though they were, were such as to amount to a frustration of the contract. I think, therefore, that his argument fails on this point also.

Accordingly, I agree that this appeal must be dismissed.

**LORD JUSTICE DIPLOCK**: The contract, the familiar "Baltime 1939" Charter, and the facts upon which this case turns have been already stated in the judgment of Lord Justice Sellers, who has also referred to many of the relevant cases. With his analysis of the cases, as with the clear and careful judgment of Mr. Justice Salmon, I am in agreement, and I desire to add only some general observations upon the legal questions which this case involves.

Every synallagmatic contract contains in it the seeds of the problems In what event will a party be relieved of his undertaking to do that which he has agreed to do but has not yet done? The contract may itself expressly define some of these events, as in the cancellation clause in a charter-party; but, human prescience being limited, it seldom does so exhaustively and often fails to do so at all. In some classes of contracts such as sale of goods, marine insurance, contracts of affreightment evidenced by bills of lading and those between parties to tills of exchange, Parliament has defined by statute some of the events not provided for expressly in individual contracts of that class; but where an event occurs the occurrence of which neither the parties nor Parliament have expressly stated will discharge one of the parties from further performance of his undertakings it is for the court to determine whether the event has this effect or not.

The test whether an event has this effect or not has been stated in a number of metaphors all of which I think amount to the same things Does the occurrence of the event deprive the party who has further undertakings still to perform of substantially the whole benefit which it was the intention of the parties as expressed in the contract that he should obtain as the consideration for performing those undertakings?

This test is applicable whether or not the event occurs as a result of the default of one of the parties to the contract, but the consequences of the event are different in the two cases. Where the event occurs as a result of the default of one party the party in default cannot rely upon it as relieving himself of the performance of any further undertakings on his part and the innocent party, although entitled to, need not treat the event as relieving him of the performance of his own

undertakings. This is only a specific application of the fundamental legal and moral rule that a man should not be allowed to take advantage of his own wrong. Where the event occurs as a result of the default of neither party each is relieved of the further performance of his own undertakings and their rights in respect of undertakings previously performed are now regulated by the Law Reform (Frustrated Contracts) Act, 1943.

This branch of the common law has reached its present stage by the normal process of historical growth, and the fallacy in Mr. Ashton Roskill's contention that a different test is applicable when the event occurs as a result of the default of one party from that applicable in cases of frustration where the event occurs as a result of the default of neither party lies, in my view, from a failure to view the cases in their historical context. The problems in what event will a party to a contract be relieved of his undertaking to do that which he has agreed to do but has not yet done? has exercised the English Courts for centuries, probably ever since assumpsit emerged as a form of action distinct from covenant and debt and long before even the earliest cases which we have been invited to examine; but until the rigour of the rule in Paradine v. Jane (1647) Aleyn page 26 was mitigated in the middle of the last century Toy the classic judgments of Mr. Justice Blackburn in Taylor v. Caldwell (1863) 3 Best & Smith, page 826 and Baron Bramwell in Jackson v. Union Marine Insurance (1874) 10 Common Pleas, page 125) it was in general only events resulting from one party's failure to perform his contractual obligations which were regarded as capable of relieving the other party from continuing to perform that which he had undertaken to do.

In the earlier cases before the Common Law Procedure Act, 1852, the problem tends to be obscured to modern readers by the rules of pleading peculiar to the relevant forms of action- covenant, debt and assumpsit, and the nomenclature adopted in the judgments, which were mainly on demurrer, reflects this. It was early recognised that contractual undertakings were of two different kinds; those collateral to the main purpose of the contract as expressed in the contract and those which were mutually dependent so that the non-performance of an undertaking of this class was an event which excused the other party from the performance of his corresponding undertakings. In the nomenclature of the eighteenth and early nineteenth centuries undertakings of the latter class were called "conditions precedent" and a plaintiff under the rules of pleading had to aver specially in his declaration his performance or readiness and willingness to perform all those contractual undertakings on his part which constituted conditions precedent to the defendant's undertaking for non-performance of which the action was brought. In the earliest cases such as Pordage v. Cole (1607) 1 Williams page 319 and Thorpe v. Thorpe (1700) 12 Modern page 435 the question whether an undertaking was a condition precedent appears to have turned upon the verbal niceties of the particular phrases used in the written contract and it was not until 1773 that Lord Mansfield, in the case which is a legal landmark, Boone v. Eyre (1 Henry Blackstone, page 273), swept away these arid technicalities.

> "The distinction", he said, "is very clear. Where mutual covenants go to the whole of the consideration on both sides they are mutual conditions, the one precedent to the other. But where they go only to a part, where a breach may be paid for in damages, there the defendant has a remedy on his covenant and shall not plead it as a condition precedent".

This too was a judgment on demurrer but the principle was the same when the substance of the matter was in issue. Other phrases expressing the same idea were used by other judges in the cases which have already been cited by Lord Justice Sellers, and I would only add to his comments upon them that when it is borne in mind that until the latter half of the nineteenth century the only event that could be relied upon to excuse performance by one party of his undertakings was a default by the other party no importance can be attached to the fact that in occasional cases, and there may be others besides Freeman v. Taylor (1831) 8 Bingham page 124 , the Court has referred to the object or purpose of the party not in default rather than to the object or purpose of the contract, for the relevant object or purpose of the party not in default is that upon which there has been a consensus ad idem of both parties as expressed in the words which they have used in their contract construed in the light of the surrounding circumstances.

The fact that the emphasis in the earlier cases was upon the breach by one party to the contract of

his contractual undertakings, for this was the commonest circumstance in which the question arose, tended to obscure the fact that it was really the event resulting from the breach which relieved the other party of further performance of his obligations; but the principle was applied early in the nineteenth century and without analysis to cases where the event relied upon was one brought about by a party to a contract before the time for performance of his undertakings arose but which would make it impossible to perform those obligations when the time to do so did arrive: for example, Short v. Stone (8 Queen's Bench page 358); Ford v. Tiley (8 Barnewall & Cresswell page 325); Bowdell v. Parsons (10 East page 359). It was not, however, until Jackson v. Union Marine Insurance (1874) 10 Common Pleas page 125, that it was recognised that it was the happening of the event and not the fact that the event was the result of a breach by one party of his contractual obligations that relieved the other party from further performance of his obligations.

> "There are the cases", said Baron Bramwell (at page 147. of the report in 10 Common Pleas) "which hold that, where the shipowner has not merely broken his contract, but has so broken it that the condition precedent is not performed, the charterer is discharged. Why? Not merely because the contract is broken. If it is not a condition precedent, what matters it whether it is unperformed with or without excuse? Not arriving with due diligence or at a day named is the subject of a cross-action only. But not arriving in time for the voyage contemplated, but at such a time that it is frustrated is not only a breach of contract, but discharges the charterer. And so it should though he has such an excuse that no action lies".

Once it is appreciated that it is the event and not the fact that the event is a result of a breach of contract which relieves the party not in default of further performance of his obligations two consequences follow. (1) The test whether the event relied upon has this consequence is the same whether the event is the result of the other party's breach of contract or not, as Mr. Justice Devlin pointed out in Universal Cargo Carriers Corporation v. Citati (1957 2 Queen's Bench page 401, at page 434). (2) The question whether an event which is the result of the other party's breach of contract has this consequence cannot be answered by treating all contractual undertakings as falling into one of two separate categories: "conditions" the breach of which gives rise to an event which relieves the party not in default of further performance of his obligations, and "warranties" the breach of which does not give rise to such an event.

Lawyers tend to speak of this classification as if it were comprehensive, partly for the historical reasons which I have already mentioned and partly "because Parliament itself adopted it in the Sale of Goods Act, 1893, as respects a number of implied terms in contracts for the sale of goods and has in that Act used the expressions "condition" and "warranty" in that meaning. But it is by no means true of contractual undertakings in general at common law.

No doubt there are many simple contractual undertakings, sometimes express but more often because of their very simplicity ("It goes without saying") to be implied, of which it can be predicated that every breach of such an undertaking must give rise to an event which will deprive the party not in default of substantially the whole benefit which it was intended that he should obtain from the contract. And such a stipulation, unless the parties have agreed that breach of it shall not entitle the non-defaulting party to treat the contract as repudiated, is

a "condition". So too there may be other simple contractual undertakings of which it can be predicated that no breach can give rise to an event which will deprive the party not in default of substantially the whole benefit which it was intended that he should obtain from the contract; and such a stipulation, unless the parties have agreed that breach of it shall entitle the non-defaulting party to treat the contract as repudiated, is a "warranty ".

There are, however, many contractual undertakings of a. more complex character which cannot be categorised as being "conditions" or "warranties" if the late nineteenth century meaning adopted in the Sale of Goods Act, 1893, and used by Lord Justice Bowen in Bensen v. Taylor Sons & Co. (1893 2 Queen's Bench page 274, at page 280) be given to those terms. Of such undertakings all that can be predicated is that some breaches will and others will not give rise to an event which will

deprive the party not in default of substantially the whole benefit which it was intended that he should obtain from the contract; and the legal consequences of a breach of such an undertaking, unless provided for expressly in the contract, depend upon the nature of the • event to which the breach gives rise and do not follow automatically from a prior classification of the undertaking as a "condition" or a "warranty". For instance, to take Baron Bramwell's example in <u>Jackson v. Union Marine Insurance</u> itself (at page 142), breach of an undertaking by a shipowner to sail with all possible dispatch to a named port does not necessarily relieve the charterer of further performance of his obligation under the charter-party, but if the breach is so prolonged that the contemplated voyage is frustrated it does have this effect.

In 1874 when the doctrine of frustration was being foaled by "impossibility of performance" out of "condition precedent" it is not surprising that the explanation given by Baron Bramwell should give full credit to the dam by suggesting that in addition to the express <u>warranty</u> to sail with all possible dispatch there was an implied <u>condition precedent</u> that the ship should arrive at the named port in time for the voyage contemplated. In <u>Jackson v. Union Marine Insurance</u> there was no breach of the express warranty; but if there had been, to engraft the implied condition upon the express warranty would have been merely a more complicated way of saying that a breach of a shipowner's undertaking to sail with all possible dispatch may, but will not necessarily, give rise to an event which will deprive the charterer of substantially the whole benefit which it was intended that he should obtain from the charter. Now that the doctrine of frustration has matured and flourished for nearly a century and the old technicalities of pleading "conditions precedent" are more than a century out of date, it does not clarify, but on the contrary obscures, the modern principle of law where such an event has occurred as a result of a breach of an express stipulation in a contract, to continue to add the now unnecessary colophon "therefore it was an implied <u>condition</u> of the contract that a particular kind of breach of an express <u>warranty</u> should not occur." The common law evolves not merely by breeding new principles but also, when they are fully grown, by burying their ancestors.

As my "brethren have already pointed out, the shipowner's undertaking to tender a seaworthy ship has, as a result of numerous decisions as to what can amount to "unseaworthiness", become one of the most complex of contractual undertakings. It embraces obligations with respect to every part of the hull and machinery, stores and equipment and the crew itself. It can be broken by the presence of trivial defects easily and rapidly remediable as well as by defects which must inevitably result in a total loss of the vessel.

Consequently the problem in this case is, in my view, neither solved nor soluble by debating whether the shipowner's express or implied undertaking to tender a seaworthy ship is a "condition" or a "warranty". It is like so many other contractual terms an undertaking one breach of which may give rise to an event which relieves the charterer of further performance of his undertakings if he so elects and another breach of which may not give rise to such an event but entitle him only to monetary compensation in the form of damages. It is, with all deference to Mr. Ashton Roskill's skilful argument, by no means surprising that among the many hundreds of previous cases about the shipowner's undertaking to deliver a seaworthy ship there is none where it was found profitable to discuss in the judgments the question whether that undertaking is a "condition" or a "warranty"; for the true answer, as I have already indicated, is that it is neither, but one of that large class of contractual undertakings one breach of which may have the same effect as that ascribed to a breach of "condition" under the Sale of Goods Act and a different breach of which may have only the same effect as that ascribed to a breach of "warranty" under that Act. The cases referred to by Lord Justice Sellers illustrate this and I would only add that in the dictum which he cites from <u>Kish v. Taylor</u> (1912 Appeal Cases page 604, at page 617) it seems to me from the sentence which immediately follows it as from the actual decision in the case and the whole tenor of Lord Atkinson's speech itself that the word "will" was intended to be "may".

What the learned judge had to do in the present case as in any other case where one party to a contract relies upon a breach by the other party as giving him a right to elect to rescind the contract, was to look at the events which had occurred as a result of the breach at the time at which the charterers purported to rescind the charter-party and to decide whether the occurrence of those events deprived the charterers of substantially the whole benefit which it was the intention of the parties as expressed in the charter-party that the charterers should obtain from the further performance of their own contractual undertakings.

One turns therefore to the contract, the Baltime 1939 Charter, of which Lord Justice Sellers has already cited the relevant terms. Clause 13, the "due diligence" clause, which exempts the shipowners from responsibility for delay or loss or damage to goods on board due to unseaworthiness unless such delay or loss or damage has been caused by want of due diligence of the owners in making the vessel seaworthy and fitted for the voyage, is in itself sufficient to show that the mere occurrence of the events that the vessel was in some respect unseaworthy when tendered or that such unseaworthiness had caused some delay in performance of the charter-party would not deprive the charterer of the whole benefit which it was the intention of the parties he should obtain from the performance of his obligations under the contract - for he undertakes to continue to perform his obligations notwithstanding the occurrence of such events if they fall short of frustration of the contract and even deprives himself of any remedy in damages unless such events are the consequence of want of due diligence on the part of the shipowner.

The question which the learned judge had to ask himself was, as he rightly decided, whether or not at the date when the charterers purported to rescind the contract, namely 6th June, 1957, or when the shipowners purported to accept such rescission, namely 8th August, 1957, the delay which had already occurred as a result of the incompetence of the engine room staff, and the delay which was likely to occur in repairing the engines of the vessel and the conduct of the shipowners "by that date in taking steps to remedy these two matters, were, when taken together, such as to deprive the charterers of substantially the whole benefit which it was the intention of the parties they should obtain from further use of the vessel under the charter-party.

In my view, in his judgment - on which I would not seek to improve - the learned judge took into account and gave due weight to all the relevant considerations and arrived at the right answer for the right reasons.

**(Appeal dismissed with costs. No order on respondents' cross-notice. Leave to appeal to House of Lords refused. Stay of execution until 19th January 1962, to enable defendants to apply to House of Lords for leave to appeal. Provided petition lodged within the appropriate time, stay continued until the hearing of the application. Usual solicitors' undertaking as to costs).**

Exhibit D

**HOUSE OF LORDS**

**WHITE AND CARTER (COUNCILS) LTD v McGREGOR [1962] AC 413**

December 6 1961

**LORD HODSON:**

My Lords, the main business of the appellants is the supply of litter receptacles to town councils in urban areas throughout Great Britain. They are paid not by the councils but by advertisers who enter into agreements with them in accordance with a standard form of contract.

In 1954 the parties entered into a contract whereby the appellants agreed to give the respondent the use of advertising space on certain bins in Clydebank during a period of three years at a weekly rental. This contract expired in November, 1957. On June 26, 1957, a new contract was signed, in the case of the respondent by the hand of Mr Ward, his sales manager, providing that the respondent agreed to take from the appellants advertising sites in fixed positions on Clydebank for a period of 156 weeks commencing from the date when the advertisement was first exhibited and to pay to the appellants 2s per week per plate, payable annually in advance, together with the sum of 5s per annum towards the costs of each plate or replacement plate fixed. Payments were to be made direct to the appellants at their office in London, the first payment to be made seven days after the first display of advertisements.

The contract was headed by a warning notice that it was not to be cancelled by the advertiser and one of the conditions of the contract (no 7) was to the same effect. Control of the advertising matter vested in the appellants (condition no 1) and in the last resort the appellants could comply with the contract by exhibiting the name, business and address of the advertiser.

Condition 8 reads as follows:

'In the event of an instalment or part thereof being due for payment, and remaining unpaid for a period of four weeks or in the event of the advertiser being in any way in breach of this contract then the whole amount due for the 156 weeks or such part of the said 156 weeks as the advertiser shall not yet have paid shall immediately become

due and payable.'

Immediately after the signing of the contract the respondent sought to repudiate it by a letter to the appellants of the same date:

'26th June, 1957.

'Dear Sirs,

'We regret that our Mr Ward signed an order today continuing the lamp post advertisements for a further period of three years. He was unaware that our proprietor Mr McGregor does not wish to continue this form of advertisement. Please therefore cancel the order.' The appellants did not accept the attempted cancellation and proceeded with the preparation of plates which they exhibited on Nov 2, 1957, and continued to display during the ensuing 156 weeks.

In due course the appellants demanded payment in accordance with the contract. When the respondent refused to pay on demand the appellants sued for £196 4s of which £187 4s represented the cost of advertising space on twelve sites for 156 weeks at 2s a week and £ 9 represented 5s a year for each plate for the same period.

...

The claim of the appellants has always been for a debt due under contract made for good consideration, they being always ready to perform the contract and having performed it according to its terms never having accepted the attempt of the respondent to cancel...It follows that...the contract remains alive for the benefit of both parties and the party who has repudiated can change his mind but it does not follow that the party at the receiving end of the proffered repudiation is bound to accept it before the time for performance and is left to his remedy in damages for breach...When the assistance of the court is not required the innocent party can choose whether he will accept repudiation and sue for damages for anticipatory breach or await the date of performance by the guilty party. Then, if there is failure in performance, his rights are preserved.

It may be unfortunate that the appellants have saddled themselves with an unwanted contract causing an apparent waste of time and money...but there is no equity which can assist the respondent ... [E]quity will not rewrite an improvident contract where there is no disability on either side. There is no duty laid on a party to a subsisting contract to vary it at the behest of the other party so as to deprive himself of the

benefit given to him by the contract. To hold otherwise would be to introduce a novel equitable doctrine that a party was not to be held to his contract unless the court in a given instance thought it reasonable so to do. In this case it would make an action for debt a claim for a discretionary remedy. This would introduce an uncertainty into the field of contract which appears to be unsupported by authority either in English or Scottish law...

I would allow the appeal.

**LORD REID:**

... The general rule cannot be in doubt. It was settled in Scotland at least as early as 1848 and it has been authoritatively stated time and again in both Scotland and England. If one party to a contract repudiates it in the sense of making it clear to the other party that he refuses or will refuse to carry out his part of the contract, the other party, the innocent party, has an option. He may accept that repudiation and sue for damages for breach of contract whether or not the time for performance has come; or he may if he chooses disregard or refuse to accept it and then the contract remains in full effect.

...

It might be, but it never has been, the law that a person is only entitled to enforce his contractual rights in a reasonable way and that a court will not support an attempt to enforce them in an unreasonable way. One reason why that is not the law is no doubt because it was thought that it would create too much uncertainty to require the court to decide whether it is reasonable or equitable to allow a party to enforce his full rights under a contract.

...

It might be said that ... in most cases the circumstances are such that an innocent party is unable to complete the contract and earn the contract price without the assent or co-operation of the other party ...

The other ground would be that there is some general equitable principle or element of public policy which requires this limitation of the contractual rights of the innocent party. It may well be that, if it can be shown that a person has no legitimate interest, financial or otherwise, in performing the contract rather than claiming damages, he ought not to be allowed to saddle the other party with an additional burden with no benefit to himself. If a party has no interest to enforce a stipulation he cannot in general enforce it: so it might be said that if a party has no interest to insist on a

particular remedy he ought not to be allowed to insist on it. And, just as a party is not allowed to enforce a penalty, so he ought not to be allowed to penalise the other party by taking one course when another is equally advantageous to him.

... Here the respondent did not set out to prove that the appellants had no legitimate interest in completing the contract and claiming the contract price rather than claiming damages, there is nothing in the findings of fact to support such a case, and it seems improbable that any such case could have been proved.

It is, in my judgment, impossible to say that the appellants should be deprived of their right to claim the contract price merely because the benefit to them as against claiming damages and re-letting their advertising space might be small in comparison with the loss to the respondent: that is the most that could be said in favour of the respondent. Parliament has on many occasions relieved parties from certain kinds of improvident or oppressive contracts, but the common law can only do that in very limited circumstances.  Accordingly, I am unable to avoid the conclusion that this appeal must be allowed ...

**Full text**

**LORD REID:**

My Lords, the pursuers supply to local authorities litter bins which are placed in the streets. They are allowed to attach to these receptacles plates carrying advertisements, and they make their profit from payments made to them by the advertisers. The defender carried on a garage in Clydebank and in 1954 he made an agreement with the pursuers under which they displayed advertisements of his business on a number of these bins. In June, 1957, his sales manager made a further contract with the pursuers for the display of these advertisements for a further period of three years. The sales manager had been given no specific authority to make this contract and when the defender heard of it later on the same day he at once wrote to accept this cancellation. They prepared the necessary plates for attachment to the bins and exhibited them on the bins from November 2, 1957, onwards.

The defender refused to pay any sums due under the contract and the pursuers raised the present action in the Sheriff Court craving payment of £196 4s. the full sum due under the contract for the period of three years. After sundry procedure the Sheriff-Substitute on March 15, 1960, dismissed the action. He held that the sales manager's

action in renewing the contract was within his apparent or ostensible authority and that is not now disputed. The ground on which he dismissed the action was that in the circumstances an action for implement of the contract was inappropriate. He relied on the decision in Langford & Co. Ltd. v. Dutch, and cannot be criticised for having done so.

The pursuers appealed to the Court of Session and on November 2, 1960, the Second Division refused the appeal. The present appeal is taken against their interlocutor of that date. That interlocutor sets out detailed findings of fact and, as this case began in the Sheriff Court, we cannot look beyond those findings. The pursuers must show that on those findings they are entitled to the remedy which they seek.

The case for the defender (now the respondent) is that, as he repudiated the contract before anything had been done under it, the appellants were not entitled to go on and carry out the contract and sue for the contract price: he maintains that in the circumstances the appellants' only remedy was damages, and that, as they do not sue for damages, this action was rightly dismissed.

The contract was for the display of advertisements for a period of 156 weeks from the date when the display began. This date was not specified but admittedly the display began on November 2, 1957, which seems to have been the date when the former contract came to an end. The payment stipulated was 2s. per week per plate together with 5s. per annum per plate both payable annually in advance, the first payment being due seven days after the first display. The reason why the appellants sued for the whole sum due for the three years is to be found in clause 8 of the conditions: 'In the event of an instalment or part thereof being due for payment, and remaining unpaid for a period of four weeks or in the event of the advertiser being in any way in breach of this contract then the whole amount due for the 156 weeks or such part of the said 156 weeks as the advertiser shall not yet have paid shall immediately become due and payable.'

A question was debated whether this clause provides a penalty or liquidated damages, but on the view which I take of the case it need not be pursued. The clause merely provides for acceleration of payment of the stipulated price if the advertiser fails to pay an instalment timeously. As the respondent maintained that he was not bound by the contract he did not pay the first instalment within the time allowed. Accordingly, if the appellants were entitled to carry out their part of the contract notwithstanding the respondent's repudiation, it was hardly disputed that this clause entitled them to sue immediately for the whole price and not merely the first instalment.

The general rule cannot be in doubt. It was settled in Scotland at least as early as 1848 and it has been authoritatively stated time and again in both Scotland and England. If one party to a contract repudiates it in the sense of making it clear to the other party that he refuses or will refuse to carry out his part of the contract, the other party, the innocent party, has an option. He may accept that repudiation and sue for damages for breach of contract, whether or not the time for performance has come; or he may if he chooses disregard or refuse to accept it and then the contract remains in full effect.

In Howie v. Anderson Anderson sold shares to be delivered on January 8, 1847: on October 31, 1846, his agent intimated to Howie that he refused to go on with the transaction. Howie refused to accept this repudiation. Anderson pleaded that Howie ought to have gone into the market and bought other shares on October 31, but it was held that damages must be awarded on the price ruling on January 8. Lord Justice-Clerk Hope said: 'I do not understand exactly what is meant by the plea that the contract was broken and at an end on October 31, merely because the defender, in pursuance of his scheme of acting wrongfully, gave notice that he would not fulfil the contract.... He had no power to alter the date of the fulfilment of the contract: he had no power to affect the extent of the rights and claims of the pursuer, as on the day when the contract was to be fulfilled. That very intimation was a wrongful act, - the commencement of the wrong which was consummated by the actual failure of delivery on January 8. The bargain continued to subsist as a binding contract to be fulfilled at the proper time by the defender, after his intimation of October 31, exactly as if that intimation had not been made.' Lord Medwyn said: '... the defender cannot plead that the buyer was bound to go into the market to make a new time-bargain, merely because this might have lessened the damages to him if he acted improperly in refusing to implement the bargain. The breach of bargain was properly on January 8, because that was the day on which it was to be fulfilled by delivery of the stock.'

I need not refer to the numerous authorities. They are not disputed by the respondent but he points out that in all of them the party who refused to accept the repudiation had no active duties under the contract. The innocent party's option is generally said to be to wait until the date of performance and then to claim damages estimated as at that date. There is no case in which it is said that he may, in face of the repudiation, go on and incur useless expense in performing the contract and then claim the contract price. The option, it is argued, is merely as to the date as at which damages are to be assessed.

Developing this argument, the respondent points out that in most cases the innocent party cannot complete the contract himself without the other party doing, allowing or accepting something, and that it is purely fortuitous that the appellants can do so in this case. In most cases by refusing co-operation the party in breach can compel the innocent party to restrict his claim to damages. Then it was said that, even where the innocent party can complete the contract without such co-operation, it is against the public interest that he should be allowed to do so. An example was developed in argument. A company might engage an expert to go abroad and prepare an elaborate report and then repudiate the contract before anything was done. To allow such an expert then to waste thousands of pounds in preparing the report cannot be right if a much smaller sum of damages would give him full compensation for his loss. It would merely enable the expert to extort a settlement giving him far more than reasonable compensation.

The respondent founds on the decision of the First Division in Langford & Co. Ltd. v. Dutch. There an advertising contractor agreed to exhibit a film for a year. Four days after this agreement was made the advertiser repudiated it but, as in the present case, the contractor refused to accept the repudiation and proceeded to exhibit the film and sue for the contract price. The Sheriff-Substitute dismissed the action as irrelevant and his decision was affirmed on appeal. In the course of a short opinion Lord President Cooper said: 'It appears to me that, apart from wholly exceptional circumstances of which there is no trace in the averments on this record, the law of Scotland does not afford to a person in the position of the pursuers the remedy which is here sought. The pursuers could not force the defender to accept a year's advertisement which she did not want, though they could of course claim damages for her breach of contract. On the averments the only reasonable and proper course, which the pursuers should have adopted, would have been to treat the defender as having repudiated the contract and as being on that account liable in damages, the measure of which we are, of course, not in a position to discuss.'

The Lord President cited no authority and I am in doubt as to what principle he had in mind. In the earlier part of the passage which I have quoted he speaks of forcing the defender to accept the advertisement. Of course, if it had been necessary for the defender to do or accept anything before the contract could be completed by the pursuers, the pursuers could not and the court would not have compelled the defender to act, the contract would not have been completed and the pursuers' only remedy would have been damages. But the peculiarity in that case, as in the present case, was that the pursuers could completely fulfil the contract without any co-operation of the

defender. The Lord President cannot have meant that because of non-acceptance the contract had not been completely carried out, because that in itself would have been a complete answer to an action for the contract price. He went on to say that the only reasonable and proper course which the pursuers should have adopted would have been to treat the defender as having repudiated the contract, which must, I think, mean to have accepted the repudiation. It is this reference to 'the only reasonable and proper course' which I find difficult to explain. It might be, but it never has been, the law that a person is only entitled to enforce his contractual rights in a reasonable way, and that a court will not support an attempt to enforce them in an unreasonable way. One reason why that is not the law is, no doubt, because it was thought that it would create too much uncertainty to require the court to decide whether it is reasonable or equitable to allow a party to enforce his full rights under a contract. The Lord President cannot have meant that.

The only principle I can think of which he may have had in mind is the principle invoked by Lord Watson in a well-known passage at the beginning of his speech in Grahame v. Magistrates of Kirkcaldy: 'It appears to me that a superior court, having equitable jurisdiction, must also have a discretion, in certain exceptional cases, to withhold from parties applying for it that remedy to which, in ordinary circumstances, they would be entitled as a matter of course.' But Lord Watson went on to say: 'In order to justify the exercise of such a discretionary power there must be some very cogent reason for depriving litigants of the ordinary means of enforcing their legal rights. There are, so far as I know, only three decided cases, in which the Court of Session, there being no facts sufficient to raise a plea in bar of the action, have nevertheless denied to the pursuer the remedy to which, in strict law, he was entitled. These authorities seem to establish, if that were necessary, the proposition that the court has the power of declining, upon equitable grounds, to enforce an admittedly legal right; but they also show that the power has been very rarely exercised.'

Langford & Co. Ltd. v. Dutch is indistinguishable from the present case. Quite properly the Second Division followed it in this case as a binding authority and did not develop Lord Cooper's reasoning: they were not asked to send this case to a larger court. We must now decide whether that case was rightly decided. In my judgment it was not. It could only be supported on one or other of two grounds. It might be said that, because in most cases the circumstances are such that an innocent party is unable to complete the contract and earn the contract price without the assent or co-operation of the other party, therefore in cases where he can do so he should not be allowed to do so. I can see no justification for that.

The other ground would be that there is some general equitable principle or element of public policy which requires this limitation of the contractual rights of the innocent party. It may well be that, if it can be shown that a person has no legitimate interest, financial or otherwise, in performing the contract rather than claiming damages, he ought not to be allowed to saddle the other party with an additional burden with no benefit to himself. If a party has no interest to enforce a stipulation, he cannot in general enforce it: so it might be said that, if a party has no interest to insist on a particular remedy, he ought not to be allowed to insist on it. And, just as a party is not allowed to enforce a penalty, so he ought not to be allowed to penalise the other party by taking one course when another is equally advantageous to him. If I may revert to the example which I gave of a company engaging an expert to prepare an elaborate report and then repudiating before anything was done, it might be that the company could show that the expert had no substantial or legitimate interest in carrying out the work rather than accepting damages: I would think that the de minimis principle would apply in determining whether his interest was substantial, and that he might have a legitimate interest other than an immediate financial interest. But if the expert had no such interest then that might be regarded as a proper case for the exercise of the general equitable jurisdiction of the court. But that is not this case. Here the respondent did not set out to prove that the appellants had no legitimate interest in completing the contract and claiming the contract price rather than claiming damages; there is nothing in the findings of fact to support such a case, and it seems improbable that any such case could have been proved. It is, in my judgment, impossible to say that the appellants should be deprived of their right to claim the contract price merely because the benefit to them, as against claiming damages and re-letting their advertising space, might be small in comparison with the loss to the respondent: that is the most that could be said in favour of the respondent. Parliament has on many occasions relieved parties from certain kinds of improvident or oppressive contracts, but the common law can only do that in very limited circumstances. Accordingly, I am unable to avoid the conclusion that this appeal must be allowed and the case remitted so that decree can be pronounced as craved in the initial writ.

**LORD MORTON OF HENRYTON**:

My Lords, the facts of this case have already been fully stated. It is plain that the respondent (defender in the action) repudiated the contract of June 26, 1957, immediately after his sales manager had entered into it and some months before the time for performance of it by the appellants, and persisted in his repudiation

throughout. Notwithstanding this, the appellants proceeded with the preparation of plates advertising the respondent's garage business and, as the Sheriff-Substitute held, they 'made no effort to procure another advertiser to take up the advertising space included in said contract and thus minimise their loss.' The plates were first exhibited on the litter bins on November 2, 1957, and they remained on display during the whole of the contract period of 156 weeks. The defender throughout made it clear that he did not want the advertisements and refused to pay for them. The present action is brought to recover £196 4s. the full sum payable under the contract. Alternatively, the appellants claim the same sum as liquidated damages. The respondent contends that in the circumstances of the present case the only remedy of the appellants was damages, to be assessed according to ordinary principles.

My Lords, I think that this is a case of great importance, although the claim is for a comparatively small sum. If the appellants are right, strange consequences follow in any case in which, under a repudiated contract, services are to be performed by the party who has not repudiated it, so long as he is able to perform these services without the co-operation of the repudiating party. Many examples of such contracts could be given. One, given in the course of the argument and already mentioned by my noble and learned friend, Lord Reid, is the engagement of an expert to go abroad and write a report on some subject for a substantial fee plus his expenses. If the appellants succeed in the present case, it must follow that the expert is entitled to incur the expense of going abroad, to write his unwanted report, and then to recover the fee and expenses, even if the other party has plainly repudiated the contract before any expense has been incurred.

It is well established that repudiation by one party does not put an end to a contract. The other party can say 'I hold you to your contract, which still remains in force.' What then is his remedy if the repudiating party persists in his repudiation and refuses to carry out his part of the contract? The contract has been broken. The innocent party is entitled to be compensated by damages for any loss which he has suffered by reason of the breach, and in a limited class of cases the court will decree specific implement. The law of Scotland provides no other remedy for a breach of contract and there is no reported case which decides that the innocent party may act as the appellants have acted. The present case is one in which specific implement could not be decreed, since the only obligation of the respondent under the contract was to pay a sum of money for services to be rendered by the appellants. Yet the appellants are claiming a kind of inverted specific implement of the contract. They first insist on performing their part of the contract, against the will of the other party, and then claim

that he must perform his part and of pay the contract price for unwanted services. In my opinion, my Lords, the appellants' only remedy was damages, and they were bound to take steps to minimise their loss, according to a well-established rule of law. Far from doing this, having incurred no expense at the date of the repudiation, they made no attempt to procure another advertiser, but deliberately went on to incur expense and perform unwanted services with the intention of creating a money debt which did not exist at the date of the repudiation.

The only cases cited in which a claim of the kind now put forward has been considered are Langford & Co. Ltd. v. Dutch, when it was rejected by the Court of Session, and White & Carter (Councils) Ltd. (that is, the present appellants) v. Harding. The latter case is, I think, distinguishable from the present case; but, if it cannot be distinguished, it was, in my opinion, wrongly decided by the Court of Appeal. The former case is directly in point and was, in my opinion, rightly decided, and rightly followed by the Court of Session in the present case.

The facts in Langford's case have been stated by my noble and learned friend, Lord Reid. The Court of Session held that the law of Scotland did not 'afford to a person in the position of the pursuers the remedy which is here sought.' These words are quoted from the short opinion of Lord President Cooper, and he continued, 'The pursuers could not force the defender to accept a year's advertisement which she did not want, though they could of course claim damages for her breach of contract.' These two sentences embodied, I think, the basis of the learned Lord President's opinion, but he added 'On the averments the only reasonable and proper course, which the pursuers should have adopted, would have been to treat the defender as having repudiated the contract and as being on that account liable in damages, the measure of which we are, of course, not in a position to discuss.' My Lords, I think that this last sentence was merely a comment on the behaviour of the pursuers, which applies with equal force to the appellants in the present case. The course of action followed by the appellants seems to me unreasonable and oppressive, but it is not on that ground that I would reject their claim. I would reject it for the reasons which I have already given.

In my opinion, the appellants' alternative claim for the same sum of £196 4s. as liquidated damages should be rejected for the reasons which will shortly be given by my noble and learned friend, Lord Keith of Avonholm.

I would dismiss the appeal.

**LORD TUCKER**:

My Lords, I have had the advantage of reading the opinion prepared by my noble and learned friend, Lord Hodson. I am in complete agreement with the reasons he gives for allowing the appeal.

**LORD KEITH OF AVONHOLM**:

My Lords, the issue in this case is of some general importance in contract law. It is whether, where one party has contracted to perform certain services for a money price to be paid by the other contracting party he can, when his time of performance arrives, insist on performing these services so as to earn his price, against the will of the other party who wrongfully insists on repudiating the contract.

Much argument and citation of authority was advanced on the topic of anticipatory repudiation. That, in my view, was largely beside the point. There is no doubt that there was here an anticipatory repudiation, for the contract was repudiated by the defender the very day it was made and some months before it could come into operation. But the pursuers did not choose to act on that repudiation and sue the defender for what has sometimes been called an anticipatory breach. The real question at issue is what were the rights of parties when the contract fell to be put into operation, the defender having maintained his repudiation throughout.

I should first state the submission made by Mr. Johnston for the pursuers (the appellants) in the words used by him. 'Where one party to a contract,' he said, 'intimates that he refuses to implement the obligations he has undertaken the innocent party has the option of accepting the repudiation and rescinding the contract and availing himself at once of the remedies open to him OR he may ignore the repudiation and wait until time for performance arrives before setting in train proceedings for remedy. The innocent party has truly a choice. He is not compelled to accept repudiation. The guilty party cannot rid himself of his contractual liability or limit his liability under the contract by repudiating it and insisting that such repudiation be accepted by the innocent party. If the innocent party chooses not to accept he may go on and await the date of the performance by the guilty party and if it is not tendered his rights as at that date are preserved to him.'

There are certain refinements in this submission and certain questions which it does not answer. A number of cases were cited which were intended to illustrate the

submission. These are all cases where the successful litigant obtained damages, or escaped damages, in actions for breach of contract. The appellants, it is to be observed, are suing primarily for a debt, not for damages for breach of contract. Nor is there any difficulty in seeing, in the circumstances of the cases what was the date or time of performance. In many of the cases it was either the date of tender and refusal to take delivery of the subject-matter of the contract (Braithwaite v. Foreign Hardwood Co.; or the date of failure to deliver (Mersey Steel and Iron Co. Ltd. v. Naylor, Benzon & Co.; Johnstone v. Milling; Howie v. Anderson; Avery v. Bowden. I take one case in this branch of law for a passage relied on by Mr. Johnstone for the appellants in Frost v. Knight. A man had promised to marry a lady in two years. Before that time elapsed he intimated that he did not intend to abide by his promise. An action of damages for breach was raised within the two years. Cockburn C.J. stated the alternative option in these words: 'The promisee, if he pleases, may treat the notice of intention [to repudiate] as inoperative, and await the time when the contract is to be executed, and then hold the other party responsible for all the consequences of non-performance.' There could be no difficulty here about the date of performance. It was on the expiry of the two years. But there is some ambiguity in the words 'the time when the contract is to be executed.' Do they mean the time when the contract is to become operative by the action of either of the parties, as the case may be, or the time when the defaulting party would have been bound to carry out his obligations under the contract? In the latter case there may be two times of performance, the time when the complaining party has to perform his obligations on the one hand and the time when the defaulting party has to perform his on the other. This dichotomy does not come to the surface in any of the cases, so far as I have observed. The position again is stated quite generally in a passage in Mayne on Damages (11th ed., pp. 141-142) in a chapter entitled Time to which Damages are Calculated: 'If before the time for performance arrives one party absolutely and definitely repudiates the contract, the other party is entitled either to wait till the time arrives, and then bring his action, or to treat the contract as broken, and sue for the breach at once.' If I understand aright, counsel for the appellants would read time of performance as time of performance by the defender after the appellants had discharged their part of performance under the contract. Their claim then becomes a claim, not for damages for breach of contract, but for a debt due by the defender under the contract. In other words, there would be an anticipatory repudiation by the defender which the appellants were not bound to accept as a breach of contract and which did not cease to be anticipatory until the moment when the defender was due to make payment under the contract. This, I think, goes beyond anything that has been decided in the cases where anticipatory repudiation has been considered. It makes an arbitrary distinction and one differing in

its consequences according as performance is first called for under the contract from the repudiating party, or from the other party. In the former case there is a plain breach of contract making the repudiating party liable in damages, unless where a claim for specific implement is available. In the latter case, according to the submission made, he is liable contractually for a debt at least where the consideration for performance by the other party is expressed in money. The law of Scotland has always stressed the mutuality of contracts and it should follow, in my opinion, that the consequences of breach of contract by either party should correspond. I would state the position in the case of an anticipatory repudiation not accepted by the other party as a breach of contract thus: If the contract is to take operative effect in the first place by performance of the repudiating party and he maintains his repudiation by refusing, or failing to give performance, the other party has a cause of action for either damages or specific implement. If performance is first to be given by the other party and the time for his performance has arrived he must tender performance, in the sense of showing that he is now ready and able to give performance, and if this tender is still rejected by the repudiating party his only cause of action again arises to him as at that date.

I would refer first to contracts for the sale of goods which were touched on in the course of the debate, for the reason that one of the remedies provided to the seller by the Sale of Goods Act, 1893, is an action for the price. This, however, applies only in two cases. One is where the property in the goods has passed to the buyer. But property cannot pass without the intention of the buyer as well as that of the seller and, except in some such cases as fraud or lack of consensus in idem or breach of contract by the seller, no question of repudiation can arise. The contract is completed and finished apart from delivery and nothing remains but payment of the price. The only other case is where parties have contracted for payment on a day certain, irrespective of delivery or the passing of property. This is a clear case of a contractual debt unconditioned by any question of performance by the other party. A much closer parallel with the present case is a contract to sell future, or unascertained goods. In this case there can be no appropriation of, and therefore passing of, property in the goods without the assent of both buyer and seller. If therefore the buyer repudiates the contract before appropriation, or refuses his assent to appropriation, there can be no passing of property. The seller is then confined to an action of damages for breach of contract. This, of course, is a rule of statute. But the Act is largely declaratory of English law, though not of Scots law. So the rule can only be treated as an analogy, but it is an analogy which seems to me to make a hole in the principle contended for by the appellants.

Repudiation of a contract is nothing but a breach of contract. Except where it is accepted as an anticipatory breach and as a ground for a claim of damages, a repudiation can never be said to be accepted by the other party except in the sense that he acquiesces in it and does not propose to take any action. Otherwise he founds on it as a cause of action.

The late Professor Gloag in his work on Contract (2nd ed., p. 592), considering the rights arising on breach of contract, said: 'The primary rights of the creditor in a contractual obligation may be said to be to secure performance by invoking the assistance of the court to compel it, or, where that remedy is inappropriate, to obtain compensation in damages.' It may be said that the learned author has here in mind an obligation other than the mere payment of money. But payment of money is often with another obligation as, for instance, to accept delivery, and the courts will not enforce acceptance of delivery unless in certain cases where they may order specific implement. They will merely give damages for failure to take delivery. Nor will they give a decree ad factum praestandum for the payment of money. Here the appellants are saying: 'We shall do something which the courts will not enforce. We shall force our services on an unwilling defender and then sue him for the price.'

This point receives additional force in the circumstances of this case. The contract was to come into operation on November 2, 1957, when the previous contract expired. But it involved, in the absence of other advertising matter supplied by the defender, the display by the appellants of at least the name, business and address of the advertiser. I should hesitate to say that any contractor was entitled to display these particulars of the defender against his wish, even if the withholding of his assent be in breach of contract.

Some play was made by counsel for the appellants with an expression used by Asquith L.J. in Howard v. Pickford Tool Co. Ltd. 'an unaccepted repudiation is a thing writ in water.' A graphic phrase, or expression, has its uses even in a law report and can give force to a legal principle, but it must be related to the circumstances in which it is used. Howard was a managing director with a six years contract of service. He thought that the company with which he was serving had shown by the conduct of its chairman that it no longer intended to be bound by its agreement. He brought an action which, as amended, sought a declaration that the company by so acting had repudiated the contract and excused the plaintiff from further performance of his obligations under it. Evershed M.R. said: 'It is quite plain... that if the conduct of one

party to a contract amounts to a repudiation, and the other party does not accept it as such but goes on performing his part of the contract and affirms the contract, the alleged act of repudiation is wholly nugatory and ineffective in law.' Asquith L.J. said: 'An unaccepted repudiation is a thing writ in water and of no value to anybody: it confers no legal rights of any sort or kind.' The declaration was held to be academic and the claim struck out. These observations must be read in the light of the facts to which they relate. They were directed to an alleged repudiation unaccepted by the man who said there was a repudiation before any cause of action had arisen. At best the case was no more than one of an intended repudiation, for performance was going on. The servant was still serving and the employer was continuing to employ him. What the court was saying was that the plaintiff had at that time no cause of action. But in the case of repudiation of a contract when performance is tendered, or due to be given by the other party, the repudiation cannot be said to be writ in water. It gives rise immediately to a cause of action. This does not involve acceptance of the repudiation. There has been a breach of contract which the complaining party denies the other had any right to commit. I know of no authority for saying that the offended party can go quietly on as if the contract still continued to be fully operative between both parties. He is put to his remedy at the date of the breach. It has been said that when an anticipatory repudiation is not treated as a cause of action the contract remains alive. It does until the contract would become operative, when the repudiation, if still maintained, then becomes a cause of action and all pleas and defences then existing are available to the respective parties.

The party complaining of the breach also has a duty to minimise the damage he has suffered, which is a further reason for saying that after the date of breach he cannot continue to carry on his part of an executory contract. A breach of a contract of employment will serve to illustrate the nature of this duty. A person is engaged to serve for a certain period, say three months, to commence at a future date. When that date arrives the prospective employer wrongfully refuses to honour the engagement. The servant is not entitled to see out the three months and then sue the recalcitrant employer for three months' wages. He must take steps by seeking other employment to minimise his loss. It is true, of course, that a servant cannot invoke a contract to force himself on an unwilling master, any more than a master can enforce the service of an unwilling servant. But if the appellants' contention is sound, it is difficult to see why, by parity of reasoning, it should not apply to a person who keeps himself free to perform the duties of his contract of service during the whole period of the contract and is prevented from doing so by the refusal of the other contracting party. Yet in Hochster v. De La Tour, from which the whole law about anticipatory repudiation

stems, Lord Campbell plainly indicated that if the courier in that case, instead of accepting as he did the repudiation of his engagement as a cause of action, before it was due to commence, had waited till the lapse of the three months of the engagement he could not have sued as for a debt. The jury, he said, would be entitled to look at all that might 'increase or mitigate the loss of the plaintiff down to the day of trial.' There is no difference in this matter between the law of England and the law of Scotland (Ross v. M'Farlane).

I now turn to two case which were relied on by the appellants' counsel, which may seem to come nearer the present case, but which, I think, are clearly distinguishable.

The first is Wright v. Melville. There a man hired a phaeton selected by himself for a period of five weeks at five guineas a week. After he had had it for two or three days he took it back saying he would take another, which he did not do, and afterwards refused to pay the stipulated hire. Best C.J. charged the jury that if the plaintiff had sold the phaeton within the five weeks (which was alleged) he could not recover, but as he did not appear to have done so he was entitled to the stipulated five guineas a week. Verdict was entered accordingly. This plainly was a contract of hire for a fixed period which had been commenced and under which rent then became due. There was no question of repudiation or breach at the date of performance. The case was distinguished in National Cash Register Co. Ltd. v. Stanley, for this reason, as is stated in the case which I next mention.

The other case is White and Carter (Councils) Ltd. v. Harding, in which Morris L.J. gave the judgment of the court with which the Master of the Rolls and Ormerod L.J. agreed. Copies were provided during the hearing of this appeal. The form of contract there was identical with that in the present case. The contractors were the present appellants. But the circumstances in which the claim arose were different. The advertiser, the defendant, entered into the contract on November 13, 1956. Nothing was done under the contract until May 8, 1957, when the advertising plates were first displayed by the contractors. The defendant was then asked for payment under the contract and as he refused to pay he was sued in the Westminster County Court for the full 156 weeks under condition 8 of the contract and judgment issued against him. On two separate occasions, one in November, 1956, and the other in April, 1957, before the plates had been exhibited he asked to be released from his contract, but the plaintiffs did not agree to do so. Morris L.J. held that there had been no termination or repudiation of the contract by the defendant prior to the exhibition of the plates, only requests to be released. Some two months after the display of the plates the defendant

wrote to the plaintiffs with a cheque for £81 which he asked to be accepted in payment for the first year's advertising. He also asked to be allowed to withdraw from the remainder of the contract. The plaintiffs refused to accede to this and returned the cheque for £81. The learned Lord Justice in these circumstances held that the claim was a claim for debt, under the contract, and upheld the judgment of the county court judge. He referred to the case of National Cash Register Co. Ltd. v. Stanley, and to Karsales (Harrow) Ltd. v. Wallis, in which that case was approved. Of the case of the National Cash Register Co. Ltd. v. Stanley he said: 'That seems to me, if I may say so with respect, to have been an entirely correct decision. The payment there was to be for use and hire of the register. The defendant refused to take the register. He refused to have the use of it and refused to hire it. Therefore, the provisions of the contract were not put into operation; they were not put into operation because of the defendant's own breach, for which the remedy lay in damages.'

In my opinion, the case relied on is on its facts quite a different case from the present and is of no assistance to the appellants.

This brings me to the case of Langford & Co. Ltd. v. Dutch. I took part in the judgment in that case, though the only opinion delivered in the case was given by the Lord President (Lord Cooper), with whom I and the other judges of the Division concurred. The judgment was not a reserved judgment and the case was not, I think, so fully argued as the case now before your Lordships. It is, if rightly decided, determinative of the present appeal and is, so far as I am aware, the only other case in which the question raised on this appeal has ever been considered. The circumstances were practically indistinguisable from those in the present case and the pursuers were suing, as here, for recovery of a debt under their contract. The Lord President said that the only reasonable and practical course, which the pursuers should have adopted, would have been to treat the defenders as having repudiated the contract and as being on that account liable in damages. He made reference to the absence of any specialty in the case which would justify the pursuers in claiming the remedy which they sought. What he had in mind, I think, were circumstances like those in International Correspondence Schools Ltd. v. Irving, which he referred to as highly special on its facts. I do not need to go further than to summarise the circumstances of that case in the Lord President's own words: '... the contract there in question was one for the provision of tuition by a correspondence course, and the tuition offered was in terms of the contract a unum quid, while the circumstances disclosed that part delivery of this unum quid had already been effected before the respondent first declined to proceed further with the contract.'

International Correspondence Schools Ltd. v. Irving was thus governed by the same reasoning as prevailed in Wright v. Melville and Wilson and Carter (Councils) Ltd. v. Harding. It is unnecessary to consider whether the case was rightly decided. Even if it were it has no application, in my opinion, to the present case. I have reconsidered the decision in Langford & Co. Ltd. v. Dutch in the light of the further argument on this appeal. I have come to the conclusion that it was rightly decided and that the Second Division in the present case was bound to follow it.

I find the argument advanced for the appellants a somewhat startling one. If it is right it would seem that a man who has contracted to go to Hongkong at his own expense and make a report, in return for remuneration of £10,000, and who, before the date fixed for the start of the journey and perhaps before he has incurred any expense, is informed by the other contracting party that he has cancelled or repudiates the contract, is entitled to set off for Hongkong and produce his report in order to claim in debt the stipulated sum. Such a result is not, in my opinion, in accordance with principle or authority, and cuts across the rule that where one party is in breach of contract the other must take steps to minimise the loss sustained by the breach.

It may be put also in another way, that the pursuers are precluded from carrying on with their performance by the notice from the defender, albeit in breach of contract, that he does not intend to pay them if they do. Lord President Dunedin said very much this in Johannesburg Municipal Council v. D. Stewart & Co. (1909) Ltd. in the following passage: 'When two parties are bound together under contract, of course each must perform to the other his mutual stipulations. If one of the parties is in breach of a stipulation of the contract, what is the position of the other?... If the stipulation which is broken goes to the root and essence of the contract, the other party is entitled to say - now you have so broken the contract that I am entitled to say that it is at an end through your fault, I shall not perform any more of my stipulations, because you have precluded me, and I shall claim damages.'

There remains for consideration the alternative ease made for the appellants upon condition 8 of the contract. Their claim is, that in respect of the defender's repudiation and breach of contract he is liable in damages, and that under the clause the damages are fixed at three years' rent which they, say, is liquidated damages, and not a penalty. But the clause, in my opinion, is only intended to take effect after the contract comes into operation. This is clear in the first event mentioned in the clause, because there can be no failure of payment until the advertising plates have been displayed in terms

of the agreement. This could not happen on the hypothesis, which must be accepted on this part of the case, that the pursuers were not entitled to go on with the contract. The clause is, in my opinion, just a debt clause ancillary to the conditions for the payment of rent and providing for instant payment of the whole rent in the event of failure in punctual payment of the instalments. No very convincing suggestions were given as to what was meant to be covered by the second event. But, in my opinion, this also must refer to some breaches in the course of performance of the contract, which will again involve instant payment of the full rent. I fail to see how the clause can be at one and the same time a contractual clause sounding in payment of debt and a damages clause for repudiation of the contract. The clause accordingly has, in my opinion, no operation here, and I find it unnecessary to consider whether, if it had, it is a clause for liquidated damages, or for a penalty.

I would dismiss the appeal.

**LORD HODSON:**

My Lords, both courts held that they were bound by the decision of the First Division in Langford & Co. Ltd. v. Dutch to reject the claim and leave the appellants to their remedy, if any, in damages for breach of contract.

I need not refer to the facts in Langford & Co. Ltd. v. Dutch, which is, in my opinion, indistinguishable from the present case, and accordingly prima facie binding on both courts. The Lord President (Cooper) in that case said that, apart from wholly exceptional circumstances, the law of Scotland did not afford to a person in the position of the pursuers the remedy sought. They could not force the defender to accept unwanted advertisements though they could claim damages for breach of contract. On the averments the only reasonable and proper course, according to the Lord President, would have been to treat the defender as having repudiated the contract and as being on that account liable in damages. The other members of the First Division agreed with the Lord President. This is tantamount to saying that the pursuers should have accepted the repudiation of the defender which, in my judgment, the appellants, who are in the same position as the pursuers in Langford & Co. Ltd. v. Dutch, cannot be compelled to do. It is settled as a fundamental rule of the law of contract that repudiation by one of the parties to a contract does not itself discharge it. See Viscount Simon's speech in Heyman v. Darwins Ltd. citing with approval the following sentence from a judgment of Scrutton L.J. in Golding v. London and Edinburgh Insurance Co. Ltd.: 'I have never been able to understand what effect the

repudiation of one party has unless the other party accepts the repudiation.'

In Howard v. Pickford Tool Co. Ltd. Asquith L.J. said: 'An unaccepted repudiation is a thing writ in water and of no value to anybody: it confers no legal rights of any sort or kind.' These are English cases but that the law of Scotland is the same is, I think, clear from the authorities, of which I need only refer to one, namely, Howie v. Anderson, where language to the same effect is to be found in the opinions of the Lord President and Lord Moncrieff.

It follows that, if, as here, there was no acceptance, the contract remains alive for the benefit of both parties and the party who has repudiated can change his mind but it does not follow that the party at the receiving end of the proffered repudiation is bound to accept it before the time for performance and is left to his remedy in damages for breach.

Mr. Bennett, for the respondent, did not seek to dispute the general proposition of law to which I have referred but sought to argue that if at the date of performance by the innocent party the guilty party maintains his refusal to accept performance and the innocent party does not accept the repudiation, although the contract still survives, it does not survive so far as the right of the innocent party to perform it is concerned but survives only for the purpose of enforcing remedies open to him by way of damages or specific implement.

This produces an impossible result; if the innocent party is deprived of some of his rights it involves putting an end to the contract except in cases, unlike this, where, in the exercise of the court's discretion, the remedy of specific implement is available.

The true position is that the contract survives and does so not only where specific implement is available. When the assistance of the court is not required the innocent party can choose whether he will accept repudiation and sue for damages for anticipatory breach or await the date of performance by the guilty party. Then, if there is failure in performance, his rights are preserved.

It may be unfortunate that the appellants have saddled themselves with an unwanted contract causing an apparent waste of time and money. No doubt this aspect impressed the Court of Session but there is no equity which can assist the respondent. It is trite that equity will not rewrite an improvident contract where there is no disability on either side. There is no duty laid upon a party to a subsisting contract to

vary it at the behest of the other party so as to deprive himself of the benefit given to him by the contract. To hold otherwise would be to introduce a novel equitable doctrine that a party was not to be held to his contract unless the court in a given instance thought it reasonable so to do. In this case it would make an action for debt a claim for a discretionary remedy. This would introduce an uncertainty into the field of contract which appears to be unsupported by authority either in English or Scottish law save for the one case upon which the Court of Session founded its opinion and which must, in my judgment, be taken to have been wrongly decided.

The appellants were given leave to amend their claim by praying in the alternative for the same sum, namely, £196 4s. as liquidated damages for breach of contract on the footing that the repudiation must be treated as if accepted. The respondent resisted the alternative claim on the ground that the sum sued for being a penalty and not liquidated damages the appellants were not entitled to decree therefor.

The only material obligation which the respondent was bound to fulfil was to pay the sum of money claimed and it is difficult to see how damages should be assessed for breach of this obligation. It is, however, unnecessary in view of the opinion I have expressed to consider the question whether the sum claimed is recoverable as a genuine pre-estimate of probable or possible interest in the due performance of the contract or is irrecoverable as a penalty.

I would allow the appeal.

Exhibit E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEWLEAD HOLDINGS LTD.,

                                Petitioner,

        vs.

IRONRIDGE GLOBAL IV LIMITED,

                                Respondent,

        and

VSTOCK TRANSFER, LLC, as transfer agent,

                                Notice Party.

14 Civ. _____ ( )

## DECLARATION OF ANTONIS BERTSOS
## IN SUPPORT OF PETITION OF PETITIONER NEWLEAD HOLDINGS LTD. FOR
## TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF
## INTERNATIONAL ARBITRATION PROCEEDING

I, ANTONIS BERTSOS, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am Chief Financial Officer and Secretary of Petitioner NewLead Holdings Ltd.

("Petitioner" or "NewLead"), an exempted company that was incorporated under the laws of

Bermuda on January 12, 2005 with the name "Aries Maritime Transport Limited" and

subsequently changed its name to "NewLead Holdings Ltd." on December 21, 2009.

2.      I am duly authorized to make this affidavit on behalf of the Petitioner.

3.      I make this affidavit from the facts and matters within my own knowledge and on

the basis of documents and information kept by Petitioner in the ordinary course of its business

and/or provided to me by others.  Where the facts and matters are within my own knowledge, I

confirm that they are true. Where the facts and matters are derived from information provided to me by others, I confirm that they are true to the best of my knowledge and belief.

### *This Application Is Made In Aid Of A Pending International Arbitration*

4.     This application is made for injunctive relief in aid of a currently pending International Arbitration Proceeding (the "Arbitration") between NewLead and Respondent Ironridge Global IV Limited ("Respondent" or "Ironridge").

5.     On or about May 9, 2014, Ironridge commenced the Arbitration with JAMS International ("JAMS") pursuant to a mandatory arbitration clause contained in the Share Subscription Agreement dated March 4, 2014 between the Petitioner and the Respondent (the "Subscription Agreement") seeking "monetary damages in excess of US $2,000,000.00 to date." A copy of the Notice of Intention to Arbitrate is annexed hereto as Exhibit A (without attachments). The Notice of Intention to Arbitrate was sent to NewLead by JAMS on May 21, 2014. In the Arbitration, Ironridge's claims are for money damages only.

6.     Ironridge has demanded that the Arbitration be conducted and the hearings held in New York. See Exhibit A.

7.     Newlead agrees on New York as the venue.

8.     NewLead intends to interpose an answer and counterclaim in the Arbitration (which is not due until on or about June 20, 2014 by applicable rule) seeking (i) a declaration that (a) the Transaction Documents are terminated at NewLead's election due to Ironridge's substantial material breaches of those agreements as outlined below; and (b) even if the Transaction Documents are not terminated, Ironridge has no entitlement to additional Common Shares of NewLead; and (ii) seeking damages against Ironridge based upon its violations of the federal and state securities laws and for breach of contract and fraud.

2

9.     I make this declaration in support of the Petition filed by the NewLead seeking, *inter alia*, a temporary restraining order and an injunction in aid of the currently pending Arbitration to restrain Ironridge and those acting in concert with it, as well VStock Transfer, LLC ("VStock"), the current registrar and transfer agent for the Common Shares of NewLead listed on NASDAQ Global Select Market ("NASDAQ") and any successor transfer agent ("Transfer Agent"), pending the confirmation of an Award issued in the Arbitration, from taking any steps whatsoever:

> (i)  to convert any of the Series A Preference Shares of NewLead registered in name of Ironridge ("Preference Shares") into Common Shares of NewLead ("Common Shares"); and

> (ii)  to issue any Common Shares to Ironridge, whether in connection with the conversion of the Preference Shares or otherwise.

10.     This application is absolutely necessary because, based directly upon Ironridge's material breaches of the contracts at issue, and its wrongful and fraudulent conduct as detailed below, NewLead is on the brink of destruction.

11.     The matter before this Court, and which is being litigated in the Arbitration, involves a "death spiral" financing and stock manipulation scheme (described in greater detail below) by Ironridge that has <u>artificially driven down the price of NewLead's Common Shares</u> <u>from $146.50 per share (March 13, 2014) to $0.3899 per share (May 15, 2014) in only</u> **two** **months**.

12.     Without injunctive relief preventing Ironridge from continuing wrongfully to obtain additional vast quantities of Common Shares and to dump those Common Shares as part of its scheme to manipulate the share price of NewLead in violation of the federal securities laws

and its contractual obligations, NewLead will be irreparably harmed, as will its public shareholders and the public markets generally.

13.     NewLead discovered that Ironridge, as part of its scheme, had exceeded daily Common Share trading limitations and was "short selling" NewLead's Common Shares -- both acts being material breaches of the agreements in place.

14.     As a result, on May 12, 2014, NewLead served upon Ironridge a Notice of Default dated May 12, 2014 ("Notice of Default and Termination") which, among other things declared the Subscription Agreement, the Certificate of Designations of Preferences, Rights and Limitations of Series A Preference Shares (the "Certificate of Designations") and the other documents ancillary to the subscription transaction ("Transaction Documents") terminated. A copy of the Notice of Default is annexed hereto as Exhibit B.

15.     Accordingly, NewLead has advised Ironridge that it will not honor any Conversion Notices or requests to issue additional Common Shares to Ironridge.

16.     Ironridge has continued to demand issuance of additional Common Shares from the Transfer Agent.

17.     In doing so, Ironridge relied upon the terms of an Irrevocable Letter of Instruction dated March 4, 2014 ("Irrevocable Letter Of Instruction") which was issued in connection with the initial investment. A copy of the Irrevocable Letter Of Instruction is annexed hereto as Exhibit C (without attachments).

18.     The Irrevocable Letter of Instruction provides irrevocable instruction to the Transfer Agent in the event that Ironridge was entitled to the issuance of Common Shares in connection with the Conversion of Preferred Shares.

19.     When Ironridge first converted a portion of its Preference Shares (100 on April 10 and 100 on April 17, 2014), it received the appropriate amount of Common Shares (termed "Conversion Shares" in the Certificate of Designations). However, the Common Shares being issued to Ironridge based upon its recent demands are in connection with its claimed entitlement to "Dividends" and "Embedded Dividend Liability" under the Subscription Agreement.

20.     Section I.C.2. of the Certificate of Designations specifically provides that:

> Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable **at the Corporation's election**, (a) **in cash**, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

A copy of the Certificate of Designations is annexed hereto as Exhibit D.

21.     To protect itself from Ironridge's ongoing wrongful scheme, in accordance with the Transaction Documents and without prejudice to NewLead's claims in the Arbitration and applications before this Court, on May 27, 2014, NewLead made the election ("Notice of Election") under the Transaction Documents to pay Dividends and any applicable Embedded Dividend Liability in cash, and not in Common Shares of NewLead:.

> We are in receipt of your further issuance notice dated May 22, 2014 pursuant to your conversion notices dated April 10, 2014 and April 17, 2014. As we have previously advised you by Notice of Default dated May 12, 2014 (the "Notice"), the Transaction Documents (as that term is defined therein) are no longer valid and in effect because, among other things, of your material breaches of the Transaction Documents as set forth in the Notice.

> Notwithstanding the foregoing, if and only to the extent that the Transaction Documents are deemed not to be terminated and/or are determined to be in full force and effect, and only if NewLead is ultimately found to be liable to pay such dividend and any applicable embedded dividend liability by a tribunal of competent jurisdiction, please be advised that NewLead hereby elects to pay the dividend and any applicable embedded dividend liability in cash, and not in common shares of NewLead.

> In addition, for all the conversion notices previously delivered and all of the conversion notices requesting additional shares, NewLead never elected to issue common shares to

pay such dividends and embedded dividend liability and, therefore, any receipt of common shares in connection with such dividends and embedded dividend liability was in error and NewLead immediately requests the return of such shares and all further conversion notices requesting additional shares are not valid and are to be paid in cash. This election is made without prejudice to any claims or defenses which NewLead now has, or hereafter may have, as against Ironridge.

A copy of the Notice of Election is annexed hereto as Exhibit E.

22.     As a result, even in the unlikely event that Ironridge were to succeed on its contract claims in the Arbitration (which it will not), <u>Ironridge will not be entitled to the issuance of additional Common Shares as demanded, but only to the payment of cash as provided by the provisions of the Subscription Agreement.</u>

23.     Ironridge, through counsel, has responded to NewLead's Notice of Election by declaring that it rejects the election to pay Dividends and Embedded Dividend Liability in cash, and will continue to demand issuance of Common Shares in connection with such Dividends and Embedded Dividend Liability based upon the Irrevocable Letter of Instruction – which amounts to a pure abuse. A copy of the letter dated May 27, 2014 from Ironridge's counsel is annexed hereto as Exhibit F.

24.     Notwithstanding both the Notice of Default and Termination and the Letter of Election, Ironridge continued to send directly to VStock additional notices demanding the issuance of Common Shares.

25.     Indeed, on Friday, May 30, 2014, Ironridge sent directly to VStock a notice demanding an additional 3,820,000 Common Shares (the "May 30, 2014 Conversion Notice"). A copy of the May 30, 2014 Conversion Notice is annexed hereto as Exhibit G. Also, Ironridge is intending to request and receive shares up to 9.99% of the company's outstanding common shares every day (approximately 2.7 M shares) and sell them to the market.

26.     Even though Ironridge is not entitled to additional Common Shares (the Company has elected to pay such Dividends and Embedded Dividend Liability in cash), it is abusing the terms and intent of the Irrevocable Letter of Instruction to obtain wrongfully additional Common Shares for use in its illegal and fraudulent "death spiral" financing and stock manipulation scheme.

27.     Although we have advised VStock of the existence of both the Notice of Default and Termination and the Letter of Election, VStock has indicated that absent an order from this Court, it will issue the requested Common Shares to Ironridge based upon the Irrevocable Letter of Instruction in connection with the May 30 Conversion Notice and any future conversion notice from Ironridge.

28.     By this application, we respectfully ask this Court to enjoin the conversion of Preferred Shares by, and the issuance of any further Common Shares to, Ironridge, pending the outcome of the Arbitration.

### *Absent Injunctive Relief, NewLead Will Suffer Irreparable Injury*

29.     If injunctive relief is not granted, Ironridge's "death spiral" mechanism will have its intended effect: the death of NewLead.

30.     As stated above, Ironridge has artificially driven down the price of NewLead's Common Shares from $146.50 per share (March 13, 2014) to $0.3899 per share (May 15, 2014) in only **two months**.

31.     Ironridge's conduct is destroying this developing company's access to the capital needed to pursue its business plans.

32.     Ironridge intends to continue to convert the Preference Shares and sell the Common Shares arising thereunder (at a significant profit) with a view of driving down the

market value of the Common Shares on NASDAQ. If it is not enjoined, NewLead will be put in a position where the market value of its Common Shares will become so low that its business and the interests of all its other public shareholders will be irreparably damaged.

33. If this pattern of abuse is allowed to continue, there is a high likelihood that the Common Shares of NewLead will be de-listed for being unable to comply with the continued listing requirements of NASDAQ, particularly the $1 bid price and minimum market capital rules.

34. NewLead is already fielding numerous serious complaints from public shareholders about the sharp decrease in the share price. We fear that if we do not stop Ironridge, NewLead will begin to see possible claims against the company, management and the Board.

35. The Board of Directors of NewLead will have no choice but to commence winding-up proceedings.

36. On the other hand, Ironridge will suffer no prejudice if an injunction issues. It has already commenced the Arbitration seeking only monetary damages for the alleged delay in converting Preferred Shares and issuing Common Shares.

37. The Certificate of Designations provides a calculation mechanism for determining Ironridge's damages in the unlikely event it were to succeed in convincing an arbitrator that it was entitled to the issuance of Common Shares rather than the payment of money.

38. Section G.1.b. of the Certificate of Designations provides as follows:

If the Corporation shall fail, for any reason, to issue or cause to be issued to the Holder, within 3 Trading Days after receipt of the applicable Conversion Notice, the number of Conversion Shares to which the Holder is entitled as stated in the Conversion Notice, then, in addition to all other remedies available to the Holder, the Corporation shall pay in cash to the Holder on each day after such 3rd Trading Day that the issuance of such Conversion Shares is not timely effected an amount equal to 2% of the product of (i) the

8

aggregate number of Conversion Shares not issued to the Holder on a timely basis and to which the Holder is entitled and (ii) the highest Closing Price of the Common Shares between the date on which the Corporation should have issued such shares to the Holder and the actual date of receipt by Holder.

Exhibit D.

39.     Thus, while NewLead is faced with the destruction of its company and a fraud being perpetrated on it and its public shareholders, Ironridge seeks only money damages which, although unlikely to be awarded, are subject to a contractual calculation.

40.     It should be noted that in the short time of two and a half months since entering into this transaction, Ironridge, by virtue of its fraudulent scheme, **has already recouped it full investment of $2.5 million and has made an additional $10.5 million in profit**.

41.     The equities weigh completely in favor of granting the requested relief to NewLead.

42.     No prior application has been made by NewLead[1] to this or any other Court for the relief requested herein.

43.     It is respectfully requested that the Court enter a TRO and an Injunction in aid of Arbitration so that NewLead can survive long enough to vindicate its rights in the pending Arbitration.

### *Factual Background*

44.     NewLead is an international shipping company that owns a fleet of dry bulk carriers and mining assets whose Common Shares are admitted for listing and trade on NASDAQ under the symbol "NEWL".

45.     Ironridge is a British Virgin Islands' company that is part of Ironridge Global Partners, LLC, a rogue or "Bluebeard" investor that has had a history of investing in public

---

[1] NewLead has recently become aware of litigation by other victims of Ironridge's fraudulent toxic "death spiral" financing scheme as described below.

9

companies purportedly to assist in financing their operations and expansion but, as we have now discovered, has been preying upon public companies in need of financing through a device called "death spiral" financing.

46.     Upon information and belief, VStock is a California limited liability company with a principal place of business in Cedarhurst, New York.

47.     NewLead has joined VStock, the current Transfer Agent for the Common Shares of NewLead listed on NASDAQ, because VStock has indicated that, absent an order from this Court, it will honor all conversion or issuance notices from Ironridge based on the Irrevocable Letter of Instruction.  VStock will not be a party to the pending Arbitration and is joined here only for notice purposes (for purposes of the application for injunctive relief).

### *Ironridge's Toxic Death Spiral Financing and Market Manipulation Scheme*

48.     As we have only recently discovered, and far too late, Ironridge has repeatedly used the same "death spiral" financing and stock manipulation scheme against numerous other U.S. public companies.  Although the mechanism by which Ironridge initially receives the preferred stock can vary slightly depending on the victim, the scheme by which it destroys the target and obtains hugely disproportionate profits is largely the same in every case.

49.     Initially, Ironridge provides "financing" to the intended victim company, as it did here, by purchasing the target's convertible preferred stock. The terms of the arrangement -- known colloquially as a "toxic convertible" -- allows the preferred stock to be converted into common stock at a value tied to (but significantly less than) the lowest market value of the common stock during a period of time surrounding the time of conversion; the lower the stock price, the greater the number of common shares received in the conversion.

50.     Ironridge aggressively short-sells the target's common stock both before and after conversion to drive down the share price, or employs other techniques in order to manipulate the price downward. Later, Ironridge exercises its toxic convertibles to obtain shares of the victim's common stock at artificially depressed (and contractually discounted) prices, profiting from the difference between the price at which the stock was sold short and the artificially depressed price at which it was obtained through conversion. Ironridge then uses the shares obtained upon conversion to cover its short positions.

51.     Ironridge makes a large profit, but the target company is devastated. This has certainly been the case for NewLead (and for other victims as set forth below).

52.     For example, on its original investment of $2,500,022.50, in two short months, Ironridge has already seen a return of **nearly $13 million so far**. It has only converted a small percentage of the total Preferred Shares in its name. Unless stopped, Ironridge will continue to convert Preferred Shares, short sell NewLead's Common Shares, and cover with converted Common Shares, all the while making a huge profit until NewLead is driven out of existence.

53.     During this time, NewLead has not only been forced to sell its own shares at an artificially low price in the conversion, but the issuance of the shares upon conversion has diluted the value of the outstanding Common Shares, which has caused the Common Shares price to fall further -- hence the characterization "death spiral." As the Common Shares price has plummeted, NewLead has found it impossible to raise the capital it needs to continue in business.

### *Ironridge's Fraud on NewLead*

54.     Ironridge fraudulently induced NewLead to issue convertible Preference Shares based on assurances that it and its principals, including John Kirkland ("Kirkland"), Brendan

O'Neill ("O'Neill") and Richard Kreger ("Kreger") were reputable, trustworthy, long-term investors who would not put pressure on NewLead's stock.

55.    I first met Kreger in around July or August 2013, when he began trying to interest NewLead in accepting investment from Ironridge. He stressed that Ironridge was interested in long-term partnering with the companies in which it invested, and that it sought to have mutually beneficial relationships that allowed the company to prosper.

56.    After discussions over time, Kreger initiated more serious discussions regarding an Ironridge investment in NewLead in February 2014.

57.    Somewhere around the last week of February 2014, Kirkland delivered to NewLead an initial term sheet for an investment by Ironridge in NewLead. At this point, negotiations became quite serious.

58.    From the time that the initial term sheet was delivered by Kirkland in late February 2014 until the closing of the investment on March 4, 2014, I participated in conference calls with Kreger, Kirkland and O'Neill on average one to five times per day.

59.    During these conference calls, each of them repeatedly and specifically stated that Ironridge was a long-term investor which would do nothing to hurt NewLead and was interested in the long-term growth of NewLead.

60.    Each of Kirkland, O'Neill and Kreger promised that Ironridge would not sell vast quantities of shares into the market (and hence damage NewLead's share price). During these conference calls, Kirkland, Kruger and O'Neill made the following representations to NewLead:

- Ironridge and its principals were long-term investors.

- Ironridge would not put pressure on the NewLead stock.

- Ironridge would not short NewLead's stock. Indeed, each specifically stated that Ironridge had a greater interest in seeing the stock price of its investments

12

appreciate over time, rather than depreciate.

- Ironridge would pledge assets as a security for the $22.5 million in Notes (it has never actually pledged any such assets). In fact, Ironridge boasted that unlike other potential investors, it had the assets and money to grow NewLead and see it prosper.

61.     Each of the foregoing oral representations was false.

62.     Believing Kirkland's, Kreger's and O'Neill's representations regarding Ironridge's bona fides, integrity and intention to be a long term beneficial holder of NewLead securities, NewLead agreed to the financing proposal made by Ironridge. Pursuant to the Subscription Agreement, Ironridge agreed to subscribe for 2,500 Preference Shares for an aggregate subscription amount of US$25,000,000. The terms of the subscription were as follows:

(i)     at closing, Ironridge paid to NewLead US$2,500,022.50 in cash, representing payment, in full, for 250 Preference Shares and payment of the nominal value of the remaining 2,250 Preference Shares (being US$0.01 per share) issued to it. Ironridge also received an additional 250 Preference Shares in consideration for a commitment fee payable to it in respect of the investment; or

(ii)     the balance of the subscription proceeds were secured by the issue by Ironridge of nine promissory notes (in the principal amount of U$2,499,997.50 each) (the "Notes"); or

(iii)     pursuant to the Transaction Documents, Ironridge is entitled to convert the 500 Preference Shares currently held by it into Common Shares and, subject to certain conditions, may convert each further tranche of 250 Preference Shares into Common Shares upon payment, in full, of the related Note.

63.     A copy of the Subscription Agreement is annexed hereto as Exhibit H.

64.     Clause IV.M (Share Conversions) of the Subscription Agreement limits the ability of Ironridge to sell Common Shares on any Trading Day (as defined therein). The aggregate trading limit is expressed to be the greater of three amounts, as follows:

20% of (a) the daily trading volume for that day or (b) the worldwide average daily trading volume in the Common Shares on all exchanges on which the Common Shares are listed (excluding the Respondent's sales) for the 10 Trading Days immediately preceding such Trading Day;

$295,000 worth of Common Shares; or

any greater amount that NewLead permits any other person to sell.

65.    Further, clause IV.I (No Shorting) provides that Ironridge will not engage in or effect, directly or indirectly, any Short Sale (as defined therein) of NewLead's share capital.

66.    Certain rights and restrictions attaching to the Preference Shares are set out in the Certificate of Designations.

67.    Specifically, Clause G of the Certificate of Designations sets out the mechanics for conversion and provides the mechanism whereby Ironridge may deliver a written notice to NewLead of its election to convert the Preference Shares.

68.    Upon conversion, Ironridge is entitled to a set number of Common Shares, and separately to the payment of "Dividends."

69.    Section I.C.2. of the Certificate of Designations specifically provides that:

Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable **at the Corporation's election**, (a) **in cash**, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

Exhibit D.

70.    As part of the transaction, Ironridge induced NewLead to enter into the Irrevocable Letter of Instruction dated March 4, 2014 to the Transfer Agent.  Exhibit C. However, the Irrevocable Letter of Instruction only applies to the extent Ironridge is entitled to the issuance of Common Shares (which it is currently not).

71.    Based upon all of Ironridge's misrepresentations, NewLead was not concerned that Ironridge would short sell or manipulate the price of NewLead's Common Shares.  There were prohibitions on short selling and daily trading limits in the Transaction Documents.

72.     Thus, we were completely unaware of the potential disastrous consequences of the conversion and pricing provisions that Ironridge had built into the Transaction Documents without our knowledge. Although we do not believe that the contract provisions in fact operate as Ironridge has interpreted them, that is a dispute to be determined in the Arbitration.

73.     For example, Ironridge had drafted the Certificate of Designation to include provisions that essentially provided that upon conversion of Preferred Shares, Ironridge would be entitled to Dividends at the time of Conversion, if paid in Common Shares, of almost an unlimited number of Common Shares so long as the share price continued to go down. The Dividends are determined "in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period [a period starting thirty Trading Days before and ending Thirty Trading Days after the relevant date], not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period." So long as the share price continued to drop, Ironridge claims[2] that the Equity Conditions Measuring Period continues to be open-ended, and additional Common Shares would keep being issued at an amount not to exceed the 85% of the lowest closing price on any Trading Day. Exhibit D (Certificate of Designations) at Sections I.C.2. and I.G.6.g.

74.     Pursuant to the Irrevocable Instruction Letter, once Ironridge demands conversion of Preference Shares or issuance of Common Shares, the Transfer Agent is (arguably) directed to issue the relevant number of Common Shares to Ironridge.

75.     Because Ironridge is a "Non-U.S. Person" who purchased securities pursuant to Regulation S of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* (the "33 Act"), Ironridge's

---

[2] NewLead believes that the Equity Conditions Measuring Period is tied to the date upon which Ironridge receives the "Conversion Shares" not when it receives additional Common Shares in payment of any obligations for Dividends or Imbedded Dividend Liability.

converted Common Shares were not freely tradable until the end of the 40 day hold period after it obtains the security.

76. Contrary to its commitment to act as a long-term investor in NewLead, on April 10, 2014 (the 36th day of the hold period), Ironridge began converting Preference Shares to Common Shares, and requesting that the Common Shares be issued beginning on April 14, 2014 – the 40th day of the old period.

77. Annexed hereto as Exhibit I are Ironridge's Conversion Notices from April 10 to May 30, 2014.

78. In each instance, Ironridge asked for the maximum number of shares it could obtain without becoming a 10% (or greater) holder of NewLead's Common Shares ("9.99% blocker") and thereby avoiding Section 16 reporting obligations.

79. Ironridge then began dumping converted Common Shares into the market on April 14 – the first day it could do so -- and continued to sell large blocks of Common Shares daily as part of its scheme to put pressure on the NewLead stock price (although we believe that they began manipulating the Common Share Price as early as March 13 or 14 (see below).

80. Indeed, for 14 straight Trading Days beginning April 14, Ironridge converted and sold the maximum volume of total outstanding Common Share that it could without incurring Section 16 reporting obligations (and in at least one case exceeding that limit), establishing that its intent was specifically to manipulate the Common Share price and harm NewLead.

81. During this period, Ironridge exceeded the daily trading volume limits contained in clause IV.M of the Subscription Agreement constituting a material breach of the Subsctiption Agreement.

82. Annexed hereto as Exhibit J is a chart analyzing the information collected by NewLead from Ironridge which establishes that, as part of its fraudulent scheme and in violation of the provisions of the Subscription Agreement, Ironridge has exceeded the daily trading limit on at least five separate days: April 14, 28, 30 and May 1 and 2, 2014. As shown, on each day, Ironridge has failed to meet each of the three tests contained in the Subscription Agreement.

83. Annexed hereto as Exhibit K is a chart which I prepared from trading activity records of NewLead Common Shares which accurately sets forth the daily trading volumes and trading prices (open, high, low and close) for the full year preceding March 27, 2014.

84. As the Court can see from Exhibit K, on March 13, 2014, the opening price of the Common Shares was $162.50. This is the close before the approximate first Trading Day that would form the beginning of the Equity Conditions Measuring Period for Ironridge's April 14 Trading. Beginning on March 14, 2014, the Common Shares of NewLead began an historically unprecedented period of high trading volume, jumping from 9,717 shares on March 13 to 153,275 shares on March 14, 2014. Thereafter, the share trading volumes have remained historically high, and towards the end of March, rose exponentially – 10,464,710 on May 15; 11,317,580 on May 16; 32,352,490 on May 19 and a high of 54,245,800 on May 20, 2014.

85. Upon information and belief, and consistent with the unusual, historically high trading volumes coinciding with the Ironridge transaction, NewLead believes that Ironridge began manipulating the trading volume and share price for the Common Shares starting on or about March 14 in order to achieve the maximum benefits when it converted its Preferred starting on April 10 and trading shares on April 14, 2014 (the Equity Conditions Measuring Period would reach back that far). We believe Ironridge has been causing shares to be sold or short selling to manipulate down the price to receive the maximum benefit at its later conversion.

86.     On April 14, the opening price of the Common Shares was $25.50. The closing price on May 15, 2014 was $0.3899. Exhibit K.

87.     To date, Respondent has converted only a very small portion of the Preference Shares held by it and sold the Common Shares arising from such conversion.

88.     In order to effectuate the manipulation of NewLead's share price, Ironridge has been both exceeding the daily trading volumes limitations set forth in the Transaction Documents as well as short selling NewLead's Common Shares, in violation of its contractual commitments. Overall, this series of wrongful acts has artificially depressed the trading price of NewLead's Common Shares so that Ironridge can profit immensely from covering its short sales with below market converted Common Shares.

89.     Moreover, based on information provided to NewLead by Ironridge, Ironridge has sold more Common Shares than it has received, to date, pursuant to the terms of the Subscription Agreement.

90.     On April 16, 2014, after the market closing, Ironridge requested and received at the next trading day opening 2,550,000 Common Shares which would bring Ironridge to a total possession of 234,291 Common Shares in excess of its 9.99% blocker. We believe that these 234,291 Common Shares were used to cover a short position that Ironridge had. This activity is detailed on Exhibit L, establishing that, as part of its fraudulent scheme and in violation of the provisions of the Subscription Agreement, Ironridge has been short selling NewLead Common Stock.

91.     Although this is proof of just one instance of short selling, upon information and belief, Ironridge is vigorously short selling NewLead Common Stock to both artificially deflate the share price and make profits for itself through its market manipulation scheme. NewLead

believes that Ironridge is also short selling without having cover from borrowed shares because it knows that it will get additional Common Shares under the Transaction Documents and further, by manipulating the share price down, it will continue to receive shares through its fraud and misuse of the Irrevocable Letter of Instruction on an exponential and never-ending basis (that is until the company is put into liquidation and winding up).

92.     Of course, if Ironridge is permitted to continue its fraudulent scheme, this number will perpetually increase. This is the primary attribute of the "death spiral" financing scheme.

93.     As such, Ironridge has been selling borrowed Common Shares, or Common Shares that it did not yet possess (and which it would later acquire through the conversion of Preference Shares), i.e., short selling Common Shares, in breach of clause IV.I.

94.     The sale of Common Shares by Ironridge in breach of the terms of the Subscription Agreement has, to date, resulted in a return of over US$13,000,000 to date on an investment of US$2,500,022.50.

95.     The misuse of the Irrevocable Letter of Instruction to obtain shares (in the face of NewLead's election to pay Dividends and Embedded Dividend Liability in case rather than Common Shares), and the breaches of the undertakings given by Ironridge in clauses IV.I and IV.M are such that they have adversely affected the market price of the Common Shares and the continued actions of Ironridge threaten the ability of NewLead to continue in business.

96.     It is respectfully submitted that there are sufficient grounds for the Court to grant an injunction pending a determination by a duly appointed arbitrator as to the rights of the respective parties under the Subscription Agreement.

### *Ironridge's Continuing Pattern Of Fraud And Market Manipulation*

97.     We were unaware of Ironridge's prior death spiral financing schemes at the time of doing the transaction with it.

98.     As we now know, the victims of these frauds are often ignorant of the details of how the scheme has been carried out because the wrongdoers typically carry out their schemes in secret, through offshore entities -- both to provide the initial funding and to engage in the manipulative trading. In addition, because of the automatic discovery stay provision of the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4(b)(3)(B) ("PSLRA"), victims of this type of fraud are unable to pursue discovery. As a result, in pleading their claims, the victims must rely heavily on inferences to be drawn from circumstantial evidence.

99.     The wrongdoers in these cases are usually "Bluebeard" investors; that is, the overwhelming majority of the companies in which they "invest" experience death spirals soon after the "investment." In addition, the wrongdoers like Ironridge typically assure the victim prior to purchasing the convertible securities that they are long-term investors, but, soon after purchasing the convertible securities, they exercise their rights of conversion and sell the shares obtained upon conversion. This is exactly what Ironridge did in its negotiations with NewLead.

100.    We have recently discovered that at least two other public companies are currently litigating this exact pattern of fraudulent conduct with Ironridge:  Green Automotive and ScripsAmerica.

### *Green Automotive*

101.    In *Ironridge Global IV, Ltd v Green Automotive Company, Inc.*, Case No. BC526570, Ironridge sought an injunction requiring Green Automotive to issue additional shares of common stock to Ironridge pursuant to a similar toxic preferred death spiral financing scheme.

102.    In her decision denying Ironridge's motion, Judge Deirder Hill describes the

dispute as follows:

> Plaintiff seeks an order enforcing the settlement agreement arguing that defendant is
> refusing to issue 55,000,000 additional shares of Defendants common stock as required
> by the settlement agreement.    Plaintiff seeks a court order (1) requiring Defendant and
> its officers and directors, including  CEO Ian Hobday and transfer agent Action Stock
> Transfer to immediately issue 55,000,000 shares of common stock to Plaintiff, (2)
> restraining and enjoining such persons from issuing or transferring any shares to any
> other person until transfer is made to Plaintiff, and (3) for payment of Plaintiff's legal fees
> and costs.
>
> Defendant argues that Plaintiff has received $2,000,000 in shares of Defendant for its
> $500,000 claim, which is a four-fold return. Defendant argues that when the parties
> submitted their application for an order approving the stipulated settlement to the court
> for a *fairness* hearing on December  2, 2013, Plaintiff never disclosed  to the court or to
> Defendant that Plaintiff's interpretation of the Stipulation could lead to such a radically
> unfair result.  Defendant is suspicious that Plaintiff has engaged in a pattern of similar
> frauds on corporations and courts as a purported "toxic financier."  Defendant  requests
> that this court find that the Stipulation as interpreted by Plaintiff is not fair, deny this
> motion, and establish  a procedure  to determine the amount by which Plaintiff unfairly
> and fraudulently  profited  from its scheme so as to pay restitution   to Defendant.
> However, if this court determines that additional discovery is required to obtain evidence
> necessary to adjudicate the matter, the court should allow the parties to conduct  such
> discovery.  In either event, the court should dissolve the TRO in view of Plaintiff's utter
> failure to resent admissible  evidence  that it is likely to prevail on the merits.

103.    A copy of the Order issued by the California Court in Green Automotive is

annexed hereto as Exhibit M.

### *ScripsAmerica*

104.    On or about May 22, 2014, ScripsAmerica, Inc. filed a complaint in the United

States District Court for the Central District of California alleging claims of securities fraud,

market manipulation, common law fraud and breach of contract against Ironridge and its

principal, Kirkland on alleged fact incredibly similar to those set out here.   In essence,

ScripsAmerica alleges that Ironridge and Kirkland engaged in a toxic spiral financing scheme

that mirrors in all respects the fraudulent scheme that Ironridge has perpetrated on NewLead. A copy of ScripsAmerica's federal securities Complaint is annexed hereto as Exhibit N.

105.  This recurring pattern of conduct by Ironridge is certainly sufficient evidence of scienter on the part of Ironridge.

106.  Paragraph 30 of the ScripsAmerica complaint reads as follows:

30.  Plaintiff's conduct with respect to Defendant is part of a wider pattern illegal and deceptive activity. Indeed, Plaintiff has engaged in essentially the same or similar wrongful conduct in connection with the stock of many other companies. The watchdog website "Scam Informer" recently observed that "[t]he destruction in stocks [IRONRIDGE] has completed transactions with makes the devastation from Hurricane Irene seem tame by comparison."

Ex. N at ¶ 30.

## *Conclusion*

WHEREFORE, NEWLEAD HOLDINGS LTD. respectfully requests that this Court

enter a TRO and Injunction in aid of Arbitration, restraining Ironridge and those acting in concert

with it, as well VStock (and any successor transfer agent), pending the confirmation of an Award

issued in the Arbitration, from taking any steps whatsoever:

    (i) to convert any of the Preference Shares registered in name of Ironridge into Common Shares of NewLead, or to issue any Common Shares to Ironridge, whether by giving notice to the Transfer Agent, requesting the issue of Common Shares on conversion of the Preference Shares or otherwise; and

    (ii) to effect the conversion of Preference Shares, or to issue Common Shares to Ironridge pursuant to the terms of a certain Certificate of Designations or the Irrevocable Letter of Instruction to the Transfer Agent; and

granting to NewLead such other and further relief as this Court deems just and proper.

    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(1) that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 2, 2014
      Piraeus, Greece

                                     _____
                                ANTONIS BERTSOS

Exhibit A



**THE RESOLUTION EXPERTS®**

NOTICE TO ALL PARTIES                                          May 21, 2014

      Re:    **Ironridge Global IV Limited vs. NewLead Holdings Limited**
              Reference #: 1425016179

Dear Parties:

JAMS has received a Request for Arbitration in the above-referenced matter, pursuant to a pre-dispute arbitration clause contained in the contracts between the parties. The date of commencement is May 9th, 2014. Pursuant to JAMS International Arbitration Rules, Article 2.3, enclosed is a copy of the Request for Arbitration and associated contracts for Respondents.

Pursuant to the parties' arbitration agreement and JAMS policy, it is my understanding this arbitration shall be conducted in accordance with JAMS International Rules and Procedures. All arbitrations at JAMS are conducted in accordance with the Arbitration Administrative Policies regarding payment of fees, document retention, and limitations of liability. It is important to familiarize yourself with the enclosed arbitration rules and the JAMS Arbitration Administrative Policies.

Please note that per Article 4.1, a Statement of Defense is due within 30 days after date of receipt of the Request for Arbitration.

If you have any questions, please contact me directly at 212-607-2761.

Sincerely,

Veronica Guevara
ADR Specialist
vguevara@jamsadr.com
Fax# 212-751-4099


Enclosures to Respondent only

| From: | John C. Kirkland [jkirkland@ironridgeglobal.com] |
|---|---|
| To: | info@jamsinternational.simplyms.com |
| Subject: | New submission from Submit a Case |
| Date: | 5/9/2014 7:23:14 PM |
| CC: | |
| BCC: | |

Message:
**Name**

John C. Kirkland

**Position**

Attorney

**Full Address**

881 Alma Real Drive, Suite 305, Los Angeles, CA 90272

**Country**

USA

**Telephone**

1-310-935-3900

**Fax**

1-310-935-3838

**Email**

jkirkland@ironridgeglobal.com

**Web Address of Company/Firm**

http://ironridgeglobal.com

**Submitting Party Name**

Ironridge Global IV, Ltd.

**Case Information**

Binding contractual arbitration of breach of contract action for monetary damages in excess of US $2,000,000.00 to date, by Ironridge Global IV, Ltd., a British Virgin Islands business company, against NewLead Holdings Limited, a Bermuda company, pursuant to Section V.H, Arbitration, of Share Subscription Agreement dated March 4, 2014, which provision provides: "Any dispute, controversy, claim or action of any kind arising out of or relating to this Agreement, or in any way involving Company and Subscriber or their respective Affiliates, will be resolved by final and binding arbitration in English before a retired judge at JAMS International, or its successor, in Bermuda, pursuant to its most expedited and Streamlined Arbitration Rules and Procedures for international arbitrations. Any interim or final award may be entered and enforced by any court of competent jurisdiction. The

1

final award will include the prevailing partys reasonable arbitration, expert witness and attorney fees, costs and expenses."

**In Litigation?**

No

## CLAIMANT INFORMATION

**Company/Firm (if applicable)**

Ironridge Global IV, Ltd.

**Full Address**

Harbour House, 2nd Floor, Waterfront Drive, Road Town, Tortola, BVI VG1110

**Country**

British Virgin Islands

**Email**

jkirkland@ironridgeglobal.com

**Attorney Representative**

John C. Kirkland

## DEFENDANT INFORMATION

**Company/Firm (if applicable)**

NewLead Holdings Limited

**Full Address**

83 Akti Miaouli & Flessa Str., Piraeus Greece 185 38

**Country**

Greece

**Email**

Todd.Mason@ThompsonHine.com

**Attorney Representative**

Todd E. Mason

## HEARING DESIRED

**Binding or Non-Binding?**

Binding

**Location**

New York

**Location, Alternative**

Bermuda

**Date(s) Desired**

Immediate

Exhibit B

# THOMPSON HINE

**BY EMAIL AND FACSIMILE (310-935-3838)**

May 12, 2014

Ironridge Global IV, Ltd.
Harbour House, 2nd Floor
Waterfront Drive, Road Town
Tortola, British Virgin Islands VG1110

Re:    **NOTICE OF DEFAULT**

To Whom It May Concern,

We are counsel for NewLead Holdings Ltd. ("NewLead" or the "Company").

Reference is hereby made to: (i) that certain Certificate Of Designations Of Preferences, Rights And Limitations Of Series A Preference Shares dated March 4, 2014 (the "Certificate Of Designations"); and (ii) that certain Share Subscription Agreement dated as of March 4, 2014 by and between Ironridge Global IV, Ltd. ("Ironridge") and NewLead (the "Share Subscription Agreement" and, together with the Certificate of Designations, the "Agreement").

We hereby give you notice that Ironridge is in material default and breach of the Agreement and as a result we herewith terminate the agreement and reserve all rights and privileges for the material damages caused to the Company from your improper actions.

NewLead believes Ironridge has breached Section IV.M of the Share Subscription Agreement in that it has exceeded the limit on aggregate trading on at least five different Trading Days. NewLead's investigation into this matter is ongoing and there may be further breaches of the Agreement and specifically of Section IV.M of which NewLead is currently unaware.

In addition, NewLead believes that Ironridge has breached Section IV.H (a), IV.H. (e) and IV.I. As a result of Ironridge's various actions and in order to ascertain whether additional violations have occurred, NewLead requests records of all of Ironridge's ownership and trading activities with respect to NewLead's common shares.

We also note that, as a result of your many conversations with management, it is likely you are in possession of material non-public information and have been for some period of time.

THOMPSON HINE LLP    335 Madison Avenue    www.ThompsonHine.com
ATTORNEYS AT LAW    12th Floor    Phone: 212.344.5680
    New York, New York 10017-4611    Fax: 212.344.6101

We have been authorized to use all legal methods to protect NewLead's rights and interests, including but not limited to moving for injunctive relief against you and others as necessary, and to take such other action as may be necessary to protect NewLead's business.

All rights are reserved.

Very truly yours,

Richard De Palma

Copy: NewLead Holdings Ltd.

Exhibit C



**NEWLEAD**

March 4, 2014

Continental Stock Transfer & Trust Company
17 Battery Place, 8th Floor
New York, NY 10004

Ladies and Gentlemen:

NewLead Holdings Ltd., a Bermuda company (the "Company") and Ironridge Global IV, Ltd., a British Virgin Islands business company (the "Investor") have entered into a Share Subscription Agreement, dated as of March 4, 2014 (the "Agreement"), providing for the issuance of Series A Preference Shares (the "Preference Shares"), which are convertible into common shares of the Company (the "Common Shares").

A copy of the Agreement and the Certificate of Designations for the Preference Shares are attached (the "Certificate of Designations"). You should familiarize yourself with your issuance and delivery obligations, as Transfer Agent, contained therein. The Common Shares to be issued are to be registered in the names of the registered holder of the securities submitted for conversion.

You are hereby irrevocably authorized and instructed to reserve a sufficient number of Common Shares of the Company (initially, 30,000,000 shares) for issuance upon full conversion of the Preference Shares in accordance with the terms thereof. The number of Common Shares so reserved may be increased, from time to time, by written instructions of the Company or the Investor if required by the terms of the Agreement.

The ability to convert the Preference Shares in a timely manner is a material obligation of the Company pursuant to the Agreement and the Certificate of Designations. Provided you are acting as Transfer Agent at the time, your firm is hereby irrevocably authorized and instructed to **within three (3) trading days** issue the Common Shares of the Company to the Investor without any further action or confirmation by the Company upon your receipt from the Investor of: (i) a notice of conversion ("Conversion Notice") executed by the Investor; and (ii) an opinion of counsel for the Company or the Investor confirming that the shares to be issued have been registered and the Registration Statement is currently effective or otherwise may be issued pursuant to Regulations S (or any other available exemption) under the Federal Securities Act of 1933, as amended (the "Securities Act"), without any transfer restrictions. Such shares should be issued, at the option of the Investor as specified in the Notice of Conversion within 3 trading days, either (i) electronically by crediting the

account of a Prime Broker with the Depository Trust Company through its Deposit Withdrawal at Custodian ("DWAC") system provided the Investor causes its broker or bank to initiate a DWAC deposit or (ii) in certificated form without any restrictive legend which would restrict the transfer of the shares. Provided however that if such shares are not registered for resale under the Securities Act and are not able to be sold under Regulations S or any other exemption under the Securities Act, and you have received an opinion from the Investor's counsel that the issuance of the shares is exempt from registration but must be issued with a restrictive legend under the Securities Act, then the issued certificates for such shares shall bear the following restrictive legend:

THE SECURITIES REPRESENTED HEREBY HAVE BEEN OFFERED IN AN OFFSHORE TRANSACTION TO A PERSON WHO IS NOT A U.S. PERSON PURSUANT TO REGULATION S UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"). NONE OF THE SECURITIES REPRESENTED HEREBY HAVE BEEN REGISTERED UNDER THE ACT, OR ANY U.S. STATE SECURITIES LAWS, AND, UNLESS SO REGISTERED, MAY NOT BE OFFERED OR SOLD, DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO U.S. PERSONS EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF REGULATION S UNDER THE ACT, PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT, OR PURSUANT TO AN AVAILABLE EXEMPTION FROM, OR IN A TRANSACTION NOT SUBJECT TO, THE REGISTRATION REQUIREMENTS OF THE ACT AND IN EACH CASE ONLY IN ACCORDANCE WITH APPLICABLE STATE SECURITIES LAWS. IN ADDITION, HEDGING TRANSACTIONS INVOLVING THE SECURITIES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT. "UNITED STATES" AND "U.S. PERSON" ARE AS DEFINED BY REGULATION S UNDER THE ACT.

If the Investor confirms the accuracy of its representations in Section III.C.2 of the Agreement, any Common Shares issued to the Investor more than 40 days after the date of these instructions shall be issued in DWAC form, or if requested by the Investor in certificated form without a restrictive legend.

The shares shall remain in the created reserve with the Transfer Agent until counsel to the Investor **and** an authorized officer of the Company provides written instructions to the Transfer Agent that the shares or any part of them shall be taken out of the reserve and shall no longer be subject to the terms of these instructions.

The Company shall indemnify you and your officers, directors, principals, partners, agents and representatives, and hold each of them harmless from and against any and all loss, liability, damage, claim or expense (including the reasonable fees and disbursements of its attorneys)

incurred by or asserted against you or any of them arising out of or in connection with the instructions set forth herein, the performance of your duties hereunder and otherwise in respect hereof, including the costs and expenses of defending yourself or themselves against any claim or liability hereunder, except that the Company shall not be liable hereunder as to matters in respect of which it is determined that you have acted with gross negligence or in bad faith. You shall have no liability to the Company in respect of this if such action was taken or omitted to be taken in good faith, and you shall be entitled to rely in this regard on the advice of counsel.

The Board of Directors of the Company has approved the foregoing (irrevocable instructions) and does hereby extend the Company's irrevocable agreement to indemnify your firm for all loss, liability or expense in carrying out the authority and direction herein contained on the terms herein set forth.

The Company agrees that in the event that the Transfer Agent resigns as the Company's transfer agent, the Company shall engage a suitable replacement transfer agent that will agree to serve as transfer agent for the Company and be bound by the terms and conditions of these Irrevocable Instructions within five (5) business days. You may not be replaced as Company's transfer agent or transfer any files to any successor transfer agent for Company, until such time as any successor transfer agent has agreed in writing to be bound by the terms and conditions of these Irrevocable Instructions.

The Investor is intended to be and is a third party beneficiary hereof, and no amendment or modification to the instructions set forth herein may be made without the consent of the Investor.

Continental Stock Transfer & Trust Company ("Continental") has not previously received contrary instructions from the issuer or its agents, nor is Continental aware of any facts or circumstances that would make the transaction improper or illegal under applicable U.S. laws or regulations.

Very truly yours,

NewLead Holdings Ltd.

By: _____
Name: Antonis Bertsos
Title: CFO

3

Acknowledged and Agreed:
Ironridge Global IV, Ltd.

By: _____
Name: *David Sims*
Title: *Director*


Acknowledged and Agreed:
Continental Stock Transfer & Trust Company


By: _____
Name:
Title:

Acknowledged and Agreed:
Ironridge Global IV. Ltd.


By: _____
Name:
Title:




Acknowledged and Agreed:
Continental Stock Transfer & Trust Company

By: _____
Name:      John W. Comer, Jr.
Title:      Vice President

4

Exhibit D

EX-99.2 3 v371072_ex99-2.htm EXHIBIT 99.2

**Exhibit 99.2**

NEWLEAD HOLDINGS LTD.

CERTIFICATE OF DESIGNATIONS OF PREFERENCES,
RIGHTS AND LIMITATIONS
OF
SERIES A PREFERENCE SHARES

The undersigned, Michael S. Zolotas and Antonios Bertsos, hereby certify that:

1. They are the Chief Executive Officer and Chief Financial Officer, respectively, of NewLead Holdings Ltd., a Bermuda company (the "**Corporation**").

2. The Corporation is authorized to issue 500,000,000 preference shares, of which none are currently designated, issued or outstanding.

3. The following resolutions were duly adopted by the Board of Directors of the Corporation on March 4, 2014:

WHEREAS, the Memorandum of Association and Bye-laws of the Corporation provide for a class of its authorized share capital known as preference shares, comprised of 500,000,000 shares, $0.01 par value per share (the "**Preference Shares**"), issuable from time to time in one or more series;

WHEREAS, pursuant to the Bye-laws of the Corporation, the Board of Directors of the Corporation is authorized to fix the dividend rights, dividend rate, voting rights, conversion rights, rights and terms of redemption and liquidation preferences of any wholly unissued series of Preference Shares and the number of shares constituting any series and the designation thereof, of any of them;

WHEREAS, it is the desire of the Board of Directors of the Corporation, pursuant to its authority as aforesaid and as set forth in this Certificate of Designations of Preferences, Rights and Limitations of Series A Preference Shares, to designate the rights, preferences, restrictions and other matters relating to the Series A Preference Shares, which will consist of up to 10,000 Preference Shares which the Corporation has the authority to issue, as follows:

NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors does hereby provide for the issuance of a series of Preference Shares for cash or exchange of other securities, rights or property and does hereby fix and determine the rights, preferences, restrictions and other matters relating to such series of Preference Shares as follows:

I. **Terms of Preference Shares.**

 A. **Designation and Amount.** The series of Preference Shares are hereby designated as the Corporation's Series A Preference Shares, par value of $0.01 per share (the "**Series A Preference Shares**"), which Series A Preference Shares will not be subject to increase without any consent of the holders of the Series A Preference Shares (each a "**Holder**" and collectively, the "**Holders**") that may be required by applicable law.

Page 1

**B.**     **Ranking and Voting.**

   **1.**     **Ranking.** The Series A Preference Shares will, with respect to dividend rights and rights upon liquidation, winding-up or dissolution, rank: (a) senior with respect to dividends with the Corporation's Common Shares ("**Common Shares**"); (b) pari passu with respect to rights of liquidation with the Common Shares; (c) pari passu with respect to dividends and right of liquidation with the Corporation's Series A Preference Shares; and (d) junior to all existing and future indebtedness of the Corporation. Without the prior written consent of the Holders of a majority of the outstanding Series A Preference Shares (voting separately as a single class), the Corporation may not issue any Series A Preference Shares or other Preference Shares that is not junior to, or pari passu, with the Series A Preference Shares in right of dividends and liquidation. Notwithstanding the foregoing, within 6 months of an Issuance Date, the Corporation may not issue any Series A Preference Shares or other Preference Shares that is pari passu with the Series A Preference Shares without the prior written consent of the Holders of a majority of the outstanding Series A Preference Shares (voting separately as a single class).

   **2.**     **Voting.** Except as required by applicable law or as set forth herein, the holders of shares of Series A Preference Shares will have no right to vote on any matters, questions or proceedings of this Corporation including, without limitation, the election of directors.

**C.**     **Dividends.**

   **1.**     Commencing on the date of the issuance of any such shares of Series A Preference Shares (each respectively an "**Issuance Date**"), each outstanding Series A Preference Share will accrue cumulative dividends ("**Dividends**"), at a rate equal to **10.75%** per annum, subject to adjustment as provided herein ("**Dividend Rate**"), of the Series A Face Value. Dividends will be payable with respect to any shares of Series A Preference Shares upon any of the following: (a) upon redemption of such shares in accordance with **Section I.F**; (b) upon conversion of such shares in accordance with **Section I.G**; and (c) when, as and if otherwise declared by the board of directors of the Corporation. Any calculation of the amount of such Dividends accrued and payable pursuant to the provisions of this **Section I.C.** will be made based on a 365-day year, compounded annually.

   **2.**     Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable at the Corporation's election, (a) in cash, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

   **3.**     So long as any Series A Preference Shares are outstanding, no dividends or other distributions will be paid, declared or set apart with respect to any Common Shares. The Common Shares will not be redeemed while the Series A Preference Shares are outstanding.

**D.**     **Protective Provision.** So long as any Series A Preference Shares are outstanding, the Corporation will not, without the affirmative approval of the Holders of a majority of the Series A Preference Shares then outstanding (voting separately as one class), (i) alter or change adversely the powers, preferences or rights given to the Series A Preference Shares or alter or amend this Certificate of Designations, (ii) authorize or create any class of shares ranking as to distribution of dividends senior to the Series A Preference Shares, (iii) amend its Memorandum of Association or Bye-laws in breach of any of the provisions hereof, (iv) increase the authorized number of Series A Preference Shares, (v) liquidate, dissolve or wind-up the business and affairs of the Corporation, or effect any Deemed Liquidation Event (as defined below), or (vi) enter into any agreement with respect to the foregoing.

Page 2

1.      A "**Deemed Liquidation Event**" will mean: (a) a merger, amalgamation or consolidation in which the Corporation is a constituent party or a subsidiary of the Corporation is a constituent party and the Corporation issues shares in its capital pursuant to such merger, amalgamation or consolidation, except any such merger, amalgamation or consolidation involving the Corporation or a subsidiary in which the shares in the capital of the Corporation outstanding immediately prior to such merger, amalgamation or consolidation continue to represent, or are converted into or exchanged for shares that represent, immediately following such merger, amalgamation or consolidation, at least a majority, by voting power, of the share capital or capital stock of the surviving or resulting corporation or if the surviving or resulting corporation is a wholly owned subsidiary of another corporation immediately following such merger, amalgamation or consolidation, the parent corporation of such surviving or resulting corporation; or (b) the sale, lease, transfer, exclusive license or other disposition, in a single transaction or series of related transactions, by the Corporation or any subsidiary of the Corporation of all or substantially all the assets of the Corporation and its subsidiaries taken as a whole, or the sale or disposition (whether by merger or otherwise) of one or more subsidiaries of the Corporation if substantially all of the assets of the Corporation and its subsidiaries taken as a whole are held by such subsidiary or subsidiaries, except where such sale, lease, transfer, exclusive license or other disposition is to a wholly owned subsidiary of the Corporation.

2.      The Corporation will not have the power to effect a Deemed Liquidation Event referred to in **Section I.D.1** unless the agreement or plan of merger or consolidation for such transaction provides that the consideration payable to the shareholders of the Corporation will be allocated among the shareholders of the Corporation in accordance with **Section I.E.**

E.      **Liquidation**.

1.      Upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, after payment or provision for payment of debts and other liabilities of the Corporation, pari passu with any distribution or payment made to the holders of Series A Preference Shares and Common Shares by reason of their ownership thereof, the Holders of Series A Preference Shares will be entitled to be paid out of the assets of the Corporation available for distribution to its shareholders an amount with respect to each Series A Preference Share equal to $10,000.00 ("**Series A Face Value**"), plus any accrued but unpaid Dividends thereon (collectively with the Series A Face Value, the "**Series A Liquidation Value**"). If, upon any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary, the amounts payable with respect to the Series A Preference Shares are not paid in full, the holders of Series A Preference Shares will share equally and ratably with the holders of shares of Series A Preference Shares and Common Shares in any distribution of assets of the Corporation in proportion to the liquidation preference and an amount equal to all accumulated and unpaid Dividends, if any, to which each such holder is entitled.

2.      If, upon any liquidation, dissolution or winding up of the Corporation, the assets of the Corporation will be insufficient to make payment in full to all Holders, then such assets will be distributed among the Holders at the time outstanding, ratably in proportion to the full amounts to which they would otherwise be respectively entitled.

F.    **Redemption.**

    1.    **Corporation's Redemption Option.** Upon or after 7 years after the Issuance Date ("**Dividend Maturity Date**"), the Corporation will have the right, at the Corporation's option, to redeem all or a portion of the Series A Preference Shares, at a price per share equal to 100% of the Series A Liquidation Value.

    2.    **Early Redemption.** Prior to redemption pursuant to **Section I.F.1** hereof, the Corporation will have the right, at the Corporation's option, to redeem all or a portion of the Series A Preference Shares at any time or times after the Issuance Date of such Series A Preference Shares, at a price per share (the "**Early Redemption Price**") equal to the sum of the following: (a) the Series A Face Value, plus (b) the Embedded Dividend Liability for the applicable redemption or conversion, less (c) any Dividends that have been paid.

    3.    **Credit Risk Adjustment.** Notwithstanding any other provision, the Dividend Rate shall adjust upward by an amount equal to the Credit Spread Adjustment for each amount, if any, equal to the Adjustment Factor, or any portion thereof that the Measuring Metric falls below the Minimum Triggering Level. The Dividend Rate shall adjust downward by an amount equal to the Credit Spread Adjustment for each amount, if any, equal to the Adjustment Factor that the Measuring Metric rises above the Maximum Triggering Level. The adjusted Dividend Rate for each Series A Liquidation Amount, Embedded Dividend Liability, Early Redemption Price, or Dividend, as applicable, shall be determined based upon the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

    4.    **Mandatory Redemption.** If the Corporation determines to liquidate, dissolve or wind-up its business and affairs, or effect any Deemed Liquidation Event, the Corporation will redeem the Series A Preference Shares, at the Early Redemption Price set forth in **Section I.F.2** if the event is prior to the 7-year anniversary of the Issuance Date, or the Series A Liquidation Value if the event is on or after the 7-year anniversary of the Issuance Date.

    5.    **Mechanics of Redemption.** If the Corporation elects to redeem any of the Holders' Series A Preference Shares then outstanding, it will deliver written notice thereof via facsimile and overnight courier ("**Notice of Redemption at Option of Corporation**") to each Holder, which Notice of Redemption at Option of Corporation will indicate (a) the number of Series A Preference Shares that the Corporation is electing to redeem and (b) the applicable Early Redemption Price or Series A Liquidation Value.

    6.    **Payment of Redemption Price.** Upon receipt by any Holder of a Notice of Redemption at Option of Corporation, such Holder will promptly submit to the Corporation such Holder's Series A Preference Shares certificates. Upon receipt of such Holder's Series A Preference Shares certificates, the Corporation will pay the Early Redemption Price or Series A Liquidation Value, as applicable, to such Holder in cash.

Page 4

G.    **Conversion.**

1.    **Mechanics of Conversion.**

a.        Subject to the terms and conditions hereof, one or more of the Series A Preference Shares may be converted, in part or in whole, into f Common Shares, at any time or times after the Issuance Date, at the option of Holder or the Corporation, by (i) if at the option of Holder, delivery of one or more written notices to the Corporation (each, a "**Holder Conversion Notice**"), of the Holder's election to convert the Series A Preference Shares or of additional Common Shares then due with regard to a prior conversion, and stating the number of shares to which Holder is then entitled, or (ii) if at the option of the Corporation, if the Equity Conditions are met, delivery of written notice to Holder (each, a "**Corporation Conversion Notice**" and, with the Holder Conversion Notices, each a "**Conversion Notice**"), of the Corporation's election to convert the Series A Preference Shares. On the same Trading Day on which the Corporation has received or issued a Conversion Notice by 11:59 a.m. Eastern time, or the following Trading Day if received after such time or on a non-Trading Day, (each, a "**Notice Date**") the Corporation shall transmit by facsimile or electronic mail an acknowledgment of confirmation of receipt of the Holder Conversion Notice or issuance of the Corporation Conversion Notice to the Holder and the Corporation's transfer agent (the "**Transfer Agent**") and shall either (a) only if Corporation is not approved through The Depository Trust Corporation (DTC), issue and surrender to a common carrier for overnight delivery to the address as specified in the Conversion Notice a certificate bearing no restrictive legend, registered in the name of Holder or its designee, for the number of Conversion Shares to which Holder is then entitled as set forth in the Conversion Notice, or (b) if the Corporation is approved through DTC, authorize the credit by the Transfer Agent of such aggregate number of Conversion Shares to which Holder is then entitled, as set forth in the Conversion Notice, to Holder's or its designee's balance account with the DTC Fast Automated Securities Transfer (FAST) Program, through its Deposit/Withdrawal at Custodian (DWAC) system, time being of the essence.

b.        If the Corporation shall fail, for any reason, to issue or cause to be issued to the Holder, within 3 Trading Days after receipt of the applicable Conversion Notice, the number of Conversion Shares to which the Holder is entitled as stated in the Conversion Notice, then, in addition to all other remedies available to the Holder, the Corporation shall pay in cash to the Holder on each day after such 3rd Trading Day that the issuance of such Conversion Shares is not timely effected an amount equal to 2% of the product of (i) the aggregate number of Conversion Shares not issued to the Holder on a timely basis and to which the Holder is entitled and (ii) the highest Closing Price of the Common Shares between the date on which the Corporation should have issued such shares to the Holder and the actual date of receipt by Holder.

c.        No fractional Common Shares are to be issued upon conversion of Series A Preference Shares, but rather the Corporation shall issue to Holder scrip or warrants in registered form (certificated or uncertificated) which shall entitle Holder to receive a full share upon the surrender of such scrip or warrants aggregating a full share.

d.        The Holder shall not be required to deliver the original certificates for the Series A Preference Shares in order to effect a conversion hereunder.

e.        The Corporation shall pay any and all taxes which may be payable with respect to the issuance and delivery of any Conversion Shares.

2.    **Holder Conversion.** In the event of a conversion of any Series A Preference Shares pursuant to an Holder Conversion Notice, the Corporation shall (a) satisfy the Embedded Dividend Liability as provided in **Section I.C.2,** and (b) issue to the Holder of such Series A Preference Shares a number of Conversion Shares equal to (i) the Series A Face Value multiplied by (ii) the number of such Series A Preference Shares subject to the Holder Conversion Notice divided by (iii) the applicable Conversion Price with respect to such Series A Preference Shares.

3.     <u>Corporation Conversion.</u> The Corporation shall have the right to send the Holder a Corporation Conversion Notice in the event that (x) the Closing Price of the Common Shares exceeds 300% of the Series A Conversion Price for any 20 consecutive Trading Days and (y) the Equity Conditions are met as of the time such Company Conversion Notice is given. Upon any conversion of any Series A Preference Shares pursuant to a Corporation Conversion Notice, the Corporation shall (a) satisfy the Embedded Dividend Liability as provided in **Section I.C.2,**, and (b) issue to the Holder of such Series A Preference Shares a number of Conversion Shares equal to (i) the Series A Face Value multiplied by (ii) the number of such Series A Preference Shares subject to the Holder Conversion Notice divided by (iii) the applicable Conversion Price with respect to such Series A Preference Shares.

4.     <u>Share Splits.</u> If the Corporation at any time on or after the filing of this Certificate of Designations subdivides (by any share split, share dividend, recapitalization or otherwise) one or more classes of its outstanding Common Shares into a greater number of shares, the applicable Conversion Price, Adjustment Factor, Maximum Triggering Level, Minimum Triggering Level, and other share based metrics in effect immediately prior to such subdivision will be proportionately reduced and the number of Common Shares issuable will be proportionately increased. If the Corporation at any time on or after such Issuance Date combines (by combination, reverse share split or otherwise) one or more classes of its outstanding Common Shares into a smaller number of shares, the applicable Conversion Price, Adjustment Factor, Maximum Triggering Level, Minimum Triggering Level, and other share based metrics in effect immediately prior to such combination will be proportionately increased and the number of Conversion Shares will be proportionately decreased. Any adjustment under this Section shall become effective at the close of business on the date the subdivision or combination becomes effective.

5.     <u>Rights.</u> In addition to any adjustments pursuant to Section I.G.4, if at any time the Corporation grants, issues or sells any options, convertible securities or rights to subscribe for stock, warrants, securities or other property pro rata to the record holders of any class of Common Shares (the "**Subscription Rights**"), then Holder will be entitled to acquire, upon the terms applicable to such Subscription Rights, the aggregate Subscription Rights which Holder could have acquired if Holder had held the number of Common Shares acquirable upon conversion of all Series A Preference Shares held by Holder immediately before the date on which a record is taken for the grant, issuance or sale of such Subscription Rights, or, if no such record is taken, the date as of which the record holders of Common Shares are to be determined for the grant, issue or sale of such Subscription Rights.

6.     **Definitions.** For purposes of this **Section I.G**, the following terms shall have the following meanings:

    a.     "**Adjustment Factor**" means $0.05 per Common Share.

    b.     "**Closing Price**" means, for any security as of any date, the last closing bid price for such security on the Trading Market, or, if the Trading Market begins to operate on an extended hours basis and does not designate the closing bid price, then the last bid price of such security prior to 4:00 p.m., Eastern time, or, if the Trading Market is not the principal securities exchange or trading market for such security, the last closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded, or if the foregoing do not apply, the last closing bid price of such security in the over-the-counter market on the electronic bulletin board for such security, or, if no closing bid price is reported for such security, the average of the bid prices of any market makers for such security as reported in the "pink sheets" by Pink Sheets LLC (formerly the National Quotation Bureau, Inc.).

c. "**Conversion Price**" means a price per Common Share equal to $1.00 per Common Share, subject to adjustment as otherwise provided herein.

d. "**Conversion Shares**" means Common Shares issuable upon conversion of Series A Preference Shares.

e. "**Credit Spread Adjustment**" means 98.45 basis points.

f. "**Embedded Dividend Liability**" for each Series A Preference Share means the Series A Face Value, multiplied by the product of (i) the applicable Dividend Rate, and (ii) the number of whole years between the Issuance Date and the Dividend Maturity Date.

g. "**Equity Conditions**" means (i) on each day during the period beginning 30 Trading Days prior to the applicable Notice Date or other date of determination, and ending 30 Trading Days after the later of such date or when all applicable Conversion Shares have actually been received into Holder's designated brokerage account in electronic form and fully cleared for trading (the "**Equity Conditions Measuring Period**"), the Common Shares (A) is not under chill or freeze from The Depository Trust Company, (B) is designated for quotation on the Trading Market and shall not have been suspended from trading on such exchange or market, and (C) delisting or suspension by the Trading Market has not been threatened or pending either in writing by such exchange or market or by falling below the then effective minimum listing maintenance requirements of such exchange or market, other than either the minimum bid price or market capitalization; (ii) during the Equity Conditions Measuring Period, the Corporation shall have delivered Conversion Shares upon all conversions or redemptions of the Series A Preference Shares in accordance with their terms to the Holder on a timely basis; (iii) the Corporation shall have no knowledge of any fact that would cause both of the following (1) to the extent a registration statement has been filed, it is not available for the issuance of the Conversion Shares; and (2) Section 3(a)(9) under the Securities Act of 1933, as amended, not to be available for the issuance of the Conversion Shares, or Securities Act Regulation S and Securities Act Rule 144 not to be available for the immediate resale of all the Conversion Shares underlying the Series A Preference Shares; and (iv) the Corporation otherwise shall have been in compliance with and shall not have breached any provision, covenant, representation or warranty of any Transaction Document.

h. "**Measuring Metric**" means the volume weighted average price of the Common Shares on any Trading Day following the Issuance Date of the Series A Preference Shares.

i. "**Maximum Triggering Level**" means $1.15 per Common Share.

k. "**Minimum Triggering Level**" means $0.85 per Common Share.

p. "**Trading Day**" means any day on which the Common Shares are traded on the Trading Market.

v. "**Trading Market**" means NASDAQ or whatever is at the time the principal U.S. trading exchange or market for the Common Shares, excluding OTC Pink Limited Information or below. All Trading Market data shall be measured as provided by the appropriate function of the Bloomberg Professional service of Bloomberg Financial Markets or its successor performing similar functions.

7.     **Issuance Limitations**. Notwithstanding any other provision of this Certificate of Designations, at no time may the Corporation issue Common Shares pursuant to this Certificate of Designations if the number of Common Shares to be issued, (1) when aggregated with all other Common Shares then beneficially (or deemed beneficially) owned by Holder, would result in Holder owning, on the date of such proposed issuance, more than 9.99% of all Common Shares outstanding as determined in accordance with Section 13(d) of the Exchange Act and the rules and regulations promulgated thereunder.

H.     **Share Register**. The Corporation will keep at its registered office, or at the offices of the transfer agent, a register of the Series A Preference Shares, which shall be prima facie indicia of ownership of all outstanding Series A Preference Shares. Upon the surrender of any certificate representing Series A Preference Shares at such place, the Corporation, at the request of the record Holder of such certificate, will execute and deliver (at the Corporation's expense) a new certificate or certificates in exchange therefor representing in the aggregate the number of shares represented by the surrendered certificate. Each such new certificate will be registered in such name and will represent such number of shares as is requested by the Holder of the surrendered certificate and will be substantially identical in form to the surrendered certificate.

II.     **Miscellaneous.**

A.     **Notices**. Any and all notices to the Corporation will be addressed to the Corporation's Chief Executive Officer at the Corporation's principal place of business on file with Bermuda. Any and all notices or other communications or deliveries to be provided by the Corporation to any Holder hereunder will be in writing and delivered personally, by electronic mail or facsimile, sent by a nationally recognized overnight courier service addressed to each Holder at the facsimile telephone number or address of such Holder appearing on the books of the Corporation, or if no such facsimile telephone number or address appears, at the principal place of business of the Holder. Any notice or other communication or deliveries hereunder will be deemed given and effective on the earliest of (1) the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this **Section II.A** prior to 5:30 p.m. Eastern time, (2) the date after the date of transmission, if such notice or communication is delivered via facsimile at the facsimile telephone number specified in this section later than 5:30 p.m. but prior to 11:59 p.m. Eastern time on such date, (3) the second business day following the date of mailing, if sent by nationally recognized overnight courier service, or (4) upon actual receipt by the party to whom such notice is required to be given.

B.     **Lost or Mutilated Preference Share Certificate**. Upon receipt of evidence reasonably satisfactory to the Corporation (an affidavit of the registered Holder will be satisfactory) of the ownership and the loss, theft, destruction or mutilation of any certificate evidencing Series A Preference Shares, and in the case of any such loss, theft or destruction upon receipt of indemnity reasonably satisfactory to the Corporation (provided that if the Holder is a financial institution or other institutional investor its own agreement will be satisfactory) or in the case of any such mutilation upon surrender of such certificate, the Corporation will, at its expense, execute and deliver in lieu of such certificate a new certificate of like kind representing the number of shares of such class represented by such lost, stolen, destroyed or mutilated certificate and dated the date of such lost, stolen, destroyed or mutilated certificate.

**C.** **Headings.** The headings contained herein are for convenience only, do not constitute a part of this Certificate of Designations and will not be deemed to limit or affect any of the provisions hereof.

RESOLVED, FURTHER, that the chairman, chief executive officer, chief financial officer, president or any vice-president, and the secretary or any assistant secretary, of the Corporation be and they hereby are authorized and directed to prepare a Certificate of Designation of Preferences, Rights and Limitations of Series A Preference Shares in accordance with the foregoing resolution and the provisions of the Bermuda Companies Act.

IN WITNESS WHEREOF, the undersigned have executed this Certificate of Designations for and on behalf of Newlead Holdings Ltd. this 4th day of March 2014.

Signed: /s/ Michael S. Zolotas
Name:   Michael S. Zolotas
Title:   Chief Executive Officer

Signed: /s/ Antonios Bertsos
Name:   Antonios Bertsos
Title:   Chief Financial Officer

Exhibit E



# NEWLEAD

May 27, 2014

Via Email, Fax and Courier

**Ironridge Global Partners, LLC. ("Ironridge")**
100 Spear St, Suite 320
San Francisco, CA 94105

Attention:    **John C. Kirkland**
              **Keith Coulston**
              **Richard Kreger**

Re: Securities Purchase Agreement dated March 4, 2014 entered into and between NewLead Holdings Ltd. ("NewLead") and Ironridge

Dear Sirs,

We are in receipt of your further issuance notice dated May 22, 2014 pursuant to your conversion notices dated April 10, 2014 and April 17, 2014. As we have previously advised you by Notice of Default dated May 12, 2014 (the "Notice"), the Transaction Documents (as that term is defined therein) are no longer valid and in effect because, among other things, of your material breaches of the Transaction Documents as set forth in the Notice.

Notwithstanding the foregoing, if and only to the extent that the Transaction Documents are deemed not to be terminated and/or are determined to be in full force and effect, and only if NewLead is ultimately found to be liable to pay such dividend and any applicable embedded dividend liability by a tribunal of competent jurisdiction, please be advised that NewLead hereby elects to pay the dividend and any applicable embedded dividend liability in cash, and not in common shares of NewLead.

In addition, for all the conversion notices previously delivered and all of the conversion notices requesting additional shares, NewLead never elected to issue common shares to pay such dividends and embedded dividend liability and, therefore, any receipt of common shares in connection with such dividends and embedded dividend liability was in error and NewLead immediately requests the return of such shares and all further conversion notices requesting additional shares are not valid and are to be paid in cash. This election is made without prejudice to any claims or defenses which NewLead now has, or hereafter may have, as against Ironridge.

All rights are reserved.

Cordially,

Antonios Bertsos
CFO & Corporate Secretary



**NEWLEAD HOLDINGS LTD.**
c/o NEWLEAD SHIPPING SA
83 Akti Miaouli & Flessa St, Piraeus 185 38, Greece
P: +30 213 0148000 - F: +30 213 0148019 -- E: info@newleadholdings.com
**www.newleadholdings.com**


NEWL
LISTED
NASDAQ

Exhibit F

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522
———
TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
212-735-3902
DIRECT FAX
917-777-3902
EMAIL ADDRESS
ROBERT.FUMERTON@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
MUNICH
PARIS
SÃO PAULO
SHANGHAI
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

May 27, 2014

**By E-mail**
Richard DePalma, Esq.
Thompson Hine LLP
335 Madison Avenue
12th Floor
New York, New York 10017
Tel: (212) 344-5680
Fax: (212) 344-6101

RE:    Ironridge Global IV, Ltd. v. NewLead Holdings, Ltd.

Dear Mr. DePalma:

We write regarding the letter from Antonios Berstos of NewLead Holdings, Ltd. ("NewLead") to Ironridge Global Partners, LLC, dated May 27, 2014 (hereinafter the "May 27 Letter"), purportedly concerning the Share Purchase Agreement dated March 4, 2014 (the "SSA") by and between Ironridge Global IV, Ltd. ("Ironridge") and NewLead Holdings, Ltd. ("NewLead").

First, as we have already informed you, NewLead's purported May 12, 2014 Notice of Default ("the May 12 Notice") did not effectively terminate the SSA or the Certificate of Designations of Preferences, Rights and Limitations of Series A Preference Shares, dated March 4, 2014 (the "Certificate of Designations"). In fact, no such right to terminate exists under either the SSA or the Certificate of Designations.

Furthermore, NewLead's own actions belie any credible assertion that the SSA or Certificate of Designations has been terminated.  On May 22, 2014, NewLead's Chairman and CEO, Michael S. Zolotas, agreed that VStock Transfer ("VStock") was bound by the same terms and conditions of the irrevocable instruction letter dated March 4, 2014, by and between NewLead and its previous Transfer Agent, Continental Stock Transfer & Trust Company (the "Irrevocable Instructions"), to which Ironridge is an intended third party beneficiary. Mr. Zolotas' agreement that the terms and conditions of the Irrevocable Instructions would apply

to VStock, as successor Transfer Agent, is facially inconsistent with NewLead's purported termination.

In any event, even if the SSA or Certificate of Designations was terminated, NewLead's obligation to convert Ironridge's Preference Shares to Common Shares remains in full force and effect. Section IV.L of the SSA states, in relevant part, "Company's absolute obligation to issue Commons Shares to Subscriber upon conversion of Preference Shares is an independent covenant, and any breach or alleged breach of any provision of any Transaction Document by any person shall not excuse performance of such obligation." Thus, the SSA is unequivocal that NewLead's obligation to issue Common Shares is an independent covenant that cannot be excused by any purported breach or termination of any Transaction Document.

Second, NewLead's claim that Ironridge has committed "material breaches" rings especially hollow given that NewLead has refused to provide any explanation as to how Ironridge allegedly violated any provision of the SSA -- notwithstanding Ironridge's several requests.

Third, NewLead's purported election to pay any dividend or Embedded Dividend Liability in cash is just the latest in a string of bad faith attempts by NewLead to escape its contractual obligations. In its May 27 Letter, NewLead appears to be stating that it has no intention of complying with the terms of Ironridge's valid conversion notices, and, in the event it is ordered to do so, it will elect to pay any dividends or applicable Embedded Dividend Liability in cash. NewLead's conditional statement of intention does not constitute a valid election under the terms of Certificate of Designations, which provide that NewLead may only make such an election once Ironridge elects to convert its Preference Shares to Common Shares. Moreover, NewLead's financial disclosures indicate the Company does not have the cash to be able to make those payments.

NewLead also now claims that it "never elected to issue common shares to pay such dividends and [E]mbedded [D]ividend [L]iability, and, therefore, any receipt of common shares in connection with such dividends and [E]mbedded [D]ividend [L]iability was in error." This is demonstrably false. NewLead knowingly made its election to pay with Common Shares when it issued them to Ironridge upon receipt of the conversion notices. Accordingly, Ironridge has no obligation to return any shares that have already been issued pursuant to any prior conversion notice. Nor does NewLead's election to pay cash render any prior conversion notice invalid.

Fourth, as noted above, on May 22, 2014, NewLead's Chairman and CEO acknowledged that VStock was bound by the Irrevocable Instructions, which irrevocably authorize and instruct the Transfer Agent to reserve a sufficient number of Commons Shares of the Company for issuance upon full conversion of the Preference Shares -- a mandate repeated in the SSA. *See* SSA § IV.G. Ironridge only allowed Continental to release its records to VStock after VStock and the Company agreed that VStock would be bound by the Irrevocable Instructions. Yet, since May 22, 2014, the Company has still not formally engaged the Transfer Agent or complied with its obligations to reserve for Ironridge the 498,434,257 pursuant to its May 22, 2014 written instructions. NewLead's failure to cause the Transfer Agent to reserve for Ironridge 498,434,257 shares pursuant to its May 22, 2014 written instructions to VStock constitutes yet another breach of the SSA causing further harm to Ironridge.

We reserve all rights with respect to these matters.

Very truly yours,

Robert A. Fumerton/JBC

Robert A. Fumerton

cc:    Todd Mason, Esq. (via e-mail)
       Jonathan Betts, Esq. (via e-mail)
       Scott Pearman, Esq. (via e-mail)

Exhibit G



**IRONRIDGE** ®

IRONRIDGE GLOBAL IV, LTD.
Harbour House, Waterfront Drive
P.O. Box 972 Road Town, Tortola
British Virgin Islands
Tel +1-284-494-4770
Fax +1-284-494-4771

May 30, 2014

**Via E-mail:** seth@vstocktransfer.com

VStock Transfer, LLC
77 Spruce Street, Suite 201
Cedarhurst, New York 11516
Attn: Seth Farbman

Dear Mr. Farbman:

Pursuant to a Share Subscription Agreement, dated as of March 4, 2014 (the "Agreement") entered into and between NewLead Holdings Ltd., and Ironridge Global IV, Ltd., providing for the issuance of Series A Preference Shares (the "Preference Shares"), which are convertible into common shares of the Company (the "Common Shares"), we hereby authorize and instruct you to issue and deliver to Ironridge Global IV Ltd., the aggregate of 1,700,000 (one million seven hundred thousand) shares as per the Conversion Notice attached hereto as Appendix A.

The Shares are to be issued pursuant to Regulations S under Federal Securities Act of 1933, as amended (the "Securities Act"), without any transfer restrictions.

The Shares should be issued via DWAC crediting the following account:

| | |
|---|---|
| Broker: | Trustmark Bank |
| Address: | P.O. Box 291 Ste. 820 |
| | Jackson, Mississippi 39205 |
| Account no.: | 1044006243 |
| DTC: | 2852 |

Please do not hesitate to contact us should you require any clarifications as to the aforementioned.

Very truly yours,

Ironridge Global IV, Ltd.

By:
Name: **David Sims**
Title: **Director**

# IRONRIDGE ®

Appendix A

# NEWLEAD HOLDINGS LTD.
## CONVERSION NOTICE

Reference is made to the Series A Preference Shares (the "**Preference Stock**") issued to the undersigned by Newlead Holdings, Ltd., a Bermuda Company (the "**Company**"). In accordance with and pursuant to the Certificate of Designation for the Preference Stock, the undersigned hereby elects to convert the number of Preference Stock shares indicated below into shares of Common Stock, (the "**Common Stock**"), of the Company, as of the date specified below.

*All relevant numbers below have been adjusted for reverse splits of 1 for 10 on 3-6-14 and 1 for 50 on 5-15-14*

Date of Conversion: _____ April 10, 2014 _____

Shares of Preference Stock to be converted: _____ 100 ($1,000,000.00) _____

Conversion Price: $500.00 (Adjusted for reverse splits of 1 for 10 on 3-6-14 and 1 for 50 on 5-15-14)

Number of shares of Common Stock to be issued for conversion: _2,000_____

Minimum Relevant Derivative Rate
(Subject to adjustment): _____ 27.4865% based on Closing Price of $10.74 on 4/22/14

Minimum Embedded Dividend Liability (EDL) Amount: __$1,924,055.00_____

Minimum VWAP or Lowest Closing Price in Measuring Period: $0.371 (Bid on 05/15/14)

Minimum EDL price per share (85% of VWAP or Closing Price): $0.31535

Minimum Number of shares of Common Stock to be issued for EDL: ___6,101,332____

Minimum Total shares of Common Stock to be issued for conversion: ____6,103,332____

Shares previously delivered under this conversion: _2,468,401_____

**Shares to be issued now due to 9.99% blocker: 1,700,000**

Please issue the Common Stock being converted via DWAC in the following name and to the following brokers:

## 1,700,000 Shares to:

|            |                                |
|------------|--------------------------------|
| Issue to:  | Ironridge Global IV, Ltd.      |
| Broker:    | Trustmark Bank                 |
|            | P.O. Box 291 Ste. 820          |
|            | Jackson, Mississippi 39205     |
| Account #: | 1044006243                     |
| DTC#       | 2852                           |
| Contact:   | alex@abkcapital.com            |



Exhibit H

EX-99.1 2 v371072_ex99-1.htm EXHIBIT 99.1

Exhibit 99.1

# IRONRIDGE ®

### SHARE SUBSCRIPTION AGREEMENT

This Share Subscription Agreement ("**Agreement**") is made and entered into as of March 4, 2014 ("**Effective Date**"), by and between NewLead Holdings Ltd., a Bermuda company, of 83 Akti Miaouli & Flessa, 185 38 Piraeus, Greece ("**Company**"), and Ironridge Global IV, Ltd., a British Virgin Islands business company, of Harbour House, 2nd Floor, Waterfront Drive, Road Town, Tortola, British Virgin Islands VG1110 ("**Subscriber**").

### Recitals

A.      The parties desire that, upon the terms and subject to the conditions herein, Subscriber will subscribe for $25 million in convertible, redeemable Series A Preference Shares; and

B.      The offer and issue of the Shares provided for herein are being made pursuant to Regulation S under the Act.

### Agreement

In consideration of the foregoing, the receipt and adequacy of which are hereby acknowledged, Company and Subscriber agree as follows:

I.      **Definitions**. In addition to the terms defined elsewhere in this Agreement and the Transaction Documents, capitalized terms that are not otherwise defined herein have the meanings set forth in the Glossary of Defined Terms attached hereto as **Exhibit 1**.

II.      **Subscription**.

A.      **Subscription Amount**. Subject to the terms and conditions herein and the satisfaction of the conditions to the Closing set forth below, Company hereby issues to Subscriber, and Subscriber hereby subscribes for 2,500 Series A Preference Shares ("**Preference Shares**") of Company at $10,000.00 per Preference Share, for the aggregate sum of $25,000,000.00 ("**Subscription Amount**").

B.      **Deliveries**. The following documents will be fully executed and delivered on the Effective Date:

1.      This Agreement;

2.      Certificate of Designations, in the form attached hereto as **Exhibit 2**;

3.      Nine Promissory Notes ("**Notes**"), in the form attached hereto as **Exhibit 3**;

IRONRIDGE

Page 1

4.       Transfer Agent Instructions, in the form attached hereto as **Exhibit 4**;

5.       Legal Opinion, in the form attached hereto as **Exhibit 5**;

6.       Officer's Certificate, in the form attached hereto as **Exhibit 6**;

7.       Secretary's Certificate, in the form attached hereto as **Exhibit 7**; and

8.       Eleven Preference Share certificates in the amount of 250 Preference Shares each, for the $25,000,000.00 Subscription Amount and a 250 Preference Share non-refundable commitment fee that shall be earned in full on the Effective Date.

**C.**      **Conditions**. Notwithstanding any other provision, as a condition precedent to effectiveness of this Agreement, all of the following conditions must be satisfied on the Effective Date:

1.       All documents, instruments and other writings required to be delivered by Company to Subscriber pursuant to any provision of this Agreement or in order to implement and effect the transactions contemplated herein have been fully executed and delivered, including without limitation those enumerated in **Section II.B** above;

2.       The representations and warranties of Company and Subscriber set forth in this Agreement are true and correct in all material respects as if made on such date;

3.       Company has the number of duly authorized Preference Shares and Common Shares reserved for issuance as required pursuant to the terms of the Transaction Documents;

4.       There is not then in effect any law, rule or regulation prohibiting or restricting the transactions contemplated in any Transaction Document, or requiring any consent or approval which will not have been obtained, nor is there any pending or threatened proceeding or investigation which may have the effect of prohibiting or adversely affecting any of the transactions contemplated by this Agreement; no statute, rule, regulation, executive order, decree, ruling or injunction will have been enacted, entered, promulgated or adopted by any court or governmental authority of competent jurisdiction that prohibits the transactions contemplated by this Agreement, and no actions, suits or proceedings will be in progress, pending or, to Company's knowledge threatened, by any person other than Subscriber or any Affiliate of Subscriber, that seek to enjoin or prohibit the transactions contemplated by this Agreement; and

5.       Any rights of first refusal, preemptive rights, rights of participation, or any similar right to participate in the transactions contemplated by this Agreement have been waived in writing.

**D.**      **Closing and Payment**. The "**Closing**" shall occur on the Effective Date, immediately when all conditions set forth in **Section II.C** have been fully satisfied; on such date, (a) Subscriber will subscribe and make payment for 2,500 Preference Shares by (i) payment to Company of $2,500,022.50 in cash, by wire transfer of immediately available funds, to an account designated by Company outside the United States, as payment in full for 250 Preference Shares, and partial payment of $0.01 per share for 2,250 Preference Shares; and (ii) delivery of 9 Notes in the initial principal amount of $2,499,997.50 each to Company's address first stated above, as the remaining payment for 9 share certificates of 250 Preference Shares each; and (b) Company will deliver to Subscriber by reputable overnight courier, to Subscriber's address first stated above, immediately upon receipt of the funds and Notes, 11 share certificates for 250 Preference Shares each, for a total of 2,750 Preference Shares.

**IRONRIDGE**                                      Page 2

## III.     Representations and Warranties.

**A.**          **Representations Regarding Transaction.** Except as set forth under the corresponding section of the Disclosure Schedules, if any, Company hereby represents and warrants to, and as applicable covenants with, Subscriber as of the Closing:

**1.**          **Organization and Qualification.** Company and each Subsidiary is an entity duly incorporated or otherwise organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation or organization, as applicable, with the requisite power and authority to own and use its properties and assets and to carry on its business as currently conducted. Neither Company nor any Subsidiary is in violation or default of any of the provisions of its respective certificate or articles of incorporation, bylaws or other organizational or charter documents. Each of Company and each Subsidiary is duly qualified to conduct business and is in good standing as a foreign corporation or other entity in each jurisdiction in which the nature of the business conducted or property owned by it makes such qualification necessary, except where the failure to be so qualified or in good standing, as the case may be, could not have or reasonably be expected to result in a Material Adverse Effect and no proceeding has been instituted in any such jurisdiction revoking, limiting or curtailing or seeking to revoke, limit or curtail such power and authority or qualification.

**2.**          **Authorization; Enforcement.** Company has the requisite corporate power and authority to enter into and to consummate the transactions contemplated by each of the Transaction Documents and otherwise to carry out its obligations hereunder or thereunder. The execution and delivery of each of the Transaction Documents by Company and the consummation by it of the transactions contemplated hereby or thereby have been duly authorized by all necessary action on the part of Company and no further consent or action is required by Company other than the filing of the Certificate of Designations. Each of the Transaction Documents has been, or upon delivery will be, duly executed by Company and, when delivered in accordance with the terms hereof, will constitute the valid and binding obligation of Company, enforceable against Company in accordance with its terms, except (a) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies and (c) insofar as indemnification and contribution provisions may be limited by applicable law. Neither Company nor any Subsidiary is in violation of any of the provisions of its respective certificate or articles of incorporation, by-laws or other organizational or charter documents.

I̲RONRIDGE                                                                                                      Page 3

3.  **No Conflicts.** The execution, delivery and performance of the Transaction Documents by Company, the issuance of the Shares and the consummation by Company of the other transactions contemplated thereby do not and will not (a) conflict with or violate any provision of Company's or any Subsidiary's certificate or articles of incorporation, bylaws or other organizational or charter documents, (b) conflict with, or constitute a default (or an event that with notice or lapse of time or both would become a default) under, result in the creation of any Lien upon any of the properties or assets of Company or any Subsidiary, or give to others any rights of termination, amendment, acceleration or cancellation (with or without notice, lapse of time or both) of, any agreement, credit facility, debt or other instrument (evidencing a Company or Subsidiary debt or otherwise) or other understanding to which Company or any Subsidiary is a party or by which any property or asset of Company or any Subsidiary is bound or affected, (c) conflict with or result in a violation of any material law, rule, regulation, order, judgment, injunction, decree or other restriction of any court or governmental authority to which Company or a Subsidiary is subject (including federal and state securities laws and regulations), or by which any property or asset of Company or a Subsidiary is bound or affected, or (d) conflict with or violate the terms of any material agreement by which Company or any Subsidiary is bound or to which any property or asset of Company or any Subsidiary is bound or affected; except in the case of each of clauses (b), (c) and (d), such as could not have or reasonably be expected to result in a Material Adverse Effect.

4.  **Litigation.** There is no action, suit, inquiry, notice of violation, proceeding or investigation pending or, to the knowledge of Company, threatened against or affecting Company, any Subsidiary or any of their respective properties before or by any court, arbitrator, governmental or administrative agency or regulatory authority (federal, state, county, local or foreign) (collectively, an "**Action**"), which could adversely affect or challenges the legality, validity or enforceability of any of the Transaction Documents or the Shares. The Commission has not issued any stop order or other order suspending the effectiveness of any registration statement filed by Company or any Subsidiary under the Exchange Act or the Act.

5.  **Filings, Consents and Approvals.** Neither Company nor any Subsidiary is required to obtain any consent, waiver, authorization or order of, give any notice to, or make any filing or registration with, any court or other federal, state, local or other governmental authority or other Person in connection with the execution, delivery and performance by Company of the Transaction Documents, other than any required federal and state securities filings and such filings and approvals as are required to be made or obtained under the applicable Trading Market rules in connection with the transactions contemplated hereby, each of which has been, or if not yet required to be filed will be, timely filed.

6.  **Issuance of Shares.** The Shares are duly authorized and, when issued and paid for in accordance with the applicable Transaction Documents, will be duly and validly issued, fully paid and non-assessable, free and clear of all Liens. Company has reserved and will continue to reserve from its duly authorized share capital sufficient Common Shares for issuance pursuant to the Transaction Documents.

7.  **Disclosure; Non-Public Information.** Company will disclose all material terms of this Agreement and the transactions contemplated hereby in a filing with the Commission on Form 6-K no later than 2 Trading Days following the Effective Date. Notwithstanding any other provision, except with respect to information that must be, and only to the extent that it actually is, timely publicly disclosed by Company pursuant to the foregoing sentence, neither Company nor any other Person acting on its behalf has provided Subscriber or its representatives, agents or attorneys with any information that constitutes or might constitute material, non-public information, including without limitation this Agreement and the Exhibits and Disclosure Schedules hereto. No information contained in the Disclosure Schedules constitutes material non-public information. There is no adverse material information regarding Company that has not been publicly disclosed prior to the Effective Date. Company understands and confirms that Subscriber will rely on the foregoing representations and covenants in effecting transactions in securities of Company. All disclosure provided to Subscriber regarding Company, its business and the transactions contemplated hereby, including without limitation the Disclosure Schedules, furnished by or on behalf of Company with respect to the representations and warranties made herein are true and correct in all material respects and do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading.

**8.** **No Integrated Offering.** Neither Company, nor any of its Affiliates, nor any Person acting on its or their behalf has, directly or indirectly, made any offers or sales of any security or solicited any offers to buy any security, under circumstances that would cause this offering of the Shares to be integrated with prior offerings by Company that cause a violation of the Act or any applicable stockholder approval provisions, including, without limitation, under the rules and regulations of the Trading Market.

**9.** **Financial Condition.** The Public Reports set forth as of the dates thereof all outstanding secured and unsecured Indebtedness of Company or any Subsidiary, or for which Company or any Subsidiary has commitments, and any default with respect to any Indebtedness. Company does not intend to incur debts beyond its ability to pay such debts as they mature, taking into account the timing and amounts of cash to be payable on or in respect of its debt.

**10.** **No Material Misstatement.** No representation or warranty or other statement made by Company in the Public Reports or any Transaction Document contains any untrue statement or omits to state a material fact necessary to make any of them, in light of the circumstances in which it was made, not misleading. Company is not aware of any facts or circumstances that would cause the transactions contemplated by the Transaction Documents, when consummated, to violate the registration requirements under Section 5 of the Act or other federal or state securities laws or regulations.

**11.** **Investment Company.** Company is not, and is not an Affiliate of, and immediately after receipt of payment for the Shares, will not be or be an Affiliate of, an "investment company" within the meaning of the Investment Company Act of 1940, as amended. Company will conduct its business in a manner so that it will not become subject to the Investment Company Act.

**B.** **Representations Regarding Company.** Except as set forth in any current or future Public Reports and attached exhibits, or under the corresponding section of the Disclosure Schedules, if any, Company hereby represents and warrants to, and as applicable covenants with, Subscriber as of the Closing:

**1.** **Capitalization.** The capitalization of Company is as described in Company's most recently filed Public Report and Company has not issued any share capital since such filing. No Person has any right of first refusal, preemptive right, right of participation, or any similar right to participate in the transactions contemplated by the Transaction Documents which has not been waived or satisfied. Except as a result of the subscription for the Shares, there are no outstanding options, warrants, script rights to subscribe to, calls or commitments of any character whatsoever relating to, or securities, rights or obligations convertible into or exchangeable for, or giving any Person any right to subscribe for or acquire, any Common Shares, or contracts, commitments, understandings or arrangements by which Company or any Subsidiary is or may become bound to issue additional Common Shares or securities convertible into or exercisable for Common Shares. The issuance of the Shares will not obligate Company to issue Common Shares or other securities to any Person, other than Subscriber, and will not result in a right of any holder of Company securities to adjust the exercise, conversion, exchange, or reset price under such securities. All of the outstanding shares in the capital of Company are validly issued, fully paid and nonassessable, have been issued in material compliance with all federal and state securities laws, and none of such outstanding shares was issued in violation of any preemptive rights or similar rights to subscribe for or purchase securities. Except as set forth in **Section II.D.3** above, no further approval or authorization of any shareholder, the Board of Directors of Company or others is required for the issuance of the Shares. There are no shareholder agreements, voting agreements or other similar agreements with respect to Company's share capital to which Company is a party or, to the knowledge of Company, between or among any of Company's shareholders.

I<small>RONRIDGE</small>

2. **Subsidiaries.** All of the direct and indirect subsidiaries of Company are set forth in the Public Reports or the corresponding section of the Disclosure Schedules. Company owns, directly or indirectly, all of the capital stock or other equity interests of each Subsidiary, and all of such directly or indirectly owned capital stock or other equity interests are owned free and clear of any Liens. All the issued and outstanding shares of capital stock of each Subsidiary are duly authorized, validly issued, fully paid, non-assessable and free of preemptive and similar rights to subscribe for or purchase securities.

3. **Public Reports; Financial Statements.** Company has filed all required Public Reports for the one year preceding the Effective Date. As of their respective dates or as subsequently amended, the Public Reports complied in all material respects with the requirements of the Act and the Exchange Act and the rules and regulations of the Commission promulgated thereunder, as applicable, and none of the Public Reports, when filed, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. The financial statements of Company included in the Public Reports, as amended, comply in all material respects with applicable accounting requirements and the rules and regulations of the Commission with respect thereto as in effect at the time of filing. Such financial statements have been prepared in accordance with GAAP, except as may be otherwise specified in such financial statements or the notes thereto and except that unaudited financial statements may not contain all footnotes required by GAAP, and fairly present in all material respects the financial position of Company and its consolidated subsidiaries as of and for the dates thereof and the results of operations and cash flows for the periods then ended, subject, in the case of unaudited statements, to normal, immaterial, year-end audit adjustments.

4. **Material Changes.** Except as specifically disclosed in the Public Reports, (a) there has been no event, occurrence or development that has had, or that could reasonably be expected to result in, a Material Adverse Effect, (b) Company has not incurred any liabilities (contingent or otherwise) other than (i) trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice, and (ii) liabilities not required to be reflected in Company's financial statements pursuant to GAAP or required to be disclosed in filings made with the Commission, (c) Company has not altered its method of accounting, (d) Company has not declared or made any dividend or distribution of cash or other property to its shareholders or purchased, redeemed or made any agreements to purchase or redeem any shares in the capital of the Company, and (e) Company has not issued any equity securities to any officer, director or Affiliate, except pursuant to existing Company equity incentive plans. Company does not have pending before the Commission any request for confidential treatment of information.

5. **Litigation.** There is no Action pending or, to the knowledge of the Company, threatened, which could reasonably be expected to result in a Material Adverse Effect. Neither Company nor any Subsidiary, nor to the knowledge of Company any director or officer thereof, is or has been the subject of any Action involving a claim of violation of or liability under federal or state securities laws or a claim of breach of fiduciary duty. There has not been, and to the knowledge of Company, there is not pending or contemplated, any investigation by the Commission involving Company or any current or former director or officer of Company.

IRONRIDGE

**6.      Labor Relations.** No material labor dispute exists or, to the knowledge of Company, is imminent with respect to any of the employees of Company, which could reasonably be expected to result in a Material Adverse Effect.

**7.      Compliance.** Neither Company nor any Subsidiary (a) is in material default under or in material violation of (and no event has occurred that has not been waived that, with notice or lapse of time or both, would result in a default by Company or any Subsidiary under), nor has Company or any Subsidiary received notice of a claim that it is in material default under or that it is in material violation of, any indenture, loan or credit agreement or any other similar agreement or instrument to which it is a party or by which it or any of its properties is bound (whether or not such default or violation has been waived), (b) is in violation of any order of any court, arbitrator or governmental body, or (c) is or has been in violation of any statute, rule or regulation of any governmental authority, including without limitation all foreign, federal, state and local laws applicable to its business except in each case as could not have a Material Adverse Effect.

**8.      Regulatory Permits.** Company and each Subsidiary possess all certificates, authorizations and permits issued by the appropriate federal, state, local or foreign regulatory authorities necessary to conduct their respective businesses as described in the Public Reports and as currently being conducted, except where the failure to possess such permits could not, individually or in the aggregate, have or reasonably be expected to result in a Material Adverse Effect ("**Material Permits**"), and neither Company nor any Subsidiary has received any notice of proceedings relating to the revocation or modification of any Material Permit.

**9.      Title to Assets.** Company and each Subsidiary have good and marketable title in fee simple to all real property owned by them that is material to the business of Company and each Subsidiary and good and marketable title in all personal property owned by them that is material to the business of Company and each Subsidiary, in each case free and clear of all Liens, except for Liens that do not materially affect the value of such property and do not materially interfere with the use made and proposed to be made of such property by Company and each Subsidiary and Liens for the payment of federal, state or other taxes, the payment of which is neither delinquent nor subject to penalties. Any real property and facilities held under lease by Company and each Subsidiary are held by them under valid, subsisting and enforceable leases of which Company and each Subsidiary are in compliance.

**10.      Patents and Trademarks.** Company and each Subsidiary have, or have rights to use, all patents, patent applications, trademarks, trademark applications, service marks, trade names, copyrights, licenses and other similar rights that are necessary or material for use in connection with their respective businesses as described in the Public Reports and which the failure to so have could have a Material Adverse Effect (collectively, "**Intellectual Property Rights**"). Neither Company nor any Subsidiary has received a written notice that the Intellectual Property Rights used by Company or any Subsidiary violates or infringes upon the rights of any Person. To the knowledge of Company, all such Intellectual Property Rights are enforceable and there is no existing infringement by another Person of any of the Intellectual Property Rights of Company or each Subsidiary.

IRONRIDGE

**11.** **Insurance.** Company and each Subsidiary are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which Company and each Subsidiary are engaged, including but not limited to directors and officers insurance coverage at least equal to the Subscription Amount. To Company's knowledge, such insurance contracts and policies are accurate and complete in all material respects. Neither Company nor any Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business without an increase in cost that would constitute a Material Adverse Effect.

**12.** **Transactions With Affiliates and Employees.** Except as set forth in the Public Reports, none of the officers or directors of Company and, to the knowledge of Company, none of the employees of Company is presently a party to any transaction with Company or any Subsidiary (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of Company, any entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner, in each case in excess of $120,000 other than (i) for payment of salary or consulting fees for services rendered, (ii) reimbursement for expenses incurred on behalf of Company and (iii) for other employee benefits, including stock option agreements under any equity incentive plan of Company.

**13.** **Sarbanes-Oxley; Internal Accounting Controls.** Company is in material compliance with all provisions of the Sarbanes-Oxley Act of 2002, which are applicable to it as of the date of the Closing. Company presented in its most recently filed periodic report under the Exchange Act the conclusions of the certifying officers about the effectiveness of Company's disclosure controls and procedures based on their evaluations as of the evaluation date. Since such date, there have been no significant changes in Company's internal accounting controls or its disclosure controls and procedures or, to Company's knowledge, in other factors that could materially affect Company's internal accounting controls or its disclosure controls and procedures.

**14.** **Certain Fees.** No brokerage or finder's fees or commissions are or will be payable to any broker, financial advisor or consultant, finder, placement agent, investment banker, bank or other Person with respect to the transactions contemplated by this Agreement. Notwithstanding any other provision, Subscriber will have no obligation with respect to any fees or with respect to any claims made by or on behalf of other Persons for fees of a type contemplated in this section that may be due in connection with the transactions contemplated by this Agreement or the other Transaction Documents.

**15.** **Registration Rights.** No Person has any right to cause Company to effect the registration under the Act of any securities of Company.

**16.** **Listing and Maintenance Requirements.** The Common Shares are registered pursuant to Section 12 of the Exchange Act, and Company has taken no action designed to, or which to its knowledge is likely to have the effect of, terminating the registration of the Common Shares under the Exchange Act nor has Company received any notification that the Commission is contemplating terminating such registration. Except as disclosed in the Public Reports, Company has not, in the 12 months preceding the Effective Date, received notice from any Trading Market on which the Common Shares are or have been listed or quoted to the effect that Company is not in compliance with the listing or maintenance requirements of such Trading Market. Company is, and has no reason to believe that it will not in the foreseeable future continue to be, in compliance with all such listing and maintenance requirements.

IRONRIDGE

5/27/2014 3:55 PM

**17.** **Application of Takeover Protections.** Company and its Board of Directors have taken all necessary action, if any, in order to render inapplicable any control share acquisition, business combination, poison pill (including any distribution under a rights agreement) or other similar anti-takeover provision under Company's Memorandum of Association (or similar charter documents) or the laws of its state of incorporation that is or could become applicable to Subscriber as a result of Subscriber and Company fulfilling their obligations or exercising their rights under the Transaction Documents, including without limitation Company's issuance of the Shares and Subscriber's ownership of the Shares.

**18.** **Tax Status.** Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes). Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, statute or local tax. None of Company's tax returns is presently being audited by any taxing authority. Company would not be classified as a PFIC for its most recently completed taxable year, and does not expect to be classified as a PFIC for its current taxable year.

**19.** **Foreign Corrupt Practices.** Neither Company, nor to the knowledge of Company, any agent or other person acting on behalf of Company, has (a) directly or indirectly, used any corrupt funds for unlawful contributions, gifts, entertainment or other unlawful expenses related to foreign or domestic political activity, (b) made any unlawful payment to foreign or domestic government officials or employees or to any foreign or domestic political parties or campaigns from corporate funds, (c) failed to disclose fully any contribution made by Company, or made by any person acting on its behalf of which Company is aware, which is in violation of law, or (d) violated in any material respect any provision of the Foreign Corrupt Practices Act of 1977, as amended.

**20.** **Accountants and Lawyers.** Company's accountants are set forth in the Public Reports and such accountants are an independent registered public accounting firm. There are no material disagreements presently existing, or reasonably anticipated by Company to arise, between Company and the accountants or lawyers formerly or presently employed by Company.

**21.** **Offshore Transaction.** Company is a foreign private issuer, as defined in Rule 405 under the Act. Company has not, and will not, engage in any directed selling efforts, as defined in Regulation S, in the United States in respect of any of the Shares. Company is offering and selling the Shares only in offshore transactions, in accordance with Regulation S. Company and its Affiliates have complied, and will comply, with the offering restrictions requirements of Regulation S. Company has only offered, and will only offer, the Preference Shares to Subscriber.

**22.** **Acknowledgments Regarding Subscriber.** Company's decision to enter into this Agreement has been based solely on the independent evaluation of Company and its representatives, and Company acknowledges and agrees that:

**a.** Subscriber is not, has never been, and as a result of the transactions contemplated by the Transaction Documents will not become an officer, director, insider, control person, to Company's knowledge 10% or greater shareholder, or otherwise an affiliate of Company as defined under Rule 12b-2 of the Exchange Act;

IRONRIDGE

b.        Subscriber is acting solely in the capacity of arm's length purchaser with respect to this Agreement and the transactions contemplated hereby;

c.        Subscriber does not make or has not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth in **Section III.C** below; and

d.        Subscriber is not acting as a legal, financial, accounting or tax advisor to Company, or fiduciary of Company, or in any similar capacity, with respect to this Agreement and the transactions contemplated hereby. Any statement made by Subscriber or any of its representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation, and is merely incidental to Subscriber's subscription for the Shares.

**C.        Representations and Warranties of Subscriber.** Subscriber hereby represents and warrants as of the Closing as follows:

1.        **Organization; Authority.** Subscriber is an entity validly existing and in good standing under the laws of the jurisdiction of its organization with full right, company power and authority to enter into and to consummate the transactions contemplated by the Transaction Documents and otherwise to carry out its obligations thereunder. The execution, delivery and performance by Subscriber of the transactions contemplated by this Agreement have been duly authorized by all necessary company or similar action on the part of Subscriber. Each Transaction Document, to which it is a party has been, or will be, duly executed by Subscriber, and when delivered by Subscriber in accordance with the terms hereof, will constitute the valid and legally binding obligation of Subscriber, enforceable against it in accordance with its terms, except (a) as limited by general equitable principles and applicable bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting enforcement of creditors' rights generally, (b) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies, and (c) insofar as indemnification and contribution provisions may be limited by applicable law.

2.        **Subscriber Status.** Subscriber certifies that Subscriber is not, and was not at the time Subscriber was offered the Shares, a U.S. Person, and is not acquiring the Shares for the account or benefit of any U.S. Person. Subscriber agrees to resell the Shares only in accordance with the provisions of Regulation S, pursuant to registration under the Act, or pursuant to an available exemption from registration. Subscriber agrees not to engage in hedging transactions with regard to the Shares unless in compliance with the Act. In addition,

3.        **Experience of Subscriber.** Subscriber is an accredited investor, as defined in Rule 501(a) under the Act. Subscriber is acquiring the Preference Shares as principal for its own account, in the ordinary course of its business. Subscriber, either alone or together with Subscriber's representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Shares, and has so evaluated the merits and risks of such investment. Subscriber is able to bear the economic risk of an investment in the Shares and, at the present time, is able to afford a complete loss of such investment.

**IRONRIDGE**

**4.** **No Short Sales.** Subscriber (a) does not hold any short position in, (b) has not engaged in any Short Sales of, and (c) has not participated in any hedging transactions involving, the Common Shares prior to the Effective Date.

## IV. **Securities and Other Provisions.**

**A.** **Subscriber Due Diligence.** Subscriber will have the right and opportunity to conduct customary due diligence with respect to any Registration Statement or Prospectus in which the name of Subscriber or any Affiliate of Subscriber appears.

**B.** **Furnishing of Information.** As long as Subscriber owns any Shares, Company covenants to use its reasonable best efforts to timely file, or obtain extensions in respect thereof and file within the applicable grace period, all reports required to be filed by Company after the Effective Date pursuant to the Exchange Act or, to the extent not then registered under the Exchange Act, the alternative reporting guidelines of OTC Markets Group, Inc. or its successor. As long as Subscriber owns any Shares, if Company is not required to file reports pursuant to the Exchange Act, it will prepare and furnish to Subscriber and make publicly available in accordance with Rule 144(c) such information as is required for Subscriber to sell the Shares under Rule 144. Company further covenants that it will take such further action as any holder of Shares may reasonably request, all to the extent required from time to time to enable such Person to sell such Shares without registration under the Act within the limitation of the exemptions provided by Rule 144.

**C.** **Disclosure and Publicity.** Company will notify Subscriber prior to issuing any current report, press release, public statement or communication with respect to the transactions contemplated hereby.

**D.** **Shareholders Rights Plan.** No claim will be made or enforced by Company or, to the knowledge of Company, any other Person that Subscriber is an "Acquiring Person" under any shareholders rights plan or similar plan or arrangement in effect or hereafter adopted by Company, or that Subscriber could be deemed to trigger the provisions of any such plan or arrangement, by virtue of receiving Shares under the Transaction Documents or under any other agreement between Company and Subscriber. Company will conduct its business in a manner so that it will not become subject to the Investment Company Act of 1940, as amended.

**E.** **No Non-Public Information.** Company covenants and agrees that neither it nor any other Person acting on its behalf will, provide Subscriber or its agents or counsel with any information that Company believes or reasonably should believe constitutes material non-public information. On and after the Effective Date, neither Subscriber nor any Affiliate of Subscriber will have any duty of trust or confidence that is owed directly, indirectly, or derivatively, to Company or the shareholders of Company, or to any other Person who is the source of material non-public information regarding Company. Company understands and confirms that Subscriber will be relying on the foregoing in effecting transactions in securities of Company, including without limitation issues of the Shares.

IRONRIDGE