UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEWLEAD HOLDINGS LTD.,                    :

                 Petitioner,          :

            vs.                              :

IRONRIDGE GLOBAL IV LIMITED,       :

             Respondent,        :

          and                              :

VSTOCK TRANSFER, LLC, as transfer agent, :

           Notice Party.              :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14-CV-03945 (WHP)

**ECF Case**

**Electronically Filed**

### DECLARATION OF BRENDAN T. O'NEIL IN SUPPORT OF RESPONDENT IRONRIDGE GLOBAL IV, LTD.'S MOTION TO DISMISS AND IN SUPPORT OF ITS OPPOSITION TO NEWLEAD HOLDINGS LTD.'S PETITION FOR A TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF INTERNATIONAL ARBITRATION PROCEEDING

      BRENDAN T. O'NEIL, declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

      1.     I submit this declaration in support of the motion to dismiss and opposition of respondent Ironridge Global IV, Ltd., a British Virgin Islands business company ("**Ironridge**"), to the petition of NewLead Holdings Ltd., a Bermuda corporation ("**NewLead**"), for a temporary restraining order and preliminary injunction in aid of international arbitration.

      2.     I am a Managing Member of Cahir Capital Management LLC, a Delaware limited liability company ("**Cahir**"), which is a Registered Investment Advisor (RIA) that entered into an Investment Management Agreement with Ironridge on February 15, 2011. I am also a Managing Director of Ironridge Global Partners, LLC, a Delaware limited liability company with

a principal place of business located at 100 Spear Street, Suite 320, San Francisco, California 94105-1523, ("**Partners LLC**"), a non-party to this action, which is a shareholder of Ironridge.

## I.     PROFESSIONAL EDUCATION AND EXPERIENCE

3.     I am a Certified Financial Analyst (CFA) charter holder, and a Registered Investment Advisor (RIA) in the state of California.  I am a member of the Securities Analysts Association of San Francisco.  I received my BA in Finance, and my MS in Financial Analysis from the University of San Francisco.  I have extensive experience in financial and industry analysis, negotiating and structuring direct investments and portfolio risk management.

4.     Prior to my founding Cahir in December 2009, I served as President and Chief Investment Officer for Enable Capital Management LLC, the General Partner of Enable Growth Partners LP ("**Enable**") from its inception in 2003. Enable was one of the largest and most active funds in its strategy, completing over 500 financing transactions and investing more than $600 million in life science, technology, energy, cleantech, and consumer companies.  I have also held senior investment banking and sales positions at Enable Capital LLC, The Shemano Group, Sutro & Company, and Morgan Stanley Dean Witter & Co.

## II.    FACTUAL BACKGROUND

### A.    The Parties

5.     Attached hereto as **Exhibit 1** is the Schedule 13G filed by Ironridge with regard to the NewLead transaction.  As stated on page 8, Ironridge is a British Virgin Islands business company, with its principal (and only) place of business located at Harbour House, 2nd Floor, Waterfront Drive, Road Town, Tortola, British Virgin Islands VG1110.  Attached as **Exhibit 2** is a certified true copy of the Certificate of Incorporation of Ironridge, as filed with the Registrar of Corporate Affairs for the British Virgin Islands, pursuant to the BVI Business Companies Act.

2

6.      Ironridge has two directors, neither of which is located in the United States.  The two directors of Ironridge are David Sims and Navigator Management, Ltd.  Mr. Sims is a British citizen who resides in the Cayman Islands.  Copies of his passport and driver's license (which I obtained as part of know your customer (KYC) due diligence), are attached hereto as **Exhibit 3**.  Navigator Management, Ltd. is a British Virgin Islands business company, with its principal place of business located in the BVI.  Ironridge has no other directors.  There are two officers of Ironridge, Mr. Sims and Falcon Secretaries, Ltd., a British Virgin Islands business company, with its principal place of business located in BVI, which is the corporate secretary.  Ironridge has no other officers.

7.      Neither Partners LLC nor its directors, Keith Coulston, John C. Kirkland, Richard H. Kreger and myself, are officers or directors of Ironridge.  Neither Messrs. Coulston, Kirkland, Kreger, nor myself are shareholders of Ironridge.

8.      Ironridge does not have (and has never had) any offices, addresses, telephone numbers or fax numbers in New York, or anywhere in the United States.  Ironridge does not have (and has never had) any employees, property, or bank accounts in New York, or anywhere in the United States.  Ironridge does not (and has never) conducted business in New York, or anywhere in the United States.  Ironridge is not (and has never been) registered to do business in New York, or anywhere in the United States.

9.      Partners LLC has a satellite office in New York which Mr. Kreger occasionally uses.  However, the office has never been used by Ironridge, and no one from Ironridge has ever been there.  No one from NewLead has ever been to the New York office of Partners LLC, and no meetings or negotiations concerning the transaction between Ironridge and NewLead occurred there.

B.       **NewLead's Desperate Financial Condition and Plummeting Stock Price**

10.      Attached as **Exhibit 4** are excerpts from NewLead's Annual Report on Form 20-F

for the year ended December 31, 2013 (two months before the subsequent deal with Ironridge),

which was filed by NewLead on May 9, 2014 (two months after the Ironridge deal).

11.      NewLead's Annual Report states that, "The legal and commercial name of the

Company is NewLead Holdings Ltd., a company incorporated under the BCA [Bermuda

Companies Act] on January 12, 2005. NewLead's principal place of business is 83 Akti Miaouli

& Flessa Street, Piraeus Greece 185 38 and its telephone number is (+30) 213-014-8600." (Ex. 4

at 41.)  It also states that, "NewLead has historically been an international shipping company,

which in 2012 started also engaging "in the business of the purchasing and trading of certain

commodities, principally coal." (*Id.*)

12.      NewLead's Annual Report states that the company's primary risk factor is its

insolvent financial condition, which is so dismal that it raises substantial doubt about the

company's ability to continue to exist, explaining (in the company's own words) as follows:

> ***There is substantial doubt about our ability to continue as a going concern.***
>
> ... Because of our losses, working capital deficiencies, negative operating cash flow and 'shareholders' deficiency, we concluded that there is substantial doubt as to our ability to continue as a going concern.
>
> Over the past three years, we have experienced net losses, negative operating cash flows, working capital deficiencies, negative operating cash flow and 'shareholders' deficiency, which has affect, and which is expected to continue to affect, our ability to satisfy our obligations.  In addition, we are in default under various debt obligations which are currently due on demand.  Charter rates for bulkers have experienced a high degree of volatility and continue to be distressed. To date, we have also been unable to generate sustainable positive cash flows from operating activities. *For the year ended December 31, 2013, our loss from continuing operations was $146.8 million.  As of December 31, 2013, our cash and cash equivalents were $2.3 million and current liabilities of $291.7 million were payable within the next twelve months.*

4

The above conditions raise substantial doubt about our ability to continue as a going concern. …

Our existence is dependent upon our ability to obtain necessary financing, which we are currently in the process of attempting to secure. We believe that our existing cash resources, combined with projected cash flows from operations, will *not* be sufficient to execute our business plan and continue operations for the next twelve months and without additional funding."

(*Id.* at 4 (emphasis original and added).)

13.    The Annual Report's risk factors further warn that, *"**Our restructuring and development efforts to strengthen our financial position and reduce our debt may adversely affect our common shareholders through dilution or complete loss in value***." (*Id.* at 38 (emphasis original).)

14.    In addition, for the 8-year period prior to Ironridge ever receiving or selling any shares, NewLead's stock price has dropped a staggering 99.999%, from a reverse split-adjusted high of $3,699,000.00 per share in 2006 to $17.00 per share in April 2014. A stock price chart from Bloomberg illustrating the consistent decline in NewLead's stock over an 8-year period pre-dating any involvement by Ironridge is attached as **Exhibit 5**. Ironridge could not possibly have caused any of this decline, since it occurred over an extended period before Ironridge ever entered into the transaction, or received or sold a single share of NewLead stock.

### C.    Ironridge and NewLead Enter Into the Share Subscription Agreement

15.    In mid-February 2014, NewLead and Ironridge began discussions concerning a possible $25 million financing that would give NewLead a much needed capital infusion. It was contemplated that the transaction would be exempt from registration under Regulation S, which is available only for "offers and sales of securities *outside the United States*."

16.    On February 24, 2014, NewLead and Ironridge entered into a Term Sheet, a copy of which is attached hereto as **Exhibit 6**. The Term Sheet was executed on behalf of NewLead

by Antonis Bertsos, its Chief Financial Officer, in Greece and on behalf of Ironridge by Mr. Sims, as a Director of Ironridge, in BVI.

17.     The Term Sheet references the parties' reliance on Regulation S.  (Ex. 6 at 2.) The Term Sheet contemplates that Ironridge would adhere to defined trading limitations and provides, "Trading Limitation: Purchaser will limit daily trading to the greater of $295,000 or 20% of the total daily trading volume." (Ex. 6 at 3.)  The comparison of a dollar amount ($295,000) to total daily trading volume makes clear that "trading volume" refers to a dollar amount, not a number of shares.  (If volume referred to a share number rather than a dollar amount, that would be a nonsensical comparison of apples and oranges.)  It was my clear understanding that this was the case, and based upon my telephone discussions with Mr. Bertsos, that was *NewLead's clear understanding as well*.

18.     Mr. Bertsos, Michael S. Zolotas (NewLead's Chariman and CEO), and NewLead's internal Legal Department conducted the negotiations with Ironridge by telephone and email from Piraeus, Greece.  No meetings or negotiations took place in New York.

19.     NewLead was represented in the negotiations by the Bermuda law firm of Cox Hallett Wilkinson Limited, who conducted negotiations from Hamilton, Bermuda.  A copy of the Bermuda legal opinion of Cox Hallett is attached as **Exhibit 7.**  NewLead was also represented in the negotiations by the Bermuda firm of Appleby Global, the corporation's registrar, who conducted negotiations from Hamilton, Bermuda.  NewLead was also represented, with regard to securities law matters, by the law firm of Thompson Hine LLP, who provided a legal opinion that Regulation S applied to the transaction (see item 5 on page 4), a copy of which is attached hereto as **Exhibit 8.**

20.     Ironridge was represented in the negotiations by the Bermuda law firm of Conyers

Dill & Pearman Limited, who conducted negotiations from Hamilton, Bermuda.  I participated in

negotiations from San Francisco, California, as did Mr. Kirkland from Los Angeles, California,

and Mr. Kreger from his office in Westport, Connecticut.  Ironridge was also represented, with

regard to securities law matters, by an Australian registered foreign lawyer at the international

law firm of Baker & McKenzie, who conducted negotiations from Sydney, Australia.

21.     According to the board minutes attached as **Exhibit 9**, on February 25, 2014,

NewLead's board held a formal meeting of the corporation's Board of Directors in Piraeus,

Greece, at which they (a) found that it was "in the Company's best interests to enter into the

proposed transaction," (b) reviewed and approved the Term Sheet, a Share Subscription

Agreement, and a Certificate of Designations, and (d) authorized the issuance of Series A

Preference Shares, and the reservation and issuance of Common Shares upon conversion of the

preference shares.

22.     On March 4, 2014, NewLead and Ironridge entered into the Share Subscription

Agreement (the "**SSA**"), a copy of which is attached as **Exhibit 10.**  The SSA was executed on

behalf of NewLead in Greece by Mr. Bertsos (and the Certificate of Desigations by both Mr.

Bertsos and Mr. Zolotas), and on behalf of Ironridge in the British Virgin Islands by Navigator

Management, Ltd., as Director of Ironridge.  The SSA is governed by Bermuda law (§ 5.G.), and

provides for mandatory binding arbitration of any disputes in Bermuda (§ 5.H.)

23.     In Section III.B.21 of the SSA, NewLead represents and warrants as follows:

"Offshore Transaction. … *Company has not, and will not, engage in any directed selling efforts,*

*as defined in Regulation S, in the United States* in respect of any of the Shares. *Company is*

*offering and selling the Shares only in offshore transactions*, in accordance with Regulation S.

Company and its Affiliates have complied, and will comply, with the offering restrictions requirements of Regulation S. Company has only offered, and will only offer, the Preference Shares to Subscriber"." (*Id.* (emphasis added).) Also, Mr. Berstos admits in his declaration that Ironridge is a "Non-U.S." Person that purchased securities pursuant to Regulation S of the Securities Act of 1933, 15 U.S.C. § 77a, et seq. (Berstos Decl. ¶ 75.)

24.     Section IV.M of the SSA provides that Ironridge will limit its daily trading to the greater of 20% of daily trading volume (daily or 10-day average) or $295,000.00, provided that Ironridge may sell any greater amount that anyone else is permitted to sell. The comparison of trading volume to a specific dollar amount again makes clear that, for purposes of this clause, volume must be measured in dollars. The SSA also restricts Ironridge from engaging in a "short sale" as defined in Rule 200 of Regulation SHO of the Securities and Exchange Act. (Ex. 10 § III.C.4 and Ex. 1 thereto.)

25.     In Section III.B.22 of the SSA, NewLead represents, warrants and acknowledges that "Subscriber does not make or has not made any representations or warranties with respect to the transactions contemplated hereby other than those specifically set forth" in the agreement. The SSA's broad form integration clause, immediately above NewLead's signature, states that "No party, representative, attorney or agent has relied upon any collateral contract, agreement, assurance, promise, understanding or representation not expressly set forth hereinabove. The parties hereby expressly waive all rights and remedies, at law and in equity, directly or indirectly arising out of or relating to, or which may arise as a result of, any Person's reliance on any such assurance." (Ex. 10 § V.P.)

26.     The parties consummated the SSA in accordance with the closing conditions outlined in Section II.D thereto. In accordance with this provision, Ironridge paid NewLead

$2,500,022.50 in cash by wire transfer on March 4, 2014, as payment in full for 250 Preference

Shares, and partial payment for the remaining Preference Shares.  A copy of the wire transfer

receipt is attached as **Exhibit 11.**  The wire was sent from Ironridge's bank account at

Caledonian Bank Limited in Grand Cayman, Cayman Islands, to NewLead's bank account at

EuroBank Ergasias in Athens, Greece.

27.    Partners LLC was not the source of any of the funds paid to NewLead. A copy

of Ironridge's bank statement, showing the withdrawal of funds for the wire from Ironridge's

bank account in the Cayman Islands, is attached as **Exhibit 12.**

28.    In accordance with the SSA, Ironridge also delivered nine promissory notes (the

"**Notes**") in the principal amount of $2,499,997.50 each.  The Notes were executed on behalf of

Ironridge by Navigator Management, Ltd., as a Director of Ironridge.  Each of the Notes states

that the "Note has been *executed and delivered in*, and is to be construed, enforced, and governed

according to the internal laws of, *Bermuda*, without regard to its principles of conflict of laws

that would require or permit the application of the laws of any other jurisdiction."  (Ex. 10 at Ex.

3 § 8.c (emphasis added).)

29.    In exchange for this consideration, NewLead delivered to Ironridge eleven share

certificates for 250 Preference Shares each (2,500 Preference Shares + 250 Preference Share

commitment fee = 2,750 shares total).  A copy of the share register, showing Ironridge as the

holder of 2,750 Series A Preference Shares, is attached as **Exhibit 13**.  The share register is

maintained by Appleby Global, the corporation's registrar, in Hamilton, Bermuda.

30.    Timing of the closing was critical to NewLead, because the company needed $2

million for a cash deposit for the purchase two ships which NewLead said it could not otherwise

afford to pay.  Attached as **Exhibit 14** is a March 6, 2014 email from NewLead, confirming

receipt of payment from Ironridge and stating, "I want to thank you all for your efforts, it has

been a pleasure working with you in what was maybe the quickest and smoothest closing ever."

> D.   **Ironridge's Absolute Right to Convert Series A Preference Shares to Common Shares**

31.    Under the SSA, Ironridge has the right to convert its Preference Shares into

Common Shares at its "sole and absolute discretion." NewLead expressly acknowledges that

Ironridge's conversions may result in "substantial dilution." Section IV.L of the SSA states in

full:

> **L. Share Conversions.** Subscriber may convert any or all of the 250
> Preference Shares issued for cash and the 250 Preference Shares issued as the
> commitment fee at any time after the Effective Date, from time to time, at its sole
> and absolute discretion. Subscriber may convert any or all of the other Preference
> Shares at any time after the Effective Date, from time to time, at its sole and
> absolute discretion; provided, however, that notwithstanding any other provision,
> Subscriber may not convert any Preference Shares unless the respective Note
> given as consideration for issuance of the share certificate representing such
> shares has been paid in full, by wire transfer of immediately available funds to an
> account designated by Company, at or prior to the time of such conversion.
> Company acknowledges that Subscriber's conversion of Preference Shares may
> result in substantial dilution. *Company's absolute obligation to issue Common
> Shares to Subscriber upon conversion of Preference Shares is an independent
> covenant, and any breach or alleged breach of any provision of any Transaction
> Document by any person shall not excuse performance of such obligation.*

(Ex. 10 § IV.L (emphasis added).) Section IV.L is unequivocal that NewLead's conversion

obligation to issue common shares upon conversion is absolute, and is an independent covenant

that cannot be excused by any purported cancellation or termination of the Agreement based on

any breach or alleged breach of the agreement.

> 1.    **The Mechanics of Converting Shares under a Holder Conversion Notice**

32.    The procedures for conversion are set forth in the Certificate of Designations of

Preferences, Rights and Limitations of Series A Preference Shares (the "**Certificate**"), attached

hereto as **Exhibit 15.** Under Section I.G.l.a of the Certificate, Ironridge may convert one or more of its Preference Shares to Common Shares at any time by delivering a written "**Holder Conversion Notice**" to NewLead. (*Id.*) Either that same day (if the Holder Conversion Notice is received before noon) or the next trading day (time being of the essence), NewLead must transmit a written acknowledgment to 'NewLead's transfer agent,[1] confirming that it has received the Holder Conversion Notice, and authorizing immediate electronic delivery of the shares to Ironridge's Depository Trust Corporation (DTC) account.

33.     The transfer agent, in turn, must issue the Common Shares requested pursuant to the terms of an irrevocable instruction letter from NewLead dated March 4, 2014 (the "**Irrevocable Instructions**"), issued pursuant to Section II.B.4 of the SSA. A copy of the Irrevocable Instructions are attached as **Exhibit 17.** In the Irrevocable Instructions, NewLead "irrevocably authorizes and instructs [the original transfer agent, Continental] to" (1) "reserve a sufficient number of Common Shares ... for issuance upon full conversion of the Preference Shares," and (2) issue the required number of Common Shares to Ironridge "without any further action or confirmation by [NewLead] upon receipt from Ironridge of (a) the Holder Conversion Notice and (b) an opinion of counsel for Ironridge confirming the shares may be issued pursuant to Regulation S. Thus, the agreed process ensures that Ironridge will continue to receive Common Shares even if NewLead completely refuses to cooperate.

---

[1]     The company's transfer agent at the time of the SSA was Continental Stock Transfer & Trust Company ("**Continental**") and is now VStock Transfer LLC ("**VStock**"). When Continental refused NewLead's demand that it breach the Irrevocable Instructions, NewLead caused Continental to be terminated as the Company's transfer agent. However, because the transfer records could not be sent to VStock until it agreed in writing to be bound by the Irrevocable Instructions (AB Decl. Ex. C), on May 22, 2014, NewLead confirmed VStock's agreement to be bound by the Irrevocable Instructions issued pursuant to the SSA. (*See* email from Mr. Zolotas attached as **Exhibit 16.**) In addition, on May 29, 2014, the Company authorized VStock to reserve common shares for Ironridge as required by the SSA.

      2.       **The Shares Owed to Ironridge Pursuant to a Holder Conversion Notice**

34.      The number of shares that Ironridge is entitled to upon a Conversion Notice is set forth in the "**Holder Conversion**" section of the Certificate.  Subject to defined Issuance Limitations (described below), anytime Ironridge converts Preference Shares, under Section I.G.2 of the Certificate of Designations, NewLead must: (1) issue the number of Conversion Shares required pursuant to a set conversion formula, and (2) pay dividends and a contractually defined "Embedded Dividend Liability" in either cash or Common Shares pursuant to a prescribed formula.[2]  (Exhibit 15 at I.G.2; I.C.1.)

35.      Section I.C.1. of the Certificate provides that dividends are payable "*upon conversion.*"  Section C.1.2 provides:

> Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable at the Corporation's election, (a) in cash, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

      (a)      **The Embedded Dividend Liability**

36.      Given NewLead's extremely precarious financial condition, Ironridge's investment was (and is) speculative and high risk (in Section II.C.3 of the SSA, Ironridge was required to represent and warrant that it is able to afford "a complete loss" of its investment).  Thus, Ironridge was (and is) entitled to a substantial return on its investment if it paid off.  In

---

[2]   NewLead elected to satisfy the Embedded Dividend Liability by issuing additional Common Shares rather than paying cash, and issued such shares pursuant to the April 10, 2014 and April 17, 2014 Holder Conversion Notices and several subsequent issuance requests.  After breaching the agreement and being sued by Ironridge, NewLead attempted to retroactively undo its election to pay in Common Shares, stating in condition, confusing and contradictory fashion that it would elect to pay in cash, while at the same time refusing to pay in cash.

addition, given that NewLead's stock price had been rapidly declining since long before Ironridge ever became involved, Ironridge needed some form of protection in the highly likely event the trend continued.

37.    The **Embedded Dividend Liability** is a mechanism by which NewLead can benefit by performing and causing its stock price to go up, while conversely Ironridge is (at least partially) protected from volatility and is able to receive a return on its investment, either a cash payment or an issuance of additional Common Shares in the event of a conversion.  The Embedded Dividend Liability equals the Face Value of the Preference Shares ($10,000 per share), multiplied by the product of (a) the applicable annual Dividend Rate (10.75% subject to adjustment if the stock price goes up or down during a defined Equity Conditions Measuring Period) and (b) the number of years between the Issuance Date and the Dividend Maturity Date.

38.    Attached as  **Exhibit 18** is a chart setting forth the relevant calculations to determine the Embedded Dividend Liability as well as the amount of cash or alternatively Common Shares that are owed to Ironridge under the three outstanding Holder Conversion Notices dated April 10, 2014, April 17, 2014 and June 3, 2014.  As shown in the spreadsheet, if the company elects to pay the Embedded Dividend Liability in cash, then it must immediately pay Ironridge a minimum of $1,318,096.86 in the aggregate, for the April 10, 2014 and April 17, 2014 conversion notices, and $962,027.52 for the June 3, 2014 conversion notice, for a total of at least $2,280,124.38.  NewLead has paid nothing.

### (b)    The Conversion Shares Issued to Ironridge

39.    The number of Common Shares to be issued by NewLead to Ironridge equals (1) the $10,000 face value of each Preference Share (2) multiplied by the number of Preference Shares subject to the Holder Conversion Notice, and (3) divided by the Conversion Price per

share (defined as $1.00, subject to adjustment for the 1-for 10 reverse stock split on March 6, 2014 and the 1-for-50 reverse stock split on May 15, 2014 – or a net 1-for-500 reverse stock split).  (Ex. 10, § I.G.2.)

(c)    <strong>The 9.99% Share Ownership Blocker</strong>

40.    To ensure that Ironridge does not become an affiliate, the parties agreed that the number of Common Shares issued under a Holder Conversion Notice may not result in Ironridge owning more than 9.99% of all Common Shares at any given time.  (Ex. 15, § I.G.7; *see also* Ex. 10, § III.B.22.a; *id.* § IV.H.(ii)(a).) This has the practical effect of placing a ceiling on the number of Common Shares that could be issued by NewLead at any one time. Due to the 9.99% blocker, NewLead's issuance of Common Shares pursuant to the first two Holder Conversion Notices on April 10, 2014 and April 17, 2014, has been less than the total number of shares owed to Ironridge. For this reason, Ironridge has received additional share issuances whenever it advises that it can accept more shares and remain under the 9.99% limit. (Bertsos Decl. Ex. I)

41.    To date, Ironridge has issued Holder Conversion Notices for a total of 250 Preference Shares. From April 14, 2014 to present, Ironridge has received a total of 8,026,874 Common Share issuances under this protocol.  After each block was delivered by the Transfer Agent, Ironridge sold Common Shares on the open market so that it could temporarily reduce its ownership stake and, in so doing, become eligible under the SSA to receive more Common Shares while remaining below the 9.99% blocker.

E.    **NewLead's Request for Early Payment of Note No. 1**

42.    Note No. 1 in the initial principal amount of $2,499,997.50 was initially due on May 28, 2014, as set forth in the email I sent to Newlead on April 28, 2014, which is attached as

14

**Exhibit 19**. The Maturity Date was later extended by various Tolling Events defined in the Note, and it is not yet due.

43. On April 28, 2014, NewLead asked that Ironridge agree "as a favor" to pay the $2.5 million early, so that NewLead could use the money to pay a delivery deposit for another ship. Mr. Bertsos stated that he had been keeping track of Ironridge's stock sales, and that by his calculation Ironridge had sold approximately $5 million in stock. Although paying early represented a substantial increased risk for Ironridge with no corresponding benefit, in the spirit of being a long-term financial partner, Ironridge agreed to pay Note No. 1 early, as reflected in the emails attached as **Exhibit 20**.

44. The parties were unable to reach agreement on the terms, and on May 5, 2014, Mr. Zolotas advised that NewLead would not agree to the prepayment agreement proposed by Ironridge, as reflected in his email attached as **Exhibit 21**.

45. This resulted in a sea change in NewLead's attitude and behavior. In the same email, Mr. Zolotas demanded that Ironridge stop selling any shares. I explained that Ironridge was not the cause of any drop in the stock price, which has been in constant decline for several years and has not been caused by Ironridge. I attached detailed stock charts demonstrating this reality. (*See* Ex. 21.)

46. On May 7, 2014, Ironridge emailed NewLead an Excel spreadsheet setting forth in detail that Ironridge had fully complied with the trading limits, a copy of which is attached as **Exhibit 22**. NewLead accepted the calculation provided by Ironridge, and did not claim that it was incorrect.

47. NewLead completely shut down, and would no longer communicate. Ironridge repeatedly asked to speak with Mr. Bertsos or Mr. Zolotas to try to mend the relationship, and

they repeatedly refused, with Mr. Zolotas ultimately responding (in the email attached as **Exhibit 23**), "just all make sure that this does not kill our filings because all we will be fucked..."

48.    NewLead failed to comply with Ironridge's May 7, 2014, additional issuance request. After repeated inquiries attempting to determine why NewLead had defaulted, Mr. Zolatas sent an email on May 9, 2014, stating "we have a good faith belief that Ironridge is in violation of their agreement," as set forth in the emails attached as **Exhibit 24**. This is the first time that NewLead ever hinted at any alleged breach by Ironridge. As set forth in the emails attached as **Exhibit 25**, despite repeated requests, NewLead refused to explain any basis for their claim that Ironridge had breached the agreement. NewLead nevertheless refused to issue any common shares.

49.    On May 9, 2014, Ironridge commenced arbitration proceedings against NewLead before JAMS International. A copy of the Arbitration Submission is attached as **Exhibit 26**. In the Case Information section, Ironridge quoted the Arbitration clause of the SSA in full, including the requirement that arbitration be in Bermuda. The drop down menu under Location on the JAMS International website only allow for London, Amsterdam, Milan, New York and Rome as choices, so Ironridge clicked New York (the closest geographic location to Bermuda), and under Location, Alternative (which allowed for entry of text) typed in Bermuda.

50.    On May 12, 2014, NewLead sent a purported "Notice of Default" to Partners LLC, alleging that Ironridge was "in material default and breach of the Agreement" and, notwithstanding the lack of any termination provision therein, purported to terminate the SSA, and apparently also the outstanding Series A Preferred Shares. As reflected in the attached **Exhibit 27**, Ironridge responded by requesting an explanation of the bases for the alleged breaches and has received nothing to date.

51.     On May 22, 2014, at NewLead's request VStock agreed in writing to be bound by the Irrevocable Instructions, a fact that was confirmed in writing by Mr. Zolotas. (*See* Ex. 16.)

## III.     IRONRIDGE HAS FULLY COMPLIED WITH THE SSA

52.     Ironridge has at all times fully complied with all of its obligations under the SSA. Ironridge has never engaged in any short sale of NewLead stock, and has always limited its daily aggregate trading volume to the limits provided in the SSA.

53.     Attached as **Exhibit 28**, **Exhibit 29** and **Exhibit 30** are copies of Ironridge's brokerage account statements for March, April and May, 2014, from Caledonian, GP Numenkari, and Summit (ABK), which are cash accounts (meaning that no one can borrow the shares to cover a short sale) and the only three accounts in which Ironridge has ever deposited or sold NewLead shares.  These trading records indisputably prove that Ironridge has never engaged in short selling, or selling above the agreed volume limits.

### A.     Ironridge Has Never Engaged in Short Selling of NewLead Stock

54.     The account statements attached as Exhibits AA, BB at CC show every deposit of NewLead Stock, and every sale of NewLead stock by Ironridge.  As shown in the statements, the number of shares deposited, pursuant to each Holder Conversion Notice and additional issuance request, exactly match the number of shares thereafter sold.  The statements prove that all shares received from NewLead were sold long.  It is, therefore, impossible for any shares received from NewLead to have been used to cover any short sales.

55.     Ironridge received its first delivery of any NewLead shares on April 14, 2014, into the Summit brokerage account. (Ex. 30 at 33)  Ironridge never received any NewLead shares prior to that date.  Ironridge has never borrowed any NewLead shares, has never loaned any

NewLead shares, and has never shorted any NewLead shares. Ironridge first sold any NewLead shares on April 14, 2014. Ironridge never sold any NewLead shares prior to that date.

56.     I have reviewed the statements in Mr. Bertsos's declaration, relating to his speculation that Ironridge must have engaged in short selling of NewLead's stock in breach of the SSA. Mr. Bertsos erroneously states that on April 17, 2014, Ironridge was in possession of 234,291 shares in excess of the 9.99% blocker, which he claims is proof of short selling. (Bertsos Decl. ¶ 90) He is mistaken.

57.     Mr. Bertsos's erroneous belief appears to be based on a calculation error. Mr. Bertsos appears to incorrectly calculate the 9.99% limit based on the 23,391,003 shares outstanding *before* the issuance to Ironridge. However, under Regulation 13D, ownership calculations are done on a post-issuance basis. See 17 CFR § 240.13d-1(a) ("Any person who, *after* acquiring directly or indirectly the beneficial ownership of any equity security of a class which is specified in paragraph (i) of this section, is directly or indirectly the beneficial owner of more than five percent of the class…") When Ironridge received the 2,550,000 additional shares on April 17, those shares became outstanding shares. Therefore, the 23,391,003 share number on Exhibit L of Mr. Bertsos's Declaration should actually be 25,941,003 shares (23,391,003 initial outstanding shares + 2,550,000 new shares issued to Ironridge = 25,941,003 total outstanding shares). Using the proper number of shares outstanding, Ironridge was below the 9.99% blocker with 9.83% of total shares outstanding.

**B.     Ironridge Has at All Times Complied with the Issuance Limitations in the SSA**

58.     The SSA and Certificate of Designations expressly contemplate that Ironridge will have the right to sell its Common Shares in the secondary market, subject only to the trading

restrictions specifically enumerated therein.  Under Section IV.M of the SSA, the parties agreed that:

> Subscriber [Ironridge] will limit its aggregate trading on any single Trading Day to the greater of: (1) 20% of (a) the daily trading volume for that day, or (b) the worldwide average daily trading volume in the Common Shares on all national securities exchanges and automated quotation systems, if any, on which the Common Shares are listed or designated for quotation (as the case may be), excluding any sales of Common Shares by Subscriber, for the 10 Trading Days immediately preceding such Trading Day; (2) $295,000.00 worth of Common Shares; or (3) any greater amount that Company permits or allows any other person to sell, pursuant to any agreement with Company other than for the issuance of Common Shares at a fixed price.

(Ex. 10, § IV.M.)

59.     As set forth in **Exhibit 22**, and in the updated calculation sent to NewLead on May 23, 2014, a copy of which is attached as **Exhibit 31,** Ironridge has never sold more than it is allowed to under the limits set forth above.  To the contrary, it has sold dramatically less.

60.     After Ironridge initiated arbitration against NewLead, NewLead claimed for the first time that Ironridge allegedly exceeded the daily trading limit on five of the last 35 trading days: April 14, 28, 30 and May 1 and 2, 2014. Now in Mr. Bertsos's declaration, NewLead explains the alleged basis for its claim for the first time.  (Bertsos Decl. ¶ 82.)  Once again, he is mistaken.  Mr. Bertsos's erroneous belief again appears to be based on a calculation error.

61.     The daily trading volume limits are based on dollars, not number of shares.  The reason for this is clear, because the aggregate daily trading limit is the greater of three separate measures, one of which is $295,000 worth of Common Shares.  In order to appropriately compare those metrics, it only makes sense that dollar volume be compared to dollar volume, such that the "20% of (a) the daily trading volume for that day or (b) the worldwide average daily trading volume in the Common Shares on all national securities exchanges and automated quotation systems," must also be measured in dollars.

19

62.     NewLead was always fully aware of the number of shares sold by Ironridge daily, because, due to the operation of the 9.99% blocker, they can be easily calculated based on the number of shares requested the next day.  Mr. Bertsos and Mr. Zolotas both said that NewLead carefully tracked Ironridge's sales, and the amounts they said they believed Ironridge has sold were always fairly accurate.  Yet no one from NewLead ever complained about the number of shares being sold until after Ironridge did not pay the $2.5 million early.

63.     In fact, on numerous occasions Ironridge has supplied NewLead with copies of its daily trading activity against the share conversion limitations in Section IV.M of the SSA, as well as spreadsheets of total share amounts sold per day.  These materials demonstrate conclusively that Ironridge has at all times complied with the SSA's trading restrictions.  As shown in Exhibit 31, Ironridge has sold less than 10% of the $120 million that it could have sold to date within the SSA's contractual volume limitation.  Ironridge could have sold ten times the number of shares it has sold over the last month, and still been well within the SSA's volume limits, whether measured in dollar volume or share number.

64.     In any event, the difference between calculating the trading limits on a dollar volume as opposed to a share number basis is de minimus.  (Bertsos Decl. ¶ 82, Ex. J.)  As set forth in the attached **Exhibit 32**, the total dollar value of the alleged excess shares sold by Ironridge is less than $200,000.  This represents only 2% of the total dollar volume during the 5 days in question, and a scant 0.03% of the total dollar volume over the entire period that Ironridge has been selling shares, neither of which could possibly have had a material impact on the stock price.  Based on my many years' of professional experience, the sale of an additional $200,000 in stock of a NASDAQ listed company with consistently large daily trading volume

over five days would not materially impact the price. Based on my review of NewLead's trading volume, the alleged overages had no impact on its price.

65.    Moreover, even if one were to accept NewLead's strained interpretation of the agreement, the last alleged breach was more than a month ago, on May 2, 2014, which is contrary to any allegation that the company would be in imminent danger of irreparable harm if a preliminary injunction were not granted. Even assuming, for purposes of argument, that Ironridge made a few inadvertent "foot faults" early on, the last month of consistent performance has shown that any such problems are not likely to occur again.

### C.    Ironridge is Not the Cause of the Ongoing Decline in NewLead's Stock Price

66.    As noted above, NewLead's stock price has been in ongoing decline for the last eight years, dropping 99.999% over that period. In addition, between the time that Ironridge signed the SSA (March 4, 2014) and the first day that Ironridge received and sold NewLead shares (April 14, 2014), NewLead's stock declined by an additional 94.23%. (*see* Ex. 21 at chart 2.) No part of either decline could have been caused by Ironridge, because it did not sell a single share during this entire period.

67.    As noted above, I had previously explained this to the Company in early May, I also sent to Mr. Zolotas charts showing that, according to NewLead's own Form 6-K filings, another two large shareholders, Hanover Holdings I, LLC and MG Partners Limited (part of Magna Group LLC), had received and sold $68,010,667 in NewLead stock since April. These shareholders have sold more than five times the amount of stock issued to Ironridge, which would have a substantially greater dilutive effect.

68.    Based on the public filings of NewLead, from April 11, 2014 to June 6, 2014 the company has issued a total of 68,949,604 new shares of common stock. Thus, over the last two

months, shares outstanding have increased an astonishing 18,000%. The dilutive effect has been staggering. But only 8,026,874 shares (or approximately 12% of the total) were issued to Ironridge. NewLead has issued more than 60 million new shares to others during this time.

69.     In addition, shares sold by Ironridge represented only 1.9% of the 416,495,718 total shares traded on the markets for this period. Whereas Ironridge sold less than $16 million of stock during this time, the value of all shares traded was well over $800 million. Thus, Ironridge also represented less than 2% of the total dollar volume. Based on my professional experience, such a small percentage would generally not have a material negative affect on a company's share price. It is not reasonable, or even rational, to assert that Ironridge was the cause of NewLead's price decline.

70.     Just in the few days since the TRO was issued to prevent Ironridge from being issued 2,242,859 shares, NewLead has issued 34,276,705 shares to others, nearly doubling its total outstanding from 35,061,763 to 69,338,468 shares, according to its Form 6-K filed today, attached here as **Exhibit 33**. The stock was down 9.7% today. Ironridge is being materially harmed, by suffering massive dilution while not being able to receive its own shares.

71.     Choosing any period of time prior to when Ironridge received shares, and comparing the price drop on a split-adjusted basis, further demonstrates that Ironridge could not possible have caused the ongoing decline:

(a)   *3 Months Prior to April 14, 2014:* NewLead shares fell from $225 to $17 per share or 97.8%.

(b)   *6 Months Prior to April 14, 2014:* NewLead shares fell from $2,085 to $17 per share or 99.2%.

(c)   *9 Months Prior to April 14, 2014:* NewLead shares fell from $3,600 to $17 per share or over 99.5%.

(d)     *12 Months Prior to April 14, 2014:* NewLead shares fell from $9,900 per share to $17 per share or over 99.8%.

72.     Attached hereto as **Exhibit 34** is a Bloomberg chart showing NewLead's stock prices, starting two months before Ironridge received stock on April 14, 2014, which show no material change in trend due to Ironridge receiving shares. To the contrary, it fairly conclusively demonstrate that the Ironridge transaction has no significant impact on the stock.

73.     As a shareholder and investor, the best result for Ironridge is that stock price of companies in which it invests increase, the more the better. Ironridge does not sell stock in a manner designed to hurt a company's stock price. To the contrary, it sells in a manner designed to maximize its total economic return. This typically means selling as many shares as possible, at the highest price possible, in manner that least impacts the price. Intentionally driving down a stock price to zero is a recipe for failure, not long term gains. The higher the price, the more valuable each share, and the more money Ironridge makes eventually selling it. Ironridge acts accordingly.

74.     After making an investment, Ironridge typically waits a period of time before selling any shares, in the hope that the deal will be a catalyst to positive results, improved company performance, and higher stock price. "Buy low, sell high" is Investing 101. Here, the market reacted well to the Ironridge financing and the ship acquisition that it funded, and the price went up substantially on deal announcement. Unfortunately, the company and the stock soon returned to its old ways, and the price fell substantially. After holding the Preference Shares for 40 days and 40 nights, Ironridge began to convert and sell. It did so in full compliance with the terms of the parties' agreement. It did not sell in an attempt to intentionally hurt the company or its stock, but rather in a manner consistent with its ethical responsibilities to

maximize its total long-term return on investment in the most professional and prudent manner possible.

### D.   NewLead's Material Breaches of the Agreement

75.   As set forth above, NewLead materially breached the SSA by refusing to honor Ironridge's additional issuances requests for the prior conversions that NewLead had already elected to pay in stock. As a result, Ironridge initiated arbitration proceedings against NewLead on May 9, 2014.

76.   On May 27, 2014, NewLead sent a letter to Partners LLC stating that it believed the "Transaction Documents" had been terminated pursuant to its May 12, 2014 letter. NewLead also stated that only in the event that it was "found to be liable to pay such dividend and any applicable embedded dividend liability by a tribunal of competition jurisdiction" would it pay it, and then in such event, it would elect to pay that amount in cash, not in common shares. (AB Decl. Ex. B.) This was the first time that the Company ever indicated to Ironridge that it wanted to make an election to pay Dividends and Embedded Derivative Liability in cash instead of in Common Shares. At the time of this letter, the April 10, 2014 and April 17, 2014 Conversion Notices were outstanding and the Company had already made its election upon the conversion of its Preference Shares to pay in Common Shares.

77.   On June 5, NewLead sent Partners LLC, not Ironridge, a letter stating that it had received Ironridge's June 3, 2014 Conversion Notification. While stating that it was electing to pay in cash, NewLead again refused to pay the cash owed under the Embedded Dividend Liability to Ironridge. A copy of the June 5 letter is attached hereto as **Exhibit 35**.

IV.   **ISSUANCE OF A PRELIMINARY INJUNCTION WOULD CAUSE SIGNIFICANT HARM TO IRONRIDGE**

78.     On June 3, 2014, this court issued a temporary restraining order that was limited to preventing VStock from issuing any Common Shares to Ironridge in satisfaction of any Embedded Dividend Liability.

79.     On June 5, 2014, Ironridge advised NewLead that Ironridge was willing to accept cash in full satisfaction of the conversion notices.  This offer was made in part because of the representation of 'NewLead's counsel at the TRO hearing that all NewLead sought was for Ironridge to accept cash instead of shares for its April conversion notices.  In response, NewLead indicated that, in truth, it had no intention of paying any cash, stating, "NewLead is not willing to make any such payment to Ironridge at this time."  This simply proves that NewLead's sole aim since early May of 2014 has been to avoid its contractual obligations. A copy of the June 5 correspondence is attached hereto as **Exhibit 36**.

80.     On June 5, 2014, NewLead issued a misleading press release regarding the temporary restraining order (TRO) that was granted by this Court on June 3, 2014.   As copy of the press release is attached hereto as **Exhibit 37**.  The release implied that NewLead had obtained all of the relief it sought, rather than the limited TRO actually granted by the Court. This press release sent NewLead's stock price soaring.

81.     As a result of that press release, one of Ironridge's brokers put Ironridge on a freeze and rendered Ironridge's ability to sell NewLead's shares or any other shares it held, impossible. In addition, the broker's custodian said they would not allow Ironridge to deposit Newlead shares with them should the freeze be lifted.  Thereafter, one of Ironridge's best brokers informed it would no longer do business with Ironridge.

82.     If the court were to issue a preliminary injunction against Ironridge, it is likely that Ironridge would lose additional brokers as a result, and very possible that it could lose most or all of its brokers, effectively putting the company out of business.

83.     Ironridge's business is public company financing. The reputational hit that it has taken as a result of NewLead's frivolous accusations has caused significant damage to Ironridge because it impacts whether other public companies want to do business with it.  If the Court were it issue a preliminary injunction against Ironridge, it would cause severe and long lasting harm to its ability to do business with public companies.

A.     **If the Court Issues a Preliminary Injunction in Aid of Arbitration, NewLead Should be Required to Post a Bond**

84.     In the event that the Court is inclined to issue a preliminary injunction, I have set forth in Exhibit 18 the amount of money that Ironridge would be entitled to upon conversion of its preference shares, which is $1,318,096.86 for the April 10, 2014 and April 17, 2014 Conversion Notices, $962,027.52 for the June 3, 2014 Conversion Notice and $4,810,137.62 for unconverted but fully paid Preference Shares, and $43,291,237.59 for the remaining 2,250 unconverted Preference Shares paid with Notes. These amounts do not take into account any 2% penalty for untimely issuance of shares to Ironridge.  (Ex. 15 § G.1.b.)

85.     A bond is particularly appropriate here since there are questions about the financial viability of NewLead going forward, particularly given the declaration of Mr. Berstos wherein he notes commencing wind-up proceedings is a possibility.  (Bertsos Decl. ¶ 35.)  If a preliminary injunction were ordered, Ironridge would not be protected without a bond for the full amount owed to it of approximately $50 million.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 6, 2014.

Brendan O'Neil