UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

NEWLEAD HOLDINGS LTD.,       :

        Petitioner,       :

     vs.       :

IRONRIDGE GLOBAL IV LIMITED,       :

      Respondent,       :

     and       :

VSTOCK TRANSFER, LLC, as transfer agent, :

      Notice Party.       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

14-CV-03945 (WHP)

**ECF Case**

**Electronically Filed**

## MEMORANDUM OF LAW IN SUPPORT OF RESPONDENT IRONRIDGE GLOBAL IV, LTD.'S MOTION TO DISMISS AND IN OPPOSITION TO NEWLEAD HOLDING LTD.'S PETITION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION IN AID OF INTERNATIONAL ARBITRATION PROCEEDING

SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Robert A. Fumerton
William J. O'Brien
Julie E. Cohen
Four Times Square
New York, NY 10036
(212) 735-3000

*Attorneys for Respondent Ironridge Global IV, Ltd.*

# TABLE OF CONTENTS

I.   THE PETITION MUST BE DISMISSED FOR LACK OF PERSONAL
     JURISDICTION ......................................................................................................6

     A.   NewLead Has Failed To Demonstrate a Basis For General Jurisdiction
          Under N.Y. CPLR § 301........................................................................................6

     B.   NewLead Has Failed To Demonstrate a Basis For Specific Jurisdiction
          Under N.Y. CPLR § 302........................................................................................9

     C.   NewLead Has Failed To Demonstrate a Basis For Personal Jurisdiction
          Under Federal Law ..............................................................................................10

II.  THE PETITION SHOULD BE DISMISSED
     ON THE GROUND OF *FORUM NON CONVENIENS* ...................................................11

     A.   Plaintiffs' Choice of Forum is Entitled to Minimal Deference ..............................12

     B.   Bermuda is an Adequate Alternative Forum ........................................................13

     C.   Private and Public Interests Strongly Support Dismissal ......................................14

          1.   The Private Interests ...................................................................................14

          2.   The Public Interests....................................................................................15

III. THE TRO SHOULD BE LIFTED AND THE PETITION FOR A
     PRELIMINARY INJUNCTION SHOULD BE DENIED ................................................15

     A.   NewLead Has Not Demonstrated Irreparable Harm..............................................16

     B.   NewLead Has Not Established a Likelihood of Success on (or Serious
          Questions Going to) the Merits.............................................................................17

          1.   The Independent Covenant Provision of Section IV.L Forecloses
               NewLead From Obtaining the Relief It Seeks...........................................17

          2.   Ironridge Has Complied With the Applicable Trading Limitations ..........18

          3.   NewLead Offers No Support For Its "Short Selling" Allegations.............19

          4.   NewLead's Market Manipulation Claim is Baseless................................21

     C.   The Balance of the Equities Weighs Against NewLead.......................................22

IV.  IF THIS COURT ENTERS A TRO OR PRELIMINARY INJUNCTION,
     NEWLEAD SHOULD BE REQUIRED TO POST A SUBSTANTIAL BOND ............23

V.    CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**CASES**

*Acosta v. JPMorgan Chase,*
219 F. App'x 83 (2d Cir. 2007) .......................................................................12

*Aguinda v. Texaco,*
303 F.3d 470 (2d Cir. 2002) ...........................................................................13

*Anwar v. Fairfield Greenwich Ltd.,*
No. 1:09-cv-00118, slip op. (docket no. 521) (S.D.N.Y. Sept. 14, 2010) .................. 11-12

*Bank of America v. Apollo Enterprise Solutions, LLC,*
No. 10 Civ. 5707 (DLC), 2010 WL 4323273 (S.D.N.Y. Nov. 1, 2010)............................8

*Buffalo Forge Co. v. Ampco-Pittsburgh Corp.,*
638 F.2d 568 (2d Cir. 1981)............................................................................15

*Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC,*
155 F.3d 603 (2d Cir. 1998).............................................................................13

*Deer Consumer Products, Inc. v. Little,*
938 N.Y.S.2d 767 (Sup. Ct. N.Y. County 2012) ...............................................9

*Display Technologies, LLC v. Display Industries, LLC,*
No. 11 Civ. 6390 (WHP), 2011 WL 6188742 (S.D.N.Y. Dec. 5, 2011) .........................22

*Faiveley Transport Malmo AB v. Wabtec Corp.,*
559 F.3d 110 (2d Cir. 2009).......................................................................15, 16

*Ford v. Reynolds,*
316 F.3d 351 (2d Cir. 2003)............................................................................17

*Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic,*
582 F.3d 393 (2d Cir. 2009)..............................................................................6

*Gardner v. Weisman,*
No. 06 Civ. 5998 (WHP), 2006 WL 2423376 (Aug. 21, 2006)......................................17

*Goodyear Dunlop Tires Operations, S.A. v. Brown,*
131 S. Ct. 2846 (2012).....................................................................................8

*Grand River Enterprise Six Nations, Ltd. v. Pryor,*
481 F.3d 60 (2d Cir. 2007)....................................................................1, 15, 16

*Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC,*
No. 11 Civ. 420 (RJH), 2012 WL 204102 (S.D.N.Y. Jan. 24, 2012)..........................6, 10

*Gulf Oil Corp. v. Gilbert,*
    330 U.S. 501 (1947)..................................................................................................11, 14

*Hanson Trust PLC v. SCM Corp.,*
    774 F.2d 47 (2d Cir. 1985).........................................................................................15

*Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd,*
    [1962] 2 QB 26 (Berm.)..............................................................................................19

*In re Alcon S'holder Litig.,*
    No. 10 Civ. 0139, 2010 WL 2076991 (S.D.N.Y. May 31, 2010)...............................13, 14

*Iragorri v. United Tech. Corp.,*
    274 F.3d 65 (2d Cir. 2001)....................................................................................11, 12, 14

*JSG Trading Corp. v. Tray-Wrap, Inc.,*
    917 F.2d 75 (2d Cir. 1990).........................................................................................15

*Kamerling v. Massanari,*
    295 F.3d 206 (2d Cir. 2002).......................................................................................17

*Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,*
    918 F.2d 1039 (2d Cir. 1990).......................................................................................6

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC,*
    No. 12 Civ. 3723 (RJS), 2013 WL 1294668 (S.D.N.Y. Mar. 28, 2013) ...........................8

*Mastafa v. Australian Wheat Bd. Ltd.,*
    No. 07 Civ. 7955, 2008 WL 4378443, (S.D.N.Y. Sept. 25, 2008) ...................................13

*NewMarkets Partners LLC v. Oppenheim,*
    638 F. Supp. 2d 394 (S.D.N.Y. 2009)...................................................................6, 9, 10

*NewMarkets Partners LLC v. Oppenheim,*
    No. 08 Civ. 4213 (WHP), 2008 WL 5191147 (S.D.N.Y. Dec. 4, 2008) ...........................15

*Nokia Corp. v. InterDigital, Inc.,*
    645 F.3d 553 (2d Cir. 2011)....................................................................................23, 25

*Nursan Metalurji Endustrisi A.S. v. M/V Torm Gertrud,*
    No. 07 CV 7687, 2009 WL 536059 (S.D.N.Y. Feb. 27, 2009) ......................................13

*Penguin Group (USA) Inc. v. American Buddha,*
    609 F.3d 30 (2d Cir. 2010)...........................................................................................6

*Photo Production Ltd. v Securicor Transport Ltd.,*
    [1980] AC 827 (Berm.)...............................................................................................19

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235, 247 (1981)...................................................................13

*Pollux Holding Ltd. v. Chase Manhattan Bank*,
    329 F.3d 64, 75 (2d Cir. 2003).............................................................13

*Porina v. Marward Shipping Co.*,
    521 F.3d 122 (2d Cir. 2008)..................................................................10

*Rodriguez v. DeBuono*,
    175 F.3d 227 (2d Cir. 1999)..................................................................16

*S.E.C. v. Masri*,
    523 F. Supp. 2d 361 (S.D.N.Y. 2007)...................................................21

*Suisse Atlantique Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central*,
    [1967] 1 AC 361 (Berm.).......................................................................19

*TGS-NOPEC Geophysical Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    No. 08 Civ. 10950 (SAS), 2009 WL 185995 (S.D.N.Y. Jan. 26, 2009)............................15

*Time Warner Cable, Inc. v. DIRECTV, Inc.*,
    No. 06 Civ. 14245 (LTS)(MGD), 2007 WL 1296205 (S.D.N.Y. May 2, 2007).........23, 24

*White and Carter (Councils) Ltd. v McGregor*,
    [1962] AC 413 (Berm.)..........................................................................19

## STATUTES

9 U.S.C. § 201 .......................................................................................6, 10

N.Y. CPLR § 301 ..............................................................................6, 7, 8

N.Y. CPLR § 302 ...................................................................................9, 10

## RULES

Federal Rule of Civil Procedure 4(k)(2) ...............................................10

Federal Rule of Civil Procedure 65(c) ..................................................23

## OTHER AUTHORITIES

Dan B. Dobbs, <u>Dobbs Law of Remedies</u> § 2.11(3) (2d ed. 1993)................24

13 James Wm. Moore et al., <u>Moore's Federal Practice</u> § 65.50 ..............24

2 John Norton Pomeroy & Spencer W. Symons, *A Treatise on Equity Jurisprudence* § 418, at
169 (5th ed. 1941)...................................................................................23

## PRELIMINARY STATEMENT

This petition arises from a foreign transaction in which Petitioner NewLead Holdings Ltd. ("NewLead" or the "Company"), a Bermuda shipping company with corporate headquarters located in Greece, agreed to sell preferred shares to Respondent Ironridge Global IV, Ltd. ("Ironridge"), a British Virgin Islands business company with its only place of business in the BVI. The operative transaction documents were negotiated outside New York, are governed by the laws of Bermuda, and require any related disputes to be resolved by binding arbitration proceedings held in Bermuda in accordance with Bermuda law. Despite the overwhelmingly foreign focus of the parties' relationship, NewLead nonetheless seeks the assistance of a New York federal court to enjoin Ironridge from exercising an "absolute" contractual right to convert NewLead's preferred shares into "Common Shares." Under binding U.S. Supreme Court precedent, Ironridge is not subject to personal jurisdiction within New York; and even if it were, the doctrine of *forum non conveniens* weighs heavily in favor of dismissal.

In any event, NewLead cannot meet its burden of demonstrating entitlement to preliminary injunctive relief, which is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 65 (2d Cir. 2007) (internal quotation omitted). As explained below, the sole remaining issue for the arbitration is an all-cash dispute that cannot, as a matter of law, give rise to an inference of irreparable harm. Further, NewLead's allegations that Ironridge breached certain of its contractual obligations and engaged in so-called market manipulation – which are based entirely on rank speculation without a shred of evidence – are all demonstrably false as evidenced by the indisputable trading records Ironridge has attached to the O'Neil Declaration. These trading records conclusively prove that Ironridge has never engaged in short selling, market manipulation or selling above the agreed volume limits. And even if there were a shred of merit

to these allegations (and there is none), any alleged breach cannot alter NewLead's absolute conversion obligations under the express terms of the Agreement.

On June 3, 2014, NewLead commenced this proceeding and immediately sought to invoke the equitable powers of this Court, arguing that it was on the brink of financial ruin because of an alleged market manipulation scheme orchestrated by Ironridge. In its Petition and motion for emergency injunctive relief, NewLead painted a sinister (and completely baseless) picture, with Ironridge cast as a financial predator that seeks to "destroy public companies in need of financing through a device called 'death spiral' financing." (Pls. Mem. 6.) Though it is a sophisticated commercial actor that routinely taps the financial markets for capital, NewLead implausibly portrayed itself as a financial novice who was unwittingly duped by Ironridge into executing a Share Subscription Agreement (the "SSA") with supposedly draconian terms.

The target of NewLead's indignation is a feature of the SSA that gives Ironridge the right to convert shares of NewLead's preferred stock into Common Shares and to receive, upon conversion, the payment of certain dividends and "Embedded Dividend Liabilities" as specified therein. NewLead has the option to pay these dividend-related liabilities in cash or through the issuance of additional Common Shares. From the inception of the SSA, NewLead elected to satisfy this obligation by issuing shares rather than paying cash. But by the time it appeared in Court on June 3, 2014, NewLead had experienced a change of heart: it now claimed that Ironridge was unlawfully exploiting this election to force NewLead into flooding the market with Common Shares. According to NewLead, Ironridge's preconceived but undisclosed objective in doing so was to drive down the share price so that it could profit from allegedly short selling these same shares.

Crucially, at the June 3 conference, NewLead represented that its overarching purpose in seeking injunctive relief was to secure an order that would allow it to pay dividend-related liabilities in cash rather than through the issuance of more Common Shares (which it claimed was having a disastrous effect on its business).  At the hearing, counsel for NewLead argued that, pursuant to Paragraph I.C of the Certificate of Designations (the "Certificate") for the preferred shares, NewLead should be allowed to change its election to issue Common Shares in response to Ironridge's Conversion Notices of April 10, 2014 and April 17, 2014, respectively, to an election to pay cash instead.  In response to the Court's inquiry as to why NewLead had not paid any such cash to Ironridge, counsel stated that NewLead was not prepared to pay until Ironridge stopped receiving shares:

> THE COURT:  Where is the cash?
>
> MR. DE PALMA:  I'm sorry?
>
> THE COURT:  Where is the cash?
>
> MR. DE PALMA:  <u>Well, they've not stopped getting shares, Judge.  They got shares last week.  They've taken shares when we said we would give them cash. They're not getting both</u>.  I need you to enjoin them – it's an abuse of the letter. So it does not say – they showed you a paragraph that said, you know, the covenant to issue shares is independent.  Well, it's independent except, if there's no shares due and owing, your Honor.  <u>If instead a cash election is made, you can't say, you have an independent obligation to give me shares, when you've elected to pay cash</u>.  It makes no sense.

(Tr. at 32-33 (emphasis added).)

Following these representations, the Court granted "a limited temporary restraining order that simply enjoins the issuance of common stock to satisfy the embedded liability for a dividends claim between now and Monday," but declined NewLead's request to "enjoin the conversion of preference shares to common shares."  (Tr. at 35.)

In an effort to resolve the parties' dispute amicably, on June 5, 2014, Ironridge offered to allow NewLead to elect the payment of cash in satisfaction of its Embedded Dividend Liability *for all past, present and future Conversion Notices*.  Further, in the event that NewLead actually pays such cash, Ironridge expressed its willingness to forego any claim that it is entitled to the issuance of any Common Shares in satisfaction of such liability.  Rather than accept this offer (which basically gave NewLead everything it had requested at the June 3 hearing), NewLead replied that it was not going to pay Ironridge cash either – in direct contravention of the representations it had made to the Court about the nature of this dispute and why it was seeking emergency relief in the first place.

The motivation behind NewLead's "bait and switch" tactic is difficult to comprehend – at least until one reads the press release that it issued on June 5, 2014.  In it, NewLead trumpeted the Court's issuance of the June 3 temporary restraining order, accused Ironridge of "breach[ing] material restrictions on its trading activity" and reiterated that from its perspective, the "transaction documents" with Ironridge were "no longer valid."  (O'Neil Decl. ¶ 80; Ex. 37.) NewLead's stock price promptly responded by rising approximately 70%.[1]  The June 5 press release, when coupled with NewLead's refusal to issue shares *or* pay cash, exposes this proceeding for what it really is – namely, a transparent effort to circumvent the parties' agreement to arbitrate all disputes by persuading a Court to enjoin the SSA prematurely, propping up the Company's stock price in the process.

The Court should not endorse this kind of end run around the arbitration clause.  And it need not do so here because NewLead has not satisfied any (let alone each) of the prerequisites

---

[1] Due to large stock issuances by NewLead to others since the TRO was granted, the stock price soon resumed its downward trend and has dropped almost 13% since June 3, 2014.  (*See* O'Neil Decl. ¶ 70, Ex. 33.)

for obtaining the extraordinary remedy of injunctive relief.  As outlined below, there are multiple

independent  grounds for denying NewLead's motion in its entirety:

- There is No Personal Jurisdiction.  As a threshold matter, NewLead has not made out a *prima facie* case for asserting personal jurisdiction over Ironridge.  As detailed in the Declaration of Brendan T. O'Neil, Ironridge has no connection to this jurisdiction at all, thereby precluding NewLead from bringing suit here.

- The Doctrine of *Forum Non Conveniens* Requires Dismissal.  This is a dispute between a British Virgin Islands Company and a Bermuda Company with its principal place of business in Greece, in which the parties agreed to arbitrate all disputes arising out of their agreement in Bermuda and under Bermuda law.  As such, the doctrine of *forum non conveniens* also precludes NewLead from bringing suit here.  Any petition in aid of arbitration should be brought in Bermuda, not here.

- There is No Irreparable Harm.  By agreeing that NewLead can satisfy its past, present and future dividend obligations through the payment of cash, Ironridge has rendered moot any claim that NewLead would be harmed by the issuance of additional Common Shares.  What remains is an all-cash dispute about whether NewLead has the obligation to pay cash to Ironridge.  The existence of an all-cash dispute, of course, means that any conceivable harm to NewLead could be remedied through an award of money damages, making injunctive relief inappropriate.

- NewLead Has No Chance of Prevailing on the Merits.  For all of its rhetoric about abusive behavior and "death spirals," NewLead's Petition and supporting papers are devoid of a single shred of evidence that Ironridge ever breached the SSA or engaged in any market manipulation.  To start with, in the three days since blocking the issuance of 2 million shares to Ironridge, NewLead has issued 35 million shares to third parties.  NewLead's request to halt any further conversion of preferred shares cannot be reconciled with the SSA, which makes clear that this obligation is absolute and cannot be excused by claims of breach – material or otherwise.  But even if NewLead could overcome this obstacle (and it cannot), its contract and market manipulation claims are contradicted by the very facts and documents upon which it relies.  NewLead's stock was down over 99% for the year before a single share was issued to Ironridge, and its downward trend continues unabated whether or not Ironridge receives its shares.  Moreover, the trading records Ironridge attaches to the O'Neil declaration indisputably prove that Ironridge has never engaged in short selling, or selling above the agreed volume limits.

- The Balance of Equities Weighs Decisively in Ironridge's Favor.  As explained above, because Ironridge has agreed to accept cash (rather than Common Shares) for any dividend-related liabilities, NewLead would suffer no harm – and therefore no prejudice – in the absence of injunctive relief.  By contrast, NewLead's Petition, with its inflammatory and groundless allegations, is causing grievous harm to Ironridge's

reputation in the market by the day. It has already caused one broker to sever ties with Ironridge, and there is a very real concern that others will follow suit.

Finally, in the event that this Court grants NewLead's application for a preliminary injunction and enjoins the further conversion of preferred shares, Ironridge respectfully requests that NewLead be required to post an appropriately-sized bond of $50 million.

## FACTUAL BACKGROUND

The relevant facts are set forth in detail in the accompanying Declaration of Brendan T. O'Neil (hereinafter the "O'Neil Decl."), which is incorporated by reference herein.

## ARGUMENT

### I. THE PETITION MUST BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

"A plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010). Because NewLead has brought its Petition under 9 U.S.C. § 201 *et seq.* – a statute which does not itself confer jurisdiction over the parties, *see Frontera Resources Azerbaijan Corp. v. State Oil Co. of the Azerbaijan Republic*, 582 F.3d 393, 397-98 (2d Cir. 2009) (holding that 9 U.S.C. § 201 *et seq.* does not supply ground for personal jurisdiction), it must demonstrate an independent basis for doing so "under state law, or, since the New York Convention is enacted by federal statute, Federal Rule of Civil Procedure 4(k)(2)." *Greatship (India) Ltd. v. Marine Logistics Solutions (Marsol) LLC*, No. 11 Civ. 420 (RJH), 2012 WL 204102, at *2 (S.D.N.Y. Jan. 24, 2012). NewLead cannot come close to meeting its burden here.

### A. NewLead Has Failed To Demonstrate a Basis For General Jurisdiction Under N.Y. CPLR § 301

As an initial matter, Plaintiff does not – and cannot – show that Ironridge is "subject to jurisdiction pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules

('CPLR')." (Pet. ¶ 31.) Under CPLR § 301, a foreign corporation is subject to general personal jurisdiction in New York if it is "doing business" in the state. N.Y. C.P.L.R. § 301. For purposes of this standard, a plaintiff must demonstrate that the defendant engaged in "continuous, permanent, and substantial activity in New York." *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990) (citation omitted); *NewMarkets Partners LLC v. Oppenheim*, 638 F. Supp. 2d 394, 401 (S.D.N.Y. 2009) (Pauley, J.) (for general personal jurisdiction, a corporation "must be engaged in continuous, permanent, and substantial activity in New York") (citation omitted).

NewLead attempts to meet this rigorous standard by alleging that Ironridge (1) "maintains a place of business located at 405 Lexington Avenue, 26th Floor, New York, New York"; and (2) "transacts business in this District"; and (3) "has demanded that the Arbitration be conducted and the hearings held in New York." (Pet. ¶¶ 4-5, 30-31.) All three contentions are demonstrably false:

*First*, NewLead's claim that Ironridge has a New York office is plainly incorrect: Ironridge is a British Virgin Islands ("BVI") business company with its principal (and only) place of business located at Harbour House, 2nd Floor, Waterfront Drive, Road Town, Tortola, British Virgin Islands VG1110. (O'Neil Decl. ¶ 5.)

*Second*, NewLead offers no factual support for the notion that Ironridge transacts business in New York. As detailed in the O'Neil Declaration, Ironridge is a BVI business company that conducts foreign operations. (*Id.* ¶ 9.) And in fact, Ironridge is not (and has never been) registered to do business in New York; does not conduct business in New York; and does not have offices, employees or bank accounts in New York. (*Id.* ¶ 8.) Accordingly, there is no basis to conclude that Ironridge engaged in any business activity within the State, much less that

7

it did so on a "continuous, permanent, and substantial" basis as required by CPLR § 301 for general jurisdiction purposes.

Moreover, NewLead cannot overcome its facially inadequate showing by conflating Ironridge's alleged activities with those of its shareholder, Partners LLC. As the O'Neil Declaration makes clear, Partners LLC is a separate legal entity organized under the laws of Delaware. (O'Neil Decl. ¶ 2.) This distinction is dispositive, for as the Supreme Court recently held in *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846 (2011), plaintiffs cannot establish general jurisdiction over a subsidiary by pointing to the alleged in-state activities of its parent. *Id.* at 2857.[2]

*Third*, NewLead's claim that Ironridge deliberately chose New York as the forum for its JAMS International arbitration is simply not true, and rests entirely on a misreading of the Arbitration Submission that was used to initiate the proceeding. As Ironridge explained at the June 3, 2014 hearing, when a JAMS International arbitration is commenced on the Internet through its electronic platform, as it was here, the claimant (here Ironridge) must choose a location from a drop down menu that provides for London, Amsterdam, Milan, New York and Rome as choices, so Ironridge clicked New York (the closest geographic location to Bermuda), and under Location, Alternative (which allowed for entry of text) typed in Bermuda. (O'Neil Decl. ¶ 49.) In other words, the form permits the claimant to type in an "alternative" location for the proceeding. And in this case, pursuant to Section V.H of the SSA, Ironridge affirmatively – and quite clearly – selected Bermuda (O'Neil Decl. ¶ 49; Ex. 26), a fact that NewLead neglected

---

[2] NewLead, has offered no facts that would support piercing the corporate veil or otherwise treating Ironridge and Partners LLC as a single enterprise for jurisdictional purposes. *See Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, No. 12 Civ. 3723 (RJS), 2013 WL 1294668, at *6 (S.D.N.Y. Mar. 28, 2013) (rejecting conclusory "mere department" allegations); *Bank of Am. v. Apollo Enter. Solutions, LLC*, No. 10 Civ. 5707 (DLC), 2010 WL 4323273, at *5 (S.D.N.Y. Nov. 1, 2010) (no jurisdiction where "allegations fail[ed] to address most of the factors relevant to . . . alter ego status").

to bring to the Court's attention.  In its submission, Ironridge also quoted the arbitration

paragraph in full, including the requirement that the arbitration take place in Bermuda.  In short,

this theory is squarely contradicted by the very document upon which it relies.

    **B.**    **NewLead Has Failed To Demonstrate a Basis**
             **For Specific Jurisdiction Under N.Y. CPLR § 302**

NewLead likewise has failed to demonstrate a basis for exercising specific jurisdiction

under CPLR § 302, which provides, in relevant part, that "a court may exercise personal

jurisdiction over any non-domiciliary . . . who in person or through an agent . . . transacts any

business within the state," C.P.L.R. § 302, so long as the plaintiff's cause of action arises from

that transaction.  *NewMarkets Partners LLC*, 638 F. Supp. 2d at 402 (Pauley, J.) (to establish

specific jurisdiction over a foreign company, "[t]he defendant must have transacted business

within the state" and the claim "must arise from that business activity." (citation omitted)).

NewLead conclusively asserts that "a substantial part of the events and omissions giving

rise to the claims in this action occurred in this District."  (Pet. ¶ 32.)  But the only purported

litigation-specific "events" to which NewLead points are Ironridge's alleged "trading of

[NEWL] Common Shares on NASDAQ in New York."  (*Id*.)  NewLead, however, does not

plead that Ironridge "projected" itself into New York by "trading stocks directly with an

employee of NASDAQ in New York or dealing with a New York broker."  *Deer Consumer

Prods., Inc. v. Little*, 938 N.Y.S.2d 767, 779 (Sup. Ct. N.Y. County 2012).  And in fact,

NASDAQ is located on a technology network – not a physical trading floor.  Market makers are

not sitting on an exchange matching buy and sell orders for investors; they are executing trades

through an elaborately constructed *electronic* platform.  Moreover, like every shareholder

Ironridge does not interact directly with NASDAQ, but instead merely gives order to

independent stock brokers who place trades electronically.  Therefore, merely alleging that

Ironridge traded Common Shares "on NASDAQ," as NewLead does here, is not enough to show that Ironridge committed relevant misconduct within New York for purposes of CPLR § 302. *See id.* at 388 (short sales allegedly executed on NASDAQ were "not a sufficient basis upon which to establish [personal] jurisdiction over" defendant).

### C. NewLead Has Failed To Demonstrate a Basis For Personal Jurisdiction Under Federal Law

"To establish personal jurisdiction over a defendant pursuant to Federal Rule of Civil Procedure 4(k)(2), a plaintiff must show that (1) the plaintiff's cause of action arises under federal law, (2) the defendant is not subject to the jurisdiction of any one state, and (3) the exercise of personal jurisdiction over the defendant is consistent with the requirements of due process." *Greatship (India) Ltd.*, 2012 WL 204102, at *5 (citation omitted). Here, even if one assumes that NewLead can satisfy the first requirement by seeking relief under 9 U.S.C. § 201 *et seq.*, it does not even take a stab at addressing Ironridge's amenability to being sued in the other forty-nine states. In any event, exercising jurisdiction here would not comport with the principles of fair play and substantial justice that underlie the U.S. Constitution.

Under Rule 4(k)(2), due process requires (1) that the defendant have sufficient minimum contacts with the United States, and (2) that the exercise of jurisdiction be reasonable. *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008). Demonstrating minimum contacts with the United States is a "*more stringent*" test than the comparable standard under state long-arm statutes, and requires a plaintiff to show that the defendant had "continuous and systematic general business contacts" with the United States, contacts that "approximate physical presence in the United States." *Id.*; *NewMarkets Partners LLC*, 638 F. Supp. 2d at 404 (Pauley, J.) (citation omitted) (reaffirming that plaintiff "must satisfy the more stringent minimum contacts test. . . by showing that [the defendant] had continuous and systematic general business contacts

with the United States"). As for "reasonableness," courts engage in a balancing test that in substance weighs the relative interests of different parties and entities, including plaintiffs, defendants, the forum state and the judicial system more broadly. *Porina*, 521 F.3d at 128.

Here, NewLead does not plead – and cannot show – that Ironridge engages in the kind of "continuous and systematic general business contacts" that would warrant the exercise of personal jurisdiction under the Due Process Clause. And it would be patently unreasonable to assert jurisdiction over Ironridge *even if* NewLead could satisfy the minimum contacts test (which it cannot). The parties, after all, broadly – and quite deliberately – structured their contractual relationship so that the transaction would take place *overseas* and any related disputes would be adjudicated *overseas* in Bermuda, not in New York, under Bermuda law. (*See* O'Neil Decl. Ex. 10 § V.H (specifying that "[a]ny dispute . . . arising out of or relating to this Agreement, or in any way involving Company and Subscriber or their respective Affiliates," would be conducted through a JAMS arbitration "*in Bermuda*.") (emphasis added).) To this end, during negotiations the parties were represented by Bermuda lawyers (O'Neil Decl. ¶ 20), and there were no meetings or negotiations that took place in New York (*Id.* ¶ 18), and the relevant transaction documents were signed offshore (*Id.* ¶¶ 16, 22) and the wire transfer upon consummation of the SSA was sent from Ironridge's bank account in the Caymon Islands to NewLead's bank account in Greece (*Id.* ¶ 26). Under these circumstances, NewLead cannot credibly argue that the parties' interests would be served by proceeding here.

## II.    THE PETITION SHOULD BE DISMISSED ON THE GROUND OF *FORUM NON CONVENIENS*

Regardless of whether the Court possesses personal jurisdiction over Ironridge in this case, this overwhelmingly foreign matter should be dismissed on grounds of *forum non conveniens*. The doctrine of *forum non conveniens* permits a court to "resist the imposition upon

11

its jurisdiction" where the convenience of the parties and interests of justice favor trial in another forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947). In deciding whether to dismiss on this basis, courts in this Circuit consider three factors: (i) the "degree of deference properly accorded the plaintiff's choice of forum"; (ii) the availability of an adequate alternative forum; and (3) "the private and public interests implicated." *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 73-74 (2d Cir. 2001). Each factor supports dismissal of the entire action here.

### A.    Plaintiffs' Choice of Forum is Entitled to Minimal Deference

While there is a starting presumption that a plaintiff's forum choice should be respected, the degree of deference is not static and "moves on a sliding scale" depending on several factors, including (1) whether plaintiff was motivated by genuine considerations of convenience and (2) whether the lawsuit has a "bona fide connection to the United States." *Id.* at 71 (citation omitted). In applying this test, courts within this Circuit have repeatedly held that a foreign plaintiff's choice of forum is entitled to little deference where "the vast majority of . . . activities alleged in the complaint were committed by foreign nationals on foreign soil." *Acosta v. JPMorgan Chase*, 219 F. App'x 83, 86 (2d Cir. 2007).

That is precisely the situation here. This is a dispute between a British Virgin Islands ("BVI") Company (Ironridge) and a Bermuda Company with its principal place of business in Greece (NewLead), in which the parties agreed to arbitrate any dispute arising out of their agreement in Bermuda under Bermuda law. (O'Neil Decl. Ex. 10 § V.H.) Ironridge has two directors, Mr. David Sims and Navigator Management Ltd., each located in the BVI. One of the directors is a British citizen residing in the Cayman Islands and the other is a BVI business company with its principal place of business in the BVI. (O'Neil Decl. ¶ 6.) The officers of Ironridge are Mr. Sims and Falcon Secretaries, Ltd., a BVI business company. (*Id.*) Moreover, the SSA was negotiated by Bermuda lawyers in Bermuda (*Id.* ¶¶ 19-20.) There were no

meetings or negotiations in New York, and only one of the half dozen lawyers involved in the deal is New York based, NewLead's current litigation counsel. *Nursan Metalurji Endustrisi A.S. v. M/V Torm Gertrud*, No. 07 CV 7687, 2009 WL 536059, at *2 (S.D.N.Y. Feb. 27, 2009) Simply put, there is no bone fide connection to be found to New York.

### B.  Bermuda is an Adequate Alternative Forum

"The requirements for establishing that a [proposed alternative] forum is adequate are not strenuous." *Mastafa v. Australian Wheat Bd. Ltd.*, No. 07 Civ. 7955, 2008 WL 4378443, at *6 (S.D.N.Y. Sept. 25, 2008).  Generally speaking, "[a]n alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003) (citation omitted).  Adequacy in this setting does not require that plaintiffs be provided "the best possible court," *Aguinda v. Texaco*, 303 F.3d 470, 476 (2d Cir. 2002), or a court that affords equally favorable rights.  *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 247 (1981) (forum is not inadequate merely because "the substantive law is . . . less favorable to the plaintiffs"); *Capital Currency Exchange, N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 610 (2d Cir. 1998) (plaintiffs are not entitled to "an identical cause of action in the other forum."). Substantive legal differences are not disabling unless the relief available in the proposed alternative forum is "'so clearly inadequate or unsatisfactory that it is no remedy at all.'" *In re Alcon S'holder Litig.*, No. 10 Civ. 0139, 2010 WL 2076991, at *8 (S.D.N.Y. May 31, 2010) (quoting *Piper Aircraft*, 454 U.S. at 254).

Bermuda is an adequate alternative forum here.  Like the United States, the Bermuda legal system is based on English common law.  The SSA that is the subject of this litigation provides for binding arbitration of any disputes in Bermuda.  (O'Neil Decl. ¶ 22; O'Neil Decl. Exh. 10 § V.H.)  Further, Section V.G. provides that "[a]ll questions concerning the construction,

validity, enforcement and interpretation of the Transaction Documents will be governed by and construed and enforced in accordance with the laws of Bermuda."  (O'Neil Decl. Exh. 10 §V.G.) In addition, the promissory notes executed by Ironridge were executed and delivered in, and are to be construed under, Bermuda law.  (*Id.* ¶ 28)  The Preference Shares were created under Bermuda law and the share register is maintained there.  (*Id.* ¶ 29.)  Therefore, not only does Bermuda "permit litigation of the subject matter of the dispute," it will better facilitate prompt resolution of the dispute here, where all matters are governed by Bermuda (not New York) law.

### C.    Private and Public Interests Strongly Support Dismissal

#### 1.    The Private Interests

If the Court determines that an adequate alternative forum exists, it must next weigh the private and public interests enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947), to determine whether the forum is more convenient than the U.S. court. The private interests include:  "(a) the ease of access to evidence; (b) the availability of compulsory process; (c) the cost for cooperative witnesses to attend trial; (d) the enforceability of a judgment; and (e) all other practical matters that might shorten any trial or make it less expensive."  *Alcon*, 2010 WL 2076991, at *10 (citing *Gilbert*, 330 U.S. at 508).

The private interests weigh in favor of a finding that Bermuda is a more convenient forum for several reasons, including that a lawsuit in aid of an arbitration should be based where the parties agreed the arbitration would take place, the witnesses who can testify as to the negotiation and construction of the contract are in Bermuda, and courts there are well-versed in applying Bermuda law.  That is precisely why the parties specifically provided for resolution of any dispute in Bermuda – they recognized that it would provide the most convenient and efficient forum.

## 2.    **The Public Interests**

The case for dismissal is just as compelling under *Gilbert*'s public interest analysis, which considers, among other factors:  (i) the desirability of "having localized controversies decided at home" and (ii) avoiding problems in the application of foreign law.  *See Iragorri*, 274 F.3d at 74 (citing *Gilbert*, 330 U.S. at 508-09).  There is no question that the "home base" of the SSA is Bermuda.  It was negotiated in Bermuda, largely between Bermuda lawyers and provides for dispute resolution in Bermuda.  (O'Neil Decl. ¶¶ 19-22; O'Neil Decl. Exh. 10 § V.H.)  Furthermore, litigation of this dispute in Bermuda avoids the problem of a New York court having to construe foreign law – obviously, the best court to interpret Bermuda law is in Bermuda.  Against all this, NewLead cannot establish that Bermuda is not an adequate forum.

## III.    **THE TRO SHOULD BE LIFTED AND THE PETITION FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED**

To obtain preliminary injunctive relief, NewLead must demonstrate: "(1) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor, and (2) irreparable harm in the absence of the injunction." *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 116 (2d Cir. 2009) (citation omitted) (vacating preliminary injunction where movant did not show irreparable harm); *TGS-NOPEC Geophysical Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. 08 Civ. 10950 (SAS), 2009 WL 185995, at *3 (S.D.N.Y. Jan. 26, 2009) (denying preliminary injunction motion where movant could not show irreparable harm).

The Second Circuit has recognized that a preliminary injunction is "one of the most drastic tools in the arsenal of judicial remedies." *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007) (citation omitted).  Consequently, it "must be used with great

care." *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985); *Buffalo Forge Co. v. Ampco-Pittsburgh Corp.*, 638 F.2d 568, 569 (2d Cir. 1981) (preliminary injunctive relief is an "extraordinary" and "drastic" remedy that should not be granted routinely); *NewMarkets Partners LLC v. Oppenheim*, No. 08 Civ. 4213 (WHP), 2008 WL 5191147, at *2 (S.D.N.Y. Dec. 4, 2008) (Pauley, J.) ("A preliminary injunction is an extraordinary remedy that should not be routinely granted.") (citing *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 80 (2d Cir. 1990)). As demonstrated below, NewLead cannot meet any – let alone each – of the preconditions for imposing such a "drastic" and "extraordinary" remedy.

### A. NewLead Has Not Demonstrated Irreparable Harm

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Trans.*, 559 F.3d at 118 (citing *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)) (vacating preliminary injunction). To establish this crucial element, a movant must demonstrate that it will suffer an injury that is "neither remote nor speculative but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Id.* (citing *Grand River Enter.*, 481 F.3d at 66).

NewLead's irreparable harm theory, however, has been rendered moot by events that have transpired since the June 3 hearing. In its moving papers, NewLead framed its application around the fanciful – and factually unsupported – premise that equitable relief was "required to stop Ironridge from obtaining additional Common shares of NewLead for use in" a so-called "'death spiral' scheme" that supposedly posed "a serious threat to the [Company's] continued existence." (Pls. Mem. 18.) But this dark narrative – implausible as it is – has been completely overtaken by events. On June 5, 2014, Ironridge offered to allow NewLead to elect to pay cash in satisfaction of its Embedded Dividend Liability *for all past, present and future Conversion Notices*. Further, in the event that NewLead actually pays this cash, Ironridge expressed its

16

willingness to forego any claim that it is entitled to the issuance of any Common Shares in satisfaction of such liability. As a result, the entire predicate for NewLead's emergency application – i.e., that Ironridge is acquiring newly-issued Common Shares to "destroy[]" the Company's business – has been eliminated, making this an all-cash dispute over whether NewLead has the obligation to pay cash – not tender Common Shares – to Ironridge.

The existence of an all-cash dispute, of course, means that any conceivable harm to NewLead could be remedied through an award of money damages, making injunctive relief inappropriate. *See Ford v. Reynolds*, 316 F.3d 351, 355 (2d Cir. 2003) ("[t]o establish irreparable harm, the injury alleged must be one requiring a remedy of more than mere money damages" (citation omitted)); *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (affirming denial of injunctive relief, in part, because there was no irreparable harm from purely economic injury); *see also Gardner v. Weisman*, Nos. 06 Civ. 5998 et al. (WHP), 2006 WL 2423376, at *1 (S.D.N.Y. Aug. 21, 2006) (Pauley, J.) (petitioners failed to show irreparable harm from defendant's marketing and selling properties where money damages would be sufficient, even where sale of property would dissolve partnership). Accordingly, for this reason alone, the TRO should be lifted and NewLead's motion for injunctive relief should be denied.

### B. NewLead Has Not Established a Likelihood of Success on (or Serious Questions Going to) the Merits

#### 1. The Independent Covenant Provision of Section IV.L Forecloses NewLead From Obtaining the Relief It Seeks

Even if NewLead could demonstrate irreparable harm (and it cannot), its dual claims for breach of contract and "market manipulation," while long on rhetoric, are completely barren of factual support. As a threshold matter, it is important to keep in mind the relief NewLead is seeking here – namely, an injunction that would prohibit Ironridge from converting any Preference Shares into NewLead Common Shares "pending the confirmation of an Award issued

in the Arbitration." (Pls. Mem. 1.) This relief presupposes that NewLead will be able to prove not only that Ironridge has breached the SSA, but that such breaches would entitle NewLead to terminate the SSA and stop issuing Common Shares.

But Section IV.L of the SSA, which NewLead conveniently omits from its Brief, makes clear that NewLead's "absolute obligation to issue Common Shares to Subscriber upon conversion of Preference Shares is an independent covenant, *and any breach or alleged breach of any provision of any Transaction Document by any person shall not excuse performance of such obligation*." It would be difficult to construct language that is more sweeping, unambiguous and categorical in its scope. Simply put, even if NewLead could establish that Ironridge breached the SSA (and for the reasons articulated below, it cannot), such breaches would not allow NewLead to stop issuing Common Shares for conversion. It therefore follows that under no circumstances will NewLead be able to secure the relief it is seeking through its Petition – an order enjoining the conversion of Preference Shares into Common Shares.

## 2.    Ironridge Has Complied With the Applicable Trading Limitations

Even if one were to ignore the independent covenant provision (as NewLead does in its moving papers), its breach of contract allegations are meritless. For instance, NewLead's first contention – that "Ironridge has . . . exceeded the daily trading limit on at least five separate days" (Pls. Mem. 21) – is based entirely on an erroneous construction of the SSA's 20% daily trading volume limitations. (O'Neil Decl. Ex. 10, § IV.M.) NewLead operates from the assumption that this limit is determined by looking to the *number of shares* sold each day. But this interpretation makes no sense. The provision as a whole, when read together and in context, permits Ironridge to, among other things, trade the greater of (a) 20% of the daily trading volume for that day; (b) 20% of the worldwide average daily trading volume of the shares; and (c) $295,000 worth of Common Shares. In order to perform an apples-to-apples comparison

with the $295,000 ceiling, the calculations have to be made based on *dollar trading volume* – which is the approach that Ironridge followed. Even if there was any ambiguity in this provision (and Ironridge submits there is none) the Term Sheet executed by the parties in early February 2014 resolves any question that the number of shares sold per day is the appropriate measure, since it specifically provides that the "Purchaser will limit daily trading to the greater of $295,000 or 20% of the total daily trading volume." (O'Neil Decl. ¶ 17, Ex. 6.) As the O'Neil Declaration confirms, if one uses dollar trading volume as the appropriate reference point, Ironridge has not breached the daily trading limitations *even once*. (O'Neil Decl. ¶ 64, Ex. 6.)

Moreover, even if one were to adopt NewLead's strained interpretation of Section IV.M, the difference between calculating this number based on dollar trading volume as opposed to share trading volume is trivial, and certainly would not represent a material breach of the SSA. (*Id.* ¶ 65.) Indeed, even if one calculates the daily limit using NewLead's methodology (i.e., share trading volume), the difference for *all five Trading Days combined* is less than $200,000. (*Id.* ¶ 64.) Notably, NewLead is unable to cite even a single legal authority that supports terminating a contract on the basis of such a *de minimis* breach.[3]

### 3. NewLead Offers No Support For Its "Short Selling" Allegations

NewLead also has no hope of gaining traction with its second breach of contract theory – that Ironridge "has been short selling in anticipation of receiving further Common Shares . . . in

---

[3] NewLead's Bermuda cases do not advance its cause – even incrementally. In two cases – *Suisse Atlantique Societe D'Armement Maritime SA v N.V. Rotterdamshce Kolen Central* (1967) 1 AC 361 (Bermuda); and *Hong Kong Fir Shipping Co Ltd. v Kawasaki Kisen Kaisha Ltd* (1962) 2 QB 26 (Bermuda) – the courts found *no* repudiation of the contract at issue. In NewLead's other two cases, the alleged breaches were qualitatively different: they went to the heart of the contract and were far more serious than the trivial violations alleged here. For instance, in *White and Carter (Councils) Ltd. v McGregor* (1962) AC 413 (Bermuda), the respondent refused to pay *any* amounts under an advertising contract; while in *Photo Production Ltd. v Securicor Transport Ltd.* (1980) AC 827 (Bermuda), the alleged breach was the destruction of an entire factory.

breach of Clause IV.I." (Pls. Mem. 21.) If one strips away NewLead's rhetoric about "death spirals" and the like, it becomes apparent that this assertion is devoid of factual support.

In the first instance, New Lead's trading records conclusively and indisputably show that Ironridge has never engaged in any short sale of any NewLead stock, and has always limited its aggregate daily trading volume to the limits provided in the SSA. (O'Neil Decl. ¶¶ 61-63.) Turning to NewLead's allegations, the only "fact" that NewLead points to in support of its short selling theory is not even a fact at all, and serves only to underscore just how frivolous this claim really is. Specifically, NewLead claims – "upon information and belief" no less – that it has exposed Ironridge's short selling "scheme" by discovering that on April 16, 2014, Ironridge was supposedly in possession of 234,291 Common Shares in excess of the 9.99% Ownership Blocker. (Pls. Mem. 22.) "[T]hese 234, 291 Common Shares," NewLead believes, "were used to cover a short position that Ironridge had." (*Id*. at 22-23.) There is a major problem with this narrative of deceit, however: it is based on a math error. As the O'Neil Declaration explains, Ironridge received 2,550,000 additional Common Shares on April 17, 2014. (O'Neil Decl. ¶ 57.) In determining the 9.99% threshold, therefore, one must add these 2,550,000 newly-issued shares to the other 23,391,003 shares outstanding that day, resulting in total outstanding shares of 25,941,003 (i.e., 23,391,003 + the 2,550,000 shares issued to Ironridge). (*Id.*) If one uses this figure as the denominator for calculating the daily ownership limit, Ironridge was *below* the 9.99% blocker with 9.829% of shares outstanding. (*Id.*) NewLead's calculation, however, omits the 2,550,000 additional Common Shares, thereby causing it to "find" a violation where none exists. At the end of the day, this is the only concrete allegation that NewLead proffers in support of its short selling claim. And it is completely – and verifiably – false.

4. **Newlead's Market Manipulation Claim is Baseless**

NewLead's market manipulation claim is equally barren of factual support. In its Petition and moving papers, NewLead weaves a tale in which Ironridge is the mastermind behind an illicit and elaborately-constructed conspiracy to drive down the price of NewLead Common Shares so that it can secretly profit from its alleged short selling activity, all the while driving the Company closer and closer to financial ruin. (Pls. Mem. 21-22.) Plaintiffs' main "support" for this theory, however, consists of its conclusory and objectively false allegations that Ironridge engaged in short selling and breached the 20% daily volume trading limitations.

NewLead also tries to raise an inference of manipulation from the unremarkable fact that on a number of Trading Days, Ironridge "sold the maximum volume of outstanding Common Shares that it could without incurring Section 16 reporting obligations." (Pls. Mem. 22.) As NewLead sees it, this perfectly legal and contractually permitted activity "establish[es] that [Ironridge's] intent was specifically to manipulate the Common share price and harm NewLead." (*Id.*) But this is just rank speculation and innuendo, not a conclusion drawn from concrete facts. In any event, NewLead's is the cause of its own problem – its massive share issuances have caused its stock to plummet. (O'Neil Decl. ¶¶ 70-72.)

Moreover, NewLead's theory is eviscerated by the very case upon which it relies, *S.E.C. v. Masri*, 523 F. Supp. 2d 361 (S.D.N.Y. 2007). There, the District Court ruled "that in order to impose liability for an open market transaction, the SEC must prove that *but for* the manipulative intent, the defendant would not have conducted the transaction." *Id.* at 372. One of the principal considerations for the court's holding was that "if a transaction would have been conducted for investment purposes or other economic reasons, and regardless of the manipulative purpose, then it can no longer be said that it is 'artificially' affecting the price of the security." *Id.* at 373.

Even if one could show that Ironridge was acting with malevolent intent (and there is not a shred of support that it was), NewLead cannot demonstrate that this intent was the "but for" reason Ironridge engaged in these transactions. The mere fact that Ironridge was selling lawfully obtained Common Shares in the secondary market demonstrates, at most, that it was acting in its economic self-interest by using "legitimate trading strategies intended to anticipate and respond to prevailing market forces." *Masri*, 523 F. Supp. 2d at 367 (citation omitted).

### C.     The Balance of the Equities Weighs Against NewLead

The balance of equities also weighs decisively in Ironridge's favor. On the one hand, NewLead will suffer no prejudice at all if this application is denied. Again, NewLead's entire theory of irreparable harm is based on the notion that it will be "faced with the destruction of its company" (Pls. Mem. 24) if Ironridge continues to obtain Common Shares in satisfaction of Embedded Dividend Liabilities. But as noted above, even if that claim had merit (and it does not), Ironridge has rendered it moot by offering to receive cash for all such past, present and future liabilities. (O'Neil Decl. ¶ 79, Ex. 36.)

By contrast, NewLead's Petition, with its scorched earth campaign of character assassination, is causing grievous harm to Ironridge's reputation in the market by the day. As discussed above, on June 5, 2014, NewLead issued a press release regarding the TRO that was granted by this Court on June 3, 2014. In response, all three of Ironridge's brokers put Ironridge on a "freeze," rendering impossible Ironridge's ability to sell NewLead shares. (O'Neil Decl. ¶ 81.) Thereafter, Ironridge's most valuable broker indicated that it would no longer do business with Ironridge. (*Id.*) These developments have placed Ironridge's entire business at risk. Reputation is the lifeblood of an investment firm. In this day and age, if market participants sense that there is even a whiff of scandal surrounding a firm, they might decide to sever ties with it – even if the allegations prove in the end to be false (as they are here). This natural

inclination towards risk-aversion has already inflicted harm on Ironridge's business.  And this harm is likely to grow even more acute unless NewLead's motion is promptly denied.

NewLead also has forfeited its right to invoke this Court's equitable powers by unreasonably waiting to bring suit.  "[E]quity," it has been said, "aids the vigilant, not those who slumber on their rights."  2 John Norton Pomeroy & Spencer W. Symons, *A Treatise on Equity Jurisprudence* § 418, at 169 (5th ed. 1941); *Display Techs., LLC v. Display Indus., LLC*, No. 11 Civ. 6390 (WHP), 2011 WL 6188742, at *3 (S.D.N.Y. Dec. 5, 2011) (Second Circuit has "repeatedly found that undue delay in bringing suit undercuts a movant's claim of irreparable harm).  In this case, NewLead sent its purported termination letter on May 12, 2014, three days after Ironridge initiated arbitration against it.  Yet it did not bring this "emergency" proceeding until June 3, 2014, roughly three weeks later, underscoring that there is no emergency here.

## IV.    IF THIS COURT ENTERS A TRO OR PRELIMINARY INJUNCTION, NEWLEAD SHOULD BE REQUIRED TO POST A SUBSTANTIAL BOND

Federal Rule of Civil Procedure 65(c) provides that "[a] court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  "The purpose of requiring security prior to issuance of an injunction or a restraining order is to guarantee payment of costs and damages sustained by a party who is wrongfully enjoined or restrained."  13 James Wm. Moore et al., Moore's Federal Practice § 65.50[3] (Matthew Bender 3d Ed.); *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 558 (2d Cir. 2011) (The drafters' choice of words indicates that where a bond is posted, it serves as security for the 'costs and damages' incurred by the wrongfully restrained party.").  The bond requirement "assures the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined."  *Id.*

at 557 (vacating and remanding denial of damages on injunction bond); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, No. 06 Civ. 14245 (LTS)(MGD), 2007 WL 1296205, at *2 (S.D.N.Y. May 2, 2007) (a bond is intended to afford security for damages "proximately caused by the. . . issuance of [an] injunction") (alteration in original) (citation omitted).

The party seeking an injunction bond bears the burden of establishing a rational basis for the proposed amount. *Id.* at *2. If the requisite showing is made, the court then sets the bond in an amount that "fairly estimates the [enjoined party's] probable damages, or possibly a figure that fairly estimates the upper limit of those damages." *See* 2 Dan B. Dobbs, <u>Dobbs Law of Remedies</u> § 2.11(3) (2d ed. 1993). District courts in the Second Circuit have 'wide discretion to set the amount of a bond." *Time Warner Cable*, 2007 WL 1296205, at *2. However, because the amount of the bond typically limits the amount that a wrongfully enjoined party may recover, "the court should attempt to limit the possibility that a restrained party that is ultimately successful on the merits is not able to obtain adequate relief." *Id.* (citation omitted).

There is no question that Ironridge faces a high likelihood of harm if this Court issues a preliminary injunction restraining it from converting its Preference Shares to Common Shares. Without the ability to convert its shares, Ironridge stands to lose approximately $50 million dollars that it otherwise could have made trading NewLead Common Shares on NASDAQ. Indeed, as the O'Neil Declaration explains, the amount of money that Ironridge would be entitled to upon conversion of its preference shares, is $1,318,096.86 for the April 10, 2014 and April 17, 2014 Conversion Notices, $962,027.52 for the June 3, 2014 Conversion Notice and $4,810,137.62 for unconverted but fully paid Preference Shares, and $43,291,237.59 for the remaining 2,250 unconverted Preference Shares paid with Notes. (O'Neil Decl. ¶ 26, Ex. 18.) That harm is compounded because NewLead has been facing significant financial difficulties and

may become insolvent while the preliminary injunction is pending, jeopardizing Ironridge's ability to recover at all. (AB Decl. ¶ 35; O'Neil Decl ¶¶ 12, Ex. 4); *Nokia Corp.*, 645 F.3d at 557 (a wrongfully enjoined party should be able to recover its damages "without further litigation *and without regard to the possible insolvency of the plaintiff.*" (emphasis added)).

Because Ironridge faces a high likelihood of damages if a preliminary injunction is entered, this Court should order NewLead to post security for any such injunction. Furthermore, because Ironridge, has set forth in detail the damages it will suffer if an injunction issues, it has demonstrated a rational basis for how to calculate that bond. Therefore, if this Court issues a preliminary injunction restraining the conversion of Ironridge's Preference Shares, it should require NewLead to post a bond in the amount of $50 million.

## V.  CONCLUSION

For all of the foregoing separate and independent reasons, Ironridge respectfully requests that the Court enter an order (1) denying NewLead's motion in its entirety; or, in the alternative, (2) directing NewLead to post a bond in the amount of $50 million if a preliminary injunction is entered restraining Ironridge from converting Preference Shares into Common Shares; and (3) granting such other and further relief as it may deem just and proper.

Dated:  June 6, 2014
      New York, New York

Respectfully submitted,

/s/ Robert A. Fumerton
Robert A. Fumerton (robert.fumerton@skadden.com)
William J. O'Brien (william.obrien@skadden.com)
Julie E. Cohen (julie.cohen@skadden.com)
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
*Attorneys for Respondent*
*Ironridge Global IV Limited*