UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NEWLEAD HOLDINGS LTD.,                                     1:14-cv-03945-WHP

                              Petitioner,

        vs.

IRONRIDGE GLOBAL IV LIMITED,

                              Respondent,

        and

VSTOCK TRANSFER, LLC, as transfer agent,

                              Notice Party.

## <u>REPLY DECLARATION OF ANTONIS BERTSOS</u>

I, Antonis Bertsos, pursuant to 28 U.S.C. § 1746, declare as follows:

1.      I am the Chief Financial Officer and Secretary of Petitioner NewLead Holdings
Ltd. ("Petitioner" or "NewLead").

2.      I am duly authorized to make this affidavit on behalf of the Petitioner.

3.      I make this affidavit from the facts and matters within my own knowledge and on
the basis of documents and information kept by Petitioner in the ordinary course of its business
and/or provided to me by others.  Where the facts and matters are within my own knowledge, I
confirm that they are true.  Where the facts and matters are derived from information provided to
me by others, I confirm that they are true to the best of my knowledge and belief.

### *Ironridge Global IV Limited Acts Through Ironridge Global Partners LLC*

4.     From the very beginning of and throughout the entire business relationship between NewLead and Respondent Ironridge Global IV Limited ("Respondent" or "Ironridge" or "IV Limited"), NewLead has only ever dealt with John Kirkland ("Kirkland"), Richard Kreger ("Kreger"), Brendan O'Neil ("O'Neil") and Keith Coulston ("Coulston") – who now purport to be employees/principals only of Ironridge Global Partners, LLC ("Partners LLC"), and who now try to distance themselves from IV Limited.  Every act and discussion which ever occurred with respect to the transactions at issue here were performed or directed by Kirkland, Kreger, O'Neil and/or Coulston.

5.     NewLead has never met with, spoken to or corresponded with David Sims ("Sims"), the purported sole representative of IV Limited.

6.     As evidenced below, neither myself nor anyone else at NewLead has ever seen any indication that any person whom Respondent admits to be an employee of IV Limited was actually involved in the day-to-day activities of IV Limited — other than Richard Kreger, John Kirkland, Brendan O'Neil, and/or Keith Coulston.  The communications between NewLead and IV Limited in connection with the transaction from which this action and the JAMS Arbitration arise (the "Transaction") were always with these four individuals.  This includes telephone calls, emails, and in-person meetings.  Similarly, the documents and correspondence sent to NewLead by IV Limited were sent exclusively by these individuals.

7.     Although David Sims is listed by name as the representative of IV Limited on the Conversion Notices that have been sent to NewLead, neither I nor (to my knowledge) anyone else at NewLead ever spoke or corresponded with Sims.  In fact, the LinkedIn profile of Sims

shows that he is the Director of Caledonian Global Fund Services Ltd.  A true and correct copy

of David Sims's LinkedIn profile is annexed hereto as Exhibit 1.

### *All of IV Limited's Business Dealings Are Performed And Directed By* *Kreger, Kirkland, O'Neil, Coulston and Partners LLC*

8.      From the very start, all negotiations for the Transactions were conducted by

Kreger, Kirkland, O'Neil, Coulston and Partners LLC.

9.      I am aware that the Declaration of Brendan T. O'Neil dated June 6, 2014 ("O'Neil

Declaration") states otherwise, but I am baffled by this assertion since it is plainly untrue

(although O'Neil himself did not attend these meetings).  Partners LLC met with NewLead in

New York City on multiple occasions to discuss the Transactions.

10.     In July 2013, Partners LLC, always describing itself as merely "Ironridge,"

contacted NewLead and sought an opportunity to discuss a possible investment by it in

NewLead.  Annexed hereto as Exhibit 2 is a true and correct email chain starting in early July,

2013 through July 24, 2013.

11.     After Partners LLC contacted NewLead, I began email correspondence with

Richard Kreger about the possibility of such an investment.  Richard Kreger maintains his

principal place of business at Partners LLC's New York City Office and also maintains an office

in Connecticut.  Annexed hereto as Exhibit 3 is the Schedule 13G Under the Securities Exchange

Act of 1934 that IV Limited, Partners LLC, Kreger, Kirkland, Coulston and O'Neil filed with the

Securities Exchange Commission (the "SEC") on March 10, 2014 in connection with the

Transactions.  In the Schedule 13G, Kreger certifies:

> The address of the principal business of Mr. Kreger is:
> Chrysler Building
> 405 Lexington Avenue, 26th Floor
> New York, New York 10174-2699

Ex. 3.

3

12.     After some email exchanges and some telephone discussion, on July 25, 2013, Kreger and I met for a business lunch at Capital Grille, a restaurant located on East 42nd Street in New York City, near the Ironridge offices on Lexington Avenue. *See* Ex. 2 (email setting up meeting at the Capital Grille).

13.     At the meeting, Kreger outlined Ironridge's initial proposal to invest approximately $7.5 million in NewLead through the purchase of creditor liabilities by Ironridge and its exchange for common shares of NewLead.  Kreger went into detail regarding the proposed transaction and also about Ironridge's investment strategies.  He stressed that Ironridge was a long term investor and looked to enhance the companies it invested in.

14.     Shortly after the meeting with Kreger in New York, on July 31, 2013, Kreger sent me (for NewLead) a proposed Term Sheet for the investment.  A true and correct copy of the July 31, 2013 cover email and the term sheet are annexed hereto as Exhibit 4.

15.     After receipt of the term sheet, I discussed it internally at NewLead and had several calls with Kreger.

16.     On August 21, 2013, Kreger sent me a revised term sheet for the Transaction. The subject line of the email, on which John Kirkland and Brendan O'Neil were cc'd, reads: "Ironridge Global Partners revised term sheet."  A true and correct copy of the August 21, 2013 cover email and revised term sheet are annexed hereto as Exhibit 5.

17.     After further discussion, on August 30, 2013, Brendan O'Neil, Managing Director of Partners LLC, sent me a another revised term sheet based upon comments exchanged.  A true and correct copy of the August 30, 2013 cover email and revised term sheet are annexed hereto as Exhibit 6.

18.     Negotiations between NewLead and Partners LLC/Ironridge continued.   On September 27, 2013, I had a conference call to discuss Ironridge's investment proposal with Kirkland, O'Neil, and Coulston.  Annexed hereto as Exhibit 7 is a true and correct copy of the electronic meeting invitation sent to me by Kreger which indicates "Ironridge Global Partners call with NewLead."

19.     Thereafter, due to other commitments, NewLead decided not to do the transaction outlined in the proposed term sheets with Ironridge.  Nonetheless, we agreed to remain in touch.

20.     While Elisa Gerouki (Corporate Communications Manager of New Lead) and I were in New York, a meeting among Kreger, Elisa Gerouki, and myself was scheduled for December 11, 2013 at the Crowne Plaza Hotel, located at 1605 Broadway, New York, New York, as described in email exchanges among the parties dated December 10, 2013.  A true and correct copy of the December 10, 2013 emails are annexed hereto as Exhibit 8.  However, at the last minute, the meeting was cancelled.

21.     Then, in January 2014, I was in New York with Michael Zolotas (CEO and Chairman of NewLead) and Elisa.  At this time, while I was in New York, I had a series of telephone conversations with Kreger in which he indicated that he had a different proposal for a straight equity investment (rather than the debt swap) and wanted to discuss it further with NewLead.  After I returned to Greece, the discussions continued.

22.     On February 20, 2014, Kreger sent me an email attaching the proposed term sheet for the NewLead deal and asking me when I would be available "for us to walk you through the term sheet."  The subject line of the email was entitled "Ironridge Global Partners Term Sheet for NewLead Holdings Limited."   A true and correct copy of the February 20, 2014 email is annexed hereto as Exhibit 9.

23.     Kreger and Kirkland worked directly with NewLead in negotiating the term sheet, as evidenced by email exchanges in and around February 2014.  In particular, on February 21, 2014, Kreger sent me an email in which **he stated explicitly that Kirkland represented IV Limited for purposes of the NewLead transaction**:  "Please use the following contacts E-mails CC'd [sic] hereto as the working group for the NewLead transaction during the document drafting process.  Todd Mason of Thompson Hine [New York] representing NewLead Holdings and John Kirkland of Ironridge . . . representing Ironridge Global IV."  A true and correct copy of this February 2014 email chain is annexed hereto as Exhibit 10.

24.     On February 24, 2014, Kirkland forwarded to me the fully executed term sheet. Ex. 10.

25.     From the time that the initial term sheet was delivered in late February 2014 until the closing of the investment on March 4, 2014, I participated in conference calls with Kreger, Kirkland and O'Neill on average one to five times per day.

26.     During these conference calls, each of them repeatedly and specifically stated that Ironridge was a long-term investor which would do nothing to hurt NewLead and was interested in the long-term growth of NewLead.

27.     At no time, before or after March 4, 2014 did anyone at NewLead ever speak or meet with David Sims or Navigator Management, Ltd.  We have only ever dealt with Kreger, Coulston, O'Neil and Kirkland.  Indeed, tellingly, it is O'Neil – not Sims or Navigator – that has submitted the declaration to this Court **on behalf of IV Limited.**

28.     After the signing of the Transaction Documents, Elisa and I were in New York again and were invited out to dinner with Kreger and Kirkland to discuss the Transactions and next steps.

6

29.     On March 17, 2014, Elisa and I met with Kreger for dinner at Docks Restaurant, 633 Third Avenue, New York, New York.  Kirkland had indicated that he would not come to dinner a couple of days prior after first accepting the electronic invitation.  A true and correct copy of the calendar meeting entry showing the scheduling of the March 17, 2014 dinner meeting in New York is annexed hereto as Exhibit 11.

30.     Kreger and we discussed the Transactions, the relationship between the companies, Ironridge's investment and related matters, as well as unrelated social issues.  After dinner, we parted ways at Grand Central Terminal.

31.     Subsequently, all correspondence was forwarded to NewLead by either Kreger, Coulston, O'Neil or Kirkland.

32.     On April 16 and 17, 2014, Keith Coulston sent emails to Elisa Gerouki asking her to confirm the number of issued and outstanding NewLead Common Shares, which she did.  A true and correct copy of the April 16 and 17, 2014 emails is annexed hereto as Exhibit 12.

33.     On May 9, 2014, after the instant dispute began, Kreger sent an email to me, Michael Zolotas (NewLead's Chairman and CEO), and Todd Mason (of Thompson Hine LLP New York) addressing the status of Ironridge's business relationship with NewLead and stating, "I believe that we can fix the current situation and that **I should be your point of contact to resolve the current situation**."  A true and correct copy of the May 9, 2014 email is annexed hereto as Exhibit 13.

34.     At all times, "Ironridge" usually through Coulston and/or Kirkland, sent all Conversion Notices to NewLead.  For example, on April 14, 2014, "Ironridge" by Coulston sent a Conversion Notice to NewLead and it was subsequently resent by Kirkland.  The original email and Conversion Notice are annexed hereto as Exhibit 14.  Coulston's email reads:

Antonis,

Attached please find an additional share request under the original Conversion Notice from Ironridge.

Please ensure that the Transfer Agent has the paperwork today and is ready to complete the DWAC by tomorrow morning.

Let me know if you have any questions.

Best,



**Keith Coulston**
Director
Ironridge Global Partners, LLC.
100 Spear St, Suite 320
San Francisco, CA 94105
(O)  415 658-9551
(M) 415 847-7750
kcoulston@ironridgeglobal.com

35.     In subsequent emails, O'Neil goes further and makes representations on behalf of "Ironridge":  "Ironridge confirms that this issuance will not take them over the restricted amount of 9.99% based on 6K filed on May 30, 2014."  A copy of the June 3, 2014 email from Coulston to the transfer agent, VStock Transfer, LLC ("VStock") , is annexed hereto as Exhibit 15.

36.     As the Court can see, Coulston, Kreger, Kirkland and O'Neil routinely use "Ironridge" and "Ironridge Global" interchangeably in their business dealings, press releases and emails:  words that appear in the formal names of both Respondent and Partners LLC.

37.     At all times, NewLead has corresponded orally and in writing regarding the Transactions with Coulston, Kreger, Kirkland and/or O'Neil and have never once been told that it should instead write to someone else or to someone in the BVI.

38.     Partners LLC has held itself out publicly as being responsible for the business relationship with NewLead.  On Kirkland's Twitter feed, Kirkland posted on March 9, 2014, "@Ironridge Global [the Twitter handle for Partners LLC] reports 9.99% passive stake in NewLead."  A true and correct copy of the March 9, 2014 tweet is annexed hereto as Exhibit 16.

39.     On the "Ironridge" website, www.ironridgeglobal.com, NewLead is prominently listed among its portfolio of investments, on the same web page that indicates that it has an office at the Chrysler Building in New York.  A true and correct copy of screenshots of Ironridge Global Partners, LLC's website is annexed hereto as Exhibit 17.

40.     On a Facebook page for "Ironridge Global Partners" the following two articles are posted:  (1) "Ironridge reports 9.99% stake in NewLead;" and (2) "NewLead Holdings Ltd. Announces Placement of $25.0 Million Perpetual Preferred Equity." It also shows Kreger's address as being at the Chrysler Building and having a "212" area code phone number.  A true and correct copy of screenshots of this Facebook page is annexed hereto as Exhibit 18.

### *Ironridge Conducts Business in New York, Including for the Transaction with NewLead*

41.     IV Limited has sold NewLead shares in New York through its brokerage firm GP Nurmenkari, which is located in New York City.  In paragraph 53 of the Declaration of Brendan T. O'Neil dated June 6, 2014, O'Neil states that GP Nurmenkari is one of "three [brokerage] accounts in which Ironridge has ever deposited or sold NewLead Shares."  Exhibit 29 to the O'Neil Declaration shows that IV Limited has a registered account with "GP Nurmenkari," and the transaction history for IV Limited's account for May 2014 shows that NewLead shares were sold on multiple occasions.  GP Nurmenkari's website lists two addresses for its location:  (1) 18 East 41st Street, Suite 1902, New York, NY 10017; and (2) East 39th Street, Suite 1108, New

York, NY 10016.  A true and correct copy of a screenshot of GP Nurmenkari's website is annexed hereto as Exhibit 19.

### *IV Limited Has Purposefully Availed Itself of the Benefits and Privileges of the New York State Courts*

42.    IV Limited has purposefully availed itself of the benefits and privileges of the New York State courts, as evidenced by its actions with respect to litigation commenced by IntelliCell BioSciences, Inc. ("IntelliCell") against IV Limited in New York.

43.    IV Limited noticed a foreclosure asset sale of IntelliCell's assets to take place at 405 Lexington Avenue, 26th Floor, New York, New York 10174.  A true and correct copy of the Notice of Foreclosure Sale which was filed in the pending case captioned IntelliCell Biosciences, Inc. v Ironridge Global IV, Ltd. and TCA Global Credit Mster Fund, LP, Index No. 652800/2013 (New York Sup. Ct., Oing, J.) ("IntelliCell Case") is annexed hereto as Exhibit 20.

44.    IntelliCell commenced the IntelliCell Case to enjoin IV Limited from going forward with the foreclosure sale in New York.

45.    Kreger submitted an affidavit in support of IV Limited.  Apparently, at a hearing before the Court, IV Limited was paid $535,000 and then sought additional affirmative monetary relief in the amount of $248,914.99, plus costs and attorneys' fees.  The affidavit was signed by Kreger in New York, New York.  A true and correct copy of the Affidavit of Richard H. Kreger and the Memorandum of Law by Defendant Ironridge Global IV, Ltd. to Determine the Amount Due are annexed hereto as Exhibit 21.

46.    In his affidavit at paragraph 1, Kreger defines "defendant Ironridge Global IV, Ltd. ("Ironridge")" and states: "I am one of the representatives of Ironridge responsible for it relationship with Intellicel  Biosciences, Inc."  Ex. 21 at ¶ 1.

47.     In response to a report and recommendation as to the amount owed, IV Limited filed a Notice of Cross Motion, whereby it sought relief from the court, namely through an Order rejecting the report and recommendation of the Special Referee (Justice Gammerman) and seeking an award to IV Limited of damages.  A true and correct copy of the Report and Recommendation of the Judicial Hearing Officer dated January 28, 2014 and the Notice of Cross Motion are attached hereto as Exhibit 22.

48.     IV Limited filed a Notice of Entry in the matter on May 9, 2014.  A true and correct copy of the Notice of Entry is annexed hereto as Exhibit 23.

49.     Separately, IV Limited has previously consented to jurisdiction in New York.  In a Chapter 11 bankruptcy proceeding commenced by Cereplast, Inc. in the United States Bankruptcy Court, Southern District of Indiana, Ironridge Technology Co., a division of IV Limited, filed a preliminary objection to one of Cereplast, Inc.'s first day motions, to which it attached as an exhibit a participation agreement to which IV Limited is a party.  Section 7.12 of that participation agreement states that "[e]ach party hereby irrevocably submits to the non-exclusive jurisdiction of the state and federal courts sitting in New York, New York for the adjudication of any dispute hereunder . . . ."  A true and correct copy of the preliminary objection and participation agreement is annexed hereto as Exhibit 24.

### *NewLead Has Validly Elected To Pay Any Dividends and Embedded Dividend Liability in Cash*

50.     Annexed to my declaration dated June 2, 2014 ("Moving Declaration") as Exhibit E is NewLead's written notice to elect to pay any Dividends and Embedded Dividend Liability in cash rather than in shares:

> Notwithstanding the foregoing, if and only to the extent that the Transaction Documents are deemed not to be terminated and/or are determined to be in full force and effect, and only if NewLead is ultimately found to be liable to pay such dividend and any applicable

embedded dividend liability by a tribunal of competent jurisdiction,  please be advised that NewLead hereby elects to pay the dividend and any applicable embedded dividend liability in cash, and not in common shares of NewLead.

Moving Decl. at Ex. E.

51.     The Certificate of Designations says that Dividends shall be payable "upon conversion" but the Transaction Documents are silent as to when the payment of Embedded Dividend Liability is due.  Ironridge has already received Common Shares in connection with any Dividend liability.

52.     Section I.C.2. of the Certificate of Designations specifically provides that:

Dividends, as well as any applicable Embedded Dividend Liability payable hereunder, are payable **at the Corporation's election**, (a) **in cash**, or (b) in Common Shares valued at the volume weighted average price of the Common Shares for the applicable Equity Conditions Measuring Period, not to exceed 85.0% of the Closing Price on any of the Trading Days during the Equity Conditions Measuring Period.

Moving Decl. at Ex. D (emphasis supplied).

53.      The right to elect to pay Dividends and Embedded Dividend Liability is separate from the obligation of payment itself.

54.     NewLead has reserved all rights upon this election abiding the outcome of the Arbitration on the merits of the dispute.  If NewLead wins in the Arbitration, no payment of cash will be required as I am advised by Bermuda counsel that Bermuda law gives a right of set off. If Ironridge were to succeed, it would be made whole by an appropriate award in the Arbitration.

55.     The election is proper at any time because due to Ironridge's own 9.99% blocker, it cannot convert the entire Embedded Dividend Liability all at once.   The Transaction Documents do not in any way prevent an election to pay Embedded Dividend Liability partially in Common Shares and partially in cash.

56.     NewLead's election was wholly proper under the Transaction Documents.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746(1) that the foregoing is true and correct to the best of my knowledge and belief.

Dated: June 8, 2014
       New York, New York

_____
Antonis Bertsos